1  GLANCY PRONGAY & MURRAY LLP
2  Lionel Z. Glancy (#134180)
   Robert V. Prongay (#270796)
3  Lesley F. Portnoy (#304851)
4  Charles H. Linehan (#307439)
   1925 Century Park East, Suite 2100
5  Los Angeles, California 90067
6  Telephone: (310) 201-9150
   Facsimile:  (310) 201-9160
7  Email:  info@glancylaw.com
8
   *Attorneys for Plaintiff*
9  [Additional Counsel On Signature Page]

10              **UNITED STATES DISTRICT COURT**
11              **CENTRAL DISTRICT OF CALIFORNIA**

12 ARTHUR   KAYE   IRA   FCC   AS        Case No.:
13 CUSTODIAN  DTD  6-8-00,  Individually
   and On Behalf of All Others Similarly   **CLASS ACTION**
14 Situated,
15                                         **COMPLAINT FOR VIOLATION**
                                           **OF THE FEDERAL SECURITIES**
16                            Plaintiff,   **LAWS**

17                  v.                      **DEMAND FOR JURY TRIAL**
18
19 IMMUNOCELLULAR THERAPEUTICS,
   LTD., DAVID FRACTOR, JOHN S. YU,
20 ANDREW GENGOS, MANISH SINGH,
   LAVOS, LLC, LIDINGO HOLDINGS,
21 LLC, KAMILLA BJORLIN, ANDREW
   HODGE,   BRIAN   NICHOLS,   and
22 VINCENT CASSANO,
23
24                            Defendants.
25
26
27
28

                          COMPLAINT

Plaintiff Arthur Kaye IRA FCC as Custodian DTD 6-8-00 ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ImmunoCellular Therapeutics, Ltd. ("ImmunoCellular" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  This complaint also incorporates by reference the following respective action and cease-and-desist orders: *Securities and Exchange Commission v. Lidingo Holdings, LLC*, 17-cv-02540, ECF No. 1 (S.D.N.Y. Apr. 10, 2017) ("Lidingo Action"), *In the Matter of Manish Singh and Lavos, LLC*, File No. 3-17920 (SEC Apr. 10, 2017) ("Singh Cease-And-Desist Order"), and *In the Matter of ImmunoCellular Therapeutics, Ltd.* File No. 3-17912 (SEC Apr. 10, 2017) ("ImmunoCellular Cease-And-Desist Order").  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of

all persons other than defendants who purchased or otherwise acquired ImmunoCellular common stock on the open market from May 1, 2012 through December 11, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      ImmunoCellular is a development stage company that seeks to develop imaging devices with medical diagnostic applications for the treatment of cancer, such as brain, ovarian and other solid tumors.   The Company's lead product candidate, ICT-107, is a dendritic cell-based vaccine targeting multiple tumor associated antigens for glioblastoma multiforme ("GBM"), the most common and lethal type of brain cancer.

3.      Prior to and throughout the Class Period, ImmunoCellular and its former Chief Executive Officer Manish Singh ("Singh"), were the primary architects of a scheme, along with Lidingo Holdings, LLC ("Lidingo"), Kamilla Bjorlin ("Bjorlin"), Andrew Hodge ("Hodge"), Brian Nichols ("Nichols"), and Vincent Cassano ("Cassano"), to manipulate and artificially inflate the stock price of ImmunoCellular.

4.      Unbeknownst to the market and ImmunoCellular investors, beginning in September 2011, ImmunoCellular hired Lidingo to pump up the value of

ImmunoCellular stock prior to and during the Class Period.  This endeavor, included a campaign of planting phony analyst reports and news articles that fawned over the Company.  In many cases, these phony media reports were written under aliases and the authors failed to reveal that they were paid by Lidingo for writing these phony media reports.  In fact, a number of the articles themselves declared that they were not paid promotions.  The authors also failed to reveal that ImmunoCellular had complete editorial control over their work.

5.      By virtue of this scheme, the market was conditioned to believe that the Company's clinical studies for its lead product candidate, ICT-107 were progressing as the placement of these fraudulent media reports were often timed to coincide with the Company announcements of ICT-107, so to have maximum impact upon ImmunoCellular's share price.

6.      For example, on May 31, 2012, the Company announced that it was going to present new data from its completed Phase I clinical trial of ICT-107, at the 2012 Annual Meeting of the American Society of Clinical Oncology ("ASCO") on June 2, 2012.  The next day, and in advance of the June 2, 2012 ASCO presentation, Stephen Ramey ("Ramey") under the pseudonym Chemistfrog published an article on Seeking Alpha, entitled "ImmunoCellular Therapeutics ICT-107 to Impress at ASCO 2012."   However, Ramey failed to disclose that on May 18, 2012 ImmunoCellular had paid Lidingo $25,000 and "that he had indirectly received compensation from IMUC."  ImmunoCellular Cease-And-Desist Order, at ¶ 6.

7.      As a result of this scheme, ImmunoCellular's stock price rocketed to a Class Period high of $3.88 per share on June 1, 2012, from a price as low as $1.53 per share prior to the initiation of the scheme.

8.      On December 11, 2013, after the market closed, the Company revealed that the intent-to-treat population which was the primary endpoint for its ICT-107 Phase II study "did not reach statistical significance" because it failed to increase overall survival in patients diagnosed with glioblastoma multiforme.

9.      As a result of the disclosure on December 11, 2013, ImmunoCellular stock declined $1.62 per share or nearly 60%, to close at $1.10 per share on December 12, 2013.

10.     Finally, on April 10, 2017, in response to a proceeding initiated by the SEC, Defendant Singh acknowledged that he participated "in a paid stock-touting scheme" where he "edited and approved articles, directed writers should publish articles and directed when and where those articles should be published" and "directed that Lidingo not use writers who disclosed compensation."  Singh Cease-And-Desist Order, at ¶¶ 2, 7-8.

11.     The SEC also announced on April 10, 2017 that it had initiated enforcement actions against 27 individuals and entities behind various stock promotion schemes that involved public companies including ImmunoCellular. Specifically, as part of the SEC's enforcement actions, the SEC filed a lawsuit against Lidingo and certain of its employees for paying "writers to generate

hundreds of bullish articles about public clients while concealing from investors that these were paid promotions."  Lidingo Action, at ¶ 1.

12.     As a result of defendants' wrongful acts and misleading statements and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company's principal place of business is located within this District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

17.     Plaintiff purchased ImmunoCellular common stock in reliance on defendants' materially false and misleading statements and omissions of material facts, and on the integrity of the market for ImmunoCellular common stock, at artificially inflated prices during the Class Period, and was damaged when the truth about ImmunoCellular was revealed to the market.  The certification of Plaintiff, with a listing of its transactions in ImmunoCellular common stock during the Class Period, is annexed hereto.

18.     Defendant ImmunoCellular is a Delaware corporation with its principal executive offices located at Calabasas, California.  ImmunoCellular common stock trades on the New York Stock Exchange Market ("NYSE MKT") under the ticker symbol "IMUC" as of May 30, 2012.  Prior to May 30, 2012, ImmunoCellular common stock traded on the OTCBB under the ticker symbol "IMUC."

19.     Defendant David Fractor ("Fractor") has served as the Company's Treasurer and Chief Financial Officer ("CFO") since April 2011 and as its Vice President of Finance and Principal Accounting Officer since March 2013.

20.     Defendant John S. Yu ("Yu"), a founder of the Company, has served as Chairman of the Company's Board of Directors and as its Chief Scientific Officer from January 2007 until September 2015.  Defendant Yu served as Interim Chief Executive Officer from August 2012 until November 2012.  Defendant Yu has served as a director since November 2006.  During the Class Period, Defendant Yu

sold 300,000 shares of ImmunoCellular common stock, for gross proceeds of approximately $870,000.  Defendant Yu's family trust, the Yu Family Trust offered to sell 5,933,424 shares of ImmunoCellular common stock in a stock offering in May 2012.

