GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Lesley F. Portnoy (#304851)
Charles H. Linehan (#307439)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel On Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARTHUR KAYE IRA FCC AS CUSTODIAN DTD 6-8-00, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>IMMUNOCELLULAR THERAPEUTICS, LTD., DAVID FRACTOR, JOHN S. YU, ANDREW GENGOS, MANISH SINGH, LAVOS, LLC, LIDINGO HOLDINGS, LLC, KAMILLA BJORLIN, ANDREW HODGE, BRIAN NICHOLS, and VINCENT CASSANO,<br><br>Defendants. | **No. 2:17-cv-03250-FMO (SKx)**<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 2

II. JURISDICTION AND VENUE ..... 12

III. PARTIES ..... 13

IV. SUBSTANTIVE ALLEGATIONS ..... 23

- A. Company Background ..... 23
  - 1. The Phase I ICT-107 Clinical Trials Results Fail to Demonstrate ICT-107 is Effective in Treating Newly Diagnosed Glioblastoma ..... 23
  - 2. Despite Lacking Any Conclusive Evidence of Efficacy, the IMUC Defendants Forged Ahead With the Phase II Trial of ICT-107 ..... 34
  - 3. The Securities Laws On Stock Promotion Prohibit Non-disclosure of Payments Received for Promotional Publications ..... 36
  - 4. Publication Targeted by Defendants ..... 37
  - 5. Singh Launches Illicit Paid Stock Promotion Scheme ..... 39
  - 6. Singh Had Ultimate Authority Over Content of the Articles ..... 40
  - 7. Disclosure of Compensation Was Absolutely Forbidden ..... 42
  - 8. Defendants Violated Seeking Alpha’s Terms of Use ..... 44
- B. IMUC and the Individual Defendants Had Strong Motive to Commit Fraud ..... 45
  - 1. Consummation of Offerings to Exploit the Artificial Inflation of the Company's Common Stock ..... 45
  - 2. IMUC as a Viable Target for Potential Suitors ..... 47
- C. Materially False and Misleading Statements Issued Prior to the Class Period. ..... 48
- D. Materially False and Misleading Statements Issued During the Class Period ..... 65

E. Materially False and Misleading Statements and Omissions Made by the Company and Its Officers During the Class Period .......79

F. The Truth Emerges ....................106

G. Post Class-Period Disclosures ....................108

V. SCIENTER ALLEGATIONS ....................111

A. Manish Singh ....................112

B. David Fractor ....................121

C. John S. Yu ....................124

D. Andrew Gengos ....................126

E. IMUC ....................128

F. Kamilla Bjorlin ....................130

G. Andrew Hodge ....................133

H. Brian Nichols ....................136

I. Vincent Cassano ....................140

J. Lavos LLC ....................146

K. Lidingo ....................146

VI. PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................155

VII. LOSS CAUSATION ....................158

VIII. PRESUMPTION OF RELIANCE ....................164

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....................165

X. CLAIMS FOR RELIEF ....................166

XI. PRAYER FOR RELIEF ....................173

XII. DEMAND FOR TRIAL BY JURY ....................174

Arthur Kaye IRA FCC as Custodian DTD 6-8-00 and Hayden Leason, the Court-appointed Co-Lead Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated First Amended Complaint ("Complaint") against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things (a) analyses of regulatory filings made by ImmunoCellular Therapeutics, Ltd. ("IMUC" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) analyses of press releases and investor presentations and conference calls issued or disseminated by IMUC; (c) analyses of news stories, internet postings and other publicly available information concerning IMUC; (d) interviews of former IMUC employees; (e) articles published on *seekingalpha.com* and *benzinga.com* about the Company; and (f) analysts' reports and advisories about the Company. This Complaint also incorporates by reference the following respective SEC action and cease-and-desist orders: (i) *In the Matter of Manish Singh and Lavos, LLC*, File No. 3-17920 (SEC Apr. 10, 2017) ("Singh Order"); (ii) *In the Matter of ImmunoCellular Therapeutics, Ltd.* File No. 3-17912 (SEC Apr. 10, 2017) ("IMUC Order"); (iii) *Securities and Exchange Commission v. Lidingo Holdings, LLC*, 17-cv-02540, ECF No. 1 (S.D.N.Y. Apr. 10, 2017) ("Lidingo

Action") including Appendix A; (iv) *In the Matter of Stephen Ramey*, File No. 3-17916 (SEC Apr. 10, 2017) ("Ramey Order"); and (v) *In re Matter of Christopher French*, File No. 3-17921 ("French Order").

## I. NATURE OF THE ACTION

1. This is a federal securities fraud class action on behalf of a class consisting of all persons other than Defendants[1] who purchased or otherwise acquired IMUC common stock on the open market from May 1, 2012 through December 11, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5(a); (b); and (c) promulgated thereunder against the Company and certain of its top current and/or former officials, certain entities and individuals (the "Class").

2. IMUC is a development stage company that seeks to develop and commercialize new therapeutics by using the body's own immune system for the

[1] As used herein, "Defendants" collectively refers to: IMUC, David Fractor ("Fractor"); John S. Yu ("Yu"); Andrew Gengos ("Gengos"); Manish Singh ("Singh"); Lavos, LLC ("Lavos"); Lidingo Holdings, LLC ("Lidingo"); Kamilla Bjorlin ("Bjorlin"); Andrew Hodge ("Hodge"); Brian Nichols ("Nichols"); and Vincent Cassano ("Cassano"). Defendants IMUC, Fractor, Yu, Gengos, and Singh are collectively referred to herein as the "IMUC Defendants." Defendants Lidingo, Bjorlin, Hodge, Nichols, and Cassano are collectively referred to herein as the "Lidingo Defendants."

treatment of cancer, such as brain, ovarian and other solid cancer tumors. The Company's lead product candidate, ICT-107, is a dendritic cell ("DC") based vaccine targeting multiple tumor associated antigens for glioblastoma multiforme ("GBM"), the most common type of brain cancer.

3. This action is predicated on the extensive and pervasive fraud orchestrated and perpetuated by the Defendants (defined herein) who embarked on a fraudulent scheme to misrepresent the viability of the Company's primary vaccine candidate, ICT-107, as a treatment for glioblastoma multiforme ("GBM"), the most common type of brain cancer, by: (i) misrepresenting the clinical data observed in the Company's Phase I ICT-107 study to bolster the perception of likely success at Phase II; and (ii) participating in an illegal stock promotion scheme whereby purportedly independent investors and analysts flooded the market with glowing reviews of the Company's stock and clinical performance, while concurrently receiving payment from the Company, the disclosure of which was painstakingly withheld from the market so as to keep the investing public in the dark.

4. Management for the Company perpetuated the first prong of this fraud by concealing the truth regarding the ICT-107 Phase I study: that while the "vaccine following conventional treatment ***may*** be associated with a clinically relevant response," it was not conclusive because "[v]accine responders exhibited a

non-significant trend toward increased progression-free survival, but ***not*** overall survival." *See Phase I Trial of a Multi-Epitoope-Pulsed Dendrkitic Cell Vaccine for Patients with Newly Diagnosed Glioblastoma*, Sunrasak Phuphanic, et. al., at 125-135 (Cancer Immunol Immunother, July 31, 2012). (Emphasis added). Instead, Company management, including certain defendants named herein, touted the "very encouraging" results observed at Phase I as an indicator of success at Phase II, omitting any reference to the genetic makeup of those well-responding individuals in the Phase I trial and the likelihood that their response was attributable to other factors besides ICT-107. *See* ¶ 185.

5. As set forth herein, Defendants' statements regarding the ICT-107 Phase 1 study and the likelihood of success of Phase II were materially false and misleading when made because, among other reasons: (1) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT – 107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival; (2) of the six patients who had survived for four years or more, there was no clear correlation with the presence of immune response to ICT – 107, a step necessary for the vaccine to work against GBM; (3) the Phase I trial results did not indicate that the Phase I results were "encouraging" as Defendants represented; and thus (4) Immunocellular's business and prospects were far worse than represented.

6. Further, while Company management outwardly misrepresented the results of the Phase I study, IMUC, through its then-Chief Executive Officer ("CEO"), defendant Manish Singh, entered into a written contract with defendant Kamilla Bjorlin and her firm, Lidingo Holdings, LLC, a stock promotion company with a history of orchestrating illicit stock promotion schemes. The agreement, which was not publicly disclosed, was for Lidingo to perpetuate the second prong of the fraud by injecting into the market dozens of materially false and misleading articles about the Company and its vaccines, including ICT-107 and the Phase I results. The results were favorable, as Lidingo published article after article on popular investor websites such as Seeking Alpha and Benzinga raving about, *inter alia*, the Company's potential for a "breakthrough" in the immunotherapy space and the likelihood that continued positive clinical results would lead to a major partnership or acquisition by a larger pharmaceutical company, driving the Company's stock price and market capitalization upwards (collectively, the articles published by Lidingo and/or its agents about IMUC prior to and during the Class Period, as identified *infra* in Section IV. C, D, are referred to herein as the "Articles").

7. The reality, however, was that these Articles were written by just a handful of Lidingo-paid writers (including defendants Andrew Hodge, Brian Nichols, and Vincent Cassano and non-parties Stephen Ramey ("Ramey"),

Christopher French (“French”) and Brett Korsgaard (“Korsgaard”)) and posted under several different pseudonyms. Further, each was meticulously crafted and edited with the oversight of Singh, who exercised managerial authority and editorial control over the entire process and who was receiving a kickback of his own from Lidingo through his own wholly-controlled stock promotion firm, defendant Lavos LLC. The result was a deluge of articles strategically placed into the market to artificially inflate the stock price of IMUC despite the fact that its primary drug candidate was headed towards failure in its Phase II study.

8. Additionally, ***every article*** commissioned and/or published by Lidingo about IMUC during the Class Period failed to disclose that the author or individual identified in the byline had been compensated for publication or the amount of any such compensation. This was a purposeful gambit orchestrated by defendants Singh, Bjorlin, and Hodge, who required authors to refrain from making any compensation disclosure (in violation of both Seeking Alpha’s terms of service and the federal securities laws) and insulted and disqualified from consideration any writer who indicated they would do so.

9. Thus, as set forth herein, the statements made in the Articles, which are imputed onto the Company by virtue of the doctrine of *respondeat superior* as each was made by a paid agent of Lidingo, which itself was a contracted and paid agent of IMUC acting within the scope of its engagement and operating under the

control of IMUC's then-CEO defendant Singh, were materially false and misleading when made because, among other reasons: (1) the Phase I ICT-107 hardly represented the clinical breakthrough that the Articles represented, as alleged herein; (2) the Articles fail to make any mention of the compensation received by the author or that the article was being published at the behest and under the direction of IMUC; and (3), as a result, IMUC's business prospects were far worse than represented.

10. The first signs of the truth began to emerge on August 20, 2012, when IMUC disclosed in a Form 8-K filed with the SEC that Singh had resigned as IMUC's CEO and President. The Company explained in the Form 8-K that Singh had "tendered his resignation together with a claim that he was entitled to severance benefits under the terms of his existing employment agreement. The Company accepted his resignation, confirmed his termination of employment with the Company, including termination as the Company's President and Chief Executive Officer, and disputed any claims for severance benefits for Dr. Singh." Singh's resignation, and the Company's unwillingness to pay Singh severance payments, caused IMUC stock to decline $0.48 per share or more than 16%, declining an additional 5% (or $0.13 per share) on August 22, 2012, to close at $2.30 per share as the market continued to digest Singh's resignation and questions from an analyst whether Singh's resignation had "anything to do with data or trial

conduct, either Phase I or Phase II" arose.

11. Yet even after Singh's resignation, the Individual Defendants failed to reveal that the Articles were part of a paid promotion scheme originally orchestrated by IMUC and Singh, nor correct the misrepresentations made therein about the success of the ICT-107 Phase I trial.

12. Instead, the Company, through its SEC filings and management, continued to perpetuate the fraudulent misstatements set forth in the Articles and by Singh in order to complete secondary stock offerings on October 2012 and April 2013, offerings propelled by the purported promise of a successful Phase II trial for ICT-107.

13. On December 11, 2013, after the market closed, the Company released its Phase II clinical study of ICT-107 ("Phase II"), revealing that the "differences in the overall survival (OS K-M) curves did not reach statistical significance in the intent-to-treat population (the primary endpoint) or the per-protocol population." Without reaching a statistical significance with the primary endpoint of overall survival and failing to reach oncology's gold standard, the Company was left with no choice, but to emphasize its secondary endpoint of progression-free survival where there was a statistical significance.

14. The revelation of the failure of Phase II exposed how limited the test results from Phase I were despite the constant drum-beat of the promotional

articles prior to and during the Class Period and Company statements that represented that Phase I was a revolutionary breakthrough in fighting GBM, and that Phase II was going to be as extraordinary even if the data is only half as good as Phase I data.

15. As a result of this further disclosure, IMUC stock declined $1.62 per share or nearly 60%, to close at $1.10 per share on December 12, 2013.

16. Throughout the Class Period, each IMUC Defendant was aware that their statements and the statements made in the Lidingo-published articles concerning the efficacy and success of the Phase I ICT-107 trial were false and misleading at the time they were made because, *inter alia,* (i) ***the IMUC Defendants were in possession of the Phase I clinical data and the observations therein that directly belied any public commentary on the likelihood of success at Phase II***; and (ii) defendant Singh exercised total editorial control and final approval over any Lidingo-published article.

17. Further, each Individual Defendant was aware that the statements made in the Lidingo-published articles about the author's non-receipt of compensation and the omission of the amount of that compensation was false and misleading at the time they were made because: (i) Defendant Singh entered into the engagement contract with Lidingo whereby he agreed that the Company would pay Lidingo for its promotional articles and then exercised editorial and managerial

oversight over the process in his capacity as IMUC CEO; (ii) Defendant David Fractor, as ***the only financial officer*** of a Company with just a handful of employees, was responsible for the financial reporting of the Company and would have been privy to any outside contracts made with a third-party like Lidingo; (iii) Defendant John S. Yu, as chairman of the Board of Directors for IMUC (the "Board"), co-founder of the Company, and Chief Scientific Officer, was intimately involved in the day-to-day operation of IMUC, even assuming the position of Interim Chief Executive Officer after the resignation of defendant Singh – a position he held at the time the final payment was made from IMUC to Lidingo for its stock promotion services; and (iv) Defendant Andrew Gengos, upon assuming the CEO position in December 2012 of a company with just a handful of employees, knew or was reckless in not knowing that the Company had engaged Lidingo during that same year in an effort to violate the federal securities laws regarding stock promotion; a fact he certainly would have learned at the latest upon the receipt of any request by the SEC regarding its investigation into the same.

18. Finally, each of the Lidingo Defendants was aware that the statements made in the Articles about the author's non-receipt of compensation and the omission of the amount of that compensation were false and misleading at the time they were made because: (i) defendants Bjorlin and Lidingo were actually receiving payments from IMUC; (ii) defendants Hodge, Nichols, and Cassano

were actually receiving payments from Lidingo in exchange for their articles and contributions to the IMUC promotion scheme; and (iii) each of the Lidingo Defendants purposely forbid or withheld any disclosure regarding their receipt of compensation in order to comply with the established scheme instituted at the demand of defendant Singh and defendant Bjorlin.

19. As a result of Defendants' wrongful acts and misleading statements and omissions, and the precipitous decline in the market value of IMUC common stock, Plaintiffs and other Class members have suffered damages.

20. Finally, on April 10, 2017, in response to several proceedings initiated by the SEC against IMUC, Singh, the Lidingo Defendants, Ramey and French, Singh admitted that he participated "in a paid stock-touting scheme" involving 12 issuer companies including IMUC, while he was the Chief Executive Officer and President of IMUC. According to the SEC proceeding against Singh, he "edited and approved articles, directed writers should publish articles and directed when and where those articles should be published" and "directed that Lidingo not use writers who disclosed compensation." Singh Order, at 2, ¶¶7-8. Singh was ordered by the SEC to pay more than $2.9 million in disgorgement, prejudgment interest and a civil monetary penalty for violating Section 10(b) and Rule 10b-5(a) and (c) thereunder and Sections 5(b)(1); 17(a)(1) and (3); 17(b) of the Securities Act of 1933. Singh Order, at 11.

21. On April 10, 2017, the SEC also filed a lawsuit against Lidingo and certain of its employees (Bjorlin and Hodge), for violating Sections 17(a)(1), 17(a)(3) and 17(b) of the Securities Act of 1933; and Section 10(b) and Rules 10b-5(a) and 10b-5(c) of the Exchange Act for paying "writers to generate hundreds of bullish articles about public clients while concealing from investors that these were paid promotions." Lidingo Action, at ¶1. The SEC further alleged that writers such as Nichols and Cassano "did not disclose that [they] had received compensation indirectly from [IMUC] for these publications or the amount of the compensation [they] received." *Id*. at ¶¶ 55, 61, 64. In addition, the SEC separately ordered French and Ramey to pay disgorgements, prejudgment interests and civil penalties for their roles in publishing fictitious articles describing securities including IMUC, without disclosing that they were paid promotions.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5(a); (b); and (c) promulgated thereunder (17 C.F.R. § 240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

24. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company's principal place of

business is located within this District.

25. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

**III. PARTIES**

26. As set forth in the attached amended certification, Arthur Kaye IRA FCC as Custodian DTD 6-8-00 ("Dr. Kaye") purchased IMUC common stock in reliance on defendants' materially false and misleading statements and omissions of material facts, and on the integrity of the market for IMUC common stock, at artificially inflated prices during the Class Period, and was damaged when the truth about IMUC was revealed to the market.[7] Dr. Kaye suffered losses of approximately $372,000 as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein.

27. As set forth in his certification previously filed with the Court (Dkt. No. 28-2), Hayden Leason ("Leason") purchased IMUC common stock in reliance on defendants' materially false and misleading statements and omissions of

---

[7] The amended certification supersedes the certification filed with the Court (Dkt. Nos. 1; 27-2), which inadvertently omitted certain of Dr. Kaye's trades during the Class Period.

material facts, and on the integrity of the market for IMUC common stock, at artificially inflated prices during the Class Period, and was damaged when the truth about IMUC was revealed to the market. Leason suffered losses of approximately $969,000 as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein.

28. Defendant IMUC is a Delaware corporation with its principal executive offices located at Calabasas, California. IMUC common stock has since May 30, 2012 traded on the New York Stock Exchange Market ("NYSE MKT"), a domestic exchange, under the ticker symbol "IMUC." Prior to May 30, 2012, IMUC common stock traded on the over-the-counter bulletin board ("OTCBB"), a domestic exchange, under the ticker symbol "IMUC." During the period of the paid promotion scheme, which includes the Class Period, IMUC had five full-time employees according to the Form 10-K ended December 31, 2013. IMUC outsourced its drug discovery research, process development, manufacturing and clinical development to third parties.

29. Defendant John S. Yu ("Yu"), a founder of the Company, served as Chairman of the Company's Board of Directors ("Board") and as its Chief Scientific Officer from January 2007 until September 2015. Yu served as Interim Chief Executive Officer from August 2012 until November 2012. Yu has served as a director from November 2006 to the present. Yu received total compensation

of $145,250, $158,600 and $213,979 for 2011, 2012 and 2013 respectively.

30. Within the last two months before the Phase II results for ICT-107 were disclosed on December 11, 2013, Yu sold approximately 300,000 shares of IMUC common stock, for gross proceeds of approximately $870,000. Prior to these sales, Yu did not sell any IMUC shares, making these sales unusual in timing. Specifically, on October 18, 2013, Yu sold 231,381 IMUC shares, at $2.91 per share for gross proceeds of $673,226. On October 21, 2013, Yu sold 36,003 IMUC shares, at $2.92 per share for gross proceeds of $105,071. On November 25, 2013, Yu sold 32,613 IMUC shares, at $2.85 per share for gross proceeds of $92,875.

31. Defendant David Fractor ("Fractor") has served as the Company's Treasurer and Chief Financial Officer ("CFO") from April 2011 to the present and as its Vice President of Finance and Principal Accounting Officer from March 2013 to the present. Fractor received total compensation of $114,180, $146,717 and $303,868 for 2011, 2012 and 2013 respectively.

32. According to the 2013 Proxy, Fractor's professional background includes "financial reporting and strategic planning services, including Sarbanes-Oxley compliance consulting services, to a variety of companies in a variety of industries." Fractor received his Bachelor of Science in accounting from the University of South California in 1982 and is a certified public accountant and a

member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants.

33. Under Fractor's employment agreement dated April 4, 2011 with IMUC, his primary duties as IMUC's CFO included the "maintenance of the Company's Sarbanes-Oxley compliance procedures and confirming accounting compliance under Sarbanes-Oxley on a quarterly basis" and "contract review for financial and Sarbanes-Oxley implications."

34. Defendant Andrew Gengos ("Gengos") served as the Company's President and Chief Executive Officer from December 2012 through December 2016. Gengos has served as a director since December 2012.

35. Defendant Singh was IMUC's President, Chief Executive Officer ("CEO") and a director from February 2008 through August 14, 2012. On August 20, 2012, IMUC announced the resignation of Singh effective August 14, 2012. From 2011 until 2014, Singh controlled Lavos, LLC and directed the activities of stock promotion firm Lidingo. *See* Singh Order, at 2. As stated in IMUC's Proxy Statement dated August 10, 2012, Form DEF 14A ("2012 Proxy"), Singh purported to have "extensive knowledge and experience" "in the biotechnology field" and "financing early stage healthcare companies through his prior work in the venture capital field."

36. The 2012 Proxy discussed Singh's employment agreement with

IMUC which was effective as of February 18, 2010 ("Employment Agreement"). Under the Employment Agreement, a termination for cause included "Executive's theft, dishonesty, or falsification of any Corporation documents or records." As detailed in the 2012 Proxy, the Employment Agreement including circumstances where Singh may exercise 600,000 stock options at an exercise price of $0.90 per share within a seven-year term (unless he is terminated for cause).

> Pursuant to the 2010 Employment Agreement, the Company granted to Dr. Singh a seven-year incentive stock option under the Company's Equity Plan, or a new qualified option plan, to purchase 600,000 shares of the Company's common stock at an exercise price equal to $0.90 per share, which was the closing market price of the common stock on the option grant date. The option may be exercised during the period that Dr. Singh provides services to the Company and for 24 months after termination for any reason except termination for cause by the Company, provided that such exercise is within the seven-year term of the option.

During 2012, Singh acquired 763,978 IMUC shares by exercising his IMUC stock options. The value he realized on the exercise of his stock options was approximately $2 million.

37. After Singh resigned by IMUC, he became the CEO of Lion Biotechnologies, Inc. ("LBIO") from July 2013 to December 2014 where he continued the promotion scheme by hiring Lidingo to promote Lion stock. The contract between LBIO and Lidingo "required Lion to pay $20,000 per month and issue 50,000 shares of Lion stock to Lidingo." Singh Order, ¶18. Lion paid

Lidingo more than $230,000 from 2013 through April 2014.

38. Defendant Lavos was formed in Nevada in 2011 by Singh "with his wife as the managing member and sole principal." *Id*. at ¶2 n.2. However, Singh's wife "did not have an operational role." *Id*. Singh "was Lavos' only employee and controlled its operations." *Id*.

39. From 2011 to 2014, Lavos was controlled and operated by Singh, and provided promotional services to issuers that included the publication of more than 400 articles promoting securities on various investment websites. *See* Singh Order, at 2. Prior to and during the Class Period, Lavos worked in concert with IMUC, Singh, Lidingo, Hodge and Bjorlin to hire writers to prepare and publish paid promotional articles recommending IMUC stock, which were first reviewed, edited, approved, and ultimately authorized by IMUC and Singh, with Lavos serving as intermediary between the writers and IMUC.

40. Defendant Lidingo was a Nevada limited liability company that was formed in 2011 and dissolved in 2014. Lidingo was owned and operated by Bjorlin. During its existence, Lidingo provided promotional services to issuers including IMUC, and directed the publication on various investment websites of over 400 articles about its issuer clients and the clients of an affiliated promotional services company, Lavos, with which Lidingo shared compensation. *See* Lidingo Action, ¶9. Prior to and during the Class Period, Lidingo worked in concert with

IMUC, Lavos, Bjorlin, Hodge and Singh to hire writers to prepare and publish paid promotional articles promoting IMUC stock, which were first reviewed, edited and approved by IMUC and Singh, with Lidingo serving as intermediary between the writers and IMUC.