21.     Defendant Andrew Gengos ("Gengos") served as the Company's President and Chief Executive Officer from December 2012 through December 2016.  Defendant Gengos has served as a director since December 2012.

22.     Defendant Singh was ImmunoCellular's President, Chief Executive Officer ("CEO") and a director from February 2008 through August 20 2012.  On August 20, 2012, Defendant Singh resigned effective immediately, from the CEO, President, and director positions.  From 2011 until 2014, Defendant Singh controlled Lavos, LLC and helped direct the activities of stock promotion firm Lidingo.

23.     Defendant Lavos was formed in Nevada in 2011.  From 2011 to 2014, Lavos, which was controlled and operated by Defendant Singh, provided promotional services to issuers that included the publication of more than 400 articles promoting securities on various investment websites.

24.     Defendant Lidingo was a Nevada limited liability company that was formed in 2011 and dissolved in 2014.  Lidingo was owned and operated by Defendant Bjorlin.  During its existence, Lidingo provided promotional services to issuers, and directed the publication on various investment websites of over 400 articles about its issuer clients and the clients of an affiliated promotional services

company, Lavos, with which Lidingo shared compensation.

25.     Defendant Bjorlin organized and operated Lidingo from no later than September 2011 through at least March 2014, she directed Lidingo's stock promotion services on behalf of publicly-traded issuer clients, often using her stage name, Milla Bjorn.

26.     Defendant Hodge, from no later than December 2011 through at least March 2014, he was employed by Lidingo and assisted Bjorlin in Lidingo's stock promotion work, including interacting with issuer clients and providing direction to writers drafting articles on behalf of those clients.

27.     Brian Nichols ("Nichols"), from no later than February 2012 through at least March 2014, he was a paid writer for Lidingo, publishing articles about issuer clients on various investment websites under his own name.  Nichols also wrote paid articles which Lidingo published under its own pseudonyms, including A. John Hodge, The Swiss Trader, Amy Baldwin, Trading Maven, Henry Kawabe, Teresa Dawn and Leopold Epstein.  In respect to ImmunoCellular, Nichols published approximately 24 articles between September 2011 and August 2012 using his own name or one of his pseudonyms.

28.     Vincent Cassano ("Cassano"), from no later than August 2011 through at least November 2011, he was a paid writer for Lavos, publishing at least five articles about an issuer client of Lavos on investment websites under the pseudonym VFC's Stock House.  In addition, from no later than November 2011 through at least

April 2013, he was a paid writer for Lidingo, publishing articles about issuer clients on investment websites, also under pseudonym VFC's Stock House.  In respect to ImmunoCellular, Cassano published approximately 24 articles between September 2011 and August 2012 using his pseudonym, VFC's Stock House.

29.     The defendants referenced above in ¶¶ 19-22 are sometimes referred to herein as the "Individual Defendants."

30.     The defendants referenced above in ¶¶ 24-28 are sometimes referred to herein as the "Lidingo Defendants."

31.     The defendants referenced above in ¶¶ 19-28 are sometimes referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *Background*

#### a.  Publications Targeted by Defendants

32.     According to an investor publication issued by the SEC explains that:

> Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows.… The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment. But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.

U.S. Securities and Exchange Commission, *Microcap Stock: A Guide for Investors* (Sept. 18, 2013).

33.     Seeking Alpha is a financial news and analysis website.  It publishes third party reports, analysis, and commentary as articles, and permits open discussion of the articles.  Seeking Alpha allows authors to write about individual issuers and permits users comment on these articles.

34.     Seeking Alpha permits posting of articles pseudonymously, but has an author's code of conduct:

> a.   Authors must disclose any position in any company they write about;
> b.   Authors cannot be paid promoters;
> c.   Authors cannot use multiple aliases without disclosure to Seeking Alpha, who may then take appropriate action to ensure readers are not misled; and
> d.   Authors must provide Seeking Alpha with their actual names and contact information.

35.     Each article published on Seeking Alpha must include the following disclosure:

> Disclosure: The author has no position in [the stock discussed in the article] and no plans to initiate one in the next 72 hours [or, if the author has a short or long position, the type of position.] The author wrote this article themselves, and it expresses their own opinions. The author is not receiving compensation for it (other than from Seeking Alpha). The author has no business relationship with any company whose stock is mentioned in this article.

36.     Benzinga is another financial news and analysis website.  Specifically, Benzinga is a financial media outlet that provides investors with "high-quality, unique content that is coveted by Wall Street's top traders.  Benzinga provides timely, actionable ideas that help users navigate even the most uncertain and volatile

markets – in real-time with an unmatched caliber."

### b. Company background

37.      According to the Company's Form 10-K for the year ended December 31, 2012, filed with the SEC on March 11, 2013 ("2012 Form 10-K"), the Company employed five full-time employees.  According to the 2012 10-K, ImmunoCellular "is a clinical-stage biotechnology company that is developing immune-based therapies for the treatment of cancer, such as brain, ovarian and other solid tumors. Immunotherapy is an emerging approach to treating cancer in which a patient's own immune system is stimulated to target tumor antigens, which are molecular signals that the immune system uses to identify foreign bodies."  The Company's "technology can elicit an immune response against several antigens."  The Company's "cancer immunotherapies are also distinguished by the fact that they target cancer stem cells (CSCs), which are the primary drivers of tumor growth and disease recurrence."  The Company's lead pipeline product during the Class Period is ICT-107, "a Phase II therapeutic dendritic cell (DC) vaccine for the treatment of glioblastoma multiforme (GBM), the most common and lethal type of brain cancer. ICT-107 is designed to activate a patient's immune system to target six different tumor-associated antigens.  The company is conducting a Phase IIb, double-blind, placebo-controlled, 2:1 randomized, multicenter clinical trial to evaluate the safety and efficacy of ICT-107 in patients with newly diagnosed GBM.  From January 1011 until September 2012, the clinical study enrolled 278 patients at 25 centers

throughout the U.S. and 124 patients have been randomized."

### c. ImmunoCellular Retains Lidingo to Manipulate its Stock Price

38.     In September 2011, ImmunoCellular and Singh entered into a contract with Lidingo.  The contract provided that Lidingo "develop and execute an online distribution campaign that will prominently place the [IMUC] investment opportunity in front of retail investors with an interest in early stage biotech companies."   Singh Cease-And-Desist Order, at ¶ 10.   The contract required ImmunoCellular to pay Lidingo $5,000 a month.  ImmunoCellular, through Singh, paid Lidingo more than $230,000 between September 2011 and August 2012.  *Id.*

39.     Between September 2011 and August 2012, Lidingo paid writers to publish articles describing ImmunoCellular on Seeking Alpha and Benzinga.  *Id.*  In addition, Lidingo paid writers to ghost-write articles about ImmunoCellular, which Lidingo then published on Seeking Alpha's website under Lidingo-selected pseudonyms.  *Id.*  The articles were written by at least six writers paid by Lidingo either on a salary or per article basis.  Lidingo Action, at ¶ 75.  However, no article was accompanied by a disclosure indicating the writer, or person identified in the byline, had been compensated or the amount of his compensation.

40.     The articles about ImmunoCellular published on Seeking Alpha and Benzinga "were intended to solicit offers to buy the company's securities" as "Seeking Alpha operated a widely-read website that held itself out as a 'platform for investment research, with broad coverage of stocks, asset classes, ETFs and

investment strategy' where 'articles frequently move stocks, due to a large and influential readership which includes money managers, business leaders, journalists and bloggers."  ImmunoCellular Cease-And-Desist Order, at ¶ 11.