41. Defendant Bjorlin organized and operated Lidingo. From no later than September 2011 through at least March 2014, Bjorlin directed Lidingo's stock promotion services on behalf of publicly-traded issuer clients, often using her stage name, Milla Bjorlin. *Id.* "Bjorlin and Lidingo received cash and equity of at least $1 million from the promotional scheme." *Id.* at ¶28. Prior to and during the Class Period, Bjorlin worked in concert with IMUC, Lavos, Lidingo, Hodge and Singh to hire writers to prepare and publish paid promotional articles promoting IMUC stock, which were first reviewed, edited, approved, and ultimately authorized by IMUC and Singh, but failed to disclose such review or the writers' payment for their articles.

42. Defendant Hodge, from no later than December 2011 through at least March 2014, was employed by Lidingo and assisted Bjorlin in Lidingo's stock promotion work, including interacting with issuer clients and providing direction to writers drafting articles on behalf of those clients and received compensation totaling at least $340,000 from Lidingo. *Id.* ¶5. Prior to and during the Class Period, Hodge worked in concert with IMUC, Lavos, Lidingo, Bjorlin and Singh to

hire writers to prepare and publish paid promotional articles promoting IMUC stock, which were first reviewed, edited, approved, and ultimately authorized by IMUC and Singh, but failed to disclose such review or the writers' payment for their articles.

43. Defendant Nichols, from no later than February 2012 through at least March 2014, was a paid writer for Lidingo, publishing articles about issuer clients on various investment websites under his own name. As part of his Seeking Alpha profile, Nichols describes himself as a research analyst. During the period of the promotion scheme, Nichols had approximately 5,000 followers[8] on his Seeking Alpha account. In total, "Nichols received at least $200,000 in total compensation, including bonuses, from Lidingo for his services in the stock promotion scheme." *Id*. ¶54. Nichols also wrote paid articles which Lidingo published under its own pseudonyms, including A. John Hodge which had approximately 300 followers, The Swiss Trader which had approximately 300 followers and Amy Baldwin which had approximately 300 followers. As part of The Swiss Trader's Seeking Alpha profile, he describes himself as "an avid stock trader" with "a degree in Physics and an MBA in Finance." In respect to IMUC, approximately 24 articles between September 2011 and August 2012 were either written and published by

---

[8] As a follower of an author on Seeking Alpha, the follower is able to read the author's articles and instablogs in his/her "Authors You Follow" section of Seeking Alpha's website.

Nichols under his own name, or were published by Lidingo using pseudonyms for articles that actually written by Nichols. *Id.* ¶57.

44. Defendant Cassano, from no later than August 2011 through at least November 2011, was a paid writer for Lavos, publishing articles about issuer clients of Lavos on investment websites under the pseudonym VFC's Stock House. Cassano received at least $6,700 in total compensation from Lavos for his services in the stock promotion scheme. In addition, from no later than November 2011 through at least April 2013, he was a paid writer for Lidingo, publishing articles about issuer clients on investment websites, also under pseudonym VFC's Stock House, and received at least $27,000 in total compensation from Lidingo for his services in publishing paid promotional articles. During the period of the promotion scheme, Cassano's pseudonym VFC's Stock House had approximately 2,000 followers. In respect to IMUC, Cassano published approximately 24 articles between September 2011 and August 2012 using his pseudonym, VFC's Stock House. *Id.*

45. Non-Party Ramey settled with the SEC and has agreed to disgorge $35,000, prejudgment interest of $3,538, and a civil money penalty of $24,000 in 21 installments to the SEC as part of his settlement for violating §§17(a); (b) of the Securities Act of 1933 ("Securities Act") and §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder "when he wrote articles for a stock promotion firm

when he knew the stock promotion firm would publish the articles without disclosure of compensation" between November 2011 and November 2013. Ramey Order, at 2. During the period of the promotion scheme, Ramey's pseudonym Chemistfrog's Seeking Alpha account had approximately 900 followers.

46. Non-Party French settled with the SEC and has agreed to disgorge $16,100, prejudgment interest of $2,105, and a civil penalty in the amount of $20,000 in 13 installments to the SEC as part of his settlement for violating §§17(a); (b) of the Securities Act and §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder "by paying freelance writers to write purportedly independent articles describing securities that he then published on investment websites without disclosing that they were paid promotions" between August and November 2012. French Order, at 2. During the period of the promotion scheme, French had approximately 500 followers on his Seeking Alpha's account.

47. Non-Party Korsgaard published at least two articles on Seeking Alpha's website promoting IMUC. During the period of the promotion scheme, Korsgaard had approximately 100 followers on his Seeking Alpha's account.

48. Cassano, Nichols, Ramey, Korsgaard and French published promotional articles at the direction of IMUC, Singh, Lavos, Lidingo, Hodge, and Bjorlin. Their conduct is attributable to each of those defendants, as part of a

securities fraud scheme under Rules 10b-5(a) and (c).

49. The defendants referenced above in ¶¶ 29, 31, 34, 35, are sometimes referred to herein as the "Individual Defendants."

50. The defendants referenced above in ¶¶ 40, 41-44 are sometimes referred to herein as the "Lidingo Defendants."

51. The defendants referenced above in ¶¶ 29, 31, 34, 35, 41-44, are sometimes referred to herein as the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Background

52. IMUC develops and commercializes immunotherapy drugs to fight cancer by stimulating a patient's own immune system to target tumor antigens. Antigens are molecular signals that the immune system uses to identify foreign bodies. The Company's lead pipeline product is ICT-107, which is a patient-specific, dendritic cell-based vaccine for the treatment of GBM. ICT-107 is an immunotherapy in which the patient's immune response is stimulated to kill the tumor cells.

#### 1. The Phase I ICT-107 Clinical Trials Results Fail to Demonstrate ICT-107 is Effective in Treating Newly Diagnosed Glioblastoma

53. Prior to and throughout the Class Period, IMUC's press releases and the articles the IMUC Defendants commissioned for publication in Seeking Alpha

implicitly or explicitly told investors that the Phase I study of ICT-107 had essentially ***proven*** the effectiveness of ICT-107 in the treatment of glioblastoma multiforme (GBM). For example, in a press release issued by IMUC on January 23, 2012, the Company disclosed the results of the Phase I trial and contrasted them (inappropriately) with the results from Phase III studies of the current standard of care for GBM, falsely implying that ICT-107 was superior to the standard of care. In addition, an article published on Seeking Alpha on July 23, 2012 by Nichols and edited and approved by Singh states that the results of the Phase I trial "prov[e] the effectiveness of attacking cancer from various points."[13]

54. However, these communications were false and misleading because: (a) the design of the Phase I study did not meet the U.S. Food and Drug Administration's (FDA) requirements for showing effectiveness; and (b) the actual results of Phase I did not demonstrate effectiveness.

55. For purposes of drug regulation, "effectiveness" is defined by statute as "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 USC § 355(d). Substantial evidence is defined as "evidence consisting of adequate and well-controlled

[13] Nichols, B., *ImmunoCellular Therapeutics: Explaining the Benefits of A Multiple Antigen Targeting Approach* (July 23, 2012).

investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." *Id*.

56. The characteristics of an "adequate and well-controlled investigation" are described in 21 CFR 314.126, and are intended "to distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation." 21 CFR § 314.126(a). Furthermore, "[u]ncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness." 21 CFR § 314.126(e).

57. Determining whether a drug is effective generally occurs in three phases. 21 CFR § 312.21. Phase I studies are "designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." *Id.* Phase II studies consist of "controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine

the common short-term side effects and risks associated with the drug." *Id.* Finally, Phase III studies are "expanded controlled and uncontrolled trials . . . and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id.*

58. The study described in IMUC's press release of January 23, 2012 and in the Seeking Alpha articles was a Phase I open-label, single-institution, single-arm, Phase I study with the primary endpoint to evaluate the immunogenicity[14] of ICT-107 and secondary endpoints of safety and efficacy in patients with glioblastoma or brainstem glioma. The results of the study were submitted on March 1, 2012 for publication in the journal *Cancer Immunology and Immunotherapy*, and published in that journal on July 31, 2012 (62 Cancer Immunol Immunother 125.) Although the FDA has strongly recommended that drug development sponsors submit the design and results of trials of experimental drugs to the federally funded clinical trials database clinicaltrials.gov, the Individual Defendants did not do so.

59. The primary endpoint of immunogenicity was chosen because ICT-

[14] Immunogenicity is the ability of a particular substance, such as an antigen or epitope, to provoke an immune response in the body of a human or animal. In other words, immunogenicity is the ability to induce a humoral and/or cell-mediated immune responses.

107 was hypothesized to act by producing an immune response against GBM tumor cells. Thus, for patients in whom an immune response did not occur, ICT-107 could not be presumed to have had any therapeutic effect, even if a patient survived for a particularly long time.

60. Patients first received standard of care therapy for GBM, consisting of surgery to remove the tumor, radiation therapy, and chemotherapy with temozolamide, a drug approved by FDA in 2009 for treatment of GBM. Patients who proved to have non-progressive disease after this standard of care treatment then received ICT-107, on average 5.5 months after their initial surgery for patients with newly diagnosed (as opposed to recurrent) GBM. All patients enrolled in the study received ICT-107; in other words, there was no concurrent control group.

61. IMUC enrolled 21 patients in this study between May 2007 and January 2010. Of the 21 patients enrolled, 17 had newly diagnosed (ND) GBM (as opposed to recurrent GBM), the indication of interest for ICT-107.[15] One of these ND-GBM patients never received ICT-107 and was excluded from the analyses. Of the remaining 16 patients, all but one had measures of immune response, the primary endpoint of the study. Thus, of these 16 patients, 15 were evaluable for immune response, the primary endpoint of the study and all 16 were evaluable for

[15] Of the four other patients, three had recurrent GBM and one had brainstem glioma.

secondary endpoints of overall survival (OS; referring to duration of survival regardless of whether the tumor enlarges) and progression-free survival (PFS), the duration of survival without tumor progression.

62. Measurement of the primary endpoint, immunogenicity, revealed that five of fifteen or 33% of the evaluable patients had an immune response. Of the 16 patients evaluated for the secondary endpoints, the median OS was 38.4 months, while median PFS was 16.9 months. In Phase III studies of standard of care therapy, the median OS was 14.6 months, while median PFS of 6.9 months.

63. These secondary endpoints were compared to the standard of care results from different trials, and trumpeted in IMUC's press releases and the Seeking Alpha articles as proof of ICT-107's effectiveness, while the disappointing results with the primary endpoint (immunogenicity) were not mentioned.

64. However, these results in no way demonstrated the effectiveness of ICT-107, and the presentation of the results was highly misleading. First, as explained above, an uncontrolled Phase I study cannot serve as substantial evidence of effectiveness.[16]

65. Second, the cross-study comparison between the Phase I ICT-107 study and the Phase III studies for the standard of care (temozolamide) was

---

[16] An uncontrolled Phase I study can be compared to valid historical controls to determine efficacy; however, this is very unusual and does not apply to this situation.

completely inappropriate from both a regulatory and scientific perspective. These studies represented different study phases, were performed with different patient populations at different times at different sites with different data collection methods. Most importantly, the study designs were very different – the Phase III studies were well-controlled studies with a primary endpoint of efficacy, while the Phase I study of ICT-107 was an uncontrolled study examining immunogenicity, with efficacy being a secondary endpoint. In general, strongly positive results in Phase I studies are rarely, if ever, repeated in Phase III studies.

66. This point – that Phase I results cannot be extrapolated to or compared with Phase III results – cannot be emphasized too strongly. Only 5% of investigational oncology agents entering Phase I studies in the US end up being approved (Kola and Landis, 3 *Nature Rev Drug Discovery* 711-5.) The FDA has stressed this issue by releasing a White Paper describing 22 case studies where encouraging results in Phase I and II studies could not be reproduced in Phase III trials (https://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Reports/UCM535780.pdf). Five of these case studies involved investigational oncology agents, one of which was a dendritic cell vaccine.

67. Third, the data available from the published study report show a disconnect between immune response (which is necessary for ICT-107's activity)

and clinical effectiveness. The Defendants' statements explicitly state or strongly imply that the apparently longer survival of the patients in their Phase I study is due to ICT-107. However, for this to be true, patients benefiting from ICT-107 should show an immune response. In fact, a comparison of the 5 patients who showed an immune response with the 10 who did not shows that the median OS in immune responders was 38.4 months, while in non-responders the median OS was 33.2 months. This difference, which is much less dramatic than the inappropriate comparison with standard of care, is not statistically significant. Thus, patients who did not mount an immune response to ICT-107 did not fare significantly worse than those who did, casting strong doubt on whether ICT-107 did anything at all.

68. Lastly, several of the patients enrolled in this study had characteristics that pre-disposed them to responding better to standard therapy; in other words, such patients would likely have done better with standard of care therapy, regardless of whether or not they received ICT-107.

69. As demonstrated in the chart below, of the 16 evaluable patients, only 6 (subjects 19, 15, 14, 7, 4, 6) demonstrated overall and progression-free survival of four years or more. However, in none of these cases can the observed survival be directly attributed to the ICT-107 vaccine because these patients had other genomic characteristics that made it more likely that these patients would respond

positively to standard of care treatment, regardless of whether they subsequently received the ICT-107 vaccine.

| **Subject No.** | **Survival (in months)** | **Progression-Free Survival (in months)** | **Immune Response** | **MGMT Status** |
|---|---|---|---|---|
| 17 | 16 | 11.3 | + | N/A |
| 9 | 19.5 | 6.9 | - | Met |
| 12 | 22.6 | 8.3 | - | UnMet |
| 11 | 25.9 | 12.6 | - | UnMet |
| 2 | 28.6 | 11.2 | - | UnMet |
| 16 | 32.4 | 17.7 | - | Met |
| 18 | 34 | 8.9 | - | N/A |
| 13 | 38.4 | 29 | + | N/A |
| 20 | 41.8 | 7.3 | N/A | Met |
| 19 | 47.6 | 47.6 | - | Met |
| 15 | 48.7 | 48.7 | - | N/A |
| 14 | 49.4 | 49.4 | + | N/A |
| 10 | 53 | 16 | - | N/A |
| 7 | 60.1 | 60.1 | + | Met |
| 4 | 61 | 61 | + | UnMet |
| 6 | 66.5 | 66.5 | - | Met |

* Met = Methylated and Unmet = Unmethylated.[17]

70. Specifically, while five of the sixteen patients (subjects 4, 7, 13, 14 and 17) demonstrated an immune response, two of those patients (subjects 13 and 17) did not live longer. The three patients who did have an immune response (subjects 4, 7 and 14) exhibited other characteristics that indicate that the reason they lived longer is unrelated to the ICT-107 vaccine.

71. For example, the response to standard of care therapy is strongly linked to the status of a gene known as MGMT. If MGMT is "unmethylated," it is turned on and produces an enzyme that causes resistance to standard of care therapy. If it is "methylated," MGMT is silenced, and patients are much more likely to respond to standard of care therapy.

72. Of the six patients, subjects 6, 7 and 19 had a methylated form of MGMT. Thus, the reason these three patients lived four years or more was likely because their MGMT gene was methylated and therefore silenced. Indeed, according to a New England Journal of Medicine article, the MGMT gene is the primary indicator of whether a patient will respond well to standard of care

[17] Phuphanich, S., et al., *Phase I Trial of a Multi-Epitope-Pulsed Dendritic Cell Vaccine for Patients With Newly Diagnosed Glioblastoma*, Cancer Immunol Immunother (2013).

treatment. *See Malignant Gliomas in Adults*, Patrick Y. Wen, M.D. and Santosh Kesari, M.D. Ph.D, at 496, 500-01 (N.E. Journal of Med., July 31, 2008).

73. Two of the six patients did not have their MGMT methylation status determined; in the absence of this information, it is impossible to conclude that ICT-107 achieved performance benefit. Subject 4 had unmethylated MGMT and did have an immune response to ICT-107; however, the immune response was weak, making it doubtful that the vaccine was related to any prolongation of survival.

74. Thus, of the six patients who demonstrated OS or PFS for four years or longer, there is no indication that ICT-107 had an effect, as opposed to a silenced MGMT gene or other patient characteristics that confer a favorable prognosis. The committee that reviewed and concluded on the Phase I results found that the "vaccine following conventional treatment ***may*** be associated with a clinically relevant response," but it was not conclusive because "[v]accine responders exhibited a non-significant trend toward increased progression-free survival, but ***not*** overall survival." *See Phase I Trial of a Multi-Epitoope-Pulsed Dendrkitic Cell Vaccine for Patients with Newly Diagnosed Glioblastoma*, Sunrasak Phuphanic, et. al., at 125-135 (Cancer Immunol Immunother, July 31, 2012). (Emphasis added). Accordingly, the Phase I results did not, as Defendants falsely represented, "prove[]" ICT-107 was successful and certainly was not

"impressive," nor did it demonstrate that the ICT-107 vaccine was the "holy grail" of treatments.

### 2. Despite Lacking Any Conclusive Evidence of Efficacy, the IMUC Defendants Forged Ahead With the Phase II Trial of ICT-107

75. On January 4, 2011, IMUC announced that the U.S. Food and Drug Administration ("FDA") approved the Company's Investigational New Drug, amendment to conduct a Phase II clinical trial for ICT-107. Phase II is a randomized, placebo-controlled double-blind, multicenter clinical trial to evaluate the safety and efficacy of ICT-107 in treating Glioblastoma Multiforme (GBM) in newly diagnosed GBM patients and have not received chemoradiation. ICT-107 is an immunotherapy in which the patient's immune response is stimulated to kill the tumor cells.

76. On February 2, 2011, the Company announced the first patient enrolling in its Phase II. On September 5, 2012, the Company completed enrollment for the Phase II.

77. The Phase II trial randomized a total of 124 patients to standard of care treatment plus ICT-107 or standard of care plus placebo. 43 patients were treated with placebo (their own dendritic cells not exposed to antigen), and the treatment arm of 81 patients received the ICT-107 vaccine. The regimen was four

induction doses after radiation and chemotherapy, and then maintenance doses until the patient relapses.

78. The primary endpoint of the Phase II trial was Overall Survival ("OS") in patients when treated with ICT-107 versus a control group. OS is defined as the time from randomization until date of death or the last date the patient is known to be alive (if death is not observed). Another primary endpoint was OS in a predefined subpopulation, HLA-A2 patients. HLA types refers to a patient's human leukocyte antigen status which corresponds to a family of genes that regulate the immune system. All randomized patients are included in the intent to treat population.

79. Secondary endpoints included progression-free survival which is defined as the time from randomization until the date of documented progressive disease or death, whichever occurs first, or the last date the patient is known to be alive and progression-free if progression or death is not observed. Other secondary endpoints included the rates of OS and PFS at six months after surgery, then assessed every three months until the end of the study. Safety and immune response were additional secondary endpoints.

## B. IMUC Retains Lavos and Lidingo to Manipulate its Stock

80. By July 2011 the Phase I test results had not generated sufficient investor interest in IMUC to allow it to trade on the NYSE MKT to justify a

secondary offering of stock necessary to raise financing for the Phase II study. Accordingly, in July 2011, Singh devised a paid stock promotion scheme when he founded Lavos while he was the CEO of IMUC. Singh Order, ¶6. The paid stock promotion scheme involved 12 issuers including IMUC, where paid writers published promotional articles on third-party investor websites including *seekingalpha.com*. As a result of the stock promotion scheme, Singh and Lavos received illegal payments of "at least $1.75 million in cash and equity." Singh Order, at 2, ¶22.

**3. The Securities Laws On Stock Promotion Prohibit Non-Disclosure of Payments Received for Promotional Publications**

81. The U.S. securities laws prohibit publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer. Lidingo Action, ¶121; *see* Section 17(b) of the Securities Act of 1993 [15 U.S.C. 77q(b)].

82. Congress enacted this anti-touting provision to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for." *S.E.C. v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

83. An investor publication issued by the SEC explains the role of paid promotions under the Federal Securities Laws and that the failure of an author to disclose that s/he is being paid by the company to promote its stock is materially misleading to investors:

> Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows.… The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment. But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.

U.S. Securities and Exchange Commission, *Microcap Stock: A Guide for Investors* (Sept. 18, 2013). As alleged herein, despite clear SEC rules, Defendants engaged an illicit stock promotion scheme with Lidingo and Lavos in which they failed to disclose more than 60 promotional articles were paid for promotions, in violation of SEC rules. There was an almost total absence in independent, non-fraudulent commentary, adding to the significance to the market of the biased, fraudulent commentary.

**4. Publication Targeted by Defendants**

84. Seeking Alpha is a financial news and analysis website. It publishes third party reports, analysis, and commentary as articles, and permits open discussion of the articles. Seeking Alpha allows authors to write about individual

issuers and permits users comment on these articles. As of November 2014, Seeking Alpha authors had written on approximately 5,000 companies. Seeking Alpha also lets users comment on these articles.

85. Seeking Alpha currently has approximately 4 million registered users, received 7 million monthly unique visitors in 2016, and 85 million average page views in 2016. Seeking Alpha has approximately 2.4 million real-time alert users (email subscribers and application users with push notifications), which translates to approximately 200 million alerts sent monthly, and approximately 2.4 billion real-time alerts on an annual basis.

86. Seeking Alpha permits posting of articles pseudonymously, but has an author's code of conduct:

a. Authors must disclose any position in any company they write about;

b. Authors cannot be paid promoters;

c. Authors cannot use multiple aliases without disclosure to Seeking Alpha, who may then take appropriate action to ensure readers are not misled; and

d. Authors must provide Seeking Alpha with their actual names and contact information.

87. Seeking Alpha provides a "Terms of Use" before contributors can publish articles on its website. As part of Seeking Alpha's Terms of Use which

was updated on March 29, 2015[18], there is an "Online Rules of Conduct" for "User Submissions" including the following:

> When you post any User Submission on the Site, you also agree to abide by the following disclosure rules:
>
> ***
>
> You may not write about a stock with the intention to boost or reduce the stock's price and sell (or buy) the stock into the resulting strength or weakness.
>
> ***
>
> Abide by the following conflict of interest rule: You will disclose any material relationships with companies whose stocks you write about in a User Submission or parties that stand to gain in any way from the viewpoint you are outlining. Examples: You must disclose if you are employed by a company whose stock you are writing about; perform consulting for a company you write about; receive paid advertising revenue or any other form of sponsorship fee from a company you write about.

**5. Singh Launches Illicit Paid Stock Promotion Scheme**

88. In September 2011, IMUC and Singh entered into a contract with Lidingo, through Bjorlin, who owned and controlled Lidingo. The contract provided that Lidingo would "'develop and execute an online distribution campaign that will prominently place the [IMUC] investment opportunity in front of retail investors with an interest in early stage biotech companies.'" Singh Order,

---

[18] https://seekingalpha.com/page/terms-of-use

¶10. The contract[19] required IMUC to pay Lidingo $5,000 a month. In all, IMUC, through Singh, paid Lidingo more than $230,000 between September 2011 and August 2012 for publishing over 60 articles on third party websites including Seeking Alpha. *Id.* ¶11.

89. Each of these Articles misrepresented that the author was independent of IMUC and was not paid for their research report. Those statements were materially false and misleading since the purportedly independent research was commissioned, reviewed, edited, approved, and ultimately authorized by IMUC and Singh.

### 6. Singh Had Ultimate Authority Over Content of the Articles

90. Defendant "Singh edited and approved articles, directed which writers should publish articles and directed when and where those articles should be published." Singh Order, ¶7. Indeed, "throughout the period in which Lidingo provided services to" IMUC, Singh, in his capacity as IMUC's CEO, "had ultimate approval authority for all IMUC articles published by Lidingo or its writers" and "provided input on article content and gave directions on authors and publication timing." *Id.* ¶14. Indeed, in an email on March 19, 2012 to Bjorlin, Singh stated "that he wanted 'ultimate approval authority'" over draft articles and "'In the

[19] According to the Singh Order, the contract had a four-month term, but Singh and IMUC continued to pay Lidingo for an additional seven months after the initial term ended.

future, please let me review it even if it requires waiting a day or two extra.'" IMUC Order, ¶7.