### Materially False and Misleading
### Statements Issued Prior to the Class Period

41.     Prior to the institution of the promotional scheme (*e.g.*, from January 2, 2011 through August 31, 2011), ImmunoCellular common stock traded in a range of $1.35 per share through $2.51 per share.

42.     Prior to the Class Period, beginning in September 2011, Lidingo and/or Lavos published approximately 44 articles on Seeking Alpha and Benzinga, without disclosing the writers' or Lidingo's compensation from ImmunoCellular or otherwise suggested that the articles were part of a paid promotion.  On November 8, 2011, Ramey using a pseudonym Chemistfrog published an article on Seeking Alpha entitled, "ImmunoCellular Therapeutics' Cancer Stem Cell Drug Garnering Much Attention."

43.     On January 18, 2012, Cassano, using his psuedonym VFC's Stock House published an article on Seeking Alpha entitled, "Another Revival Could Be In Store for ImmunoCellular Therapeutics" where the author represented that ImmunoCellular's ICT-107 as being "a potentially ground-breaking immunotherapeutic treatment for glioblastoma" and it has "already proven to be very successful in Phase I, and interim results form an ongoing Phase II should start

trickling in within the year."

44.     As a result, ImmunoCellular stock increased nearly 4% on January 18, 2012 and gained an additional 8% on January 19, 2012.

45.     On February 16, 2012, Nichols published an article on Seeking Alpha entitled, "10 Biotech Stocks with Big Potential Upside in 2012: Part III."  Without disclosing that he was compensated from ImmunoCellular or disclose that the article was part of a paid promotion, the writer placed ImmunoCellular second in the list of 10 biotech stocks discussed in the article.

46.     Furthermore, Nichols failed to disclose that on February 8, 2012, Defendant Singh had reviewed the Nichols' article topic and noted that "the article topic was a '[v]ery good idea as I think it would move these stocks' and suggested that IMUC be the second company mentioned in the article's discussion of several biotech stocks."  Singh Cease-And-Desist Order, at ¶ 16.

47.     On March 21, 2012, the Company filed a Form 10-K ("2011 Form 10-K") with the SEC for the year ended December 31, 2011, which was signed by, Singh, Yu and Fractor.   In addition, the 2011 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Singh and Fractor, stating that the financial information contained in the 2011 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

48.     The 2011 Form 10-K represented the following concerning the

Company's Controls and Procedures, in relevant part:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file with the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate, to allow for timely decisions regarding required disclosure. As required by SEC Rule 15d-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our principal executive and financial officers, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2011, which is the end of the period covered by this report. Based on the foregoing, our principal executive and financial officers concluded that our disclosure controls and procedures were effective as of December 31, 2011.

49.     In the 2011 Form 10-K, the Company also represented certain risks related to its common stock and possible fluctuations in its stock price:

> The shares of our common stock may trade infrequently and in low volumes on the OTC Bulletin Board, meaning that the number of persons interested in purchasing our common shares at or near bid prices at any given time may be relatively small or non-existent. This situation may be attributable to a number of factors, including the fact that we are a small early stage company which is relatively unknown to stock analysts, stock brokers, institutional investors and others in the investment community who can generate or influence sales volume, and that even if we came to the attention of such institutionally oriented persons, they tend to be risk-averse in this environment and would be reluctant to follow an early stage company such as ours or purchase or recommend the purchase of our shares until such time as we became more seasoned and viable. As a consequence, there may be periods of several days or more when trading activity in our shares is minimal or non-existent, as compared to a seasoned issuer which has a large and steady volume of trading activity that will generally support continuous sales without an adverse effect on share price. A broader or more active public trading market for our common shares may not develop or be

sustained. Due to these conditions, you may not be able to sell your shares at or near bid prices or at all if you need money or otherwise desire to liquidate your shares. As a result, investors could, and should be prepared to, lose all or part of their investment.

50.     The 2011 Form 10-K noted that the Company's "Board of Directors has adopted a code of ethics covering all of our executive officers and key employees" and its "code of ethics is available on our website www.imuc.com."

51.     According to the Company's Code of Business Conduct and Ethics ("Code"), the "objective of this Code is to ensure full, fair, accurate, timely and understandable disclosure in the reports and other documents that we file with, or otherwise submit to, the SEC and in the press release and other public communications that we distribute."

52.     The Code further state the following in respect to the Company's "Public Disclosure of Information Required by the Securities Laws:"

> The federal securities laws, rules and regulations require the Company to maintain "disclosure controls and procedures," which are controls and other procedures that are designed to ensure that financial information and non-financial information that is required to be disclosed by us in the reports that we file with or otherwise submit to the SEC (i) is recorded, processed, summarized and reported within the time periods required by applicable federal securities laws, rules and regulations and (ii) is accumulated and communicated to our management, including our President or Chief Executive Officer and CFO, in a manner allowing timely decisions by them regarding required disclosure in the reports.

53.     On March 22, 2012, Nichols published an article on Seeking Alpha entitled "ImmunoCellular Therapeutics Patent Acquisition Paradigm Shift" and less than a week later, on March 28, 2012, Ramey, using his pseudonym Chemistfrog

published an article on Seeking Alpha entitled, "ImmunoCellular Therapeutics' Growing Intellectual Property Garnering Attention."   Singh Cease-And-Desist Order, at ¶ 15.

54.       However, "[n]either writer disclosed his receipt of compensation from IMUC or otherwise suggested that the articles were part of a paid promotion." *Id.* Moreover, the articles failed to disclose that two articles were specifically published under the instructions of Singh.  On March 21, 2012, "Singh instructed Lidingo to arrange for two articles to be written about IMUC by two specific Lidingo writers." *Id.*   Singh "asked that the first writer focus on IMUC building a stronger patent portfolio and wanted the article to be published later that week" and he also "asked that the second writer produce a longer, "'more technical piece,'" to be published the following week. *Id.*

55.       The statements in ¶¶ 42-43; 45-49; 51-53 were false and misleading as (i) ImmunoCellular retained Lidingo to publish promotional articles designed to unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendants was manipulating ImmunoCellular's stock price through an unlawful paid promotional campaign; and (iii) Defendant Singh directly, reviewed, edited and approved promotional articles prior to publication for the purpose of manipulating ImmunoCellular stock; (iv) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock; and (iv) the promotional articles failed to disclose that

the authors were compensated from ImmunoCellular or disclose that the articles were part of a paid promotional campaign.

### *Materially False and Misleading Statements Issued During the Class Period*

56.     During the Class Period, Lidingo and/or Lavos published approximately 21 articles on Seeking Alpha, without disclosing the writers' or Lidingo's compensation from ImmunoCellular or otherwise suggested that the articles were part of a paid promotion.

## First Quarter ended March 31, 2012

57.     On May 1, 2012, Cassano, utilizing his pseudonym VFC's Stock House published an article on Seeking Alpha entitled, "Immunocellular Therapeutics: Any Pullback May Mean Opportunity."  Similar to previous articles, Cassano or VFC's Stock House failed to disclose that he was compensated from ImmunoCellular or disclose that the article was part of a paid promotion.

58.     On May 10, 2012, the day before the Company filed its Form 10-Q for the quarterly period ended March 31, 2012, Nichols wrote an article entitled "Pre-ASCO Interview with ImmunoCellular Therapeutics CEO Dr. Singh" on Seeking Alpha.

59.     As a result, ImmunoCellular stock gained over 4% and closed at $2.52 per share on May 10, 2012 and gained an additional 7.9% and closed at $2.72 per share on May 11, 2012.