91. As part of the deception to the market and IMUC investors, Singh also "encouraged Lidingo to use pseudonyms to publish articles ghost-written by other Lidingo writers and, at times, directed or approved which pseudonym to use." Singh Order, ¶7. To disguise his involvement in the promotion scheme, Singh had Lidingo employees called him "Charlie" when communicating with him. *Id.* Lavos, through the actions of Singh "sent a portion of the compensation it received under its contracts to Lidingo both to share profits from the enterprise and to cover Lavos' share of Lidingo's promotional expenditures." Lidingo Action, ¶28.

92. In return for the monetary consideration, Lidingo, "acting through Bjorlin and Hodge, and its writers, including [Nichols, Cassano, Ramey, Korsgaard, and French] engaged in a concerted effort to generate articles on investment websites about publicly-traded issuer clients [including IMUC] that appeared to be objective and independent, when in fact, they were simply paid promotions." Lidingo Action, ¶4. Furthermore, with direction from Singh, the Lidingo Defendants "often published ghost-written articles about the clients using an assortment of pseudonyms, failed to disclose the compensation in the articles and therefore misrepresented the nature of their relationship with the clients to the investing public" including IMUC investors. *Id.* Significantly, as discussed

below, Lidingo, Bjorlin and Hodge took affirmative steps to ensure compensation to writers was not disclosed by rejecting "writers who indicated they would disclose compensation and, in some cases, explicitly directed writers not to disclose compensation." *Id.*

**7. Disclosure of Compensation Was Absolutely Forbidden**

93. Specific to IMUC, between at least from November 2011 through August 2012, Lidingo paid writers including Nichols, Cassano, Ramey, French, and Korsgaard to publish articles promoting IMUC by "either on a salary or per-article basis." Lidingo Action, ¶75. Nichols and Cassano were the primary authors of the promotional articles. Ramey, French and Korsgaard also contributed to the writing and publication of the promotional articles.

94. However, during this period, no article was accompanied by a disclosure indicating the writer had been compensated or the amount of his compensation as "Singh directed that Lidingo not use writers who disclosed compensation." IMUC Order, ¶9. For example, after "a writer had expressed concerns to Bjorlin that Seeking Alpha prohibited writers from receiving compensation to write about specific stocks," on February 20, 2012, Singh, in his capacity as IMUC's CEO, emailed Bjorlin the following response for her to send to the concerned writer. IMUC Order, ¶9.

We understand [Seeking Alpha] policy. We would like to do a

> consulting agreement with you for research and investment advice, but there would be no disclosures associated with any article. Any such disclosures are damaging and discredit the validity of these articles.

IMUC Order, ¶9.

95. Lidingo, through the actions of Bjorlin and Hodge, completely understood Singh's instructions of not wanting writers to disclose compensation received from Lidingo. On April 17, 2012, Bjorlin sent an email on April 17, 2012 to Singh referencing a writer who had previously disclosed "that he had been paid" in a Seeking Alpha article in October 2011, stating "'the idiot we used in the beginning, he will NOT post a disclosure again…'" Lidingo Action, ¶33. In two additional emails, "Bjorlin made similar comments about the writer in an email to Singh on August 7, 2012 and again in January 2013." *Id.*

96. As part of the scheme of not using writers who wanted to disclose their compensation, Bjorlin and Hodge "continually identified as problematic those writers who disclosed compensation" and emailed names of "potential writers and asked Singh to approve them." Lidingo Action, ¶34.

97. The articles about IMUC published on Seeking Alpha "were intended to solicit offers to buy the company's securities" as "Seeking Alpha operated a widely-read website that held itself out as a 'platform for investment research, with broad coverage of stocks, asset classes, ETFs and investment strategy' where

'articles frequently move stocks, due to a large and influential readership which includes money managers, business leaders, journalists and bloggers." IMUC Order, ¶11. Hence, any disclosure about compensation according to a May 1, 2012 email by Singh would "create a red flag for investors or folks [who] would want to dent his credibility." *Id.* at ¶10.

98. A number of the paid IMUC promotional articles coincided with IMUC's news releases and SEC filings. This facilitated the stock promotion scheme in four principal ways: First, on or around days where IMUC made an announcement, the articles were used to highlight and amplify the news the Company released. Second, during quiet periods where the Company was not making public statements, the promotional articles maintained the artificial inflation in the price of the Company's common stock. Third, the Company benefited from the artificial inflation of the stock price as it was able to commence stock offerings. Fourth, the promotional articles artificially inflated the price of the Company's common stock by presenting IMUC as a viable potential candidate to potential acquirers including big pharmaceutical companies.

**8. Defendants Violated Seeking Alpha's Terms of Use**

99. At the end of each IMUC article published on Seeking Alpha, the author represented a disclosure such as "I have no positions in any stocks

mentioned, and no plans to initiate any positions within the next 72 hours[20]," "I have no positions in any stocks mentioned, but may initiate a long position in IMUC.OB over the next 72 hours[21]," "I am long IMUC[22]," or "No position[23]."

100. After the Class Period ended, Seeking Alpha highlighted Defendants' deceptive conduct by removing 59 of the promotional articles Defendants had published on its website and substituting the following language, "This article has been removed due to a violation of Seeking Alpha's Terms of Use."

### B. <u>IMUC and the Individual Defendants Had Strong Motive to Commit Fraud</u>

#### 1. Consummation of Offerings to Exploit the Artificial Inflation of the Company's Common Stock

101. The Defendants' stock promotion scheme enabled IMUC prior to and during Class Period, to raise necessary capital using artificially inflated shares of the Company's common stock in ***three*** stock offerings where the net proceeds of approximately $35 million were used for, among other things, financing of IMUC's "ongoing clinical development of ICT-107."

---

[20] Frangold, C., *3 Diverse Investment-Grade Pharmaceuticals to Consider Today* (Aug. 8, 2012).

[21] Korsgaard, B., *Why the Markets Continue to Coalesce Around New Approaches to Treating Cancer* (Apr. 19, 2012).

[22] The Swiss Trader, *3 Innovative Cancer Treatments…But Which Is the Best Bet?* (July 17, 2012).

[23] VFC's Stock House, *ImmunoCellular: Pipeline Potential and Institutional Interest Fuel Rebound* (Jan. 31, 2012).

102. First, just two months after the start of the promotion scheme, in January 2012, IMUC was able to institute a critical offering of 9,489,436 units consisting of one share of IMUC common stock and a warrant exercisable at a strike price of $1.41 per share, enabling the Company to raise nearly $10 million from IMUC investors.

103. Second, even after Singh resigned in August 2012, Defendants allowed the Articles to remain in the market and continued to leave IMUC investors in the dark by failing to disclose that the Articles were part of a paid promotion, and not genuine, independent reports. As a result, IMUC was able to conduct a secondary offering of 10 million shares of IMUC common stock in October 2012, enabling the Company to raise over $19 million from investors.

104. Third, as IMUC continued to fail to correct the fake promotional articles, in April 2013, IMUC was able to enter into a Controlling Equity Offering Sales Agreement ("Sales Agreement") with Cantor Fitzgerald & Co. ("Cantor") where IMUC had the right to offer and sell shares of its common stock, from time to time through Cantor, for an aggregated offering price of up to $17 million. By the end of September 30, 2013, IMUC sold 1,862,142 shares of its common stock under the Sales Agreement that resulted in proceeds to IMUC of nearly $5 million.

### 2. IMUC as a Viable Target for Potential Suitors

105. According to the 2012 and 2013 Proxies, Singh and Yu had significant IMUC common stock holdings where if IMUC was purchased by an acquirer, both Singh and Yu would have made significant profits from such an acquisition of IMUC. Specifically, as of August 2, 2013, Yu beneficially owned 10,000 shares of IMUC common stock and 6,616,888 shares of IMUC common stock issuable upon exercise of options. As of July 31, 2012, Singh beneficially owned 907,000 shares of IMUC common stock and 716,384 shares of IMUC common stock issuable upon exercise of options. Using the Class Period high of $3.88 per share as the purchase price for IMUC, Yu and Singh would have reaped net proceeds of approximately $20 million and $12 million, respectively.

106. The Articles falsely interjected rumors and gossip into the market by representing that IMUC may receive acquisition interests from big pharmaceutical companies or may conduct joint ventures with other companies, and thereby, caused an artificial inflation in the price of IMUC common stock. By way of example, on January 30 and 31, 2012, Cassano published two articles on Seeking Alpha promoting IMUC as an "attractive buyout candidate."

107. On Cassano's two articles promoting IMUC as an "attractive buyout candidate," IMUC shares gained over 21% on January 30 and 31, 2012, on combined volume of more than 1.3 million shares traded.

108. On May 10, 2012, Nichols wrote an article where he quoted Singh representing that "[i]f the Phase II data is even half as good as Phase I, this would create a potential huge opportunity for partnering." As a result, IMUC shares gained 12% on May 10 and 11, 2012, on combined volume of 651,204 shares traded.

### C. Materially False and Misleading Statements Issued Prior to the Class Period.

109. Prior to the institution of the promotion scheme (January 2, 2011 through August 31, 2011), IMUC common stock traded in a range of $1.35 per share through $2.51 per share.

110. Between November 2011 and April 30, 2012, Defendants disseminated approximately 44 articles[24] to the market via Seeking Alpha's website and push notifications to email subscribers of Seeking Alpha. These articles were false and misleading as the articles materially misstated the results of the ICT-107 Phase I trial and created the false impression that the Company would ultimately succeed in its Phase II trial of ICT-107 and obtaining FDA approval.

111. During this period, the promotional articles published by Defendants caused IMUC common stock to triple as it increased from a low of $1.05 per share

[24] During this period, there were two articles published by Ramey on benzinga.com on March 28, 2012 and April 24, 2012 titled, "ImmunoCellular's Intellectual Property Steady Increases" and Multiple Antigen Target Could Mean a Multiple Marketing for These Immunotherapy Drugs," respectively.

on January 10, 2012, to a high of $3.15 per share on March 23, 2012. Below are examples of the false and misleading articles.

**<u>November 8, 2011 Article</u>**

112. Ramey was among the persons employed by Lidingo and Bjorlin to write fictitious articles using pseudonyms without disclosing payments. On November 8, 2011, during the day, Ramey using his pseudonym Chemistfrog published an article on Seeking Alpha titled, "ImmunoCellular Therapeutics' Cancer Stem Cell Drug Garnering Much Attention." Ramey praised the Phase I study as "unprecedented…. with incredible clinical efficacy, side-effects were minimal" as "[s]ix of the 16 patients in the Phase I trial remain free of disease recurrence over three years; one patient is approaching five years of progression free survival." Ramey concluded that "[i]f the Phase II data is even half as good as the Phase I data, it is almost certain the company will be acquired for significant multiples…."

**<u>January 2012 Offering</u>**

113. On January 10, 2012, the Company announced the pricing of an offering of 9,489,436 units consisting of one share of IMUC common stock at a purchase price of $1.10 per share, and a warrant to purchase one half of a share of its common stock, at an exercise price of $1.41 per share. IMUC expected to

"receive net proceeds of approximately $9.4 million, after deducting the underwriting discount and estimated offering expenses."

114. On January 11, 2012, IMUC filed with the SEC a prospectus on a Form 424B4 dated January 11, 2012 ("January 2012 Prospectus"), in connection with the offering. The January 11, 2012 Prospectus was part of a registration statement on a Form S-1 that the Company filed with the SEC on November 29, 2011 (collectively, "November 2011 Registration Statement") which was signed by Singh, Fractor and Yu. The Company stated in the January 2012 Prospectus on page 19 that it "intend[s] to use the net proceeds of this offering to fund our ongoing ICT-107 Phase II clinical trial and for general corporate purposes…."

115. IMUC represented in the January 2012 Prospectus on page 17 that the market price of its common stock "is likely to be volatile and could fluctuate widely in response to many factors, including" "changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates."

116. The statements in ¶115 were materially false and misleading because IMUC and the Individual Defendants either knowingly or recklessly failed to disclose the following facts: (i) that one factor that was affecting the market price of the Company's common stock was that IMUC had paid Lavos and the Lidingo Defendants to issue articles designed to inflate the price of IMUC common stock as part of paid promotion scheme in order to consummate the January 2012

Offering; (ii) Singh surreptitiously reviewed, edited, approved and exercised ultimate authority over the materially misleading articles and their content prior to their public dissemination; (iii) the authors used false aliases to publish the Articles, and failed to disclose their material relationship with IMUC; (v) the true risk in reliance on the Phase I results did not lie in the small sample size, but rather on the fact that those results failed to account for other genetic markers that made those individuals more likely to respond to standard of care treatments whether or not they were also receiving ICT-107; and (vi) as a result of the foregoing, November 2011 Registration Statement was materially false and misleading at all relevant times.

**January 16, 2012 Article**

117. On January 16, 2012, before the market opened, Ramey using his pseudonym Chemistfrog published an article on Seeking Alpha titled, "Pharma Leaders Emerging in Immunotherapy Approach to Fighting Glioblastoma" and represented, "I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours." Ramey promoted the "impressive" and "stellar" Phase I results as "three-year OS for the patient set was 55% with 6 patients having no recurrence of the tumor after three years." Ramey continued, "ICT-107 phase I data are currently superior with a larger patient population target set without the limitations of treating only the GBM patient population." Ramey

also stated that there is high hope that the Company "will start capturing attention as 2012 catalysts approach" and "vault the company into the spotlight and world of Big Pharma."

**January 18 and 19, 2012 Articles**

118. On January 18, 2012, before the market opened, Cassano, using his pseudonym VFC's Stock House published an article on Seeking Alpha titled, "Another Revival Could Be In Store for ImmunoCellular Therapeutics" and represented, "Long IMUC." Cassano represented that ICT-107 is "a potentially ground-breaking immunotherapeutic treatment for glioblastoma" and it has "already proven to be very successful in Phase I" and should Phase II trial results "come with the similar success of the Phase I trials, there's little doubt that a new round of investor interest would come the way of IMUC." Cassano disseminated and added to the gossip the possibility that "big" pharmaceuticals are on "the prowl" for smaller pharmaceutical companies, and "IMUC could also benefit from the occasional buyout speculation that has been dominating the industry these days."

119. During the next day, Cassano published an article on Seeking Alpha titled, "Biopharma Stocks to Watch This Week." He wrote that "given the encouraging Phase I data – may lead to a swift increase in IMUC share price, as could the occasional buyout speculation that dominates the biotech industry these

days."

120. As a result of the January 18 and 19 articles by Cassano, IMUC stock gained 12% over two trading days, on a combined share volume of 1,072,448, to close at $1.20 per share on January 19, 2012, compared to a 1.2% decline of Agenus Inc. ("Agenus") common stock and a gain of 4.2% for Cytokinetics Inc. ("Cytokinetics") common stock over the two trading days. Agenus and Cytokinetics are identified on IMUC"s Proxy Statement as "peer" companies. Nasdaq Biotechnology Index[26] ("NBI") gained 0.8% over the two trading days.

**<u>January 30 and 31, 2012 Articles</u>**

121. On January 30, 2012, before the market opened, Ramey using his pseudonym Chemistfrog published an article on Seeking Alpha titled, "Verastem IPO Validates Investor Interest In Cancer Stem Cell Approach" and represented, "I have no positions in any stocks mentioned, but may initiate a long position in IMUC.OB over the next 72 hours." Ramey represented that "Phase I study showed extremely promising results in patients with GBM with extended median survival almost two years when compared to historical standard of care. The three-year disease free survival rate was 38% in patients treated with ICT-107 versus only 6% for historical controls."

[26] NBI is a market weighted index that measures the performance of all NASDAQ stocks in the biotechnology sector.

122. On January 30, 2012, during the day, Cassano published an article on Seeking Alpha titled, "Stocks To Watch Week of Jan. 30." Cassano promoted that "ImmunoCellular's next-generation technology makes the company an attractive buyout candidate, as well."

123. The next day, on January 31, 2012, before the market opened, Cassano published another article on Seeking Alpha titled, "ImmunoCellular: Pipeline Potential and Institutional Interest Fuel Rebound" and represented "No position." Cassano again emphasized that "ImmunoCellular may look like an attractive buyout candidate" "given the impressive Phase I trial results for ICT-107 that had 100% of the 16 patients treated still alive after one year."

124. As a result of the January 30 and 31, 2012 articles by Cassano, IMUC stock gained over 21% over two trading days, on combined share volume of more than 1.3 million, to close at $1.64 per share on January 31, 2012, compared to a decline of 0.3% for Agenus; a gain of 4% for Cytokinetics; and a gain of 0.2% for NBI.

**February 6, 2012 Articles**

125. On February 6, 2012, before the market opened, Cassano published an article on Seeking Alpha titled, "Stocks To Watch Week of Feb. 6." Cassano promoted "new institutional interest and positive developments from the pipeline still have [IMUC] as a potential mover, and a stock to watch."

126. On February 6, 2012, during the day, Korsgaard published an article on Seeking Alpha titled, "ImmunoCellular And Cancer Treatment's Next Frontier" and represented, "I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours." Korsgaard represented that patients who took ICT-107 have shown to have "an 80% chance of survival after two years and 55% after three years in a phase I trial" and "6/16 patients in this phase I trial continue to be disease free between 3-5 years at this point. 38% disease free at 3 years compares superbly with expected based on historical data for glioblastoma."

127. On the February 6 articles, IMUC stock gained 18% over two trading sessions, on combined share volume of more than 1.1 million, to close at $1.90 per share on February 7, 2012, compared to gains of 2%, 0.9% and 0.4% for Agenus, Cytokinetics and NBI, respectively.

**February 16, 2012 Article**

128. On February 16, 2012, during the day, Nichols published an article on

Seeking Alpha titled, "10 Biotech Stocks with Big Potential Upside in 2012: Part III" and represented, "I am long SPPI, IMUC.OB, QCOR." Nichols "placed IMUC second in the list of 10 biotech stocks discussed in the article." Nichols stated the results of the Phase I trial were "incredible" as "100% of all patients who used ICT-107 surpassed their first year and 40% of the patients with glioblastoma were disease free after three years. Without ICT-107 only 6% of patients lived 3 years, but with ICT-107 40% are disease free, which is incredible."

129. In the article, Nichols failed to disclose that he was compensated by IMUC or disclose that the article was part of a paid promotion. Furthermore, Nichols failed to disclose in the article that on February 8, 2012, Singh had reviewed Nichols' article topic and Singh noted that "the article topic was a '[v]ery good idea as I think it would move these stocks' and suggested that IMUC be the second company mentioned in the article's discussion of several biotech stocks." Singh Order, ¶16. Nichols failed to "disclose his receipt of compensation from IMUC or otherwise suggest that the article was part of a paid promotion." *Id.*

**<u>February 21, 2012 Article</u>**

130. On February 21, 2012, during the day, Lavos and Lidingo, through writer, Brett Korsgaard published an article on Seeking Alpha titled, "A Roadmap For Immunotherapy Success In Oncology" and represented, "I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72

hours." Korsgaard said that the path of IMUC "is to eradicate cancer at the source" which is "[t]he 'holy grail' for cancer treatments."

131. On this news, IMUC's stock gained 4.5% on volume of 444,439 shares traded, and closed at $1.85 per share on February 21, 2012, compared to declines of 3%, 1.9%, and 1.9% for Agenus; Cytokinetics and NBI respectively.

**February 22, 2012 Article**

132. On February 22, 2012, after the market closed, Nichols published an article on Seeking Alpha titled, "Buy Biotech in Phase II For the Best Upside" and represented, "I am long IMUC.OB." Nichols represented that the data from Phase I "is simply incredible" as ICT-107 showed "much better results compared to standard of care alone in treating glioblastoma." Further, Nichols represented that "ICT-107 treated patients with glioblastoma, and 100% of the patients exceeded their first year of treatment, 40% were disease free in three years, and the company's expecting 18% of the patients to survive through 2012, which would be 5 years."

**March 1, 2012 Article**

133. On March 1, 2012, before the market opened, Nichols published an article titled, "Dendreon's Woes Mask the Exciting Opportunities In Immunotherapy Companies" and represented, "I am long IMUC, GALE, ONTY." Nichols stated that IMUC has showed "significant breakthroughs in cancer

research and" has a lead candidate that "will challenge and change the way that we as a society perceive cancer." Specifically, Nichols represented that based on early testing in Phase I, "40% of patients who use the drug are disease-free after three years."

134. On this news, IMUC shares gained nearly 14% over two trading days, on 3.4 million shares traded, to close at $2.75 per share on March 2, 2012, compared to gains of 2%, 0.1%, and 0.7% for Agenus, Cytokinetics and NBI, respectively.

**March 5, 2012 Article**

135. On March 5, 2012, during the day, Cassano published an article titled, "Immunocellular Therapeutics: Pending Catalysts Could Spark Share Price Run." Cassano represented that "Immunocellular might be flying high as a solid buyout candidate, given the fact that big players in the industry are increasingly looking to scoop up smaller companies earlier in the stages of pipeline development. The buyout speculation will grow that much more if interim results, that are due out late this year, are as encouraging as earlier results were."

136. On this news, IMUC common stock gained over 9% on more than 1.2 million shares traded, to close at $3.01 per share on March 5, 2012, compared to declines of 0.6% and 0.5% for Agenus and NBI, respectively, and unchanged for Cytokinetics.

**March 6, 2012 Article**

137. On March 6, 2012, during the day, Ramey using his pseudonym Chemistfrog published an article on Seeking Alpha titled, "Big Pharma's Growing Appetite For Cancer Stem Cell Biotechs" and represented, "I have no positions in any stocks mentioned, but may initiate a long position in IMUC over the next 72 hours." Ramey represented that in the last few months, "Big Pharma interest the last few months" "is likely fueled by its impressive ICT-107 Phase I results for treating newly diagnosed glioblastoma." Ramey further promoted that the data from Phase I "were impressive" where "[m]edian OS for the patient set was 38.4 months with a median PFS of 17 months. The three-year OS for the patient set was 55% with 6 patients having no recurrence of the tumor after three years. 19% were still disease-free after four years with one patient now at 5 years of PFS."

**March 19, 2012 Article**

138. On March 19, 2012, during the day, Lidingo using a pseudonym name A. John Hodge published an article on Seeking Alpha titled, "Small Cap Biotech Stocks Trading Higher" and represented, "I am long AGEN, GALE, SNSS, IMUC.OB." Lidingo represented that in "early trials" ICT-107 has "been shown to be both safe and effective, with all of its patients exceeding one year and 40% surviving 3 years, which is quite remarkable considering the history of the disease."

**March 22 and 28, 2012 Articles**

139. On March 21, 2012, "Singh instructed Lidingo to arrange for two articles to be written about IMUC by two specific Lidingo writers." Singh Order, ¶15. Singh "asked that the first writer focus on IMUC building a stronger patent portfolio and wanted the article to be published later that week" and he also "asked that the second writer produce a longer, 'more technical piece,' to be published the following week." *Id.*

140. On March 22, 2012, one day after IMUC filed its 2011 10-K, during the day, Nichols published an article on Seeking Alpha titled "ImmunoCellular Therapeutics Patent Acquisition Paradigm Shift" and represented, "I am long IMUC." The March 22 article discussed IMUC's intellectual properties and its "patent portfolio [as] another catalyst for success with IMUC having a very diversified patent portfolio." Nichols represented that ICT-107's "success rate has been remarkable, with 40% of the patients treated with ICT-107 surpassing three years of life with no measurable disease." Nichols stated that IMUC "could become a very attractive acquisition target" if IMUC "can prove that its vaccines can treat other cancers outside brain tumors."

141. On the publication of the March 22 article by Nichols, IMUC common stock gained 12% on volume of 660,202 shares traded, to close at $3.14 per share on March 22, 2012, compared to a decline of 1.5% for Agenus; and gains

of 0.9% and 0.1% for Cytokinetics and NBI, respectively.