60.      The next day, on May 11, 2012, the Company filed a Form 10-Q ("1Q 2012 Form 10-Q") with the SEC for the quarterly period ended March 31, 2012, which was signed by, Defendant Singh.   In addition, the 1Q 2012 Form 10-Q contained signed certifications pursuant to SOX by Defendants Singh and Fractor, stating that the financial information contained in the 1Q 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.      The 1Q 2012 Form 10-Q represented the following concerning the Company's Controls and Procedures, in relevant part:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of March 31, 2012, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure. There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.
>
> We do not expect that our disclosure controls and procedures and internal control over financial reporting will prevent all error and all

fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. The design of any system of controls also is based in part upon assurance that any design will succeed in achieving its stated goals under all potential future conditions. However, controls may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

62.     The statements in ¶¶ 57-58; 60-61 were false and misleading as (i) ImmunoCellular retained Lidingo to publish promotional articles designed to unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendants was manipulating ImmunoCellular's stock price through an unlawful paid promotional campaign; and (iii) Defendant Singh directly, reviewed, edited and approved promotional articles prior to publication for the purpose of manipulating ImmunoCellular stock; (iv) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock; and (iv) the promotional articles failed to disclose that the authors were compensated from ImmunoCellular or disclose that the articles were part of a paid promotional campaign.

**May 2012 Offering**

63.     On May 14, 2012, the Company filed a prospectus on a Form 424B3 dated May 9, 2012 ("May 9, 2012 Prospectus"), related to an offering of up to

13,471,326 shares of ImmunoCellular common stock by some of ImmunoCellular stockholders, including the Yu Family Trust.  The Yu Family Trust offered to sell 5,993,424 shares of ImmunoCellular common stock.  The May 9, 2012 Prospectus was part of a registration statement on a Form SB-2 dated and filed on July 12, 2007 (collectively, "May 2012 Registration Statement").

64.     ImmunoCellular represented in the May 2012 Registration Statement on possible fluctuations in its stock price:

> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:
> • announcements of the results of clinical trials by us or our competitors;
> • developments with respect to patents or proprietary rights;
> • announcements of technological innovations by us or our competitors;
> • announcements of new products or new contracts by us or our competitors;
> • actual or anticipated variations in our operating results due to the level of development expenses and other factors;
> • changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;
> • conditions and trends in the pharmaceutical and other industries;
> • new accounting standards;
> • general economic, political and market conditions and other factors; and
> • the occurrence of any of the risks described in this report.

65.     The statements in ¶ 64 were false and misleading because ImmunoCellular omitted that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock.

**New Data From Phase I of ICT-107**

66.     On May 31, 2012, the Company issued a press release announcing that

COMPLAINT
21

"it will present new data from the previously completed Phase I clinical trial of ICT-107, the Company's lead cancer vaccine candidate for the treatment of glioblastoma multiforme (GBM), at the 2012 Annual Meeting of the American Society of Clinical Oncology (ASCO) in Chicago, IL" on June 2, 2012.

67.    The next day, on June 1, 2012, Ramey under the pseudonym Chemistfrog published an article about ImmunoCellular on Seeking Alpha, entitled "ImmunoCellular Therapeutics ICT-107 to Impress at ASCO 2012," after receiving payment from Lidingo. ImmunoCellular Cease-And-Desist Order, at ¶ 6. However, the writer failed to "disclose in the article that he had indirectly received compensation from IMUC" as ImmunoCellular paid Lidingo $25,000 on May 18, 2012. *Id.*

68.    As a result, ImmunoCellular stock gained nearly 5% and closed at $3.88 per share on June 1, 2012.

69.    The statements in ¶¶ 66-67 were false and misleading as (i) ImmunoCellular retained Lidingo to publish promotional articles designed to unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendants was manipulating ImmunoCellular's stock price through an unlawful paid promotional campaign; and (iii) Defendant Singh directly, reviewed, edited and approved promotional articles prior to publication for the purpose of manipulating ImmunoCellular stock; (iv) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock

promoters to pump its stock; and (iv) the promotional articles failed to disclose that the authors were compensated from ImmunoCellular or disclose that the articles were part of a paid promotional campaign.

**June 2012 Offering**

70.     On June 27, 2012, the Company filed a prospectus on a Form 424B3 dated June 25, 2012 ("June 25, 2012 Prospectus") related to an offering of 4,249,625 shares of ImmunoCellular common stock at $1.41 per share from time to time upon exercise of currently outstanding five-year warrants that the Company issued in January 2012.  The June 25, 2012 Prospectus was part of a registration statement on a Form S-1 that the Company filed with the SEC on November 29, 2011 (collectively, "June 2012 Registration Statement").

71.     ImmunoCellular represented in the June 2012 Registration Statement on possible fluctuations in its stock price:

> The shares of our common stock may trade infrequently and in low volumes on the NYSE MKT, meaning that the number of persons interested in purchasing our common shares at or near bid prices at any given time may be relatively small or non-existent. This situation may be attributable to a number of factors, including the fact that we are a small early stage company which is relatively unknown to stock analysts, stock brokers, institutional investors and others in the investment community who can generate or influence sales volume, and that even if we came to the attention of such institutionally oriented persons, they tend to be risk-averse in this environment and would be reluctant to follow an early stage company such as ours or purchase or recommend the purchase of our shares until such time as we became more seasoned and viable. As a consequence, there may be periods of several days or more when trading activity in our shares is minimal or non-existent, as compared to a seasoned issuer which has a large and

steady volume of trading activity that will generally support continuous sales without an adverse effect on share price. A broader or more active public trading market for our common shares may not develop or be sustained. Due to these conditions, you may not be able to sell your shares at or near bid prices or at all if you need money or otherwise desire to liquidate your shares. As a result, investors could, and should be prepared to, lose all or part of their investment.

72.     The statements in ¶ 71 were false and misleading because they omitted that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock.

**Second Quarter Ended June 30, 2012**

73.     On July 17, 2012, Lidingo published an article on Seeking Alpha entitled "3 Innovative Cancer Treatments…But Which is the Best Bet?" under the pseudonym "The Swiss Trader."  However, the article failed to disclose that on July 2, 2012, ImmunoCellular paid Lidingo $25,000 and "Singh provided edits to the article, which were incorporated into the published version."  Singh Cease-And-Desist Order, at ¶ 13.

74.     On July 26, 2012, before the market opened, Lidingo under the pseudonym Amy Baldwin published an article on Seeking Alpha entitled, "5 Momentum Stocks With Pullbacks That Could Be Your Opportunity."  The article represented that ImmunoCellular recent stock loss "is nothing more than a bump in the road, and that it will resume its bullish trends in the immediate future" as the Company's "study results showing that 37% of the patients treated with the company's lead candidate have no signs of brain cancer following 44-63 months

after treatment (compared to just 6% for standard care alone), it appears as though a significant amount of upside exists for this stock."  The article also represented that ImmunoCellular "is still in the early stages of its rally" because "the company is enrolling for its new trial [ICT-107] and has already reached 213 patients, and has done so 3 times faster than other studies for glioblastoma multiforme, which shows a level of acceptance and excitement among both physicians and patients."

75.     As a result, ImmunoCellular stock gained 1.4% and closed at $2.85 per share July 26, 2012, and gained an additional 9% and closed at $3.11 per share on July 27, 2012.

76.     On August 14, 2012, the Company filed a Form 10-Q ("2Q 2012 Form 10-Q") with the SEC for the quarterly period ended June 30, 2012, which was signed by, Defendant Singh.  In addition, the 2Q 2012 Form 10-Q contained signed certifications pursuant to SOX by Defendants Singh and Fractor, stating that the financial information contained in the 2Q 2012 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

77.     The 2Q 2012 Form 10-Q represented the following concerning the Company's Controls and Procedures, in relevant part:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act.

Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of June 30, 2012, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure. There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We do not expect that our disclosure controls and procedures and internal control over financial reporting will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. The design of any system of controls also is based in part upon assurance that any design will succeed in achieving its stated goals under all potential future conditions. However, controls may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

78.     The statements in ¶¶ 73-74; 76-77 were false and misleading as (i) ImmunoCellular retained Lidingo to publish promotional articles designed to unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendants was manipulating ImmunoCellular's stock price through an unlawful paid promotional campaign; and (iii) Defendant Singh directly, reviewed, edited and

approved promotional articles prior to publication for the purpose of manipulating ImmunoCellular stock; (iv) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock; and (iv) the promotional articles failed to disclose that the authors were compensated from ImmunoCellular or disclose that the articles were part of a paid promotional campaign.

**Resignation of Singh**

79.     On August 20, 2012, after the market closed, the Company filed a Form 8-K announcing that on August 14, 2012, Defendant Singh tendered his resignation and the Company accepted his resignation from the CEO, President, and Board positions; and appointed Defendant Yu as the Company's Interim CEO and President.

80.     On August 21, 2012, analysts at Cowen and Company ("Cowen") wrote in an analyst report that they it long discussions with Defendants Singh and Yu and a director of business development about Defendant Singh's resignation. Cowen concluded that after the long discussions Defendant Singh's "departure was related to direction the company was moving towards, financing needs, corporate governance, compensation and reporting structure and relationship between the Board and the CEO."

81.     As a result of Defendant Singh's resignation, ImmunoCellular shares declined more than 16% and closed at $2.43 per share on August 21, 2012.

82.     On September 6, 2012, an analyst at Zacks Investment Research wrote in an analyst report, "We don't know the rationale behind the management change, but we believe the change won't have significant impact on IMUC's operations."

**October 2012 Offering**

83.     On October 19, 2012, the Company filed a prospectus supplement on a Form 424B5 ("October 19, 2012 Prospectus Supplement") related to an offering by the Company to sell 10 million shares of ImmunoCellular common stock at $2.09 per share and five year warrants to purchase up to an aggregate of 4.5 million shares of ImmunoCellular common stock at $0.01 per warrant to purchase $0.45 per share of ImmunoCellular common stock.  The October 19, 2012 Prospectus Supplement was part of a shelf registration statement on a Form S-3 that the Company filed with the SEC on September 20, 2012 and a prospectus dated October 9, 2012 (collectively, "October 2012 Registration Statement").  The net offering proceeds to ImmunoCellular from the offering expected to be approximately $19.3 million, after deducting underwriting discounts and commissions and other estimated offering expenses, but excluding the exercise of any warrants and any exercise of the underwriters' over-allotment option.

84.     ImmunoCellular represented in the October 2012 Registration Statement on possible fluctuations in its stock price:

> The market price for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the

future.  If the market price of our common stock declines, the per share value of the common stock you purchase will decline.  The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

• the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;

• the receipt or failure to receive the additional funding necessary to conduct our business;

• selling by large stockholders;

• presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;

• announcements of technological innovations or new commercial products by our competitors or us;

• developments concerning proprietary rights, including patents by our competitors or us;

• developments concerning our collaborations;

• publicity regarding actual or potential medical results relating to products under development by our competitors or us;

• regulatory developments in the United States and foreign countries;

• manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;

• litigation or arbitration;

• economic and other external factors or other disaster or crisis; and

• period-to-period fluctuations in financial results.

85.     The statements in ¶ 84 were false and misleading because they omitted that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock.

**Third Quarter Ended September 30, 2012**

86.     On November 9, 2012, the Company filed a Form 10-Q ("3Q 2012 Form 10-Q") with the SEC for the quarterly period ended September 30, 2012, which was signed by, Defendant Yu.  In addition, the 3Q 2012 Form 10-Q contained

signed certifications pursuant to SOX by Defendants Yu and Fractor, stating that the financial information contained in the 3Q 2012 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

87. The 3Q 2012 Form 10-Q represented the following concerning the Company's Controls and Procedures, in relevant part:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of September 30, 2012, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure. There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.
>
> We do not expect that our disclosure controls and procedures and internal control over financial reporting will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. The design of any system of controls

also is based in part upon assurance that any design will succeed in achieving its stated goals under all potential future conditions. However, controls may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

88.     The Company also represented certain risks related to its common stock and possible fluctuations in its stock price:

The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

• the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;
• the receipt or failure to receive the additional funding necessary to conduct our business;
• selling by large stockholders;
• presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;
• announcements of technological innovations or new commercial products by our competitors or us;
• developments concerning proprietary rights, including patents by our competitors or us;
• developments concerning our collaborations;
• publicity regarding actual or potential medical results relating to products under development by our competitors or us;
• regulatory developments in the United States and foreign countries;
• manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;
• litigation or arbitration;
• economic and other external factors or other disaster or crisis; and

• period-to-period fluctuations in financial results.

Furthermore, during the last few years, the stock markets have experienced extreme price and volume fluctuations and the market prices of some equity securities continue to be volatile. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes or international currency fluctuations, may cause the market price of shares of our common stock to decline.

89.     The statements in ¶¶ 86-88 were false and misleading as (i) ImmunoCellular retained Lidingo to publish promotional articles designed to unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendant Singh directly, reviewed, edited and approved promotional articles prior to publication for the purpose of manipulating ImmunoCellular stock; and (iii) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock.

**Fourth Quarter Ended December 31, 2012**

90.     On March 11, 2013, the Company filed a Form 10-K ("2012 Form 10-K") with the SEC for the year ended December 31, 2012, which was signed by, Defendants Gengos, Yu and Fractor.  In addition, the 2012 Form 10-K contained signed certifications pursuant to SOX by Gengos and Fractor, stating that the financial information contained in the 2012 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

91.     The 2012 Form 10-K represented the following concerning the Company's Controls and Procedures, in relevant part:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file with the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate, to allow for timely decisions regarding required disclosure. As required by SEC Rule 15d-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our principal executive and financial officers, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2012, which is the end of the period covered by this report. Based on the foregoing, our principal executive and financial officers concluded that our disclosure controls and procedures were effective as of December 31, 2012.

92.     In the 2012 Form 10-K, the Company also represented certain risks related to its common stock and possible fluctuations in its stock price:

> The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:
>
> • the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;
> • the receipt or failure to receive the additional funding necessary to conduct our business;
> • selling by large stockholders;
> • presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;

• announcements of technological innovations or new commercial products by our competitors or us;
• developments concerning proprietary rights, including patents by our competitors or us;
• developments concerning our collaborations;
• publicity regarding actual or potential medical results relating to products under development by our competitors or us;
• regulatory developments in the United States and foreign countries;
• manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;
• litigation or arbitration;
• economic and other external factors or other disaster or crisis; and
• period-to-period fluctuations in financial results.

Furthermore, during the last few years, the stock markets have experienced extreme price and volume fluctuations and the market prices of some equity securities continue to be volatile. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes or international currency fluctuations, may cause the market price of shares of our common stock to decline.

93.     The 2012 Form 10-K notes that the Company's "Board of Directors has adopted a code of ethics covering all of our executive officers and key employees" and its "code of ethics is available on our website www.imuc.com."

94.     According to the Company's Code, the "objective of this Code is to ensure full, fair, accurate, timely and understandable disclosure in the reports and other documents that we file with, or otherwise submit to, the SEC and in the press release and other public communications that we distribute."

95.     The Code further stated the following in respect to the Company's

"Public Disclosure of Information Required by the Securities Laws:"

> The federal securities laws, rules and regulations require the Company to maintain "disclosure controls and procedures," which are controls and other procedures that are designed to ensure that financial information and non-financial information that is required to be disclosed by us in the reports that we file with or otherwise submit to the SEC (i) is recorded, processed, summarized and reported within the time periods required by applicable federal securities laws, rules and regulations and (ii) is accumulated and communicated to our management, including our President or Chief Executive Officer and CFO, in a manner allowing timely decisions by them regarding required disclosure in the reports.