142. Less than a week later, on March 28, 2012, during the day, Ramey, using his pseudonym Chemistfrog published an article on Seeking Alpha titled, "ImmunoCellular Therapeutics' Growing Intellectual Property Garnering Attention" and represented, "I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours." The article discussed IMUC's "Phase I data in which the median overall survival (OS) for the patient set was 39.4 months with a median progression free survival (PFS) of 17 months." Ramey also stressed that IMUC is "a good target for partnership or acquisition for Big Pharma" when it received orphan drug designation from the FDA for ICT-107 in June 2011 and patent protection in October 2011.

143. On the publication of the March 28 article by Nichols, IMUC common stock gained nearly 3.5%, on volume of 182,646 shares traded, to close at $2.97 per share on March 28, 2012, compared to declines of 0.9% and 0.5% for Cytokinetics and NBI; and a gain of 4% for Agenus.

144. However, neither Nichols nor Ramey "disclosed his receipt of compensation from IMUC or otherwise suggested that the articles were part of a paid promotion." Singh Order, ¶15. Moreover, the articles failed to disclose that the two articles were specifically published under the instructions of Singh as he arranged "for two articles to be written about IMUC by two specific Lidingo

writers." *Id.*

**April 10, 2012 Article**

145. On April 10, 2012, Nichols published an article titled "Breaking the Mold of Oncology Drug Development" and represented, "I am long IMUC." Nichols represented that the "early stage clinical data from Phase I seems to provide validation to this approach [to] treat the cancerous cells. The results show 40% of patients treated in a small Phase I study had no progression of disease over 3 years in the most aggressive type of brain tumor, glioblastoma."

**April 12, 2012 Article**

146. On April 12, 2012, Nichols published an article titled on Seeking Alpha "Which Q1 Biotech Movers Can Build Off Momentum? Part II" and represented, "I am long IMUC.OB, AAPL." Nichols represented that Phase I test results "were incredible and created instant optimism surrounding the future of the company" as ICT-107 showed "40% of patients treated with its drug having no progression of glioblastoma over a period of three years." As such, IMUC could be "very attractive as an acquisition target."

**April 25, 2012 Article**

147. On April 25, 2012, Ramey under his pseudonym published an article titled on Seeking Alpha "Multiple Antigen Targeting Could Indicate Big Potential for Immunotherapy Drugs" and represented, "I am long GALE." Ramey

represented that "Phase I data was extremely hopeful in which median overall survival for the patient set was 38.4 months with a median progression free survival of 17 months. The three-year OS for the patient set was 55% with 6 patients having no recurrence of the tumor after three years."

**April 30, 2012 Article**

148. On April 30, 2012, Nichols published an article on Seeking Alpha titled "ImmunoCellular Therapeutics and the Benefits of a Large Exchange" and represented, "I am long IMUC." Nichols stated that ICT-107 "is easy to manufacture, cheap to develop, and can be stored along with countless other benefits. Not to mention, 40% of the patients treated with ICT-107 have surpassed three years of life while 6% will live three years with standard care alone." However, Nichols failed to disclose "that he had been indirectly compensated by IMUC" as Lidingo paid Nichols to publish the article after IMUC paid Lidingo $28,390 on April 16, 2012. IMUC Order, ¶6.

149. The articles in ¶¶ 112, 117, 118-119, 121-123, 125-126, 128, 130, 132, 133, 135, 137-138, 140, 142, and 145-147, were removed by Seeking Alpha for violating "Seeking Alpha's Terms of Use," for failing (1) to disclose that the authors had indirectly received compensation from IMUC through Lidingo or the amount they received; and/or (2) to disclose that the articles were part of a paid promotion scheme.

150. The statements in ¶¶ 112, 117, 118-119, 121-123, 125-126, 128, 130, 132, 133, 135, 137-138, 140, 142, and 145-147 were materially false and misleading when made because (i) IMUC had paid Lavos and the Lidingo Defendants to publish promotional articles as part of a paid promotional campaign to unlawfully promote the Company's current performance and future prospects and manipulate the price of IMUC common stock in order to consummate public offerings of IMUC common stock and present IMUC as a viable acquisition candidate to potential acquirers; (ii) Singh surreptitiously reviewed, edited, approved and exercised ultimate authority over the materially misleading articles and their content prior to their public dissemination; (iii) authors of the promotional articles including Cassano and Nichols were compensated from IMUC as the promotional articles were part of a paid promotional campaign; (iv) the authors of the promotional articles including Cassano and Nichols used false aliases when they authored the promotional articles to promote IMUC; (v) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT-107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival, because of the lack of an appropriate control group and the design and the conduct of the study not being aimed at demonstrating efficacy; (vi) of the six patients who had survived for four years or more, there was no clear correlation with the presence of immune response to ICT-

107, a step necessary for the vaccine to work against GBM; (vii) in five of the six patients, an apparently favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; (viii) given that promising results in early studies are frequently not confirmed in later, more well-controlled and conducted clinical trials, the Phase I trial results did not indicate that the Phase I results were "encouraging" as Defendants represented; and, thus (ix) Immunocellular's business and prospects were far worse than represented.

### D. Materially False and Misleading Statements Issued During the Class Period

151. In addition to the promotional articles issued prior to the Class Period, which remained in the market distorting IMUC stock, Defendants published approximately 20 additional articles during the Class Period that were false and misleading. These additional fake articles were disseminated to the market via Seeking Alpha's website and push notifications to email subscribers of Seeking Alpha.

152. As a result of the promotional articles published by Defendants during the Class Period, IMUC common stock nearly increased by 50%, from $2.59 per

share on May 1, 2012, to $3.84 per share on July 3, 2012. Below are samples of the false and misleading articles during the Class Period.

**May 1, 2012 Article**

153. On May 1, 2012, during the day, Cassano, utilizing his pseudonym VFC's Stock House, published an article on Seeking Alpha titled, "Immunocellular Therapeutics: Any Pullback May Mean Opportunity," and represented, "Long IMUC.OB." Cassano promoted that IMUC's stock has "posted some significant gains" in 2012 "due to the success demonstrated by the company's immunotherapeutic cancer-fighting technology" which "has been put to test with ICT-107 in the treatment of gliblastoma through its Phase I trial" and the "results have been highly encouraging" to reduce "the threat that the cancer will grow and spread."

**May 2, 2012 Article**

154. On May 2, 2012, before the market opened, Nichols utilizing his pseudonym The Swiss Trader published an article on Seeking Alpha titled, "Finding An Oncology Player That Will Change the Rules of the Game," and represented, "I am long AMGN, IMUC.OB." Nichols represented that based on "[e]arly-stage clinical data" in Phase I, "ICT-107 demonstrated a 3-year survival rate of 55%. 6 patients have now lived over 3 years and one patient is nearing the 5-year survival point." Nichols promoted that IMUC "has both the technology and

the early-stage data to suggest its potential to seriously change the way cancer is treated, and with a Phase II trial in progress and proof-of-concept data just a couple years away, there can be no doubt that prospective acquirers are keeping a close eye on it." Later in the article, Nichols represented that "there can be no doubt that big drug developers are looking to this little company to usher in the paradigm shift that oncology needs."

**<u>May 10, 2012 Article</u>**

155. On May 10, 2012, before the market opened, one day before the Company filed its Form 10-Q for the quarterly period ended March 31, 2012, Nichols wrote an article titled "Pre-ASCO Interview with ImmunoCellular Therapeutics CEO Dr. Singh" on Seeking Alpha and represented, "I am long IMUC." During the interview, Singh stated that "phase I data has demonstrated a survival improvement of about 24 months over the standard of care." Singh has represented that "Phase I data presented so far has demonstrated a 55% overall survival and 38% disease free survival at three years." In addition, Singh hinted at a potential acquisition of the Company or joint venture with a third party by representing that the "Phase II trial is designed to be a randomized and double blinded trial, which is as close to the gold standard trial as one can design. If the Phase II data is even half as good as Phase I, this would create a potential huge opportunity for partnering."

156. As a result, IMUC stock gained over 12% over two trading sessions, on combined share volume of 651,204, to close at $2.72 per share on May 11, 2012, compared to gains of 0.3%, 2% and 2.3% for Agenus, Cytokinetics and NBI, respectively.

**<u>May 18, 2012 Article</u>**

157. On May 18, 2012, before the market opened, Lidingo utilizing the pseudonym published an article on Seeking Alpha titled, "ASCO 2012 Abstracts: 4 Hopeful Overachievers" and represented "I am long GALE, IMUC." Lidingo represented that Phase I data demonstrated a "3-year survival rate [of] 55% for ICT-107 patients vs. 16% for historical controls." Further, Lidingo represented that "6 of the 16 patients in the Phase I trial remained free of disease recurrence over 3 years with at least one patient exceeding five years of progression free survival."

**<u>May 21, 2012 Article</u>**

158. On May 21, 2012, an author named A. John Hodge published an article on Seeking Alpha titled, “Interest Growing In Cancer Stem Cell Biotechs.” A. John Hodge was one of the pseudonyms that Lidingo used when it published articles written by Nichols. Interestingly, Lidingo/Nichols mentioned Nichols in the third person and his article on May 10, 2012 where he interviewed Singh. Lidingo/Nichols wrote that based on IMUC’s ASCO abstract, Phase I showed

"40% of patients continue to be disease free beyond 3.5 years with longest surviving patient at over 5 years" and interim data on Phase II later in the year would be "a validation of its earlier data."

**<u>May 29, 2012 Article</u>**

159. On Tuesday, May 29, 2012, the next trading session and before the market opened, a day before the listing of IMUC on the NYSE MKT, Nichols published an article on Seeking Alpha titled, "ImmunoCellular Therapeutics' Uplisting to NYSE Could Immediately Open Many Doors" and represented, "I am long IMUC." Nichols discussed an interview with Singh where he explained "how far the company has come over the last five years, from starting with a market cap of just millions to trading with a market cap of over $110 million." In addition, Nichols promoted that "all clinical data has been impressive from IMUC, and the short-term catalysts have kept its stock trading higher despite the recent selloff in the market."

160. On this news, IMUC common stock gained nearly 9%, on more than 1.1 million shares traded, to close at $3.32 per share on May 29, 2012, compared to gains 1.9% and 0.1% for Agenus and NBI; and unchanged for Cytokinetics.

**<u>June 1, 2012 Article</u>**

161. On June 1, 2012, during the day, in the run up to the ASCO annual meeting on June 2, 2012, Ramey under the pseudonym Chemistfrog published an

article about IMUC on Seeking Alpha titled “ImmunoCellular Therapeutics ICT-107 to Impress at ASCO 2012” and represented, “I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours.” However, the writer failed to “disclose in the article that he had indirectly received compensation from IMUC” as IMUC paid Lidingo $25,000 on May 18, 2012. IMUC Order, ¶6. Ramey promoted that the “eye-opening Phase I data” as being “astounding” as "6 of the 16 newly-diagnosed GBM patients showed no signs of tumor recurrence" which represented "a 38% survival rate at over 4 years, a substantial improvement over the 10% seen with the standard of care regimen." As such, Ramey stated that the “data set is simply too good to ignore, and any indication whatsoever on comparable interim data for the Phase II trial underway in the future will quickly garner the attention of investors and large pharmaceutical suitors.”

162. As a result, IMUC stock gained nearly 5%, on volume of 1,656,573 shares traded, and closed at a Class Period high of $3.88 per share on June 1, 2012, compared to declines of 2.9%, 2.2%, and 3.1% for Agenus, Cytokinetics and NBI, respectively.

**June 4, 2012 Article**

163. On June 4, 2012, before the market opened, Nichols published an article on Seeking Alpha titled, “5 Biotech Stocks That Could Be Included in the

Russell 2000" and represented, "I am long IMUC.OB." Nichols represented that results from IMUC's phase I trial were "very impressive" and "so effective" as it "showed survival rates over four years" and "38% of patients treated with ICT-107 survived over four years compared to 10% with standard care alone."

**June 13, 2012 Article**

164. On June 13, 2012, during the day, Ramey utilizing the pseudonym Chemistfrog published an article on Seeking Alpha titled, "Dendreon: Room for Improvement" and represented, "I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours." Ramey represented that IMUC "has been receiving a lot of attention from bloggers, investors, healthcare providers and large pharmaceuticals after a follow up presentation of phase I data for ICT-107 indicated highly impressive results for newly diagnosed glioblastoma." Ramey further represented that Phase I "[d]ata indicated a median overall survival rate of 38.4 months with 6 of 16 patients showing no recurrence of the cancer at 44-63 months, both phenomenal improvements over historical norms in which median overall survival is 14.6 months and 5 year survival is roughly 5%." Ramey also suggested that a "synergistic partnership between" IMUC and another immunotherapy company, Dendreon "could be a marriage made in heaven" based on the companies' respective needs.

165. As a result, IMUC stock gained 4.5% over two days, on combined

volume of 864,589 shares traded, to close at $3.45 per share on June 14, 2012, compared to gains of 2%, 1% and 0.2% for Agenus, Cytokinetics and NBI, respectively.

**<u>June 18, 2012 Article</u>**

166. On June 18, 2012, after the market closed, Lidingo utilizing the pseudonym The Swiss Trader published an article on Seeking Alpha titled, “Immunotherapy Comes of Age At ASCO 2012” and represented, “I am long AMGN, IMUC.” Lidingo/Nichols stated that even though the Phase I trial was “small, uncontrolled study, the survival rates are unprecedented considering that GBM patients on average survive less than two years.” Specifically, Lidingo represented that Phase I "showed that eight of sixteen glioma patients treated with ICT-107 continued to survive for more than four years - six patients without any progression of disease. Three patients continue to survive beyond the five mark."

167. On this news, IMUC common stock gained 3%, on volume of 535,535 shares traded, to close at $3.71 per share on June 19, 2012, compared to a decline of 5.9% for Cytokinetics; unchanged for Agenus; and a gain of 1.3% for NBI.

**<u>June 27, 2012 Article</u>**

168. On June 27, 2012, during the day, Lidingo utilizing the pseudonym A. John Hodge published an article on Seeking Alpha titled, “ImmunoCellular: Cancer Is Smart, But Could An Experimental Cancer Vaccine Be Smarter” and

represented, “I am long IMUC.” Lidingo represented that the Phase I study "demonstrated a three-year progression-free survival rate of 38.5%. Three patients have now lived four years free of disease, and one an almost unheard of five years."

**July 4, 2012 Article**

169. On July 4, 2012, during the day, Ramey utilizing the pseudonym Chemistfrog published an article on Seeking Alpha titled, “Dendritic Cell Evolution: Investment Potential” and represented, “I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours.” Ramey represented that IMUC's "phase I GBM data mostly revealed with substantial improvement over the standard of care for GBM" and there is "substantial value to shareholders if the phase II data shows even a portion of the efficacy of the phase I success." Accordingly, Ramey represented, "Big Pharma rumors are likely coming as the company continues to advance ICT-107 and proves that its intellectual property is worthy of licensing or acquisition."

**July 17, 2012 Article**

170. On July 17, 2012, before the market opened, Lidingo using the pseudonym The Swiss Trader, published an article on Seeking Alpha titled “3 Innovative Cancer Treatments…But Which is the Best Bet?” and represented, “I am long IMUC.” The article represented that “through positive results and the

acquisitions of new intellectual property, the [IMUC] stock has developed a following" and the possibility of IMUC being "acquired at massive valuations." In discussing IMUC's Phase I, Lidingo stated that "37% of patients with glioblastoma had no signs of recurrence after 44-63 months and all exceeded one year of life following treatment" and "nearly 40% are still alive and well five years later as opposed to 5% with the current standard of care." Lidingo concluded that "[w]hen you compare this data to the fact that only 5% of those diagnosed with glioblastoma live three years disease-free then it's easy to see why investors and physicians are so excited about ICT-107."

171. The article failed to disclose that Lidingo was compensated $25,000 on July 2, 2012 and Singh, in his capacity of IMUC's CEO "provided edits to the article, which were incorporated into the published version." Singh Order, ¶13. Indeed, on July 11, 2012, Singh "sent Bjorlin a new draft with his edits and directed that the writer revise the article accordingly." Lidingo Action, ¶77.

**<u>July 19, 2012 Article</u>**

172. On July 19, 2012, before the market opened, Nichols published an article on Seeking Alpha titled, "New Legislation Speeds Up FDA Approval Process for ImmunoCellular Therapeutics And Other Innovating Therapies" and represented, "I am long IMUC, AAPL." Nichols represented that in the Phase I study, "37% of the patients treated have no signs of glioblastoma brain cancer after

44-63 months (compared to 6% after three years with standard care alone)." As such, Nichols stated that ICT-107 "definitely falls under the category of drugs with considerable improvements over existing therapies."

**July 23, 2012 Article**

173. On July 23, 2012, before the market opened, Nichols published an article on Seeking Alpha titled, "ImmunoCellular Therapeutics: Explaining the Benefits of a Multiple Antigen Targeting Approach" and represented, "I am long IMUC." Nichols represented that IMUC "had the best results in glioblastoma cancer treatment with a 38.5% progression-free survival over a period of three years in a disease where only 6% live three years with standard care alone." Nichols further represented that there are "buy-out rumors" and if Phase II "results are even 25% as good as early trials then it would be awarded an approval and be considered the best treatment in the market."

**August 15, 2012 Article**

174. On August 15, 2012, after the market closed, one day after the filing of the 2Q 2012 10-Q, Nichols published an article titled, “ICT-107 Into Perspective: Part 1” and represented, “I am long IMUC.” Nichols promoted that the “ICT-107's Phase I results are simply amazing: there is nothing else in development or on the market with similar results.” Nichols addressed concerns about the small sample size of Phase I by stating that in his “opinion, this makes

the results even more impressive" and viewed "ICT-107 as a huge positive, with 6 patients still alive after four years, and with only 16 patients tested, which is consistent with standard of care based on 100 patients." Nichols further promoted that he has "no reason to believe that [the ICT 107 Phase II trial] won't at least have 10 patients from 100 achieve similar results, or show significant improvements over [standard of care], and if so, it would be considered the most effective vaccine in the market." Nichols concluded that Phase II results do not "need to be as effective in order to eventually receive an approval from the FDA.... If results from the Phase 2 study are as good as the Phase 1 trial, I believe the approval of ICT-107 could be much sooner than we anticipate."

175. The articles in ¶¶ 153-155, 157-159, 161, 163-164, 166, 168-170, and 172-174, were removed by Seeking Alpha for violating "Seeking Alpha's Terms of Use," for failing (1) to disclose that the authors were compensated by IMUC; and/or (2) to disclose that the articles were part of a paid promotion.

176. The statements in ¶¶ 153-155, 157-159, 161, 163-164, 166, 168-170, and 172-174 were false and misleading as alleged in ¶ 150.

**Singh Abruptly Resigns, Providing the Market with the First Inkling of the Illicit Promotion Scheme and False Statements about ICT-107**

177. On August 20, 2012, after the market closed, the Company filed a Form 8-K ("8-K") announcing that on August 14, 2012, Singh tendered his

resignation and claimed "that he was entitled to severance benefits under the terms of his existing employment agreement." In the 8-K, the Company disclosed that it had terminated Singh's "employment with the Company, including termination as the Company's President and Chief Executive Officer, and disputed any claims for severance benefits for Dr. Singh."

178. On August 21, 2012, a blogger, Larry Smith ("Smith"), who Plaintiffs presumed is unrelated to Defendants, posted an article questioning Singh's resignation and defendants' public statements regarding ICT-107. Smith stated that based on the "8-K, there was a disclosure that there is a disagreement regarding whether Mr. Singh is entitled to severance, which implies that he may have been forced to resign."

179. Smith further questioned that there may be inconsistencies in the Company's statements concerning the number of patients actually enrolled in the Phase I clinical trial:

> [B]loggers raised questions that patients who were reported as being enrolled in the phase I trial were actually patients who were screened for enrollment. If so, this would appear to overstate the number of patients enrolled.

180. On August 21, 2012, analysts at Cowen and Company ("Cowen") similarly wrote in an analyst report that the 8-K "disclosed that there's disagreement between the two parties regarding whether the former CEO is titled

to severance, which makes it like this wasn't a truly voluntary departure." Cowen also noted whether Singh's sudden resignation had "'anything to do with data or trial conduct, either Phase I or Phase II'" and cautioned IMUC investors to "consider any and all scenarios, from the worst case scenario to the most benign" as "it is very hard to get the absolute truth from either party, due to liability and personal reputation concerns."

181. Although investors did not yet had specific knowledge of Singh's participation in the illegal stock promotion scheme, his (i) resignation and termination, and (ii) dispute with respect to his entitlement to severance benefits, caused uncertainty in the market and among IMUC investors that Singh had acted illegally, causing IMUC's stock price to decline.

182. As a result of Singh's surprise termination, IMUC shares declined more than 16% and closed at $2.43 per share on August 21, 2012. As the market continued to digest Singh's termination and Cowen's analyst report, IMUC shares declined an additional 5% on August 22, 2012, to close at $2.30 per share, compared to gains of 0.9% and 0.8% for Agenus and NBI; and a decline of 1.5% for Cytokinetics.

183. On August 16, 2013, after the market closed, the Company filed the 2013 Proxy with the SEC where it disclosed that Singh did not receive any severance benefits from his termination of employment as the Company's CEO

and President. The denial of severance benefits to Singh strongly suggested to IMUC investors that he was terminated for cause which would not have titled him to severance benefits, consistent with his 2010 Employment Agreement.

184. Even if Yu and Fractor had not known prior to August 2012 of Singh's illegal stock promotion, there is a strong inference that they learned these true facts in the period leading up to and following Singh's resignation based on their critical roles in the management of IMUC. In a small company with only five employees, there is a reasonable inference that Yu, the co-founder, Chairman of the Board and Chief Scientific Officer of IMUC had a dominant presence and control over IMUC. Fractor, as the Company's CFO, it was part of his employment to identify any internal control and disclosures issues, illegal activities in the Company, and any illegal payments to third parties.

### E. Materially False and Misleading Statements and Omissions Made in Company Press Releases and SEC Filings During the Class Period

185. As alleged herein, prior to and throughout the Class Period, the Individual Defendants were in possession of clinical trial data and studies showing that ICT-107, when viewed in the proper context, lacked the clinical efficacy to support the Individual Defendants' optimism of the vaccine's success at Phase II. In fact, even the authors of the Phase I study results admitted that "[a]lthough it is possible that with further follow-up some of these metrics [observed in the Phase I

study] may [have] reached significance, [the Phase I study] continue[d] a predominant trend of poor correlation of immune and survival metrics in cancer vaccine trials." *Phase I Trial of a Multi-Epitoope-Pulsed Dendrkitic Cell Vaccine for Patients with Newly Diagnosed Glioblastoma*, Sunrasak Phuphanic, et. al., at 131. Yet despite the unlikelihood of Phase II success for ICT-107, the Individual Defendants regularly and repeatedly misrepresented the Phase I results as "impressive" and "very encouraging" in an effort to further the narrative that ICT-107 was on the verge of a breakthrough.

186. These material misstatements and omissions created the false impression that the Company would ultimately succeed in its Phase II trial of ICT-107 and continue forward towards FDA approval. This false impression caused the Company's stock price to be artificially inflated throughout the Class Period.

**<u>May 14, 2012 Form 424(b)(3) Prospectus</u>**

187. On May 14, 2012, the Company filed with the SEC a Prospectus pursuant to Rule 424(b)(3) wherein the Company offered more 13 million shares of IMUC common stock for sale. In this prospectus, the Company stated:

> In 2010, ***we completed a Phase I clinical trial of ICT-107 to treat newly diagnosed GBM that showed encouraging results***, including progression free survival of 16.9 months and overall survival of 38.4 months. We believe that ICT-107 may also be efficacious in the treatment of recurrent GBM. (Emphasis added).

188. The above statements were materially false and misleading when

made because: (1) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT-107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival, because of the lack of an appropriate control group and the design and the conduct of the study not being aimed at demonstrating efficacy; (2) of the six patients who had survived for four years or more, there was no clear correlation with the presence of immune response to ICT-107, a step necessary for the vaccine to work against GBM; (3) in five of the six patients, an apparently favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; (4) given that promising results in early studies are frequently not confirmed in later, more well-controlled and conducted clinical trials, the Phase I trial results did not indicate that the Phase I results were "encouraging" as Defendants represented; and, thus (5) IMUC's business and prospects were far worse than represented.