96.    The statements in ¶¶ 90-92; 94-95 were false and misleading as (i) ImmunoCellular retained Lidingo to publish promotional articles designed to unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendant Singh directly, reviewed, edited and approved promotional articles prior to publication for the purpose of manipulating ImmunoCellular stock; and (iii) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock.

**April 2013 Offering**

97.    On April 26, 2013, the Company filed a prospectus supplement on a Form 424B5 dated April 18, 2013 ("April 18, 2013 Prospectus Supplement"), related to an offering to sell up to $17 million of shares of ImmunoCellular common stock.  The April 18, 2013 Prospectus Supplement was part of a prospectus dated October 9, 2012 and a registration statement on a Form S-3 filed with the SEC on

September 21, 2012 (collectively, "April 2013 Registration Statement").

98.     The April 2013 Registration Statement incorporated by reference the "Risk Factors" contained in the 2012 Form 10-K, including representations by the Company in respect to certain risks related to its common stock and possible fluctuations in its stock price:

> The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:
>
> • the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;
> • the receipt or failure to receive the additional funding necessary to conduct our business;
> • selling by large stockholders;
> • presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;
> • announcements of technological innovations or new commercial products by our competitors or us;
> • developments concerning proprietary rights, including patents by our competitors or us;
> • developments concerning our collaborations;
> • publicity regarding actual or potential medical results relating to products under development by our competitors or us;
> • regulatory developments in the United States and foreign countries;
> • manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;
> • litigation or arbitration;
> • economic and other external factors or other disaster or crisis; and
> • period-to-period fluctuations in financial results.

> Furthermore, during the last few years, the stock markets have experienced extreme price and volume fluctuations and the market prices of some equity securities continue to be volatile. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes or international currency fluctuations, may cause the market price of shares of our common stock to decline.

99.     The statements in ¶ 98 were false and misleading because ImmunoCellular omitted that the price of ImmunoCellular stock fluctuated due to an unlawful campaign by ImmunoCellular to pay stock promoters to pump its stock.

**First Quarter Ended March 31, 2013**

100.     On May 10, 2013, the Company filed a Form 10-Q ("1Q 2013 Form 10-Q") with the SEC for the quarterly period ended March 31, 2013, which was signed by, Defendants Gengos and Fractor.  In addition, the 1Q 2013 Form 10-Q contained signed certifications pursuant to SOX by Defendants Gengos and Fractor, stating that the financial information contained in the 1Q 2013 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

101.     The 1Q 2013 Form 10-Q represented the following concerning the Company's Controls and Procedures, in relevant part:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act.

Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of March 31, 2013, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure. There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We do not expect that our disclosure controls and procedures and internal control over financial reporting will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. The design of any system of controls also is based in part upon assurance that any design will succeed in achieving its stated goals under all potential future conditions. However, controls may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

102.    The Company incorporated by reference the risk factors in its 2012 Form 10-K, including representations by the Company in respect to certain risks related to its common stock and possible fluctuations in its stock price:

The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the

future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

• the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;

• the receipt or failure to receive the additional funding necessary to conduct our business;

• selling by large stockholders;

• presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;

• announcements of technological innovations or new commercial products by our competitors or us;

• developments concerning proprietary rights, including patents by our competitors or us;

• developments concerning our collaborations;

• publicity regarding actual or potential medical results relating to products under development by our competitors or us;

• regulatory developments in the United States and foreign countries;

• manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;

• litigation or arbitration;

• economic and other external factors or other disaster or crisis; and

• period-to-period fluctuations in financial results.

Furthermore, during the last few years, the stock markets have experienced extreme price and volume fluctuations and the market prices of some equity securities continue to be volatile. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes or international currency fluctuations, may cause the market price of shares of our common stock to decline.

103.    The statements in ¶¶ 100-102 were false and misleading (i) ImmunoCellular retained Lidingo to publish promotional articles designed to

unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendant Singh directly, reviewed, edited and approved promotional articles prior to publication for the purpose of manipulating ImmunoCellular stock; and (iii) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock.

**Second Quarter Ended June 30, 2013**

104.    On August 8, 2013, the Company filed a Form 10-Q ("2Q 2013 Form 10-Q") with the SEC for the quarterly period ended June 30, 2013, which was signed by, Defendants Gengos and Fractor.  In addition, the 2Q 2013 Form 10-Q contained signed certifications pursuant to SOX by Defendants Gengos and Fractor, stating that the financial information contained in the 2Q 2013 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

105.    The 2Q 2013 Form 10-Q represented the following concerning the Company's Controls and Procedures, in relevant part:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of June 30, 2013, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file

under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure. There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We do not expect that our disclosure controls and procedures and internal control over financial reporting will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met.  Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. The design of any system of controls also is based in part upon assurance that any design will succeed in achieving its stated goals under all potential future conditions. However, controls may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

106.    The Company incorporated by reference the risk factors in its 2012 Form 10-K, including representations by the Company in respect to certain risks related to its common stock and possible fluctuations in its stock price:

The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

• the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;

• the receipt or failure to receive the additional funding necessary to conduct our business;

• selling by large stockholders;

• presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;

• announcements of technological innovations or new commercial products by our competitors or us;

• developments concerning proprietary rights, including patents by our competitors or us;

• developments concerning our collaborations;

• publicity regarding actual or potential medical results relating to products under development by our competitors or us;

• regulatory developments in the United States and foreign countries;

• manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;

• litigation or arbitration;

• economic and other external factors or other disaster or crisis; and

• period-to-period fluctuations in financial results.

Furthermore, during the last few years, the stock markets have experienced extreme price and volume fluctuations and the market prices of some equity securities continue to be volatile. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes or international currency fluctuations, may cause the market price of shares of our common stock to decline.

107.    The statements in ¶¶ 104-106 were false and misleading as (i) ImmunoCellular retained Lidingo to publish promotional articles designed to unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendant Singh directly, reviewed, edited and approved promotional articles prior

to publication for the purpose of manipulating ImmunoCellular stock; and (iii) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its stock price was its own unlawful campaign to pay stock promoters to pump its stock.

**Third Quarter Ended September 30, 2013**

108.     On November 7, 2013, the Company filed a Form 10-Q ("3Q 2013 Form 10-Q") with the SEC for the quarterly period ended June 30, 2013, which was signed by, Defendants Gengos and Fractor.  In addition, the 3Q 2013 Form 10-Q contained signed certifications pursuant to SOX by Defendants Gengos and Fractor, stating that the financial information contained in the 3Q 2013 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

109.     The 3Q 2013 Form 10-Q represented the following concerning the Company's Controls and Procedures, in relevant part:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of September 30, 2013, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information

required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure. There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We do not expect that our disclosure controls and procedures and internal control over financial reporting will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. The design of any system of controls also is based in part upon assurance that any design will succeed in achieving its stated goals under all potential future conditions. However, controls may become inadequate because of changes in conditions or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

110.    The Company incorporated by reference the risk factors in its 2012 Form 10-K, including representations by the Company in respect to certain risks related to its common stock and possible fluctuations in its stock price:

The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:
• the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;

• the receipt or failure to receive the additional funding necessary to conduct our business;
• selling by large stockholders;
• presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;
• announcements of technological innovations or new commercial products by our competitors or us;
• developments concerning proprietary rights, including patents by our competitors or us;
• developments concerning our collaborations;
• publicity regarding actual or potential medical results relating to products under development by our competitors or us;
• regulatory developments in the United States and foreign countries;
• manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;
• litigation or arbitration;
• economic and other external factors or other disaster or crisis; and
• period-to-period fluctuations in financial results.

Furthermore, during the last few years, the stock markets have experienced extreme price and volume fluctuations and the market prices of some equity securities continue to be volatile. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes or international currency fluctuations, may cause the market price of shares of our common stock to decline.