189. Further, the Company made a materially misleading and omissive statement regarding the risk factors related to relying on the Company's Phase I ICT-107 data:

> In particular, the results generated in our Phase I trial of ICT-107 covered a small number of patients at a single trial site and may not be indicative of the results that will be obtained in our current multi-center Phase II trial of a new, optimized formulation of ICT-107.

190. This statement was materially false and misleading because the true risk in reliance on the Phase I results did not lie in the small sample size, but rather on the fact that those results failed to account for other genetic markers that made those individuals more likely to respond to standard of care treatments ***whether or not they were also receiving ICT-107***.

191. The Company continued to issue nearly identical materially statements as alleged in ¶¶ 187, 189 in the following prospectuses and Form 8-K, and were materially false and misleading when made as alleged in ¶¶ 188, 190.

i. June 27, 2012 Form 424(b)(3)
ii. Prospectus September 21, 2012
iii. Form S-3 Registration Statement
iv. Exhibit 99.1 to October 18, 2012
v. Form 8-K April 18, 2013 Form 424(b)(5)
vi. Prospectus April 2013 Prospectus Supplement.

**IMUC Receives NYSE MKT Listing**

192. On Friday, May 25, 2012, before the market opened, the Company issued a press release announcing "that its common stock has been approved for listing on the NYSE: MKT" and trading will commence on the NYSE MKT on Wednesday, May 30, 2012. In the press release, Singh stated, "This listing marks an important step in our Company's development by giving us access to a broader

investor base and should provide increased transparency and liquidity for investors owning our stock."

193. The above statements were false and misleading as defendants failed to disclose that IMUC stock volume and qualification for listing with the NYSE MKT was achieved through a fraudulent scheme to pay professional promoters of stock to inflate IMUC stock price and trading volume in order to consummate stock offerings and present IMUC as a viable candidate to potential suitors and third party partners.

**May 31, 2012 Press Release**

194. On May 31, 2012, the Company issued a press release announcing that "it will present new data from the previously completed Phase I clinical trial of ICT-107" at the 2012 Annual Meeting of the American Society of Clinical Oncology (ASCO) in Chicago, IL on June 2, 2012.

195. In the press release, the Company represented that the data from its completed Phase I "will show that there is downregulation of both the tumor associated antigens that ICT-107 is targeting as well as CD-133, a cancer stem cell (CSC) marker, in some of the patients. These observations suggest that targeting antigens highly expressed by CSCs is a promising strategy for treating patients with GBM." The press release further stated "the 16 patients in the Phase I trial...reported overall survival (OS) of 50% after four years and 38% of the trial

patients are progression free (PFS) for 48-66 months." Moreover, IMUC represented that the Phase I results are very favorable "to historic mean OS of 12.1% after four years and 5.6% PFS after 48 months with standard of care."

196. In the press release, Singh commented that the "***continued impressive survival data*** we have seen to date and the timely enrollment in our ongoing Phase II trial, ***further build out confidence that targeting CSCs may provide a breakthrough in the treatment of GBM***."

197. The statements in ¶¶ 195-196 were materially false and misleading when made as alleged in ¶ 188.

**July 25, 2012 Press Release**

198. On July 25, 2012, the Company issued a press release titled "ImmunoCellular Therapeutics Announces Clearance of IND Application for Phase I Study of Company's Second Vaccine Product Candidate in Recurrent GBM" wherein the Company announced that the FDA had given clearance to a physician sponsored investigative new drug application to initiate a Phase I clinical trial of ICT-121.

199. The Company issued this announcement, however, to bolster public perception of ICT-107's past purported success in its Phase I study as an indicator of future success for the Company's immunotherapy vaccines. Specifically, Individual Defendant Singh is quoted as stating:

> "Preclinical studies conducted by IMUC indicate that ICT-121 effectively targets CD-133, a protein that is over-expressed by a very wide range of solid tumors, including glioblastoma, pancreatic, breast, non-small-cell lung cancer, and several other malignancies associated with poor survival and limited treatment options," said Manish Singh, Ph.D., President and CEO of IMUC. ***"Given the highly encouraging survival benefit we have observed to date in GBM patients treated with ICT-107, we are especially eager to continue evaluating this promising immunotherapeutic approach to cancer treatment with this new study of our second vaccine formulation*** — initially in recurrent GBM, and eventually in several other tumor types associated with high CD-133 expression." (Emphasis added).

200. The statements in ¶¶ 198-199 were materially false and misleading when made as alleged in ¶ 188.

**October 17, 2012 Form 424(b)(3) Prospectus**

201. On October 17, 2012, the Company filed with the SEC a Preliminary Prospectus pursuant to Rule 424(b)(3). In this prospectus, the Company stated:

> Of the 16 patients, six continue to survive free of cancer—three for more than four years and three of these patients for more than five years. Less than 10% of newly diagnosed GBM patients treated with only radiation and chemotherapy typically survive more than five years. ***The initial Phase I ICT-107 results appear encouraging, but larger, well-controlled clinical trials will be required to obtain regulatory approval***, in particular compared against approved competitive products and other products further along in development that may be approved prior to the time that the company initiates trials sufficient to support regulatory approval. (Emphasis added).

202. The above statements were materially false and misleading when made as alleged in ¶¶ 188.

203. Further, the Company made a materially misleading and omissive

statement regarding the risk factors related to relying on the Company's Phase I ICT-107 data:

> In particular, the results generated in our Phase I trial of ICT-107 covered a small number of patients at a single trial site and may not be indicative of the results that will be obtained in our current multi-center Phase II trial of a new, optimized formulation of ICT-107.

204. This statement was materially false and misleading as alleged in ¶ 199.

**<u>Exhibit 99.1 to October 18, 2012 Form 8-K</u>**

205. On October 18, 2012, the Company filed with the SEC a Current Report on Form 8-K attached to which as Exhibit 99.1 was an "updated Business Description and Risk Factors," updating pre-Class Period statements made in the Company's annual report for the year ended December 31, 2011 filed with SEC on Form 10-K on March 21, 2012, as well as the Form 10-Q for the quarter ended June 30, 2012, field with the SEC on August 14, 2012. In this exhibit, the Company stated:

> Of the 16 patients, six continue to survive free of cancer—three for more than four years and three of these patients for more than five years. Less than 10% of newly diagnosed GBM patients treated with only radiation and chemotherapy typically survive more than five years. ***The initial Phase I ICT-107 results appear encouraging, but larger, well-controlled clinical trials will be required to obtain regulatory approval***, in particular compared against approved competitive products and other products further along in development that may be approved prior to the time that the company initiates trials sufficient to support regulatory approval. (Emphasis added).

206. The above statements were materially false and misleading when made as alleged in ¶ 188.

207. Further, the Company made a materially misleading and omissive statement regarding the risk factors related to relying on the Company's Phase I ICT-107 data:

> In particular, the results generated in our Phase I trial of ICT-107 covered a small number of patients at a single trial site and may not be indicative of the results that will be obtained in our current multi-center Phase II trial of a new, optimized formulation of ICT-107.

208. This statement was materially false and misleading as alleged in ¶ 190.

209. Finally, the Company materially misrepresented the risks related to the Company's common stock by stating:

> ***The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future.*** If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

- the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;
- the receipt or failure to receive the additional funding necessary to conduct our business;

- selling by large stockholders;
- presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;
- announcements of technological innovations or new commercial products by our competitors or us;
- developments concerning proprietary rights, including patents by our competitors or us;
- developments concerning our collaborations;
- ***publicity regarding actual or potential medical results relating to products under development by our competitors or us;***
- regulatory developments in the United States and foreign countries;
- manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;
- litigation or arbitration;
- economic and other external factors or other disaster or crisis; and
- period-to-period fluctuations in financial results.

> Furthermore, during the last few years, the stock markets have experienced extreme price and volume fluctuations and the market prices of some equity securities continue to be volatile. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes or international currency fluctuations, may cause the market price of shares of our common stock to decline. (Emphasis added).

210. The above statements were false and misleading because this list of

risk factors, like the entirety of the exhibit or SEC filing it sought to supplement, failed to make any mention of the stock promotion scheme orchestrated by the Company's former CEO and the effect such a scheme had and continued to have with respect to artificially inflating the price of IMUC common stock.

**October 2012 Offering**

211. Just a mere two months after the resignation of Singh in August 2012, on October 17, 2012, the Company announced a public offering of "shares of its common stock and warrants." The next day, the Company priced the offering of an aggregate of 10 million shares at $2.10 per share, and five-year warrants to purchase up to an aggregate of 4.5 million shares of IMUC common stock.

212. On October 19, 2012, the Company filed a prospectus supplement on a Form 424B5 ("October 2012 Prospectus Supplement") related to the offering of 10 million shares of common stock at $2.10 per share, and five year warrants to purchase up to an aggregate of 4.5 million shares of IMUC common stock at an exercise price of $2.65 per share. The October 19, 2012 Prospectus Supplement was part of a shelf registration statement on a Form S-3 that the Company filed with the SEC on September 21, 2012 and a prospectus dated October 9, 2012 (collectively, "October 2012 Registration Statement"). The October 2012 Registration Statement was signed by Yu and Fractor. The net proceeds to IMUC from the offering was approximately $19.3 million.

213. IMUC represented in the October 2012 Prospectus Supplement on page S-29 that it "intend[s] to use the net proceeds from this offering for our ongoing clinical development of ICT-107 and for general corporate purposes, including research and development activities for our other product candidates and any future product candidates that we may develop or acquire, as well as for general corporate purposes."

214. IMUC represented in the October 2012 Prospectus Supplement on page S-26 that the following risk factors "may have a significant impact on the market price of our common stock," but failed to disclose the truth about the promotion scheme and its impact on the market price of IMUC common stock:

- the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;
- the receipt or failure to receive the additional funding necessary to conduct our business;
- selling by large stockholders;
- presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;
- announcements of technological innovations or new commercial products by our competitors or us;
- developments concerning proprietary rights, including patents by our competitors or us;
- developments concerning our collaborations;
- **publicity regarding actual or potential medical results relating to products under development by our competitors or us;**

- regulatory developments in the United States and foreign countries;
- manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;
- litigation or arbitration;
- economic and other external factors or other disaster or crisis; and
- period-to-period fluctuations in financial results.

(Emphasis added).

215. The above statements were false and misleading including specifically the statement with respect to "publicity" were materially false and misleading because IMUC and the Individual Defendants either knowingly or recklessly failed to disclose the following facts: (i) that one factor that was affecting the market price of the Company's common stock was that IMUC had paid Lavos and the Lidingo Defendants to issue articles designed to inflate the price of IMUC common stock as part of paid promotion scheme in order to consummate October 2012 Offering; (ii) Singh surreptitiously reviewed, edited, approved and exercised ultimate authority over the materially misleading articles and their content prior to their public dissemination; (iii) the authors used false aliases to publish the Articles, and failed to disclose their material relationship with IMUC; and (iv) as a result of the foregoing, October 2012 Registration Statement was materially false

and misleading at all relevant times.

216. On October 19, 2012, the Company filed with the SEC a Prospectus pursuant to Rule 424(b)(3). In this prospectus, the Company stated:

> ***Results from a single center, uncontrolled Phase I trial with ICT-107 in 16 newly diagnosed GBM patients were very encouraging***: median progression free survival (PFS) was 16.9 months, and median overall survival (OS) was 38.4 months. In comparison, median PFS and OS for the current standard of care in newly diagnosed GBM patients (radiation and chemotherapy) are only 6.9 months and 14.6 months, respectively. Of the 16 patients, six continue to survive free of cancer—three for more than four years and three of these patients for more than five years. Less than 10% of newly diagnosed GBM patients treated with only radiation and chemotherapy typically survive more than five years. ***The initial Phase I ICT-107 results appear encouraging, but larger, well-controlled clinical trials will be required to obtain regulatory approval***, in particular compared against approved competitive products and other products further along in development that may be approved prior to the time that the company initiates trials sufficient to support regulatory approval. (Emphasis added).

217. The above statements were materially false and misleading when made as alleged in ¶ 188.

218. Further, the Company made a materially misleading and omissive statement regarding the risk factors related to relying on the Company's Phase I ICT-107 data:

> In particular, the results generated in our Phase I trial of ICT-107 covered a small number of patients at a single trial site and may not be indicative of the results that will be obtained in our current multi-center Phase II trial of a new, optimized formulation of ICT-107.

219. This statement was materially false and misleading as alleged in ¶ 190.

**<u>November 9, 2012 Form 10-Q Quarterly Report</u>**

220. On November 9, 2012, the Company filed with the SEC a Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2012. In this quarterly report, the Company made a materially misleading and omissive statement regarding the risk factors related to relying on the Company's Phase I ICT-107 data:

> In particular, the results generated in our Phase I trial of ICT-107 covered a small number of patients at a single trial site and may not be indicative of the results that will be obtained in our current multi-center Phase II trial of a new, optimized formulation of ICT-107.

221. This statement was materially false and misleading as alleged in ¶ 190.

**<u>March 5, 2013 Investor Call Regarding 2012 Fourth Quarter Earnings</u>**

222. On March 5, 2013, the Company held its first quarterly conference call with analysts and IMUC's investors. During the call, Gengos represented that during the quarter IMUC "listed on the NYSE MKT and considerably strengthened the balance sheet by raising more than $28 million in two public offerings in January and October, thus expanding our shareholder base and putting us in a position to achieve our near-term milestones." Later in the call, Gengos similarly

represented that "the company completed two equity financings in January and October, which provided $28.6 million net of expenses and the company also received $3.2 million from the exercise of warrants."

223. The above statements were materially false and misleading because IMUC and the Individual Defendants either knowingly or recklessly failed to disclose the following facts: (i) that one factor that was affecting the market price of the Company's common stock was that IMUC had paid Lavos and the Lidingo Defendants to inflate the price of IMUC common stock as part of paid promotion scheme in order to conduct the January and October offerings; (ii) Singh surreptitiously reviewed, edited, approved and exercised ultimate authority over the materially misleading articles and their content prior to their public dissemination; and (iii) the authors used false aliases to publish the Articles, and failed to disclose their material relationship with IMUC.

224. On that call, Gengos also represented:

> Here's what I saw when I was considering joining ImmunoCellular late last year. First, there's a great team. ***Next we had quite provocative data in the Phase I trial of ICT-107, which I found validating for progressing to Phase II and thought-provoking in terms of what we could potentially see from this ongoing trial and where this program could lead with respect to the potential to bring this to market ourselves.*** (Emphasis added).

225. The above statements were materially false and misleading when made as alleged in ¶ 188.

**March 11, 2013 Form 10-K Annual Report**

226. On March 11, 2013, the Company filed with the SEC an Annual Report on Form 10-K for the year ended December 31, 2012. In this annual report, the Company stated:

> ***The initial Phase I ICT-107 results appear encouraging, but larger, well-controlled clinical trials will be required to obtain regulatory approval***, in particular compared against approved competitive products and other products further along in development that may be approved prior to the time that the company initiates trials sufficient to support regulatory approval. (Emphasis added).

227. The above statements were materially false and misleading when made as alleged in ¶ 188.

228. Further, the Company made a materially misleading and omissive statement regarding the risk factors related to relying on the Company's Phase I ICT-107 data:

> In particular, the results generated in our Phase I trial of ICT-107 covered a small number of patients at a single trial site and may not be indicative of the results that will be obtained in our current multi-center Phase II trial of a new, optimized formulation of ICT-107.

229. This statement was materially false and misleading as alleged in ¶ 190.

**March 18, 2013 Presentation by Individual Defendant Gengos on Behalf of IMUC at the Roth Conference**

230. On March 18, 2013, Individual Defendant Gengos, on behalf of the

Company, presented at the 25th Annual ROTH Conference hosted by Roth Capital Partners. During that presentation, Individual Defendant Gengos stated:

> To give you a sense here, we found of these 16 patients the median survival for our population was roughly 38 months. Now this is an open label uncontrolled trial so the only comparison you can make is to a historical control. There's sort of a standard historical control people use as a trial roughly 600 patients, it was the Schering-Plough trial to get [TEMAZOL] approved. And in that, in the paper that talks about that trial you can find a group of 113 patients that received surgery and were fully resected and chemo and radiation therapy.
>
> So that is as close to our control using historical controls we can get. And you can see that was around 19 months of survival.
>
> ***So the difference here, again, this is not a in trial difference but the difference with the historical control was easily enough for us to get excited about running a Phase II and then there was some provocative points that you know we still have five or six patients that are living after five years without progression.*** (Emphasis added).

231. The above statements were materially false and misleading when made as alleged in ¶ 188.

**<u>April 26, 2013 Controlled Equity Offering</u>**

232. On April 18, 2013, the Company filed a Form 8-K with the SEC, announcing that it had entered into the Sales Agreement with Cantor where the Company "may offer and sell, from time to time through Cantor, shares of our common stock" with an aggregate offering price of up to $25 million. Under the Sales Agreement, "Cantor may sell Shares by any method permitted by law and

deemed to be an "'at-the-market'" offering, but IMUC "may instruct Cantor not to sell Shares if the sales cannot be effected at or above the price designated by us from time to time."

233. In connection with the Sales Agreement, on April 26, 2013, the Company filed a prospectus supplement on a Form 424B5 dated April 18, 2013 ("April 2013 Prospectus Supplement"), related to an offering to sell up to $17 million of shares of IMUC common stock.[27] The April 2013 Prospectus Supplement was part of a prospectus dated October 9, 2012 and a shelf registration statement on a Form S-3 filed with the SEC on September 21, 2012 (collectively, "April 2013 Registration Statement"). The April 2013 Registration Statement was signed by Yu and Fractor.

234. In the April 2013 Prospectus Supplement on page S-7, the Company represented that it "intend[s] to use the net proceeds from this offering for our ongoing clinical development of ICT-107 and ICT-140, to fund the clinical development of ICT-121, as well for general corporate purposes."

235. The April 2013 Prospectus Supplement on page S-5 incorporated by

[27] The April 2013 Prospectus Supplement was filed as a clarification to a prospectus supplement filed on April 18, 2013 where IMUC originally stated that the Sales Agreement with Cantor was "an aggregate offering price of up to $25 million." The April 2013 Prospectus Supplement was filed to "clarify that we initially intend to offer and sell shares of our common stock having an aggregate gross sales price of up to $17 million pursuant to the sales agreement entered into on April 18, 2013 with Cantor Fitzgerald & Co."

reference the "Risk Factors" contained in the Form 10-K 2012 on page 26, such as the representation that "publicity regarding actual or potential medical results relating to products under development by our competitors or us" "may have a significant impact on the market price of our common stock" and possible fluctuations in its stock price as alleged in ¶ 214, but failed to disclose the truth about the promotion scheme and that it may have significant impact on the market price of IMUC common stock.

236. As represented in the Company's Form 10-Q for the third quarter ended September 30, 2013, by the end of September 30, 2013, IMUC had sold 1,862,142 shares of its common stock under the Sales Agreement that resulted in gross proceeds to the Company of $4,906,078, less offering expenses of approximately $338,000.

**May 9, 2013 Conference Call**

237. On May 9, 2013, the Company held a conference call to discuss its third quarter ended March 31, 2013. On the call, Fractor represented that under the Sales Agreement, "the company may sell shares of its common stock having an aggregate offering price of up to $25 million, of which $17 million of shares has been registered with the Securities and Exchange Commission. The company will control the timing and number of shares to be sold under this [Sales] arrangement."

**November 6, 2013 Conference Call**

238. On November 6, 2013, the Company held a conference call to discuss its third quarter ended September 30, 2013. On the call, Gengos represented that in the third quarter, IMUC "made judicious use of our controlled equity offering and raised $4.5 million." Gengos further stated that the Sales Agreement with Cantor was "a useful financial tool" and the Company will "continue to use this tool carefully based on our company's needs and market conditions."

239. The statements in ¶¶ 235, 237-238 were materially false and misleading because IMUC and the Individual Defendants either knowingly or recklessly failed to disclose the following facts: (i) that one factor that was affecting the market price of the Company's common stock was that IMUC had paid Lavos and the Lidingo Defendants to issue articles designed to inflate the price of IMUC common stock as part of paid promotion scheme in order to enter into the Sales Agreement with Cantor; (ii) Singh surreptitiously reviewed, edited, approved and exercised ultimate authority over the materially misleading articles and their content prior to their public dissemination; (iii) the authors used false aliases to publish the Articles, and failed to disclose their material relationship with IMUC; and (iv) as a result of the foregoing, April 2013 Registration Statement was materially false and misleading at all relevant times.

**August 7, 2013 Investor Call Regarding 2013 Second Quarter Earnings**

240. On August 7, 2013, the Company hosted is Second Quarter 2013 Financial results Conference Call with analysts and investors. On this call, Individual Defendant Gengos stated:

> Here's some insight into how we will be thinking about the results of the trial and those potential next steps. ***The Phase II trial is randomized and controlled and is designed as an exploratory trial that will build upon our understanding of ICT-107 safety and efficacy profile from the Phase I trial. The Phase I trial was highly suggestive of ICT-107's potential positive therapeutic benefit***, but it was a small uncontrolled trial conducted at a single investigational center. So, we expect to learn a lot more about ICT-107 from the Phase II trial, which will inform how we approach talking with the FDA in an end of Phase II meeting and how we could design a Phase III registration program.

241. The above statements were materially false and misleading when made as alleged in ¶ 188.

242. Prior to and during the Class Period, IMUC was required under the federal securities laws to represent in its SEC filings whether IMUC's disclosure controls and procedures were effective.

243. Instead of admitting that its controls and procedures were defective in failing to disclose the stock promotion scheme to the market, IMUC consistently represented prior to and during the Class Period in its Form 10-Qs that its "disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we filed…is recorded, processed,

summarized and reported or submitted within the time period specified in the rules and forms of the SEC" and "disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit…was accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure." Form 10-Q 1Q 2012, at 18-19; Form 10-Q 2Q 2012, at 27; Form 10-Q 3Q 2012, at 26; Form 10-Q 1Q 2013, at 25; Form 10-Q 2Q 2013, at 24; Form 10-Q 3Q 2013, at 25.

244. Furthermore, as part of the Company's controls and procedures, its Form 10-Ks consistently represented that IMUC maintained "disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file with the SEC." In addition, IMUC represented that as part of its "evaluation, under the supervision and with the participation of our management," "our principal executive and financial officers concluded that our disclosure and controls and procedures were effective." Form 10-K 2011, at 37; Form 10-K 2012, at 36.

245. Prior to and during the Class Period, the Individual Defendants signed the Company's SEC filings. Specifically, Singh signed Form 10-K for year 2011; and Form 10-Qs for the first and second quarterly periods of 2012. Yu signed Form 10-Ks for years 2011 and 2012; and the Form 10-Q for the quarterly period

ended September 30, 2012. Fractor signed Form 10-Ks for years 2011 and 2012; and the Form 10-Qs for the quarterly periods in 2013. Gengos signed Form 10-K for year 2012; and the Form 10-Qs for the quarterly periods in 2013.

246. The Individual Defendants consistently signed respective certifications pursuant to SOX in IMUC's respective Form 10-Ks and 10-Qs prior to and during the Class Period, representing that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

247. Specifically, Singh signed SOX certifications for the Form 10-K for year 2011; and Form 10-Qs for first and second quarterly periods 2012. Yu signed SOX certifications for Form 10-Q for the third quarter ended September 30, 2012. Fractor signed certifications for the Form 10-Ks for year 2011 and 2012; and Form 10-Qs for the quarterly periods in 2012 and 2013. Gengos signed certifications for the Form 10-K for year 2012; and Form 10-Qs the quarterly periods in 2013. Yu, Fractor and Gengos continued to sign the same SOX certifications even after Singh resigned. Given the large amount of money that IMUC had paid to Lidingo and the circumstances of Singh's resignation, each of the Individual Defendants either knew or but for their deliberate recklessness would have known of Singh's illegal

stock promotion scheme and the falsity of their own certifications.

248. In the Company's Form 10-K for year 2011, IMUC represented its "general and administrative expenses for the years ended December 31, 2011 and 2010 were $2,446,757 and $2,035,526 respectively. ***The increase in general and administrative expenses is primarily due to increased personnel costs, investor relations expenditures and professional fees.***" (Emphasis added).