111.    The statements in ¶¶ 108-110 were false and misleading as (i) ImmunoCellular retained Lidingo to publish promotional articles designed to unlawfully promote the Company and inflate the price of ImmunoCellular stock; (ii) Defendant Singh directly, reviewed, edited and approved promotional articles prior to publication for the purpose of manipulating ImmunoCellular stock; and (iii) ImmunoCellular failed to disclose that the most likely cause of fluctuations in its

stock price was its own unlawful campaign to pay stock promoters to pump its stock.

### THE TRUTH EMERGES

112.     On December 11, 2013, after the market closed, the Company issued a press release, disclosing that its ICT-107 Phase II study's primary endpoint of overall survival was not statistically significant.   Specifically, the Company disclosed the following, in relevant part:

> ImmunoCellular Therapeutics, Ltd. ("ImmunoCellular") (NYSE MKT:IMUC) announced that ICT-107, its dendritic cell-based vaccine, demonstrated a statistically significant increase in progression-free survival (PFS) in patients with newly diagnosed glioblastoma multiforme (GBM) in its randomized, placebo-controlled phase II trial. A comparison of PFS between ICT-107 and placebo showed a statistically significant difference in the Kaplan-Meier (K-M) curves favoring ICT-107 (p=0.014 two-sided, hazard ratio (HR)=0.56) in the intent-to-treat population of all 124 randomized patients. The difference in the median progression-free survival times between ICT-107 and placebo favored ICT-107 and was two months in duration. For the per-protocol population (117 of 124 patients receiving at least four induction vaccinations), the K-M comparison p-value improved in treated patients to 0.0074 two-sided (HR=0.53) and the difference in median progression-free survival times increased to three months in favor of ICT-107.

> The differences in the overall survival (OS) K-M curves did not reach statistical significance in the intent-to-treat population (the primary endpoint) or the per-protocol population, with p-values and HRs of p=0.58 two-sided, HR=0.87, and p=0.40 two-sided, HR=0.79, respectively. However, there were numerical differences in the median survivals favoring ICT-107 of two months in the intent-to-treat population and three months in the per-protocol population.

> The OS analysis includes data on 67 events (patient deaths) out of a possible 124, whereas the PFS analysis includes data from 103 events.

ImmunoCellular Therapeutics plans to continue following patients in this trial to collect more mature OS data.

In the matured data from the open label, phase I trial, the Company observed a consistent benefit in both PFS and OS compared with historical controls, and on this basis thinks that it is possible that the primary OS benefit could be clarified as the phase II data mature.

In this phase II study, ICT-107 was generally safe and well tolerated, with no imbalance of adverse events between the active and placebo groups.

113.     On this news, ImmunoCellular common stock declined $1.62 per share or nearly 60%, to close at $1.10 per share on December 12, 2013.

## POST-CLASS PERIOD DISCLOSURES

114.     On April 10, 2017, the SEC issued an immediate release, announcing "enforcement actions against 27 individuals and entities behind various alleged stock promotion schemes" that involved public companies including ImmunoCellular.  According to the SEC, the schemes involved public companies hiring "promoters or communications firms to generate publicity for their stocks, and the firms subsequently hired writers to publish articles that did not publicly disclose the payments from the companies."  Next, the "writers allegedly posted bullish articles about the companies on the internet under the guise of impartiality when in reality they were nothing more than paid advertisements."  Moreover, many of the articles "specifically included false statements that the writers had not been compensated by the companies they were writing about."    The schemes "left investors with the impression they were reading independent, unbiased analyses on

investing websites while writers were being secretly compensated for touting company stocks."

115.    In respect to ImmunoCellular, the SEC instituted two separate cease-and-desist orders against ImmunoCellular; and Singh and Lavos.  As part of the cease-and-desist order against Singh, he agreed to pay a disgorgement of $1,750,000 for his engagement "in a paid stock-touting scheme involving 12 issuers [including ImmunoCellular], at least 10 writers, over 400 internet publications, and the distribution of emails to thousands of potential investors."  Singh Cease-And-Desist Order, at 2.  As part of the scheme, "Singh edited and approved articles, directed writers should publish articles and directed when and where those articles should be published" and "directed that Lidingo not use writers who disclosed compensation." *Id.* at ¶¶ 7-8.

116.    On this news, ImmunoCellular common stock declined $0.13 per share or nearly 5%, to close at $2.57 per share on April 11, 2017.

## SCIENTER ALLEGATIONS

117.    As the Company's most senior executives, the Individual Defendants were active, culpable, and primary participants in the fraud as evidenced by their knowing issuance and control over the Company's materially false and misleading statements.    Further, the Individual Defendants were the senior officers of ImmunoCellular during the Class Period and had final approval over the public statements issued in the name of the Company.

118.     The Individual Defendants were the most senior officers of ImmunoCellular.  In connection with each quarterly report and the annual report ImmunoCellular filed with the SEC during the Class Period, the Individual Defendants signed certifications pursuant to SOX.  Pursuant to applicable law, every 10-Q and 10-K filed with the SEC and reporting a company's quarterly or annual financial performance must be accompanied by SOX certifications signed under oath by personnel able to attest to the veracity of the underlying financial reports. The Individual Defendants certified under oath quarter after quarter during the Class Period that all financial reports filed by ImmunoCellular with the SEC complied with Section 13(a) of the Exchange Act and that each such report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

119.     The SOX certifications stated that the financial information contained in the respective Form 10-Q and Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the Company's Form 10-Qs and 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The SOX certifications also stated that the Individual Defendants have disclosed "[a]ll significant deficiencies and material weaknesses in the design

or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

120.    The SOX certifications signed by the Individual Defendants were materially false and misleading because, at the time they were executed, these individuals were aware of, or recklessly disregarded, the severe deficiencies in the Company's controls from a financial and operational perspective.  The Individual Defendants were in a position to know that the Company lacked internal controls. The SOX certifications are strong indicia of scienter because the fraud at issue directly implicates the adequacy of the Company's systems of internal control.

121.    As signatories to the Company's SEC filings, the Individual Defendants had an affirmative obligation to familiarize themselves with the facts relevant to the Company.  To the extent that the Individual Defendants failed to fulfill that obligation, their recklessness would satisfy the scienter element of a claim brought under Section 10(b) and Rule 10b-5.

122.    ImmunoCellular and the Individual Defendants were motivated to promote the Company through the publications of promotional articles to maintain ImmunoCellular's stock price inflated as high as possible as the Company had several offerings of shares of ImmunoCellular common stock during the Class

Period.  Significantly, Defendant Yu's family trust, the Yu Family Trust offered to sell more than 5.9 million shares of ImmunoCellular common stock in the May 2012 offering.

123.　　Singh, as ImmunoCellular's CEO "directed and oversaw Lidingo's work for the company."  ImmunoCellular Cease-And-Desist Order, at ¶ 7.  Even prior to the Class Period, "Singh approved all Lidingo articles about IMUC, writing in a March 19, 2012 email to Bjorlin that he wanted 'ultimate approval authority.'"  *Id.*  In the same email, Singh provided "an instruction regarding draft articles: 'In the future, please let me review it even if it requires waiting a day or two extra."  *Id.*

124.　　Throughout the Class Period "in which Lidingo provided services to" ImmunoCellular, Singh "provided input on article content and gave directions on authors and publication timing."  Singh Cease-And-Desist Order, at ¶ 14.

125.　　Throughout the entire "period that Lidingo worked for IMUC, Singh edited articles about IMUC and provided input regarding content."  ImmunoCellular Cease-And-Desist Order, at ¶ 8.  For example, Singh provided edits to the July 17, 2012 article, "which were incorporated into the published version."  *Id.*

126.　　Singh "knew or was reckless in not knowing that Lidingo publications about" ImmunoCellular "would either not disclose compensation or would affirmatively misrepresent that the author had not been compensated."  Singh Cease-And-Desist Order, at ¶ 27.