249. In the Company's Form 10-K for year 2012, IMUC represented that its "general and administrative expenses for the years ended December 31, 2012 and 2011 were $3,619,291 and $2,446,757 respectively. ***During the latter half of 2011, we incurred additional expenses in the area of investor relations, travel, personnel, board and professional fees to expand our infrastructure. During 2012, our expenses in these continued to increase***." (Emphasis added).

250. The Company's representations about its general and administrative expenses in the Form 10-Ks for years 2011 and 2012 were materially false and misleading IMUC and defendants either knowingly or recklessly failed to disclose the facts that the increase in the Company's general and administrative expenses were a result of IMUC making illegal payments to Lavos and/or Lidingo in connection with the promotion scheme. As a result of the foregoing, the SOX certifications signed by Singh and Fractor in the Form 10-K for year 2011; and the SOX certifications signed by Yu and Fractor in the Form 10-K for year 2012 were

false and misleading as they failed to disclose "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

251. As stated in the Form 10-Ks for years 2011 and 2012, the Company's "Board of Directors has adopted a code of ethics covering all of our executive officers and key employees" and its "code of ethics is available on our website www.imuc.com."

252. Under IMUC's Code of Business Conduct and Ethics28 ("Code"), all IMUC's executive officers including the Individual Defendants and key employees were required "to ensure full, fair, accurate, timely and understandable disclosure in the reports and other documents that we file with, or otherwise submit to, the SEC and in the press release and other public communications that we distribute." IMUC's Code mandates the Company's compliance with the federal securities laws' disclosure controls and procedures requirements.

253. The Code "requires the Company to maintain 'disclosure controls and procedures,' which are controls and other procedures that are designed to ensure that financial information and non-financial information that is required to be disclosed by us in the reports that we file with or otherwise submit to the SEC:

---

[28] http://files.shareholder.com/downloads/AMDA-1HS8HT/4882178131x0x621897/1118A3E3-F756-4FA6-A861-FF6C7A9057CF/Code_of_Business_Conduct_and_Ethics.pdf

> (i) is recorded, processed, summarized and reported within the time periods required by applicable federal securities laws, rules and regulations and (ii) is accumulated and communicated to our management, including our President or Chief Executive Officer and CFO, in a manner allowing timely decisions by them regarding required disclosure in the reports.

254. In IMUC's Form 10-K 2011, on pages 28-29, the Company represented certain risks related to its common stock and possible fluctuations in its stock price including infrequencies of trading in IMUC common stock "and in low volumes on the OTC Bulletin Board, meaning that the number of persons interested in purchasing our common shares at or near bid prices at any given time may be relatively small or non-existent," but IMUC failed to disclose known material risks that the paid promotion scheme would have a on the Company's growth and prospects.

255. IMUC continued to represent certain risk factors that "may have a significant impact on the market price of our common stock," but failed to disclose that the Articles were part of a promotion scheme and its impact on the market price of IMUC common stock. Indeed, in the Company's Form 10-Q 3Q 2012 on page 38; Form 10-K for year 2012 on page 26; Form 10-Q 1Q 2013 on page 26; Form 10-Q 2Q 2013 on page 25; and Form 10-Q 3Q 2013 on page 26 (the Form 10-Qs incorporated by reference risk factors in the Form 10-K for year 2012); IMUC made similar representations as alleged in ¶ 214 including "publicity

regarding actual or potential medical results relating to products under development by our competitors or us," but failed to disclose the truth about the promotional scheme and its impact on the market price of IMUC common stock.

256. The statements in the Company's Form 10-Ks and 10-Qs, ¶¶ 243-247, 252-255 were materially false and misleading because IMUC and the Individual Defendants either knowingly or recklessly failed to disclose the following facts: (i) that one factor that was affecting the market price of the Company's common stock was that IMUC was paying Lavos and the Lidingo Defendants to issue articles designed to inflate the price of IMUC common stock; (ii) Singh directly edited and authorized the Articles; (iii) the authors used false aliases to publish the Articles, and failed to disclose their material relationship with IMUC; (iv) IMUC's controls and procedures were defective in preventing and detecting the paid promotion scheme; (v) IMUC's SOX certifications were materially false and misleading at all relevant times; and (vi) IMUC's representations with respect to IMUC's Code were materially false and misleading at all relevant times.

**F. <u>The Truth Further Emerges</u>**

257. On December 11, 2013, after the market closed, the Company issued a press release, disclosing that its ICT-107 Phase II study failed to meet the "gold standard primary endpoint of overall survival" as the intent-to-treat population did not reach statistical significance with respect to OS. The reported Phase II trial

results revealed the truth which respect to the biased, purportedly independent, research Articles that had been posted on Seeking Alpha and other investor websites by the participants in the scheme. In fact, the Phase I test results were not "spectacular" and were not indicative of anticipated success for the Phase II study.

258. In an effort to further deceive investors, the Company emphasized the secondary endpoint, progression-free survival where there purportedly was a statistical significance. Indeed, IMUC initially announced that the Phase II test results "demonstrated a statistically significant increase progression-free survival (PFS) in patients with newly diagnosed GBM."

259. Later in the day, IMUC held an analyst conference call where Gengos attempted to minimize the fact that the Company failed to meet the oncology field's gold standard of overall survival by stating that he expected the FDA to "be quite interested in the [progression-free survival] data and the safety data. And to the extent that we have any more mature [overall survival] data I think that they would take it into consideration albeit in a post-hoc way."

260. On December 11, 2013, an article titled "ImmunoCellular Tanks After Cancer Vaccine Flops on Key Endpoint in PhII," on FierceBiotech reported that the Company's "effort to keep the focus on PFS didn't stand a chance once the company's release acknowledged that the improvement in overall survival, still the gold standard in cancer and the primary endpoint of the study, didn't measure up to

a significant response."

261. On December 12, 2013, analysts continued to question the Phase II study. An analyst at MLV & Co. downgraded IMUC common stock to "hold" from "buy" and noted, "The bottom line is that the trial was a failure because overall survival is the gold standard endpoint." An analyst at Roth Capital Partners was "disappointed with the results and they represent a major disconnect with the Phase I data" and left "more questions than answers from Phase II."

262. On the results of the Phase II, IMUC common stock declined $1.62 per share or nearly 60%, to close at $1.10 per share on December 12, 2013.

### G. Post Class-Period Disclosures

263. IMUC's stock price continued to decline after December 2013 as the Company sought unsuccessfully to raise financing for a Phase III study. In fact, on November 21, 2016 IMUC split its stock 1 to 40 to maintain prices requirements for listing on the NYSE MKT. By early April 2017, IMUC stock was trading below $3.00 per share even post-split.

264. On March 30, 2016, after the market closed, the Company disclosed in a press release that it had "agreed in principle with the SEC on a proposed settlement framework to an investigation related principally to its former Chief Executive Officer involving conduct between November 2011 and August 2012." In addition, the Company disclosed that the "proposed settlement also involves the

adoption of certain corporate governance amendments to the Company's policies and practices, in particular as it relates to the retention of investor relations and public relations firms."

265. On March 9, 2017, the Company filed a Form 10-K for the year ended December 31, 2016. In the Form 10-K, the Company disclosed that on December 8, 2016, IMUC "signed an offer of settlement with the SEC related to an investigation principally of a former Chief Executive Officer involving conduct between November 2011 and August 2012 ***regarding the publication of articles without disclosing that they were paid for by us or investor relations firms hired by us***." (Emphasis added).

266. On April 10, 2017, the SEC announced enforcement actions against certain individuals and entities "behind various alleged stock promotion schemes" involving public companies including IMUC. According to the SEC, the schemes involved public companies hiring "promoters or communications firms to generate publicity for their stocks, and the firms subsequently hired writers to publish articles that did not publicly disclose the payments from the companies." Next, the "writers allegedly posted bullish articles about the companies on the internet under the guise of impartiality when in reality they were nothing more than paid advertisements." Many of the articles "specifically included false statements that the writers had not been compensated by the companies they were

writing about." The schemes "left investors with the impression they were reading independent, unbiased analyses on investing websites while writers were being secretly compensated for touting company stocks."

267. In connection with IMUC, the SEC instituted four separate cease-and-desist orders against IMUC; Ramey; French; and Singh and Lavos. As part of the cease-and-desist order against Singh, he agreed to pay a disgorgement of $1,750,000 for his engagement "in a paid stock-touting scheme involving 12 issuers [including IMUC], at least 10 writers, over 400 internet publications, and the distribution of emails to thousands of potential investors." Singh Order, 2. As part of the scheme, Singh, acting as IMUC's CEO, "edited and approved articles, directed writers should publish articles and directed when and where those articles should be published" and "directed and oversaw Lidingo's work for" IMUC including directing "that Lidingo not use writers who disclosed compensation." Id. at ¶¶ 7-8; IMUC Order, ¶7.

268. The cease-and-desist order against IMUC alleged that "[n]one of the over 50 articles disclosed the writers' or Lidingo's compensation from IMUC or otherwise suggested that the articles were part of a paid promotion" and thus, the "failure to disclose IMUC's payments for the promotional articles describing its securities was material because it suggested that views contained in the articles were objective and independently formed." IMUC Order, ¶¶5; 10. As a result,

the SEC concluded that "IMUC violated Sections 17(a)(1) and (3) and Exchange Act Section § 10(b) and Rules 10b-5(a) and (c) thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities." Id. ¶12.

269. In addition, the SEC ordered French to pay $38,205 in disgorgement, prejudgment interest and a civil penalty for his role in publishing "purportedly independent articles describing securities" including IMUC "without disclosing that they were paid promotions." French Order, at 2. Similarly, the SEC ordered Ramey to pay $62,538 in disgorgement, prejudgment interest and a civil penalty for publishing articles "that purported to be independent when, in fact they were paid promotions." Ramey Order, at 5.

270. The SEC also filed a lawsuit against the Lidingo Defendants alleging that they "engaged in a scheme to promote the stock of public companies [including IMUC] without disclosing compensation they received for the promotion directly or indirectly from the issuers, and in many instances, by falsely stating they had not received any compensation." Lidingo Action, ¶3.

271. On this news, IMUC common stock declined $0.13 per share (post-split) or nearly 5%, to close at $2.57 per share on April 11, 2017.

## V. SCIENTER ALLEGATIONS

272. As alleged herein, each of the Defendants acted with scienter in that

they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company or with the Company's assent and approval through its agents were materially false and misleading, knew or acted with deliberate recklessness in disregard that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

### A. Manish Singh

273. During the Class Period, Manish Singh was: (i) the CEO of IMUC; (ii) the day-to-day manager and controller of Lavos; and (iii) an absolute authority over Lidingo.

274. Under his arrangement with Bjorlin/Lidingo, Singh performed day-to-day promotional work, including interfacing with writers, coordinating and authorizing publications, providing ideas for articles, and editing articles.

275. Singh had final authority over the content, location and timing of all articles that were published.

276. Of the 50 articles promoting IMUC prior to and during the Class Period, none contained a disclosure indicating the writer, or person identified in the byline, had been compensated or the amount of his compensation.

277. This lack of disclosure was purposeful and orchestrated by Singh,

Bjorlin, and Hodge, as evidenced by communications prior to and throughout the Class Period. For example, in October 2011, a writer hired by Lidingo to write an article about IMUC on Seeking Alpha disclosed in the article that he had been paid. Bjorlin subsequently referred to this author in an April 17, 2012 email to Singh as "the idiot we used in the beginning, he will NOT post a disclosure again," making similar comments about the writer in an email to Singh on August 7, 2012 and in January 2013.

278. Singh was also a strong proponent of the use of pseudonyms, encouraging Lidingo to use such when publishing articles ghost-written by other Lidingo writers and even going as far as to provide approval for which identity each should be published under. *See supra*, ¶¶ 91-92.

279. As he was the CEO of IMUC (then a Lidingo client), Singh sought to disguise his involvement in promotional work by, among other ways, having IMUC contract with Lidingo instead of Lavos, or by signing the name of his wife (who was named as managing member and sole principal in the Lavos's registration papers, but who had no operational role within the company) to Lavos contracts. Others, too, made efforts to keep Singh's involvement in Lidingo's promotional schemes a secret, with Lidingo employees referring to Singh as "Charlie" when communicating about him – an identity that morphed into the "Charles Pelikan" moniker Singh adopted for promotional work beginning in 2013.

280. Despite his best efforts to conceal his involvement in the promotional scheme, Singh made no secret about his intention in pushing these articles, commenting in email on February 8, 2012 that a Lidingo's writer's idea for an article on IMUC was a ***"[v]ery good idea as I think it would move these stocks***" (emphasis added) and suggesting that IMUC be the second company mentioned in the article's discussion. That article would ultimately be published on Seeking Alpha eight days later with IMUC appearing as the second company discussed, as instructed by Singh.

281. Further, in April 2012, Bjorlin emailed Singh a list of potential writers for approval for use in the stock promotion scheme of IMUC and other clients of Lidingo and Lavos. With respect to one writer, Bjorlin disqualified him from participation on the basis that "he wants to disclose as he is a CFA. No disclosures allowed." Singh confirmed Bjorlin's assessment in his April 17, 2012 response, confirming this writer to be a "no" while also instructing Bjorlin to only try another potential writer "if no disclosure."

282. In another brazen exchange that directly acknowledged the risk writers were undertaking without disclosing compensation, in early February 2013, Bjorlin emailed Singh about a writer who had stated he would disclose compensation, stating that he "will NOT write [without] disclosure, you sure he used to write for pay?" Singh replied: "he has been spooked by [a promoter with

whom he previously worked] that the SEC may monitor him so he will never agree to anything not proper in writing. Unless we get to know him he won't [sic] write."

283. Through his participation in the stock promotion schemes of Lavos and Lidingo, Singh received at least $1.75 million in cash and equity, with much of this compensation coming from IMUC and LBIO – the two companies he served as CEO when originally retaining Lidingo in two separate contracts. *See* Singh Order, at 2; ¶22.

284. On August 20, 2012, the Company filed with the SEC a Form 8-K announcing the resignation of Singh from his post as Chief Executive Officer, President, and a director of the Company.

285. On August 15, 2012, just one day after Singh tendered his resignation, IMUC made its last payment to Lidingo and an article was published by Brian Nichols on Seeking Alpha titled "ICT-107 Into Perspective Part 1." This article, like every IMUC-sponsored article before it, omitted any reference to the receipt of payment for its publishing and affirmatively misrepresented that no payment had been received. There is a strong, reasonable inference that this last payment on August 15, 2012 was paid by one of the other defendants as it was post Singh's August 14 resignation.

286. The suspicious timing of defendant Singh's "resignation," along with

the final payment from IMUC to Lidingo being made so closely thereafter and a halting to Lidingo-authored articles about the Company are all probative of Singh's scienter.

287. Further, the Company's reference to a dispute regarding Singh's entitlement to severance payment further creates an inference of scienter related to the bad acts alleged herein. Indeed, a review of the compensation information provided in the 2013 Proxy shows that, for 2012, Singh received only a salary of $202,781, comprised of "$26,250 per month for the period January 1, 2012 to March 31, 2012 and $27,563 for the period April 1, 2012 to August 15, 2012 per month for services rendered to us as President and Chief Executive Officer." Thus, he did not receive the benefit of any 60-day notice period of continued employment and instead, his roles with the Company were immediately halted and pay stopped.

288. Further, the 2013 Proxy also shows that the Company made no severance payments to defendant Singh, indicating that he was unsuccessful in his assertion of a good cause reason for resignation, creating a further inference that such resignation was not voluntary and instead was the reaction of the Board to the actions of Singh, as alleged herein:

*Severance benefits*. The following chart presents our estimates of the dollar values of the benefits to which each of the named executive officers would have been entitled had his employment terminated by us under the circumstances described above without cause or by the executive for good reason (other than in connection with a change of control) on December 31, 2012:

| | Termination by the Company Without Cause or Involuntary Termination for Good Reason | | |
|---|---|---|---|
| Name | Salary Continuation ($) (1) | Continuation of COBRA ($) | Total ($) |
| Andrew Gengos | $ 400,000 | $ 26,352 | $426,352 |
| John Yu, MD | $ — | $ — | $ — |
| David Fractor | $ — | $ — | $ — |
| James Bender | $ 188,000 | $ — | $188,000 |
| Manish Singh (2) | $ — | $ — | $ — |

(1) Amounts in this column are based upon salary in effect as of December 31, 2012.
(2) Dr. Singh resigned from the Company on August 14, 2012. Amounts for Dr. Singh represent the actual amounts received in connection with his resignation.

289. Besides the obvious monetary kickback Singh received from Lidingo as a result of engaging that Company to assist IMUC (IMUC paid Lidingo, who, in turn, paid Singh through Lavos for his "assistance"), Singh was also motivated by his own incentive structure at IMUC that used the Company's market capitalization as a trigger for the vesting of Singh's stock options.

290. According to the 2012 Proxy, Singh was given several option grants that included market capitalization triggers:

- Awards during 2010, then valued at $332,289 that included: (i) a seven-year option to purchase 600,000 shares of our common stock granted February 10, 2010 at an exercise price of $0.90 per share, vesting monthly over a one-year period following the date of grant, ***(ii) a seven-year option to purchase 30,000 shares of our common stock granted February 10, 2010 at an exercise price of $0.90 per share, vesting if our stock maintains a price of at least $1.60 for 15 consecutive trading sessions,*** (iii) a seven-year option to purchase 20,000 shares of our common stock granted February 20, 2010 at an exercise price of $0.90 per share, vesting if we enroll our first patient in a phase 2 clinical trial, (iv) a seven-year option to purchase 30,000 shares of our common stock granted on September 27, 2010 at an exercise price of $0.62, vesting quarterly over a one-year period following the date of grant, (v) a seven-year option to purchase 90,000

shares of our common stock granted on April 4, 2011 at an exercise price of $2.25 per share, vesting semi-annually following the date of grant, ***(vi) a seven-year option to purchase 50,000 shares of our common stock granted on April 4, 2011 at an exercise price of $2.25 per share, vesting if our stock achieves a market capitalization of at least $100 million for a period of ten consecutive trading days, (vii) a seven-year option to purchase 50,000 shares of our common stock granted on April 4, 2011 at an exercise price of $2.25 per share, vesting if our stock achieves a market capitalization of at least $150 million for a period of ten consecutive trading days and (viii) a seven-year option to purchase 50,000 shares of our common stock at an exercise price of $2.25 per share, vesting if our stock achieves a market capitalization of at least $200 million for a period of ten consecutive trading days***; and

- A 2009 award, then valued at $222,500, that included: (i) a seven-year option to purchase 300,000 shares of our common stock granted February 18, 2009 at an exercise price of $0.15 per share, vesting monthly over a one-year period following the date of grant, (ii) a seven-year option to purchase 360,000 shares of our common stock granted February 18, 2010 at an exercise price of $0.90 per share, vesting monthly over a one-year period following the date of grant, ***(iii) a seven-year option to purchase 240,000 shares of our common stock granted February 18, 2010 at an exercise price of $0.90 per share, vesting in certain increments if we achieve during the term of the agreement (a) vesting of 30,000 shares for a volume weighted average trading price for our common stock of greater than $1.60 for any 15-day period during the term of the agreement on average daily trading volume of at least 20,000 shares, or (b) vesting of 90,000 shares for a volume weighted average trading price for our common stock of greater than $2.00 for any 15-day period during the term of the agreement on average daily trading volume of at least 20,000 shares***, or (c) vesting of 30,000 shares for treating the first patient in a phase II clinical trial, or (d) vesting of 90,000 shares if the Corporation completes a financing, a strategic alliance or licensing agreement with upfront licensing payments to the Corporation or a merger or acquisition that generates at least $5,000,000 of net proceeds, for services rendered as President and Chief Executive Officer.

291. Thus, for 2010, of the 200,000 option shares awarded to Singh contingent on a triggering factor for vesting, only 10% (200,000 shares that would vest only upon enrollment of the Company's first patient in a phase 2 clinical trial) were contingent on the Company's performance as a pharmaceutical Company. The remaining 180,000 awarded during 2010 were based on the Company's market capitalization and stock price, providing Singh the motive necessary to engage with Lidingo in the illegal stock promotion scheme.

292. This was similar for the awards granted in 2009, where 50% of his contingent option awards were based on the Company's volume weighted average trading price, as compared to just 12.5% that were contingent on the Company's pharmacological successes, and the remaining contingent on the Company securing a financing, strategic alliance, or licensing agreement.

293. Further, as CEO of the Company at the time the analysis of the Phase I clinical data for ICT-107 was completed, defendant Singh had actual knowledge that: (1) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT-107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival, because of the lack of an appropriate control group and the design and the conduct of the study not being aimed at demonstrating efficacy; (2) of the six patients who had survived for four

years or more, there was no clear correlation with the presence of immune response to ICT-107, a step necessary for the vaccine to work against GBM; (3) in five of the six patients, an apparently favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; (4) given that promising results in early studies are frequently not confirmed in later, more well-controlled and conducted clinical trials, the Phase I trial results did not indicate "impressive survival data" and yield "encouraging" results, as defendant Singh touted; and, thus (5) IMUC's business and prospects were far worse than represented.

294. These allegations support a strong inference of defendant Singh's scienter, as they show that Singh: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); (iii) knew these articles did not contain the required paid disclaimers; (iv) knew that the Phase I ICT-107 results were not nearly as positive or "encouraging" as he led the investing public to believe; and (v) knew that Lidingo-published articles were misrepresenting the Phase I ICT-107 clinical data. Additionally, Singh's efforts to coordinate with Bjorlin so as to hire only those writers that

would not disclose the receipt of payments, even in the face of SEC and Seeking Alpha policy concerns, supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper. Further, Singh's continuous efforts to keep his involvement in the promotional schemes further supports an inference of scienter.

**B. <u>David Fractor</u>**

295. At various points throughout the Class Period, Fractor was just one of a small group of Company executive officers, along with Singh, Yu, Gengos, and James Bender, Vice President of Product Development and Manufacturing.

296. As the only financial officer for the Company, Fractor was privy to any outside contracts made between the Company and a third-party, like the September 2011 agreement between IMUC and Lidingo. Given the substantial amounts paid by IMUC to Lidingo, and Fractor's role within IMUC, Singh's resignation and the excessive payments to Lidingo, Fractor either knew or but for his deliberate recklessness would have known the true facts concerning the services performed by Lidingo.

297. Further, Fractor was in charge of the Company's finances in August 2012 when the Company made its final payment to Lidingo (a day after defendant Singh's resignation) and continued as a member of the executive team throughout the remainder of the Class Period, during which the Company made no effort to

bring to light its past association with Lidingo or atone for its participation in the stock promotion scheme.

298. Fractor, as the Company's Treasurer and Chief Financial Officer since April 2011, knew or was deliberately reckless in not knowing about the stock promotion scheme and the payments of more than $230,000 by IMUC to Lidingo. The $230,000 in payments were material to IMUC's income statement and business. Fractor, as Treasurer and CFO either knew or was deliberately reckless in failing to know the true purpose of those payments. Accordingly, there is a strong, reasonable inference that Fractor reviewed the contract with Lidingo that called to make monthly payments of $5,000 to Lidingo and therefore, he either knew or was deliberately reckless in not knowing that IMUC had retained promotional firms Lavos and Lidingo to promote the market price of IMUC common stock and was making illegal payments to Lidingo for hiring and paying authors to publish promotional articles about IMUC.

299. Additionally, in his role as chief financial officer, Fractor signed a Certification of the Principal Executive Officer Under Section 302 of the Sarbanes-Oxley Act on March 21, 2012 and March 11, 2013, filed with the SEC as an exhibit to the Company's annual reports for the years 2011 and 2012, respectively, that indicated he reported to the Company's auditors and audit committee "[a]ny fraud, whether or not material, that involves management" of IMUC. As set forth

herein, that SOX certifications were materially false and Fractor either knew or was reckless in not knowing that the Company were then employing, or had previously employed, Lidingo to orchestrate an illicit stock promotion scheme.