COMPLAINT
51

127.     Singh knew "that disclosing compensation made these communications less credible and less likely to be effective."   ImmunoCellular Cease-And-Desist Order, at ¶ 10.   For example, in a February 20, 2012 email, "Singh believed that disclosures about compensation from issuers hurt the credibility of writers."   *Id.* Again, in a May 1, 2012 email, Singh "recommended that a writer not disclose compensation on his own website because 'this would create a red flag for investors or folks would want to dent his credibility.'"   *Id.*

128.     ImmunoCellular is liable for the acts of Lidingo and its employees and agents, including Bjorlin and Hodge under the doctrine of *respondeat superior* and common law principles of agency.   The scienter of the Lidingo Defendants, the Individual Defendants and other employees and agents of ImmunoCellular is imputed to ImmunoCellular under the doctrine of *respondeat superior* and common law principles of agency.

129.     The interests of ImmunoCellular were aligned with those of the Individual Defendants and the Lidingo Defendants.

130.     ImmunoCellular's CEO, Defendant Singh reviewed, edited and approved Lidingo's articles prior to publication.   Defendant Singh approved and adopted these statements with authority to act on behalf of ImmunoCellular, and were conducted within the scope of his employment as CEO.

131.     ImmunoCellular both controlled and had the right to control the actions, means, and manner of the Lidingo Defendants, in the Lidingo Defendants'

pursuit of a campaign to boost ImmunoCellular's stock price, ImmunoCellular authorized and had the right to authorize each of the promotional articles published by Lidingo, including their complete text, and had the right to propel the Lidingo Defendants to deny that the promotional articles were paid promotions.

132.     The Lidingo Defendants' conduct occurred substantially within the time and space limits authorized by the agency relationship, in that ImmunoCellular authorized both the promotional campaign to boost   ImmunoCellular's stock price and the specific articles the Lidingo Defendants published; the Lidingo Defendants were motived by a purpose to serve ImmunoCellular, in that Lidingo was hired to draft the promotional articles and the text of the promotional articles that were published was approved by ImmunoCellular; and the fraudulent acts were of a kind that the Lidingo Defendants were hired to perform.

133.     All of the wrongful acts complained of herein were carried out within the scope of the Individual Defendants' employment or Lidingo Defendants' agency with authorization.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

134.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ImmunoCellular common stock on the open market during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all

relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

135.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ImmunoCellular common stock was actively traded on the NYSE MKT, an efficient market.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ImmunoCellular or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

136.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

137.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

138.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ImmunoCellular;
- whether defendants caused ImmunoCellular to issue false and misleading financial statements during the Class Period;
- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of ImmunoCellular common stock during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

139.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

140.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- ImmunoCellular common stock are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE MKT and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and
- Plaintiff and members of the Class purchased, acquired and/or sold ImmunoCellular common stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

141.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

142.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

143.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

144.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading.

145.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ImmunoCellular common stock during the Class Period.

146.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of ImmunoCellular were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of ImmunoCellular, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning ImmunoCellular, participated in the fraudulent scheme alleged herein.

147.    The Individual Defendants, who were the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with extreme reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ImmunoCellular personnel or Lidingo Defendants to members of the investing public, including Plaintiff and the Class.

148.    As a result of the foregoing, the market price of ImmunoCellular common stock was artificially inflated during the Class Period.  Unaware of the falsity of the statements by Defendants, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of ImmunoCellular common stock during the Class Period in purchasing ImmunoCellular common stock at prices that were artificially inflated as a result of the false and misleading statements by Defendants.

149.    Had Plaintiff and the other members of the Class been aware that the market price of ImmunoCellular common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased ImmunoCellular common stock at the artificially inflated prices that they did, or at all.

150.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

151.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of ImmunoCellular common stock during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against the Individual Defendants, Bjorlin, and Hodge)

152.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.     Defendants named in this count acted as controlling persons of Lidingo and/or ImmunoCellular within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Lidingo and/or ImmunoCellular's operations and/or intimate knowledge of the false statements.

154.     During the Class Period, the Individual Defendants participated in the operation and management of ImmunoCellular, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.   Because

of their senior positions, they knew the adverse non-public information about the Company's misstatement and false statements.

155.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ImmunoCellular financial condition and results of operations, and to correct promptly any public statements issued by ImmunoCellular which had become materially false or misleading.

156.    Because of their positions of control and authority as senior officera, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ImmunoCellular disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ImmunoCellular to engage in the wrongful acts complained of herein. The Individual Defendants therefore, as a "controlling person" of ImmunoCellular within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ImmunoCellular common stock.

157.    Each of the Individual Defendants, therefore, acted as a controlling person of ImmunoCellular.  By reason of their senior management positions and/or being directors of ImmunoCellular, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ImmunoCellular to engage in

the unlawful acts and conduct complained of herein.  The Individual Defendants exercised control over the general operations of ImmunoCellular and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

158.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ImmunoCellular.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

# DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  May 1, 2017                    GLANCY PRONGAY & MURRAY LLP


By:  *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email:   info@glancylaw.com

WOLF POPPER LLP
Robert C. Finkel
Fei-Lu Qian
845 Third Avenue
New York, NY 10022
Tel: 212-759-4600
Fax: 212-486-2093
rfinkel@wolfpopper.com
fqian@wolfpopper.com

*Attorneys for Plaintiff*

## PLAINTIFF CERTIFICATION
## UNDER THE FEDERAL SECURITIES LAWS

I, Arthur Kaye, hereby state, on behalf of Arthur Kaye IRA FCC As Custodian DTD 6-8-00 ("Arthur Kaye IRA"):

1.     I have reviewed a complaint against ImmunoCellular Therapeutics, Ltd. ("ImmunoCellular"), certain of its officer(s), other individuals and/or entities, and have authorized the filing of a complaint on my behalf.

2.     I am willing to serve as a representative party on behalf of the Class, as defined in the above referenced complaint, including providing testimony at deposition and trial, if necessary.

3.     The following includes all of my transactions in ImmunoCellular common stock during the period May 1, 2012 through December 11, 2013.

        See attached.

4.     I did not purchase these shares at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

5.     During the three-year period preceding the date of signing this certification, I have not sought to serve, and have not served, as a representative on behalf of a class in any private action arising under the federal securities laws.

6.     I will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, such as lost wages relating to the representation of the Class.

7.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30 day of April 2017

By: _____
        Arthur Kaye

## LIST OF IMMUNOCELLULAR THERAPEUTICS LTD.
## PURCHASES AND SALES

| TRADE DATE | PURCHASE OR SALE | QUANTITY | PRICE PER SHARE |
|---|---|---|---|
| 5/2/2012 | Purchase | 90,000 | $2.59 |
| 5/8/2012 | Purchase | 50,000 | $2.11 |
| 5/11/2012 | Purchase | 36,000 | $2.70 |
| 6/1/2012 | Purchase | 10,000 | $3.46 |
| 7/24/2012 | Purchase | 20,000 | $2.85 |
| 8/10/2012 | Purchase | 5,000 | $2.97 |
| 8/21/2012 | Purchase | 10,000 | $2.45 |
| 11/14/2012 | Purchase | 3,500 | $1.59 |
| 6/25/2013 | Purchase | 26,500 | $1.99 |
| 7/19/2013 | Purchase | 30,000 | $2.32 |
| 7/30/2013 | Purchase | 20,000 | $3.08 |
| 8/7/2013 | Purchase | 8,000 | $3.40 |
| 8/9/2013 | Purchase | 25,000 | $3.23 |
| 8/27/2013 | Purchase | 20,000 | $2.91 |
| 11/7/2013 | Purchase | 3,500 | $2.59 |