300. Further, as CFO of the Company at the time the analysis of the Phase I clinical data for ICT-107 was completed, defendant Fractor had actual knowledge that: (1) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT-107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival, because of the lack of an appropriate control group and the design and the conduct of the study not being aimed at demonstrating efficacy; (2) of the six patients who had survived for four years or more,, there was no clear correlation with the presence of immune response to ICT-107, a step necessary for the vaccine to work against GBM; (3) in five of the six patients, an apparently favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; (4) given that promising results in early studies are frequently not confirmed in later, more well-controlled and conducted clinical trials, the Phase I trial results did not indicate "impressive survival data" and yield "encouraging" results, as Company

representatives touted; and, thus (5) Immunocellular's business and prospects were far worse than represented.

**C. <u>John S. Yu</u>**

301. Yu is a cofounder of the Company, acting as Chief Scientific Officer from November 2006 and Chairman of the IMUC Board since January 2007.

302. As Chief Scientific Officer and Chairman of the Board of the Company at the time the analysis of the Phase I clinical data for ICT-107 was completed, defendant Yu had actual knowledge that: (1) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT-107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival, because of the lack of an appropriate control group and the design and the conduct of the study not being aimed at demonstrating efficacy; (2) of the six patients who had survived for four years or more,, there was no clear correlation with the presence of immune response to ICT-107, a step necessary for the vaccine to work against GBM; (3) in five of the six patients, an apparently favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; (4) given that promising results in early studies are

frequently not confirmed in later, more well-controlled and conducted clinical trials, the Phase I trial results did not indicate "impressive survival data" and yield "encouraging" results, as defendant Singh touted; and, thus (5) IMUC's business and prospects were far worse than represented.

303. In fact, defendant Yu was a co-author of the Phase I ICT-107 clinical data published in July 2012 in the medical journal Cancer Immunology, Immunotherapy which stated that Phase I results showed that the "vaccine following conventional treatment may be associated with a clinically relevant response," but it was not conclusive because "[v]accine responders exhibited a non-significant trend toward increased progression-free survival, but not overall survival." *See Phase I Trial of a Multi-Epitoope-Pulsed Dendrkitic Cell Vaccine for Patients with Newly Diagnosed Glioblastoma*, Sunrasak Phuphanic, et. al., at 125-135 (Cancer Immunol Immunother, July 31, 2012). This tempered language directly contrasts with the optimistic language employed by the Company and its representatives in its SEC filings and is particularly stark in comparison to the descriptions of the Phase I results proffered by the Lidingo-published articles during the Class Period.

304. By virtue of his position as an executive officer of the Company consisting of only five full-time and two part-time management employees, and as Chairman of the Board throughout the Class Period, Yu knew or was reckless in

not knowing that the Company had: (i) engaged Lidingo to publish articles about IMUC in order to artificially inflate IMUC's stock price; (ii) that those articles would not disclose compensation; (iii) that those articles mispresented the Phase I ICT-107 clinical data; and (iv) that the Company and its representatives were actively misrepresenting the Phase I ICT-107 clinical data in their public statements.

**D. Andrew Gengos**

305. Gengos was appointed CEO of IMUC on December 3, 2012, assuming the position immediately upon his appointment, and holding the post throughout the Class Period until his resignation on December 13, 2016.

306. As Chief Executive Officer of the Company following the completion of the analysis of the Phase I clinical data for ICT-107 and during the Phase II study, defendant Gengos had actual knowledge that: (1) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT-107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival, because of the lack of an appropriate control group and the design and the conduct of the study not being aimed at demonstrating efficacy; (2) of the six patients who had survived for four years or more,, there was no clear correlation with the presence of immune response to ICT-107, a step necessary for the vaccine to work against GBM; (3) in five of the six patients, an apparently

favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; (4) given that promising results in early studies are frequently not confirmed in later, more well-controlled and conducted clinical trials, the Phase I trial results did not indicate "provactive data" and yield "encouraging" results, as defendant Gengos and the Company touted; and, thus (5) Immunocellular's business and prospects were far worse than represented.

307. Gengos signed a Certification of the Principal Executive Officer Under Section 302 of SOX on March 11, 2013, filed with the SEC as an exhibit to the Company's annual report for the year 2012, that indicated he reported to the Company's auditors and audit committee "[a]ny fraud, whether or not material, that involves management" of IMUC. As set forth herein, that SOX certification was materially false and Gengos either knew or was reckless in not knowing that the Company had previously employed Lidingo to orchestrate an illicit stock promotion scheme.

308. By virtue of his position as an executive officer of the Company consisting of only five full-time and two part-time management employees, and as Chief Executive Officer during the Class Period, Gengos knew or was reckless in

not knowing that the Company had: (i) engaged Lidingo to publish articles about IMUC in order to artificially inflate IMUC's stock price; (ii) that those articles did not disclose compensation; (iii) that those articles mispresented the Phase I ICT-107 clinical data; and (iv) that the Company and its representatives were actively misrepresenting the Phase I ICT-107 clinical data in their public statements.

**E. <u>IMUC</u>**

309. As alleged herein, Singh was acting in his capacity as the Chief Executive Officer of IMUC when he engaged Lidingo to illegally promote the Company's stock through the use of several publishers who failed to make any disclosure related to their receipt of compensation. Additionally, defendant Singh made several false and misleading statements about the efficacy of ICT-107 based on its Phase I clinical data which were belied by the actual data, evidencing a disregard for actual knowledge and the truth.

310. Furthermore, during the Class Period, Fractor acted with the requisite scienter when, as CFO for the Company, he approved the payments to Lidingo, evidencing either knowledge of the scheme or a reckless disregard to the fact that Lidingo had been engaged to unlawfully promote the Company.

311. Additionally, Yu, as Chairman of the Board of IMUC and interim CEO of the Company at the time it made its last payment to Lidingo (on the same date an illegal stock promotion article was published on Seeking Alpha) either

knew or was reckless in not knowing that Lidingo's articles about the Company would not disclose compensation, given the nature of the Company's relationship with Lidingo in the past and the unceremonious departure of defendant Singh. Additionally, defendant Yu allowed Company representatives and the Company to make several false and misleading statements about the efficacy of ICT-107 based on its Phase I clinical data which were belied by the actual data, evidencing a disregard for actual knowledge and the truth.

312. Gengos went as far as to sign a Certification of the Principal Executive Officer Under Section 302 of SOX on March 11, 2013, filed with the SEC as an exhibit to the Company's 2012 annual report, that indicated he reported to the Company's auditors and audit committee "[a]ny fraud, whether or not material, that involves management" of IMUC. As set forth herein, that SOX certification was materially false and Gengos either knew or was reckless in not knowing that the Company had previously employed Lidingo to orchestrate an illicit stock promotion scheme. Additionally, defendant Gengos made several false and misleading statements about the efficacy of ICT-107 based on its Phase I clinical data which were belied by the actual data, evidencing a disregard for actual knowledge and the truth.

313. Further, IMUC contracted with Lidingo as an agent throughout the Class Period in order to oversee the stock promotion scheme. As set forth herein,

the scienter of Lidingo's own employees and agents is imputed onto that company under the doctrine of *respondeat superior*, which is then imputed onto IMUC by virtue of this relationship.

314. The scienter of IMUC's employees and agents (including Singh, Fractor, Yu, Gengos, and Lidingo) is imputed to IMUC under the doctrine of *respondeat superior* and common law principles of agency. IMUC is liable for the acts of these defendants and their employees and agents under these common law principles.

**F. <u>Kamilla Bjorlin</u>**

315. As alleged herein, Bjorlin was the day-to-day manager and owner of Lidingo's illicit stock promotion scheme business, recruiting writers to pen articles on behalf of Lidingo's clients, including IMUC, and paying these authors out of Lidingo's bank accounts. Bjorlin was also the only member of Lidingo and the only signatory to its bank accounts.

316. Bjorlin and Singh commenced their stock promotion relationship in September 2011 when Singh assisted Bjorlin in her organization of Lidingo.

317. In September 2011, Singh, on behalf of IMUC, entered into a promotional contract with Lidingo whereby Lidingo would "develop and execute an online distribution campaign that will prominently place the [IMUC] investment opportunity in front of retail investors." Bjorlin executed this promotional contract

on behalf of Lidingo.

318. As discussed above, during the period of September 2011 through at least August 2012, Lidingo provided its stock promotion services to IMUC, arranging for at least 50 articles or blog entries to be written and published about IMUC. Of the 50 articles promoting IMUC during the Class Period, none contained a disclosure indicating the writer, or person identified in the byline, had been compensated or the amount of his compensation.

319. This lack of disclosure was purposeful and orchestrated by Bjorlin (and Hodge and Singh), as evidenced by communications throughout and following the Class Period. For example, in October 2011, a writer hired by Lidingo to write an article about IMUC on Seeking Alpha disclosed in the article that he had been paid. Bjorlin subsequently referred to this author in an April 17, 2012 email to Singh as "the idiot we used in the beginning, he will NOT post a disclosure again," making similar comments about the writer in an email to Singh on August 7, 2012 and in January 2013.

320. Further, in April 2012, Bjorlin emailed Singh a list of potential writers for approval for use in the stock promotion scheme of IMUC and other clients of Lidingo and Lavos. With respect to one writer, Bjorlin disqualified him from participation on the basis that "he wants to disclose as he is a CFA. No disclosures allowed." Singh confirmed Bjorlin's assessment in his April 17, 2012 response,

confirming this writer to be a "no" while also instructing Bjorlin to only try another potential writer "if no disclosure."

321. Bjorlin was aware that Lidingo and its paid writers were violating the terms of Seeking Alpha's disclosure policies. On September 17, 2013, a writer emailed Bjorlin expressing concern because Seeking Alpha had contacted him saying that they had obtained information that he was writing articles for payment. Bjorlin responded the same day, stating that the email was "a carbon copy of what several writers have gotten" and that Seeking Alpha was "simply fishing," following up the next day to instruct that same author to continue writing for Seeking Alpha. Bjorlin's cavalier response to the author's concern, as well as her admission of knowledge of similar letters received by other Lidingo authors, evidences a clear understanding of the policies related to disclosure of paid promotional articles and a calculated response to skirt those policies.

322. These allegations support a strong inference of defendant Bjorlin's scienter. Bjorlin: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); (iii) knew that the Articles accentuated the Phase I test results and created a misleading impression that the Phase I test results were indicative of anticipated success of the Phase II results; and (iv) knew these articles did not contain the required paid disclaimers. Further, Bjorlin's efforts to coordinate with Singh so as to hire only

those writers that would not disclose, even in the face of SEC and Seeking Alpha policy concerns, supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper, as Bjorlin would not have chastised and continuously insulted the writer who included a compensation disclosure in his published article nor would she have been so dismissive of any writer that wanted to comply with Seeking Alpha's policies.

**G. <u>Andrew Hodge</u>**

323. Hodge was employed by Lidingo from no later than December 2011 through at least March 2014, where he assisted Bjorlin in Lidingo's day-to-day stock promotion work, including interacting with issuer clients and providing direction to writers drafting articles on behalf of those clients.

324. In his capacity as a Lidingo employee, Hodge recruited writers to assist in the company's promotional schemes, sending a non-disclosure agreement that prohibited the "disclosure of compensation for contracted work," dated April 14, 2013, to a prospective Lidingo author.

325. Between December 2011 and March 2014, Hodge received a salary for his Lidingo promotion work, receiving payments totaling at least $340,000 from Lidingo.

326. Throughout the Class Period, Hodge was aware of the illicit stock promotion scheme and worked with Bjorlin and Singh to ensure that Lidingo's

authors remained silent about the kickbacks they were receiving for their published endorsements. For example, on April 16, 2013, Bjorlin emailed Singh about a potential author who Hodge voiced opposition to, feeling he was "no good because he 'advertises' he has a website that pays for writing."

327. In fact, Hodge was often the conduit between potential writers and Bjorlin and Singh, with Bjorlin reporting on an interaction between Hodge and one such writer who "told [Hodge] on several occasions that he would disclose." The result was Singh directing that Lidingo not use the writer, indicating that he was unlikely to agree to anything improper through email: "He has been spooked by [promoter] that the SEC may monitor him so he will never agree to anything not proper in writing. Unless we get to know him he won't [sic] write."

328. Further, Hodge regularly provided editorial comments to Lidingo's writers. For example, on November 3, 2013, Hodge sent edits to Nichols on an article Nichols drafted regarding LBIO. The article was ultimately published on November 12, 2013 (on direction from Bjorlin) under Nichols' name and did not disclose that Nichols had received any payment for its publishing.

329. Hodge was also a known member of Lidingo's management team, conversing with representatives of other Lidingo issuer clients (through emails on which both defendants Bjorlin and Singh were copied) about, inter alia, strategies for publication release dates in order to get the most effective stock price bump

(e.g. the January 18, 2013 email from Hodge to NBS's CEO, copying Bjorlin and Singh, in which Hodge informed her that Lidingo was delaying promotional efforts planned for the day because the market was closed the following Monday on the basis that that the promotion will "have much better results on Tuesday with emails and new article than on a Friday") and discussions about payments (e.g. the November 20, 2013 email from Hodge to GALE's CEO and CFO, copying Bjorlin regarding the receipt of outstanding GALE options owed to Lidingo, stating that "[p]lease understand that [Lidingo's] costs over the last 3+ months have exceeded the amount received, and that the equity stake is where [Lidingo] generates [its] income.").

330. These allegations support a strong inference of defendant Hodge's scienter they show that Hodge: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); (iii) knew that the Articles accentuated the Phase I test results and created a misleading impression that the Phase I test results were indicative of anticipated success of the Phase II results and (iv) knew these articles did not contain the required paid disclaimers. Further, Hodge's efforts to coordinate with Bjorlin and Singh so as to hire only those writers that would not disclose (going as far as to require a non-disclosure agreement), even in the face of SEC and Seeking Alpha policy concerns, supports a strong inference that any campaign conducted by

Lidingo (including that orchestrated on behalf of IMUC) was improper.

**H. Brian Nichols**

331. Nichols worked as a Lidingo writer from no later than February 2012 through at least March 2012, publishing articles about issuer clients, including IMUC, from whom he indirectly received compensation through Lidingo.

332. During this time period, defendant Nichols received at least $200,000 in total compensation, including bonuses, from Lidingo, for his contribution to Lidingo's stock promotion scheme.

333. During the Class Period, Nichols published 18 articles about IMUC where Lavos and Lidingo were the promoters, either under his own name or under a pseudonym, on the website Seeking Alpha in which he omitted any reference to the receipt of payment and made the material misrepresentation that he was not receiving compensation for the article:

| Date | Writer/ Publisher | Pseudonym | Issuer Client | Title |
|---|---|---|---|---|
| 2012.02.16 | Nichols, Brian | N/A | IMUC | 10 Biotech Stocks with Big Potential Upside in 2012: Part III |
| 2012.02.22 | Nichols, Brian | N/A | IMUC | Buy Biotech in Phase II for the Best Upside |

| | | | | |
|---|---|---|---|---|
| 2012.03.01 | Nichols, Brian | N/A | GALE, IMUC | Dendreon's Woes Mask the Exciting Opportunities in Immunotherapy Companies |
| 2012.03.13 | Nichols, Brian | N/A | IMUC | Upgrades Lead to Optimism in Cancer Stem Cell Therapy |
| 2012.03.22 | Nichols, Brian | N/A | IMUC | Immunocellular Therapeutics Patent Acquisition Paradigm Shift |
| 2012.04.10 | Nichols, Brian | N/A | IMUC | Breaking the Mold of Oncology Drug Development |
| 2012.04.12 | Nichols, Brian | N/A | IMUC | Which Q1 Biotech Movers Can Build off Momentum? Part II |
| 2012.04.16 | Nichols, Brian | N/A | IMUC | Successfully Profiting from Developmental Biotech |
| 2012.04.30 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics and the Benefits of a Large Exchange |
| 2012.05.10 | Nichols, Brian | N/A | IMUC | Pre-ASCO Interview with ImmunoCellular Therapeutics CEO Dr. Singh |
| 2012.05.21 | Lidingo (Nichols) | A. John Hodge | IMUC | Interest Growing in Cancer Stem Cell Biotechs |

| | | | | |
|---|---|---|---|---|
| 2012.05.29 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics' Uplisting to NYSE Could Immediately Open Many Doors |
| 2012.06.04 | Nichols, Brian | N/A | IMUC | 5 Biotech Stocks that Could Be Included in the Russell 2000 |
| 2012.06.11 | Nichols, Brian | N/A | IMUC | Russell Index Additions to Create Upside While Shares are Acquired in Open Market |
| 2012.07.17 | Lidingo (Nichols) | The Swiss Trader | IMUC | 3 Innovative Cancer Treatments . . . But Which Is the Best Bet? |
| 2012.07.19 | Nichols, Brian | N/A | IMUC | New Legislation Speeds up FDA Approval Process for Immunocellular Therapeutics and Other Innovating Therapies |
| 2012.07.23 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics: Explaining the Benefits of a Multiple Antigen Targeting Approach |
| 2012.08.15 | Nichols, Brian | N/A | IMUC | ICT-107 Into Perspective Part 1 |

334. Nichols' use of pseudonyms to publish glowing articles about Lidingo clients was derived from a strategy created by him and defendants Bjorlin and Hodge. For example, in a January 14, 2013 email, Nichols, Bjorlin, Hodge, and other Lidingo associates discussed a comment on Seeking Alpha about similarities the commenter had noticed between the writing styles of Nichols and the Lidingo-controlled pseudonyms the Swiss Trader, Amy Baldwin, and A. John Hodge. In response to a suggestion by Hodge that Nichols and the other writers not write too frequently on the same issuers, Nichols responded, "[i]t doesn't take too long for people to start putting together that the same writers write on the same stocks." To remedy the problem, Nichols suggested that Lidingo create two new accounts to publish articles from "after the [new] accounts build credibility."

335. Nichols further financially benefited from a pump-and-dump through his own trading account, acquiring 1,100 shares of IMUC on March 22, 2012 (the same day he published an article on Seeking Alpha in which he noted "I believe that the company's decision to focus on acquiring rights to these antigens is its best move at the moment, and could have several long lasting effects that we are yet to realize.") before unloading 1,090 of the shares the following day for a quick profit of approximately $500. Unsurprisingly, while the article did mention Nichols' holding in IMUC, it declined to make any mention of his intention to sell 99% of

those same shares the next day.

336. These allegations support a strong inference of defendant Nichols' scienter, as they show that Nichols: (i) knew Lidingo paid writers, as he himself was in receipt of payments; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); (iii) knew that the Articles accentuated the Phase I test results and created a misleading impression that the Phase I test results were indicative of anticipated success of the Phase II results and (iv) knew these articles did not contain the required paid disclaimers. Further, Nichols' efforts to coordinate with Bjorlin and Hodge so as to create additional publishing accounts to further the promotional scheme, supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper and required clandestine efforts to skirt detection by the investing public.

**I. <u>Vincent Cassano</u>**

337. From no later than August 2011 through at least November 2011, Cassano was a paid writer for Lavos.

338. For his work for Lavos, Cassano received at least $6,700 in total compensation.

339. From no later than November 2011 through at least April 2013, Cassano was a paid writer for Lidingo, publishing at least 35 articles about issuer

clients, under the same pseudonym, from whom he indirectly received compensation through Lidingo.

340. During this time period, Cassano received at last $27,000 in total compensation, including bonuses, from Lidingo for his contribution to Lidingo's stock promotion scheme.

341. During the Class Period, Cassano caused to be published at least 24 articles about IMUC where Lavos and Lidingo were the promoters on the website Seeking Alpha in which he omitted any reference to the receipt of payment and made the material misrepresentation that he was not receiving compensation for the article:

| Date | Writer/Publisher | Pseudonym | Issuer Client | Title |
|---|---|---|---|---|
| 2012.01.18 | Cassano, Vincent | VFC's Stock House | IMUC | Another Revival Could Be In Store for ImmunoCellular Therapeutics |
| 2012.01.19 | Cassano, Vincent | VFC's Stock House | IMUC | Biopharma Stocks To Watch This Week |
| 2012.01.30 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks To Watch Week of Jan. 30 |
| 2012.01.31 | Cassano, Vincent | VFC's Stock House | IMUC | ImmunoCellular: Pipeline Potential and Institutional Interest Fuel Rebound |

| | | | | |
|---|---|---|---|---|
| 2012.02.02 | Cassano, Vincent | VFC's Stock House | IMUC | 5 Pharmaceuticals On The Move |
| 2012.02.06 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch Week of Feb. 6 |
| 2012.02.14 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: Feb. 13 Edition |
| 2012.02.14 | Cassano, Vincent | VFC's Stock House | IMUC | Stock Watch: Immunocellular's Push Toward Two Dollars |
| 2012.02.15 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Again Pushing to $2 |
| 2012.03.04 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: Feb 27 – March 2 |
| 2012.03.05 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Pending Catalysts Could Spark Share Price Run |
| 2012.03.07 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Touches $3 on Continued Speculation |
| 2012.03.13 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: March 12-16 |
| 2012.03.21 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch: Week of March 19-23 |

| | | | | |
|---|---|---|---|---|
| 2012.03.26 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Cementing Its Place as a Major Player in Cancer Immunotherapy |
| 2012.03.26 | Cassano, Vincent | VFC's Stock House | GALE, IMUC | Stocks to Watch: Week of March 26-30 |
| 2012.03.27 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: March 26-20 [sic] |
| 2012.04.09 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 9-13 |
| 2012.04.11 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics May Be Immune to a Broad Market Downturn |
| 2012.04.19 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch Mid-Week: April 18 |
| 2012.04.23 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 23-27 |
| 2012.04.29 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 30-May 4 |
| 2012.05.01 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Any Pullback May Mean Opportunity |
| 2012.05.07 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch: Week of May 7, 2012 |

342. Cassano's failure to include any adequate disclosure related to the pay he received for publishing IMUC articles was a deliberate choice made by Cassano, with input from other defendants. For example, in August 2011, Cassano emailed a non-party promoter working with defendant Singh, asking "regarding disclosure for [the client] how do you want it." Singh responded, recommending that the article "be silent on any disclosure" -- a directive that Cassano took to heart, instead claiming that "VFC's Stock House has not been compensated to provide coverage" of the client.

343. In or around March 2012, Cassano began including a general disclosure on his Seeking Alpha profile, indicating that "VFC's Stock House has started taking compensation from third parties to research and cover certain companies that VFC believes have potential and also fit the profile of what readers of this website are looking for." This purposely vague disclosure failed to identify the third parties compensating Cassano and made no mention that these third parties were ultimately themselves being compensated by the issuers for whom he was writing.

344. Recognizing the insufficiency of such a disclosure, Cassano sought to expand the language employed, emailing Bjorlin on April 2012 to advise that he would be "tightening up [his] compensation disclosures" to include the language "VFC's Stock House has received compensation from a third party, xxx, to provide

research and coverage of xxx for a period of xxx month[s]." Along with the proposed language, Cassano asked defendant Bjorlin to "let [him] know if this poses a problem" for Lidingo.

345. Bjorlin responded that same day, indicating that "[Lidingo] unfortunately cannot have the disclosure on there," to which Cassano responded by agreeing to "keep doing you guys without it. . ."

346. Bjorlin reiterated the non-disclosure mandate a week later when, on August 10, 2012, she emailed Cassano asking whether he'd be interested in writing for three additional Lidingo clients and following up with a reminder that "[a]gain we can't have any disclosures." Cassano again assented to the requirement, agreeing that he "won't use disclosure with u [sic] guys."

347. These allegations support a strong inference of Cassano's scienter in that they show they show that Cassano: (i) knew Lidingo paid writers, as he himself was in receipt of payments; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); (iii) knew that the Articles accentuated the Phase I test results and created a misleading impression that the Phase I test results were indicative of anticipated success of the Phase II results; and (iv) knew these articles did not contain the required paid disclaimers. Further, Cassano's efforts to coordinate with Bjorlin so as to eliminate any compensation disclosure for any article written on behalf of Lidingo

supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper and required clandestine efforts to skirt detection by the investing public.

**J. <u>Lavos LLC</u>**

348. As alleged herein, Lavos was a stock promotion firm that assisted Lidingo throughout the IMUC stock promotion scheme. Through its agents, Singh, Cassano, Bjorlin, and Lidingo, Lavos engaged in a concerted effort to generate positive articles about IMUC in exchange for financial compensation, all the while failing to disclose any connection between the articles and the subject company through the direct efforts of Singh, Cassano, Bjorlin, and Lidingo.

349. The scienter of Lavos' employees and agents (including Singh, Cassano, and Bjorlin) is imputed to Lavos under the doctrine of *respondeat superior* and common law principles of agency. Lavos is liable for the acts of these defendants and their employees and agents under these common law principles.

**K. <u>Lidingo</u>**

350. As alleged herein, Lidingo was the stock promotion firm at the center of the IMUC stock promotion scheme, causing to be published more than fifty articles about IMUC where Lavos and Lidingo were the promoters that omitted any mention of the receipt of payment and affirmatively misrepresented that no

payment had been received from the article, despite the fact that Lidingo was providing compensation derived from its agreement with IMUC:

| Date | Writer/Publisher | Pseudonym | Issuer Client | Title |
|---|---|---|---|---|
| 2011.11.08 | Ramey, Stephen | Chemistfrog | IMUC | ImmunoCellular Therapeutics' Cancer Stem Cell Drug Garnering Much Attention |
| 2011.11.16 | Ramey, Stephen | Chemistfrog | IMUC | 3 Cancer Immunotherapy Biotechs with Catalysts for 2012 |
| 2012.01.16 | Ramey, Stephen | Chemistfrog | IMUC | Pharma Leaders Emerging in Immunotherapy Approach to Fighting Glioblastoma |
| 2012.01.18 | Cassano, Vincent | VFC's Stock House | IMUC | Another Revival Could Be In Store for ImmunoCellular Therapeutics |
| 2012.01.19 | Cassano, Vincent | VFC's Stock House | IMUC | Biopharma Stocks To Watch This Week |
| 2012.01.30 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks To Watch Week of Jan. 30 |
| 2012.01.30 | Ramey, Stephen | Chemistfrog | IMUC | Verastem IPO Validates Investor Interest in Cancer Stem Cell Approach |

| | | | | |
|---|---|---|---|---|
| 2012.01.31 | Cassano, Vincent | VFC's Stock House | IMUC | ImmunoCellular: Pipeline Potential and Institutional Interest Fuel Rebound |
| 2012.02.02 | Cassano, Vincent | VFC's Stock House | IMUC | 5 Pharmaceuticals On The Move |
| 2012.02.06 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch Week of Feb. 6 |
| 2012.02.08 | Writer 2 | N/A | GALE, IMUC | ImmunoCellular and Cancer Treatment's Next Frontier |
| 2012.02.14 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: Feb. 13 Edition |
| 2012.02.14 | Cassano, Vincent | VFC's Stock House | IMUC | Stock Watch: Immunocellular's Push Toward Two Dollars |
| 2012.02.15 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Again Pushing to $2 |
| 2012.02.16 | Nichols, Brian | N/A | IMUC | 10 Biotech Stocks with Big Potential Upside in 2012: Part III |
| 2012.02.21 | Writer 2 | N/A | IMUC | A Roadmap for Immunotherapy Success in Oncology |
| 2012.02.22 | Nichols, Brian | N/A | IMUC | Buy Biotech in Phase II for the Best Upside |

| | | | | |
|---|---|---|---|---|
| 2012.03.01 | Nichols, Brian | N/A | GALE, IMUC | Dendreon's Woes Mask the Exciting Opportunities in Immunotherapy Companies |
| 2012.03.04 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: Feb 27 – March 2 |
| 2012.03.05 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Pending Catalysts Could Spark Share Price Run |
| 2012.03.06 | Ramey, Stephen | Chemistfrog | IMUC | Big Pharma's Growing Appetite for Cancer Stem Cell Biotechs |
| 2012.03.07 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Touches $3 on Continued Speculation |
| 2012.03.13 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: March 12-16 |
| 2012.03.13 | Nichols, Brian | N/A | IMUC | Upgrades Lead to Optimism in Cancer Stem Cell Therapy |
| 2012.03.19 | Lidingo | A. John Hodge | GALE, IMUC | Small Cap Biotech Stocks Trading Higher |
| 2012.03.21 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch: Week of March 19-23 |

| | | | | |
|---|---|---|---|---|
| 2012.03.22 | Nichols, Brian | N/A | IMUC | Immunocellular Therapeutics Patent Acquisition Paradigm Shift |
| 2012.03.26 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Cementing Its Place as a Major Player in Cancer Immunotherapy |
| 2012.03.26 | Cassano, Vincent | VFC's Stock House | GALE, IMUC | Stocks to Watch: Week of March 26-30 |
| 2012.03.27 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: March 26-20 [sic] |
| 2012.03.28 | Ramey, Stephen | Chemistfrog | IMUC | ImmunoCellular's Intellectual Property Steadily Increases |
| 2012.03.28 | Ramey, Stephen | Chemistfrog | IMUC | ImmunoCellular Therapeutics' Growing Intellectional Property Garnering Attention |
| 2012.04.09 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 9-13 |
| 2012.04.10 | Nichols, Brian | N/A | IMUC | Breaking the Mold of Oncology Drug Development |

| | | | | |
|---|---|---|---|---|
| 2012.04.11 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics May Be Immune to a Broad Market Downturn |
| 2012.04.12 | Nichols, Brian | N/A | IMUC | Which Q1 Biotech Movers Can Build off Momentum? Part II |
| 2012.04.16 | Nichols, Brian | N/A | IMUC | Successfully Profiting from Developmental Biotech |
| 2012.04.19 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch Mid-Week: April 18 |
| 2012.04.19 | Writer 2 | N/A | IMUC | Why the Markets Continue to Coalesce Around New Approaches to Treating Cancer |
| 2012.04.23 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 23-27 |
| 2012.04.24 | Ramey, Stephen | Chemistfrog | GALE, IMUC | Multiple Antigen Targeting Could Mean a Multiple Marketing for These Immunotherapy Drugs |

| | | | | |
|---|---|---|---|---|
| 2012.04.25 | Ramey, Stephen | Chemistfrog | GALE, IMUC | Multiple Antigen Targeting Could Indicate Big Potential for Immunotherapy Drugs |
| 2012.04.29 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 30-May 4 |
| 2012.04.30 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics and the Benefits of a Large Exchange |
| 2012.05.01 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Any Pullback May Mean Opportunity |
| 2012.05.02 | Lidingo | The Swiss Trader | IMUC | Finding an Oncology Player That Will Change the Rules of the Game |
| 2012.05.07 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch: Week of May 7, 2012 |
| 2012.05.10 | Nichols, Brian | N/A | IMUC | Pre-ASCO Interview with ImmunoCellular Therapeutics CEO Dr. Singh |
| 2012.05.18 | Lidingo | The Swiss Trader | GALE, IMUC | ASCO 2012 Abstracts: 4 Hopeful Overachievers |
| 2012.05.21 | Lidingo (Nichols) | A. John Hodge | IMUC | Interest Growing in Cancer Stem Cell Biotechs |

| | | | | |
|---|---|---|---|---|
| 2012.05.29 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics' Uplisting to NYSE Could Immediately Open Many Doors |
| 2012.06.01 | Ramey, Stephen | Chemistfrog | IMUC | ImmunoCellular Therapeutics ICT-107 To Impress at ASCO 2012 |
| 2012.06.04 | Nichols, Brian | N/A | IMUC | 5 Biotech Stocks that Could Be Included in the Russell 2000 |
| 2012.06.11 | Nichols, Brian | N/A | IMUC | Russell Index Additions to Create Upside While Shares are Acquired in Open Market |
| 2012.06.13 | Ramey, Stephen | Chemistfrog | IMUC | Dendreon: Room for Improvement |
| 2012.06.18 | Lidingo | The Swiss Trader | IMUC | Immunotherapy Comes of Age at ASCO 2012 |
| 2012.06.27 | Lidingo | A. John Hodge | IMUC | ImmunoCellular: Cancer is Smart, But Could an Experimental Cancer Vaccine Be Smarter? |
| 2012.07.04 | Ramey, Stephen | Chemistfrog | IMUC | Dendritic Cell Evolution: Investment Potential |

| | | | | |
|---|---|---|---|---|
| 2012.07.11 | Ramey, Stephen | Chemistfrog | IMUC | Intellectual Property of a Biotech: An Analysis |
| 2012.07.17 | Lidingo (Nichols) | The Swiss Trader | IMUC | 3 Innovative Cancer Treatments . . . But Which Is the Best Bet? |
| 2012.07.19 | Nichols, Brian | N/A | IMUC | New Legislation Speeds up FDA Approval Process for Immunocellular Therapeutics and Other Innovating Therapies |
| 2012.07.23 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics: Explaining the Benefits of a Multiple Antigen Targeting Approach |
| 2012.07.26 | Lidingo | Baldwin, Amy | IMUC | 5 Momentum Stocks With Pullbacks That Could Be Your Opportunity |
| 2012.08.08 | French, Chris | Cris Frangold | IMUC | 3 Diverse Investment Grade Pharmaceuticals to Consider Today |
| 2012.08.15 | Nichols, Brian | N/A | IMUC | ICT-107 Into Perspective Part 1 |

351. Through its agents, Bjorlin, Hodge, Nichols and Cassano, Lidingo

engaged in a concerted effort to generate positive articles about IMUC in exchange for financial compensation, all the while failing to disclose any connection between the articles and the subject company through the direct efforts of Bjorlin, Hodge and Singh.

352. The scienter of Lidingo's employees and agents (including Bjorlin, Hodge, Nichols, Cassano, and Singh) is imputed to Lidingo under the doctrine of *respondeat superior* and common law principles of agency. Lidingo is liable for the acts of these defendants and their employees and agents under these common law principles.

## VI. PLAINTIFFS' CLASS ACTION ALLEGATIONS

353. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired IMUC common stock on the open market during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

354. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IMUC common stock

was actively traded on the NYSE MKT or OTCBB, efficient markets. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by IMUC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

355. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

356. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

357. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IMUC;
- whether defendants caused IMUC to issue false and misleading financial statements during the Class Period;
- whether defendants acted knowingly or recklessly in failing to convey material facts or to correct material facts previously disseminated;
- whether defendants participated in and pursued the fraudulent scheme or course of business complained of herein;
- whether defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;
- whether the prices of IMUC common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

358. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

359. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- IMUC common stock are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE MKT or OTCBB and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and
- Plaintiffs and members of the Class purchased, acquired and/or sold IMUC common stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

360. Based upon the foregoing, Plaintiffs and the members of the Class are titled to a presumption of reliance upon the integrity of the market.

## VII. LOSS CAUSATION

361. During the Class Period, the Defendants named in this Action materially misled the investing public, thereby inflating the price of IMUC common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse

information and/or misrepresented the truth about IMUC's business, operations, and prospects, as alleged herein.

362. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false and/or misleading statements regarding: (i) IMUC's payments to Lavos and the Lidingo Defendants as part of paid promotional scheme to issue overly optimistic statements about the Company to artificially inflate the price of IMUC common stock, without disclosing that the writers of these articles were being compensated for their Articles; and (ii) the actual viability and efficacy of the ICT-107 vaccine based on the Phase I clinical data, including the likelihood of success during the Phase II study.

363. In actuality, the Company had paid Lidingo to publish glowing articles about IMUC and ICT-107, all with the oversight of IMUC's CEO defendant Singh – a truth that was never once mentioned in the Articles despite the disclosure requirements of both Seeking Alpha and the SEC.

364. Apart from their failure to disclose compensation and affiliation with the Company, many of the Articles, much like SEC filings and comments made by

Company management, also materially misrepresented the clinical data results of the Company's Phase I ICT-107 study. The truth was that (1) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT-107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival, because of the lack of an appropriate control group and the design and the conduct of the study not being aimed at demonstrating efficacy; (2) of the six patients who had survived for four years or more, there was no clear correlation with the presence of immune response to ICT-107, a step necessary for the vaccine to work against GBM; (3) in five of the six patients, an apparently favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; (4) given that promising results in early studies are frequently not confirmed in later, more well-controlled and conducted clinical trials, the Phase I trial results did not indicate that the Phase I survival benefit results were highly encouraging or likely to lead to a breakthrough at Phase II, as various defendants represented throughout the Class Period; and, thus (5) Immunocellular's business and prospects were far worse than represented

365. These material misstatements and/or omissions had the cause and

effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. The materially false and/or misleading statements made by the Defendants named in this Action during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein. For example:

- On May 10, 2012, Nichols published an article titled "Pre-ASCO Interview with ImmunoCellular Therapeutics CEO Dr. Singh" on Seeking Alpha wherein he attempted to mitigate the effect of a negative earnings report by Dendreon (another immunotherapy-based pharmaceutical company), while also providing softball questions to allow Singh to attempt to distinguish IMUC from its competitors and paint the picture of the Company's upcoming American Stock Exchange listing that would purportedly bring about an entirely new crop of investors. As a result of the article, IMUC stock gained over 4% on May 10, 2012 and an additional 7.9% on May 11, 2012.

- On May 29, 2012, just one trading day after the Company announced approval of listing IMUC common stock on the NYSE MKT and one day before the listing of IMUC common stock on the NYSE MKT, Nichols published an article titled, "ImmunoCellular Therapeutics Uplisting to NYSE Could Immediately Open Many Doors" on Seeking Alpha wherein he promoted that "all clinical data has been impressive from IMUC" and "how far the company has come over the last five years. As a result of the article, IMUC stock gained nearly 9% on May 29, 2012.

- On June 28, 2012, just one trading day after the Company stated in its June 27, 2012 prospectus that the Phase I clinical trial of ICT-107 "showed encouraging results," the Company common stock gained

more than 7%, ultimately increasing as much as $0.44 per share (approximately 13%) by July 3, 2012.

- Following the Company's July 25, 2012 press release in which defendant Singh referred to the "highly encouraging survival benefit" observed to that point in patients traded with ICT-107, the Company's common stock shot upward, gaining $0.37 per share (approximately 13%) by close of trading on July 30, 2012.

366. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and perpetuate a course of conduct that caused the price of IMUC shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of IMUC shares was removed, and the price of IMUC shares fell.

367. Signs of trouble first became apparent with IMUC's announcement of Singh's resignation, which raised issues with respect to Singh's entitlement to employment benefits (the first indication of misconduct related to the use of promoters issuing false and misleading statements about *inter alia*, the viability of ICT-107 and the Phase I clinical data), causing IMUC stock to decline $0.61 (20%) over two days of trading.

368. With respect to the true efficacy of ICT-107, the truth would be revealed on December 11, 2013, when, after the market closed, the Company

issued a press release announcing that its ICT-107 Phase II study's primary endpoint of overall survival was not statistically significant -- news that sent the Company's common stock price careening down $1.62 per share, or nearly 60%, to close at $1.10 per share on December 12, 2013. The false impressions created by the promotional articles and Company officers with respect to how astounding the Phase I results were and how Phase II just needs to be half as good as Phase I were finally debunked at this point when Phase II failed to meet its primary endpoints.

369. Further, following the April 10, 2017 public announcement by the SEC related to its crackdown on illegal stock promotions against certain of the defendants named herein and for the perpetuation of the portions of the fraud alleged above, the Company's common stock declined nearly 5% on April 11, 2017.

370. As a result of their purchases of IMUC shares during the Class Period at artificially inflated prices, Plaintiffs, and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

371. The timing and magnitude of the price decline in IMUC shares negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## VIII. PRESUMPTION OF RELIANCE

372. At all relevant times, the market for IMUC common stock was efficient for the following reasons:

a. IMUC stock met the requirements for listing, and were listed and actively traded on the NYSE MKT or OTCBB, a highly efficient and automated market;

b. IMUC filed periodic reports with the SEC and NYSE;

c. IMUC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. IMUC was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

373. As a result of the foregoing, the market for IMUC stock promptly digested current material information regarding IMUC from all publicly available sources and reflected such information in IMUC's stock price. Under these circumstances, all purchasers of IMUC stock during the Class Period suffered similar injury through their purchase of IMUC stock at artificially inflated prices, and a presumption of reliance applies.

374. Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiffs are

titled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

375. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

376. None of the statements complained of herein was a forward-looking statement. Rather, each was historical a statement or a statement of purportedly current facts and conditions at the time such statement was made.

377. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements, rendering any generalized risk disclosures made by Pearson were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

378. To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement

because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

## X. CLAIMS FOR RELIEF

**COUNT I**

**(Against All Defendants For Violations of Section 10(b) And Rule 10b-5(b) Promulgated Thereunder)**

379. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

380. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

381. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

382. Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, conspiracies, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of IMUC common stock during the Class Period.

383. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of IMUC, Lavos and/or Lidingo were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of IMUC, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning IMUC, participated in the fraudulent scheme alleged herein.

384. The Individual Defendants, who were the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with extreme reckless disregard

for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other IMUC personnel or Lidingo Defendants to members of the investing public, including Plaintiffs and the Class.

385. As a result of the foregoing, the market price of IMUC common stock was artificially inflated during the Class Period. Unaware of the falsity of the statements by Defendants, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of IMUC common stock during the Class Period in purchasing IMUC common stock at prices that were artificially inflated as a result of the false and misleading statements by Defendants.

386. Had Plaintiffs and the other members of the Class been aware that the market price of IMUC common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased IMUC common stock at the artificially inflated prices that they did, or at all.

387. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

388. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to the

Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of IMUC common stock during the Class Period.

**COUNT II**

**(Violations of Section 10(b) of the Exchange Age and Rule 10b-5(a) & (c) Against IMUC, Singh, Lavos, and the Lidingo Defendants)**

389. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

390. During the Class Period, IMUC, Singh, Lavos and the Lidingo Defendants violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of IMUC publicly traded common stock during the Class Period as alleged in.

391. During the Class Period, IMUC, Singh, Lavos, and the Lidingo Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

392. IMUC, Singh, Bjorlin, Hodge, Cassano and Nichols made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. IMUC, Singh, Bjorlin, Hodge, Cassano and Nichols, individually and together, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of IMUC as specified herein.

393. IMUC, Singh, Bjorlin, Hodge, Cassano and Nichols had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing IMUC's true financial condition from the investing public and supporting the artificially inflated price of IMUC common stock.

394. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IMUC publicly traded common stock. Plaintiffs and the Class would not have purchased IMUC publicly traded common stock at the prices they paid, or at all, had they been aware

that the market prices for IMUC common stock had been artificially inflated by IMUC's, Singh's, Bjorlin's, Hodge's, Cassano's and Nichols' materially false and misleading statements and omissions.

**COUNT III**

**(Violations of Section 20(a) of the**
**Exchange Act Against the Individual Defendants, Bjorlin, and Hodge)**

395. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

396. Defendants named in this count acted as controlling persons of Lidingo, Lavos and/or IMUC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Lidingo's, Lavos' and/or IMUC's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants, and Bjorlin and Hodge had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, Lavos and/or Lidingo, including the content and dissemination of the materially false and misleading statements alleged herein.

397. During the Class Period, the Individual Defendants participated in the operation and management of IMUC, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their

senior positions, they knew the adverse non-public information about the Company's misstatement and false statements.

398. During the Class Period, Singh, Bjorlin and Hodge participated in the operation and management of Lavos and/or Lidingo, and conducted and participated, directly and indirectly, in the conduct of the business affairs of Lavos and/or Lidingo. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement and false statements.

399. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to IMUC financial condition and results of operations, and to correct promptly any public statements issued by IMUC which had become materially false or misleading.

400. Each of the Individual Defendants, Bjorlin and/or Hodge, therefore, acted as a controlling person of IMUC, Lavos and/or Lidingo. By reason of their senior management positions and/or being directors of IMUC, Lavos and/or Lidingo, the Individual Defendants, Bjorlin and/or Hodge had the power to direct the actions of, and exercised the same to cause, IMUC, Lavos and/or Lidingo to engage in the unlawful acts and conduct complained of herein. The Individual Defendants, Lavos and/or Lidingo exercised control over the general operations of IMUC, Lavos and/or Lidingo and possessed the power to control the specific

activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

401. By reason of the above conduct, the Individual Defendants, Bjorlin and Hodge are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by IMUC, Lavos and/or Lidingo.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XII. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Respectfully submitted this 24th day of August, 2017.

**GLANCY PRONGAY & MURRAY LLP**

By: /s/Lionel Z. Glancy
Lionel Z. Glancy
Robert V. Prongay
1925 Central Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: lglancy@glancylaw.com

*Liaison Counsel for Plaintiffs and the Class*

**WOLF POPPER LLP**
Robert C. Finkel
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093
E-mail: rfinkel@wolfpopper.com

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins (to be admitted pro hac vice)
Sebastian Tornatore (to be admitted pro hac vice)
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
E-mail: shopkins@zlk.com
stornatore@zlk.com

*Co-Lead Counsel for Plaintiffs and the Class*

**AMENDED PLAINTIFF CERTIFICATION**
**UNDER THE FEDERAL SECURITIES LAWS**

I, Arthur Kaye, hereby state, on behalf of Arthur Kaye IRA FCC As Custodian DTD 6-8-00 ("Arthur Kaye IRA"):

1. I have reviewed the accompanying Consolidated First Amended Complaint against ImmunoCellular Therapeutics, Ltd. ("ImmunoCellular"), certain of its officer(s), other individuals and/or entities, and have authorized the filing of that complaint on my behalf.

2. I am willing to serve as a representative party on behalf of the Class, as defined in the above referenced Consolidated First Amended Complaint, including providing testimony at deposition and trial, if necessary.

3. The following includes all of my transactions in ImmunoCellular common stock during the period May 1, 2012 through December 11, 2013.

See attached.

4. I did not purchase these shares at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

5. During the three-year period preceding the date of signing this certification other than with respect to this action, I have not sought to serve, and have not served, as a representative on behalf of a class in any private action arising under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, such as lost wages relating to the representation of the Class.

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24 day of August 2017

By: ______________________
Arthur Kaye

## LIST OF IMMUNOCELLULAR THERAPEUTICS LTD. PURCHASES AND SALES

| TRADE DATE | PURCHASE OR SALE | QUANTITY | PRICE PER SHARE |
|---|---|---|---|
| 5/2/2012 | Purchase | 90,000 | $2.59 |
| 5/8/2012 | Purchase | 50,000 | $2.11 |
| 5/10/2012 | Sale | 50,000 | $2.64 |
| 5/11/2012 | Purchase | 36,000 | $2.70 |
| 5/25/2012 | Sale | 36,000 | $3.04 |
| 6/1/2012 | Purchase | 10,000 | $3.46 |
| 7/24/2012 | Purchase | 20,000 | $2.85 |
| 8/1/2012 | Sale | 5,000 | $3.25 |
| 8/10/2012 | Purchase | 5,000 | $2.97 |
| 8/21/2012 | Purchase | 10,000 | $2.45 |
| 11/14/2012 | Purchase | 3,500 | $1.59 |
| 6/25/2013 | Purchase | 26,500 | $1.99 |
| 7/19/2013 | Purchase | 30,000 | $2.32 |
| 7/30/2013 | Purchase | 20,000 | $3.08 |
| 7/30/2013 | Sale | 20,000 | $3.48 |
| 8/6/2013 | Sale | 8,000 | $3.69 |
| 8/7/2013 | Purchase | 8,000 | $3.40 |
| 8/9/2013 | Purchase | 25,000 | $3.23 |
| 8/27/2013 | Purchase | 20,000 | $2.91 |
| 11/7/2013 | Purchase | 3,500 | $2.59 |
| 11/26/2013 | Purchase | 1,500 | $3.36 |

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On August 24, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 24, 2017, at Los Angeles, California.

*s/ Lionel Z. Glancy*
Lionel Z. Glancy

# Mailing Information for a Case 2:17-cv-03250-FMO-SK Arthur Kaye IRA FCC as Custodian DTD 6-8-00 v. ImmunoCellular Therapeutics, Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John C Dwyer**
  jdwyer@cooley.com,bgiovannoni@cooley.com
- **Robert C Finkel**
  rfinkel@wolfpopper.com,cdunleavy@wolfpopper.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **Jeffrey M Kaban**
  jkaban@cooley.com,lalmanza@cooley.com
- **Charles Henry Linehan**
  clinehan@glancylaw.com
- **Lesley F Portnoy**
  LPortnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Rosemary M Rivas**
  rrivas@zlk.com,qroberts@zlk.com,ebigelow@zlk.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com
- **Elizabeth Harper Skey**
  eskey@cooley.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`