GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Lesley F. Portnoy (#304851)
Charles H. Linehan (#307439)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel On Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARTHUR KAYE IRA FCC AS CUSTODIAN DTD 6-8-00, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:17-cv-03250-FMO (SKx) |
| | **CLASS ACTION** |
| Plaintiff, | **CONSOLIDATED SECOND AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| IMMUNOCELLULAR THERAPEUTICS, LTD., DAVID FRACTOR, JOHN S. YU, ANDREW GENGOS, MANISH SINGH, LAVOS, LLC, LIDINGO HOLDINGS, LLC, KAMILLA BJORLIN, ANDREW HODGE, BRIAN NICHOLS, VINCENT CASSANO, CHRISTOPHER FRENCH, AND STEPHEN RAMEY, | |
| Defendants. | |

CONSOLIDATED SECOND AMENDED COMPLAINT

# **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ...................................................................... 2

II.     JURISDICTION AND VENUE .................................................................. 9

III.    PARTIES ...................................................................................................... 10

        A.      LEAD PLAINTIFFS ............................................................................ 10

        B.      COMPANY DEFENDANT ................................................................ 11

        C.      OFFICER DEFENDANTS .................................................................. 11

        D.      LIDINGO DEFENDANTS .................................................................. 13

IV.     SUBSTANTIVE ALLEGATIONS ........................................................... 18

        A.      COMPANY BACKGROUND ............................................................ 18

        B.      THE FDA'S REQUIREMENTS FOR DEMONSTRATING EFFECTIVENESS AT
                TRIAL ............................................................................................... 19

        C.      ICT-107 – THE SUPPOSED GBM MIRACLE DRUG .................................. 21

        D.      PRIOR TO AND THROUGHOUT THE CLASS PERIOD, THE COMPANY
                REMAINED HIGHLY DEPENDENT ON THE SUCCESS OF ICT-107 AT
                CLINICAL TRIAL ............................................................................. 26

        E.      CERTAIN DEFENDANTS CREATE A STOCK PROMOTION SCHEME TO
                ARTIFICIALLY BOOST IMUC'S MARKET CAP IN VIOLATION OF THE
                FEDERAL SECURITIES LAWS AND SEEKING ALPHA'S TERMS OF USE ..... 26

                1.      The Securities Laws on Stock Promotion Prohibit Non-
                        Disclosure of Payments Received for Promotional
                        Publications ............................................................................. 27

                2.      Defendant Singh Was Motivated to Execute the Scheme by
                        Virtue of a Compensation Structure That Encouraged Him to
                        Bolster the Stock Price by Any Means Necessary .................... 28

CONSOLIDATED SECOND AMENDED COMPLAINT
i

3.      Defendants Seek to Exploit Seeking Alpha in their Scheme ..... 36

4.      Defendants Singh and Bjorlin Lay the Groundwork for their Scheme ........................................................................................ 37

F.     WITH THE FOUNDATION NOW SET, CERTAIN DEFENDANTS EXECUTE THE ACTIVE MANIPULATION PHASE OF THE SCHEME .................................... 38

1.      The IMUC Articles Were the Product of a Calculated Scheme Planned by Defendants Singh and Bjorlin with One Goal: to Artificially Move the Company's Stock Price Upwards Without Detection by the Investing Public ................................................. 40

2.      IMUC Maintained Ultimate Authority Over the Pre-Class Period and Class Period Articles Through its CEO, Defendant Singh .. 45

G.     THE COMPANY USES THE IMUC ARTICLES TO PROP UP THE STOCK PRICE WITH COMMENTARY ABOUT ICT-107 AND THE LIKELIHOOD OF SUCCESS AT PHASE II THAT IT COULD NOT OTHERWISE SAY ITSELF ..... 46

1.      The Articles Misrepresent ICT-107 as a Trailblazing Drug that Will Drive IMUC Growth After a Successful Phase II .............. 54

2.      The Articles Misrepresent the Company's NYSE Uplisting ...... 55

3.      The IMUC Articles Misrepresent the Likelihood of ICT-107 Receiving the Breakthrough Designation .................................... 56

4.      The Class Period Articles Were Timed to Amplify Good News and Mitigate Bad News .............................................................. 58

H.     THE ACTIVE STOCK PROMOTION SCHEME IS CUT SHORT WHEN SINGH IS FORCED TO RESIGN, BUT THE FRUITS OF THE SCHEME ARE ALLOWED TO REMAIN IN THE MARKET BY COMPANY MANAGEMENT ........................ 61

I.     WITH THE NEED FOR ADDITIONAL FINANCING ON THE HORIZON, COMPANY MANAGEMENT PAINSTAKINGLY SEEKS TO KEEP ANY CONNECTION BETWEEN IMUC AND LIDINGO QUIET ............................ 68

CONSOLIDATED SECOND AMENDED COMPLAINT

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS.................................................72

      A.    THE IMUC ARTICLES WERE MATERIALLY FALSE AND MISLEADING
            WHEN PUBLISHED BECAUSE THEY AFFIRMATIVELY MISSTATED AND/OR
            OMITTED MATERIAL FACTS ....................................................72

      B.    THE IMUC OFFICER DEFENDANTS MADE MATERIALLY FALSE AND
            MISLEADING STATEMENTS IN IMUC'S SEC FILINGS............................91

VI.   THE TRUTH IS REVEALED WHEN THE COMPANY ANNOUNCES
      NEGATIVE PHASE II RESULTS, THEREBY REMOVING FROM THE
      MARKET THE INFLATION CAUSED BY THE LIDINGO ARTICLES 138

VII.  POST-CLASS PERIOD EVENTS....................................................146

      A.    A DEFEATED IMUC BEGINS TO PUBLICLY ACKNOWLEDGE ITS ROLE IN
            THE STOCK PROMOTION SCHEME THROUGH A PAIR OF PARTIAL
            DISCLOSURES ................................................................146

      B.    THE SEC REVEALS THE FULL RELATIONSHIP WITH IMUC AND LIDINGO,
            BRINGING TO LIGHT THE COMPANY'S ROLE IN THE MATERIALLY FALSE
            AND MISLEADING IMUC ARTICLES ........................................148

VIII. ADDITIONAL SCIENTER ALLEGATIONS ........................................150

      A.    MANISH SINGH..............................................................150

      B.    DAVID FRACTOR ............................................................155

      C.    JOHN S. YU ..................................................................157

      D.    ANDREW GENGOS ...........................................................158

      E.    IMUC ........................................................................159

      F.    KAMILLA BJORLIN .........................................................161

      G.    ANDREW HODGE.............................................................164

      H.    BRIAN NICHOLS .............................................................166

CONSOLIDATED SECOND AMENDED COMPLAINT

iii

      I.        VINCENT CASSANO ............................................................................ 168

      J.        STEPHEN RAMEY ............................................................................. 170

      K.      CHRISTOPHER FRENCH .................................................................... 171

      L.       LAVOS LLC ................................................................................... 172

      M.     LIDINGO ......................................................................................... 172

IX.     PLAINTIFFS' CLASS ACTION ALLEGATIONS ..................................... 173

X.      LOSS CAUSATION ............................................................................ 176

XI.     PRESUMPTION OF RELIANCE ......................................................... 188

XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ...................................................... 189

XIII.   CLAIMS FOR RELIEF ...................................................................... 190

XIV.  PRAYER FOR RELIEF ...................................................................... 199

XV.   DEMAND FOR TRIAL BY JURY ....................................................... 199

Arthur Kaye IRA FCC as Custodian DTD 6-8-00 and Hayden Leason, the Court-appointed Co-Lead Plaintiffs ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Second Amended Complaint ("Complaint") against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things (a) analyses of regulatory filings made by ImmunoCellular Therapeutics, Ltd. ("IMUC," "Immunocellular," or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) analyses of press releases and investor presentations and conference calls issued or disseminated by IMUC; (c) analyses of news stories, internet postings and other publicly available information concerning IMUC; (d) interviews of former IMUC employees; (e) articles published on *seekingalpha.com* and *benzinga.com* about the Company; and (f) analysts' reports and advisories about the Company.   This Complaint also incorporates by reference the following cease-and-desist orders and SEC action: (i) *In the Matter of Manish Singh and Lavos, LLC*, File No. 3-17920 (SEC Apr. 10, 2017) ("Singh Order"); (ii) *In the Matter of ImmunoCellular Therapeutics, Ltd.* File No. 3-17912 (SEC Apr. 10, 2017) ("IMUC Order"); (iii) *Securities and Exchange Commission v. Lidingo Holdings, LLC*, 17-cv-02540, ECF No. 1 (S.D.N.Y. Apr. 10, 2017) ("Lidingo Action") including Appendix A; (iv) *In the Matter of Stephen*

*Ramey*, File No. 3-17916 (SEC Apr. 10, 2017) ("Ramey Order"); and (v) *In re Matter of Christopher French*, File No. 3-17921 ("French Order").

## I.     NATURE OF THE ACTION

1.     This is a federal securities fraud class action on behalf of a class consisting of all persons other than Defendants[1] who purchased or otherwise acquired IMUC common stock on the open market from May 1, 2012 through May 30, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5(a); (b); and (c) promulgated thereunder.

2.     IMUC is a development stage company that seeks to develop and commercialize new therapeutics by using the body's own immune system for the treatment of cancer, such as brain, ovarian and other solid cancer tumors.  During the Class Period, the Company's lead product candidate was ICT-107, a dendritic cell ("DC") based vaccine targeting multiple tumor associated antigens for glioblastoma multiforme ("GBM"), the most common type of brain cancer.

---

[1] As used herein, "Defendants" collectively refer to: IMUC, David Fractor ("Fractor"); John S. Yu ("Yu"); Andrew Gengos ("Gengos"); Manish Singh ("Singh"); Lavos, LLC ("Lavos"); Lidingo Holdings, LLC ("Lidingo"); Kamilla Bjorlin ("Bjorlin"); Andrew Hodge ("Hodge"); Brian Nichols ("Nichols"); Vincent Cassano ("Cassano"); Stephen Ramey ("Ramey"); and Christopher French ("French").  Defendants IMUC, Fractor, Yu, Gengos, and Singh are collectively referred to herein as the "IMUC Defendants."  Defendants Lidingo, Bjorlin, Hodge, Nichols, Cassano, Ramey and French are collectively referred to herein as the "Lidingo Defendants."

3.      This action is predicated on the extensive and pervasive fraud orchestrated and perpetuated by the Defendants (defined herein) who embarked on a fraudulent scheme to misrepresent the efficacy of the Company's primary vaccine candidate, ICT-107, as a treatment for glioblastoma multiforme ("GBM"), the most common type of brain cancer, by participating in an illegal stock promotion scheme whereby purportedly independent investors and analysts flooded the market with glowing reviews of the Company's stock and clinical performance, while concurrently receiving payment from the Company, the disclosure of which was painstakingly withheld from the market so as to keep the investing public in the dark.

4.      During the Class Period, IMUC, through its then-Chief Executive Officer ("CEO"), defendant Manish Singh, entered into a written contract with defendant Kamilla Bjorlin and her firm, Lidingo Holdings, LLC, a stock promotion company with a history of orchestrating illicit stock promotion schemes.  The agreement, which was not publicly disclosed, was for Lidingo to facilitate the fraud by injecting into the market dozens of materially false and misleading articles about the Company and its vaccines, including ICT-107.  The results were favorable, as Lidingo published article after article on popular investor websites such as Seeking Alpha and Benzinga raving about, *inter alia*, the Company's potential for a "breakthrough" in the immunotherapy space and the likelihood that continued positive clinical results would lead to a major partnership or acquisition by a larger

pharmaceutical company, driving the Company's stock price and market capitalization upwards (collectively, the articles published by Lidingo or its agents about IMUC prior to and during the Class Period, as identified *infra* in Section IV.G are referred to herein as the "IMUC Articles").

5.      The reality, however, was that these IMUC Articles were written by just a handful of Lidingo-paid writers (including defendants Andrew Hodge, Brian Nichols, Vincent Cassano, Stephen Ramey, and Christopher French), and posted under several different pseudonyms.  Further, each was meticulously crafted and edited with the oversight of Singh, who exercised managerial authority and editorial control over the entire process and who was receiving a $1.7 million kickback of his own from Lidingo through his own wholly-controlled stock promotion firm, defendant Lavos LLC.  The result was a deluge of articles strategically placed into the market to artificially inflate the stock price of IMUC despite the fact that its primary drug candidate was headed towards failure in its Phase II study.

6.      ***Every article*** published by a Lidingo-affiliated author about IMUC during the Class Period failed to disclose that the author or individual identified in the byline had been compensated for publication or the amount of any such compensation.  This was a purposeful gambit orchestrated by defendants Singh, Bjorlin, and Hodge, who required authors to refrain from making any compensation disclosure (in violation of both Seeking Alpha's terms of service and the federal securities laws) and insulted and disqualified from consideration any writer who

indicated they would do so.

7.     Thus, as set forth herein, the statements made in the IMUC Articles, which are imputed onto the Company by virtue of the doctrine of *respondeat superior* as each was made under the control of IMUC's then-CEO defendant Singh, were materially false and misleading when made because, among other reasons: (1) ICT-107 was not poised for success at Phase II and had not exhibited evidence of effectiveness to that point; (2) the IMUC Articles fail to make any mention of the compensation received by the author or that the article was being published at the behest and under the direction of IMUC; and (3), as a result, IMUC's business prospects were far worse than represented.

8.     The first signs of the truth began to emerge on August 20, 2012, when IMUC disclosed in a Form 8-K filed with the SEC that Singh had resigned as IMUC's CEO and President.  The Company explained in the Form 8-K that Singh had "tendered his resignation together with a claim that he was entitled to severance benefits under the terms of his existing employment agreement.  The Company accepted his resignation, confirmed his termination of employment with the Company, including termination as the Company's President and Chief Executive Officer, and disputed any claims for severance benefits for Dr. Singh."  Singh's resignation, and the Company's unwillingness to pay Singh severance payments, caused IMUC stock to decline $0.48 per share or more than 16%, declining an additional 5% (or $0.13 per share) on August 22, 2012, to close at $2.30 per share as

the market continued to digest Singh's resignation and questions from an analyst from Cowan & Company as to whether Singh's resignation had "anything to do with data or trial conduct, either Phase I or Phase II" arose.

9.     Yet even after Singh's resignation, IMUC failed to reveal that the IMUC Articles were part of a paid promotion scheme originally orchestrated by IMUC and Singh, nor correct the misrepresentations made therein about the efficacy of ICT-107.

10.     Instead, the Company, through its SEC filings and management, continued to perpetuate the fraudulent misstatements set forth in the IMUC Articles and by Singh when the Company was able to complete secondary stock offerings on October 2012 and April 2013, enabling the Company to raise $24 million.

11.     On December 11, 2013, after the market closed, the Company released its Phase II clinical study of ICT-107 ("Phase II"), revealing that the "differences in the overall survival (OS K-M) curves did not reach statistical significance in the intent-to-treat population (the primary endpoint) or the per-protocol population." Without reaching a statistical significance with the primary endpoint of overall survival and failing to reach oncology's gold standard, the Company was left with no choice, but to emphasize its secondary endpoint of progression-free survival where there was a statistical significance.

12.     The revelation of the failure of Phase II exposed how limited the test results from Phase I were despite the constant drum-beat of the promotional articles

prior to and during the Class Period that represented that Phase I was an "astounding" (¶ 205) breakthrough in fighting GBM, and that IMUC would be awarded approval and "be considered the best treatment in the market" if Phase II results are "25% as good" as Phase I data. (¶ 245).

13.     As a result of this further disclosure, IMUC stock declined $1.62 per share or nearly 60%, to close at $1.10 per share on December 12, 2013.

14.     The plug was finally pulled on the IMUC Articles on Sunday, June 1, 2014, when the Company reported updated efficacy and safety results from mature Phase II ICT-107 clinical data, giving up the ruse with respect to any claim to statistical significance of the drug for the entire patient group and instead focused on the small subgroup of individuals.

15.     With no hope for ICT-107 based on these mature results, the market reacted swiftly, sending the Company's stock down more than 14%, from $1.34 on Friday, May 30, 2014 (the last trading day prior to the announcement) to $1.15 per share on June 2, 2014.

16.     Throughout the Class Period, each IMUC Defendant was aware that their statements and the statements made in the IMUC Articles concerning the efficacy of ICT-107 were false and misleading at the time they were made because, *inter alia,* (i) **the IMUC Defendants were in possession of the Phase I clinical data and the observations therein that directly belied any public commentary on the likelihood of success at Phase II**; and (ii) defendant Singh exercised total editorial

CONSOLIDATED SECOND AMENDED COMPLAINT

7

control and final approval over any Lidingo-published article.

17.     Further, each IMUC Defendant was aware that the statements made in the IMUC Articles about the author's non-receipt of compensation and the omission of the amount of that compensation was false and misleading at the time they were made because: (i) Defendant Singh entered into the engagement contract with Lidingo whereby he agreed that the Company would pay Lidingo for its promotional articles and then exercised editorial and managerial oversight over the process in his capacity as IMUC CEO; (ii) Defendant David Fractor, as *the only financial officer* of a Company with just a handful of employees, was responsible for the financial reporting of the Company and would have been privy to any outside contracts made with a third-party like Lidingo; (iii) Defendant John S. Yu, as chairman of the Board of Directors for IMUC (the "Board"), co-founder of the Company, and Chief Scientific Officer, was intimately involved in the day-to-day operation of IMUC, even assuming the position of Interim Chief Executive Officer after the resignation of defendant Singh – a position he held at the time the final payment was made from IMUC to Lidingo for its stock promotion services; and (iv) Defendant Andrew Gengos, upon assuming the CEO position in December 2012 of a company with just a handful of employees, knew or was reckless in not knowing that the Company had engaged Lidingo during that same year in an effort to violate the federal securities laws regarding stock promotion; a fact he certainly would have learned at the latest upon the receipt of any request by the SEC regarding its investigation into the same,

and one he should have learned prior to the execution of any certification certifying that there was no fraud among management of the Company.

18.     Finally, each of the Lidingo Defendants was aware that the statements made in the IMUC Articles about the author's non-receipt of compensation and the omission of the amount of that compensation were false and misleading at the time they were made because: (i) defendants Bjorlin and Lidingo were actually receiving payments from IMUC; (ii) defendants Hodge, Nichols, Cassano, Ramey and French were actually receiving payments from Lidingo in exchange for their articles and contributions to the IMUC promotion scheme; and (iii) each of the Lidingo Defendants purposely forbid or withheld any disclosure regarding their receipt of compensation in order to comply with the established scheme instituted at the demand of defendant Singh and defendant Bjorlin.

19.     As a result of Defendants' wrongful acts and misleading statements and omissions, and the precipitous decline in the market value of IMUC common stock, Plaintiffs and other Class members have suffered damages.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5(a); (b); and (c) promulgated thereunder (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

22.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company's principal place of business is located within this District.

23.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

24.     As set forth in the certification previously filed with the Court, Arthur Kaye IRA FCC as Custodian DTD 6-8-00 ("Dr. Kaye") purchased IMUC common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts, and on the integrity of the market for IMUC common stock, at artificially inflated prices during the Class Period, and was damaged when the truth about IMUC was revealed to the market.

25.     As set forth in his certification previously filed with the Court (Dkt. No. 28-2), Hayden Leason ("Leason") purchased IMUC common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts, and on the integrity of the market for IMUC common stock, at artificially inflated prices during the Class Period, and was damaged when the truth about

IMUC was revealed to the market.

## B.   Company Defendant

26.       Defendant IMUC is a Delaware corporation with principal executive offices located in Calabasas, California.  IMUC common stock has since May 30, 2012 traded on the NYSE American (formerly known as the American Stock Exchange and, during the Class Period, the NYSE MKT) ("NYSE Market"), a domestic exchange, under the ticker symbol "IMUC."  Prior to May 30, 2012, IMUC common stock traded on the over-the-counter bulletin board ("OTCBB"), a domestic exchange, under the ticker symbol "IMUC."  IMUC has settled related charges that the SEC brought against it arising out of the facts alleged herein, agreeing to cease and desist from violations of the federal securities laws, including Sections 17(a) and 17(b) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c) promulgated herein.

## C.   Officer Defendants

27.       Defendant Singh was IMUC's President, Chief Executive Officer ("CEO") and a director from February 2008 through August 14, 2012.  On August 20, 2012, IMUC announced that Singh tendered his resignation effective August 14, 2012.  From 2011 until 2014, Singh controlled Lavos, and directed and authorized the activities of stock promotion firm Lidingo.  *See* Singh Order, at 2.  As stated in IMUC's Proxy Statement dated August 10, 2012, Form DEF 14A ("2012 Proxy"), Singh purported to have "extensive knowledge and experience" "in the

biotechnology field" and "financing early stage healthcare companies through his prior work in the venture capital field."  As identified herein, during the Class Period, Singh signed several Company SEC filings on behalf of IMUC and the accompanying Sarbanes-Oxley ("SOX") certifications.  Further, as alleged herein, *infra* Section IV.F.2, Defendant Singh, as CEO of IMUC, exercised editorial control and complete authority over the publication of IMUC Articles[2] both prior to and during the Class Period while also engaging in the violative scheme through acts separate and apart from the non-disclosure and/or misrepresentation of material information.  Singh has settled related charges the SEC brought against him arising out of the facts alleged herein.  He has agreed to cease and desist from violating the federal securities laws, including Sections 17(a) and 17(b) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c) promulgated thereunder.  Additionally, Singh has agreed to pay disgorgement of $1.75 million, prejudgment interest of $151,676.94 and a civil monetary penalty of $1 million to the SEC.  For five years after the entry of the SEC's cease-and-desist order, Singh is barred from participating in any offering of a penny stock, and he is prohibited from acting as an officer or director of any issuer that has a class of securities issued under Section 12 of the Securities Act.

28.     Defendant John S. Yu ("Yu"), a founder of the Company, served as

---

[2] "IMUC Articles" refers to the articles published by Lidingo-affiliated writers or under Lidingo pseudonyms on behalf of IMUC during the Class Period, as identified in the table presented *infra*, Section IV.G, ¶ 132.

CONSOLIDATED SECOND AMENDED COMPLAINT

12

Chairman of the Company's Board of Directors ("Board") and as its Chief Scientific Officer from January 2007 until September 2015.  Yu served as Interim Chief Executive Officer from August 2012 until November 2012.  Yu has served as a director from November 2006 to the present.  As identified herein, during the Class Period, Yu signed several Company SEC filings on behalf of IMUC and the accompanying SOX certifications.

29.     Defendant David Fractor ("Fractor") has served as the Company's Treasurer and Chief Financial Officer ("CFO") from April 2011 to the present and as its Vice President of Finance and Principal Accounting Officer from March 2013 to the present.  As identified herein, during the Class Period, Fractor signed several Company SEC filings on behalf of IMUC and the accompanying SOX certifications.

30.     Defendant Andrew Gengos ("Gengos") served as the Company's President, Chief Executive Officer, and director from December 2012 through December 2016.    As identified herein, during the Class Period, Gengos signed several Company SEC filings on behalf of IMUC and the accompanying SOX certifications.

### D.     <u>Lidingo Defendants</u>

31.     Defendant Lidingo was a Nevada limited liability company formed in 2011 and dissolved in 2014.  Lidingo was owned and operated by Bjorlin.  During its existence, Lidingo provided promotional services to issuers including IMUC, and facilitated the publication on various investment websites of over 400 articles about

its issuer clients and the clients of an affiliated promotional services company, Lavos, with which Lidingo shared compensation. *See* Lidingo Action, ¶9. Prior to and during the Class Period, Lidingo worked in concert with IMUC, Lavos, Bjorlin, Hodge and Singh to hire writers to prepare and publish paid promotional articles promoting IMUC stock, which were first reviewed, edited, approved, and authorized by IMUC through Singh, with Lidingo serving as intermediary between the writers and IMUC.

32.    Defendant Bjorlin organized and operated Lidingo. From no later than September 2011 through at least March 2014, Bjorlin facilitated Lidingo's stock promotion services on behalf of publicly-traded issuer clients, often using her stage name, Milla Bjorlin. *Id.* "Bjorlin and Lidingo received cash and equity of at least $1 million from the promotional scheme" on behalf of clients during Lidingo's operational period. *Id.* at ¶28. Prior to and during the Class Period, Bjorlin worked in concert with IMUC, Lavos, Lidingo, Hodge and Singh to hire writers to prepare and publish paid promotional articles promoting IMUC stock, which were first reviewed, edited, approved, and ultimately authorized by IMUC and Singh, but failed to disclose such review or the writers' payment for their articles.

33.    Defendant Hodge, from no later than December 2011 through at least March 2014, was employed by Lidingo and assisted Bjorlin in Lidingo's stock promotion work, including interacting with issuer clients, providing direction to writers drafting articles on behalf of those clients, and receiving compensation

totaling at least $340,000 from Lidingo. *Id*. ¶5. Prior to and during the Class Period, Hodge worked in concert with IMUC, Lavos, Lidingo, Bjorlin and Singh to hire writers to prepare and publish paid promotional articles promoting IMUC stock, which were first reviewed, edited, approved, and ultimately authorized by IMUC and Singh, but failed to disclose such review or the writers' payment for their articles.

34.     Defendant Nichols, from no later than February 2012 through at least March 2014, was a paid writer for Lidingo, publishing articles about issuer clients on various investment websites under his own name. As part of his Seeking Alpha profile, Nichols describes himself as a research analyst. At times relevant hereto, Nichols had approximately 5,000 followers[3] on his Seeking Alpha account. In total, "Nichols received at least $200,000 in total compensation, including bonuses, from Lidingo for his services in the stock promotion scheme" on behalf of all Lidingo clients during that company's operational period. *Id*. ¶54. Nichols also wrote paid articles which Lidingo published under its own pseudonyms, including A. John Hodge (which had approximately 300 followers), The Swiss Trader (which had approximately 300 followers), and Amy Baldwin (which had approximately 300 followers). During the Class Period, at least 8 of the IMUC Articles were published by Nichols.

---

[3] As a follower of an author on Seeking Alpha, the follower is able to read the author's articles and instablogs in his/her "Authors You Follow" section of Seeking Alpha's website.

35.     Defendant Cassano, from no later than August 2011 through at least November 2011, was a paid writer for Lavos, publishing articles about issuer clients of Lavos on investment websites under the pseudonym VFC's Stock House. Cassano received at least $6,700 in total compensation from Lavos for his services in the stock promotion scheme.  In addition, from no later than November 2011 through at least April 2013, he was a paid writer for Lidingo, publishing articles about issuer clients on investment websites, also under the pseudonym VFC's Stock House, and received at least $27,000 in total compensation from Lidingo for his services in publishing paid promotional articles.  From 2011 to 2014, Cassano's pseudonym VFC's Stock House had approximately 2,000 followers on Seeking Alpha.  During the Class Period, at least two of the IMUC Articles were published by Cassano.

36.     Defendant Ramey settled with the SEC and has agreed to disgorge $35,000, prejudgment interest of $3,538, and a civil money penalty of $24,000 in 21 installments to the SEC as part of his settlement for violating §§17(a) and (b) of the Securities Act and §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder "when he wrote articles for a stock promotion firm when he knew the stock promotion firm would publish the articles without disclosure of compensation" between November 2011 and November 2013, including Lidingo. Ramey Order, at 2.  During the period of the promotion scheme, Ramey's pseudonym Chemistfrog's Seeking Alpha account had approximately 900 followers.

During the Class Period, at least four of the IMUC Articles were published by Ramey.

37.     Defendant French settled with the SEC and has agreed to disgorge $16,100, prejudgment interest of $2,105, and a civil penalty in the amount of $20,000 in 13 installments to the SEC as part of his settlement for violating §§17(a) and (b) of the Securities Act and §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder "by paying freelance writers to write purportedly independent articles describing securities that he then published on investment websites without disclosing that they were paid promotions" between August and November 2012, including articles published through his connection with Lidingo. French Order, at 2.  During the period of the promotion scheme, French had approximately 500 followers on his Seeking Alpha's account.  During the Class Period, at least one of the IMUC Articles was published by French.

38.     Defendant Lavos was formed in Nevada in 2011 by Singh "with his wife as the managing member and sole principal."  *Id*. at ¶2 n.2.  However, Singh's wife "did not have an operational role."  *Id*.  Singh "was Lavos' only employee and controlled its operations."  *Id*.  From 2011 to 2014, Lavos was controlled and operated by Singh, and provided promotional services to issuers that included the publication of more than 400 articles promoting securities on various investment websites.  *See* Singh Order, at 2.  Prior to and during the Class Period, Lavos worked in concert with IMUC, Singh, Lidingo, Hodge and Bjorlin to hire writers to

prepare and publish paid promotional articles recommending IMUC stock, which were first reviewed, edited, approved, and ultimately authorized by IMUC and Singh.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Company Background

39.      The Company was originally incorporated in Delaware in 1987 under the name Redwing Capital Corp. and conducted business unrelated to the development of immunotherapies until November 2006, when it changed its name to "ImmunoCellular Therapeutics, Ltd."

40.      That change in name and business in 2006 was spurred by the November 2006 acquisition of an exclusive, worldwide license from Cedars-Sinai Medical Center ("Cedars-Sinai") of certain technology for use as cellular-based immunotherapies, including dendritic cell-based vaccines for neurological disorders that include brain tumors and neurodegenerative disorders and other cancers.

41.      IMUC purports to develop and commercialize immunotherapy drugs to fight cancer by stimulating a patient's own immune system to target tumor antigens. Antigens are molecular signals that the immune system uses to identify foreign bodies.

42.      During the Class Period, the Company's lead pipeline product was ICT-107, which is a patient-specific, dendritic cell-based vaccine that purportedly targets six different tumor-associated antigens for the treatment of newly diagnosed

glioblastoma multiforme.

43.     As reported in the Company's Annual Report on Form 10-K filed with the SEC on March 21, 2012 (the "2011 Annual Report"), at that point in time IMUC had four full-time employees, including its President and Chief Executive Officer (Defendant Singh), a Vice-President-Product Development and Manufacturing (non-party James Bender) and a director of Business Development and Licensing (non-party Peter Ho).  At that point in time, the Company's Chairman of the Board and Chief Scientific Officer (Defendant Yu) and Chief Financial Officer (Defendant Fractor) were categorized as part-time employees.

44.     As reported in the Company Annual Report on Form 10-K filed with the SEC on March 11, 2013 (the "2012 Annual Report"), at that point in time IMUC had five full-time employees, including Defendant Singh, non-parties Bender and Ho, and two unnamed individuals.  At that point time, defendants Yu and Fractor were categorized as part-time employees.

45.     As reported in the Company Annual Report on Form 10-K filed with the SEC on March 14, 2014 (the "2013 Annual Report"), at that point in time IMUC had three full-time employees: Defendant Gengos; IMUC's Senior Vice President of Strategic Resources, non-party Anthony Gringeri; and an unnamed individual.  At that point time, defendants Yu and Fractor were categorized as part-time employees.

**B.     The FDA's Requirements for Demonstrating Effectiveness at Trial**

46.     For purposes of drug approval, "effectiveness" is not an abstract term

of puffery to be bandied about with disregard.  Instead, the U.S. Food and Drug Administration ("FDA") has set forth stringent criteria for demonstrating effectiveness at clinical trial.

47.     "Effectiveness" is defined by statute as "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 USC § 355(d). Substantial evidence is defined as "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." *Id.*

48.     The characteristics of an "adequate and well-controlled investigation" are described in 21 CFR 314.126, and are intended "to distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation." 21 CFR § 314.126(a).   Furthermore, "[u]ncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness." 21 CFR § 314.126(e).

49.     Determining whether a drug is effective generally occurs in three phases. 21 CFR § 312.21. Phase I studies are "designed to determine the metabolism

and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." *Id.* Phase II studies consist of "controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug." *Id.* Finally, Phase III studies are "expanded controlled and uncontrolled trials . . . and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id.*

50.     As such, while an individual trial phase may be able to present some evidence towards the consideration of effectiveness, substantial evidence taken from a holistic assessment is required before any drug passes regulatory scrutiny.

### C.     ICT-107 – the Supposed GBM Miracle Drug

51.     Prior to and throughout the Class Period, IMUC, through the IMUC Articles, touted ICT-107 as its breakthrough drug for the treatment of GBM – the most aggressive form of brain cancer.

52.     GBM is the most common malignant primary brain tumor in adults with a yearly incidence rate of between 3 and 4 out of every 100,000 adults.

53.     The current standard of treatment options for these highly invasive and aggressive tumors generally involves surgical resection (to the extent that it is safe

and feasible) in addition to symptomatic therapies (focused on relieving symptoms and improving the patient's neurological functions, such as anticonvulsants and corticosteroids) and/or additional palliative therapies, including radiation and chemotherapy.

54.     Yet, GBM remains particularly difficult to treat for several reasons, including because: (1) the tumor cells are very resistant to conventional therapies; (2) the brain is susceptible to damage during conventional therapy; (3) the brain has a limited capacity to repair itself; and (4) many drugs cannot cross the blood-brain barrier to act on the tumor.  As a result, the common length of survival following diagnosis and with the standard of care is just 12 to 15 months, with survival for those who do not receive treatment at just 3 months.

55.     ImmunoCellular, like a handful of other biotechnology companies, sought to address GBM and other solid tumor cancers through the use of immune-response based therapies.

56.     To this end, in 2008 the Company began its Phase I study of ICT-107 for the treatment of GBM, seeking to stimulate the patient's own "immune response" in response to at least one tumor-associated antigen to kill the tumor cells from the inside.

57.     According to the Company, "ICT-107 is designed to activate a patient's immune system against specific tumor-associated antigens. ICT-107 activates a patient's immune system by extracting dendritic cells from that patient, loading the

dendritic cells with the antigens and reintroducing those cells to the patient's body to trigger an immune response."

58.     Dendritic cells "act as first responders that trigger the systems that help the body fight infection or foreign bodies, by initiating a T cell or T cell response to the infection or foreign body. The dendritic cells do this by recognizing, processing and presenting foreign antigens (substances that stimulate the production of antibodies and combine specifically with them) to the T cells, which then effectuate the immune response. The goal of a cell-based vaccine is to (i) make use of and enhance the dendritic cell's ability to trigger the T cell response and (ii) to stimulate the dendritic cell to focus the T cell response to specifically target the cancer cells for destruction."

59.     According to the Company in its December 23, 2008 press release, "[t]he Phase I clinical trial of ICT-107 was conducted to evaluate the safety and tolerability of the cancer vaccine in patients with glioblastoma, the most common and malignant type of brain cancer."

60.     In that same press release, the Company went on to report what it viewed as positive preliminary results:

> Of the 19 patients enrolled, seventeen patients are still alive, with eight patients surviving at least one year after the surgery that preceded their vaccine treatment. Ten patients were evaluated for immune responses, and five of them had a significant immune response to at least one tumor-associated antigen. Patients demonstrating an immune response are exhibiting a trend toward longer overall survival.

61.     In SEC filings dated April 23, 2009, May 14, 2009, June 12, 2009, and June 19, 2009, IMUC disclosed the number of patients in the Phase I study who exhibited an immune response and whether those patients achieved a survival benefit:

> Ten patients were evaluated for immune responses, and five of them had a significant response to at least one tumor-associated antigen. Patients demonstrating an immune response are exhibiting a trend toward longer overall survival. The preliminary data from our ICT-107 trial is encouraging and supports our view that immune therapies can potentially provide survival benefits for brain tumor patients.

62.     In a press release dated June 4, 2009, filed with the SEC, IMUC similarly disclosed that:

> Fifteen patients in the trial were evaluated for immune responses, and six of them had a significant immune response to at least one tumor-associated antigen. Patients demonstrating an immune response are exhibiting a trend toward longer overall survival.

63.     This disclosure with respect to the immune response of patients in the Phase I study and the survival benefit exhibited by those patients, was omitted from IMUC's subsequent SEC filings (without explanation).

64.     IMUC's omission of this disclosure, and the failure to explain this omission, especially in light of the failure of the Phase II trial, establishes a strong inference that defendants Yu, Singh and Fractor were aware as early as late 2009 that the immune response exhibited by patients in the Phase I study was neither "encouraging" nor did it "support[ ] [IMUC's] view that immune therapies can potentially provide survival benefits for brain tumor patients."

65.     On January 4, 2011, the Company announced that it had received approval from the FDA to commence enrollment in its Phase II ICT-107 trial. Unlike the small open-label Phase I study, Phase II would be a double-blind, placebo-controlled, 2:1 randomized study designed to evaluate the safety and efficacy of ICT-107 patients with newly diagnosed GBM.

66.     On February 2, 2011, the Company announced the first patient enrolling in its Phase II study.  On September 5, 2012, the Company completed enrollment for the Phase II study.

67.     The Phase II trial randomized a total of 124 patients to standard of care treatment plus ICT-107 or standard of care plus placebo.  43 patients were treated with placebo (their own dendritic cells not exposed to antigen), and the treatment arm of 81 patients received the ICT-107 vaccine.  The regimen was four induction doses after radiation and chemotherapy, and then maintenance doses until the patient relapsed.

68.     The primary endpoint of the Phase II trial was Overall Survival ("OS") in patients when treated with ICT-107 versus a control group.  Another second endpoint was OS in a predefined subpopulation, HLA-A2 patients.  HLA types refers to a patient's human leukocyte antigen status, which corresponds to a family of genes that regulate the immune system.  All randomized patients were included in the intent to treat population.

69.     Secondary endpoints included PFS and the rates of OS and PFS at six

months after surgery, then assessed every three months until the end of the study. Safety and immune response were additional secondary endpoints.

### D.   Prior to and throughout the Class Period, the Company Remained Highly Dependent on the Success of ICT-107 at Clinical Trial

70.   As of December 31, 2016, ICT-107 was one of just three drugs in the Company's development pipeline, and the only one that had even completed a phase I trial.

71.   Importantly, with no drugs in the market, IMUC was generating zero revenue and would be reliant on grants and equity sales to fund its future studies (which, themselves, were critically dependent on exhibiting, or at least giving the public illusion of positive clinical results).

72.   Further, as admitted multiple times throughout the Class Period, including in the Company's 2012 Annual Report filed with the SEC on March 11, 2013, IMUC's "cell-based immunotherapy technologies [is its] primary platform technologies, and [its] commercial prospects will be heavily dependent on the outcome of regulatory requirements and any future clinical trials for [its] lead immunotherapy product candidate, ICT-107."

### E.   Certain Defendants Create a Stock Promotion Scheme to Artificially Boost IMUC's Market Cap in Violation of the Federal Securities Laws and Seeking Alpha's Terms of Use

73.   Recognizing that IMUC would need to boost its total market capitalization in order to attract outside investment interest in the Company, whether in the form of a partnership or acquisition and thus personally benefitting him

CONSOLIDATED SECOND AMENDED COMPLAINT

26

through the triggering of his equity contingencies, Defendant Singh on behalf of IMUC, with the assistance of the Lidingo Defendants, implemented a stock promotion scheme designed to artificially inflate IMUC's value through the use of strategically timed purportedly neutral analyst investment articles published on Seeking Alpha.

## 1. The Securities Laws on Stock Promotion Prohibit Non-Disclosure of Payments Received for Promotional Publications

74. The U.S. securities laws prohibit publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer. *See* Section 17(b) of the Securities Act of 1993 [15 U.S.C. 77q(b)].

75. Congress enacted this anti-touting provision to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for." *S.E.C. v. Wall St. Pub. Inst., Inc*., 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

76. An investor publication issued by the SEC explains the role of paid promotions under the Federal Securities Laws and that the failure of an author to disclose that s/he is being paid by the company to promote its stock is materially misleading to investors:

Paid Promoters: Some microcap companies pay stock promoters to

> recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows.… The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment. But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.

U.S. Securities and Exchange Commission, *Microcap Stock: A Guide for Investors* (Sept. 18, 2013).

77.     As alleged herein, despite clear SEC rules, certain Defendants engaged in an illicit stock promotion scheme in which they failed to disclose that the promotional articles released prior to and during the Class Period were paid for by IMUC, in violation of SEC rules.  Given that there was an almost total absence of independent, non-fraudulent commentary on Seeking Alpha, the significance to the market of the biased, fraudulent commentary was amplified.

### 2.     Defendant Singh Was Motivated to Execute the Scheme by Virtue of a Compensation Structure That Encouraged Him to Bolster the Stock Price by Any Means Necessary

78.     Defendant Singh joined IMUC on February 18, 2008, pursuant to an employment agreement that provided him:

> an annual salary of $200,000, a $100,000 bonus if the Company generates aggregate net financing proceeds of at least $5,000,000 during the term of the agreement and an additional bonus of $100,000 if the Company generates aggregate net financing proceeds of at least $10,000,000 during the term of the agreement.

79.     Pursuant to this agreement, in February 2008, the Company granted Singh a seven-year non-qualified option to purchase 600,000 shares of common

stock at an exercise price of $1.00 per share vesting monthly in the one year following the grant.

80.     On February 15, 2008 (the last trading day prior to the entry of the Singh employment agreement), the Company's common stock closed at $0.53 per share.  As such, this newly-bestowed option for Singh to become one of the Company's largest stockholders and control nearly 5% of its outstanding shares upon the exercise was directly related to his ability to increase the Company's stock price above the $1.00 exercise price.

81.     On September 30, 2008, Defendant Singh was granted a five-year non-qualified option to purchase 25,000 shares in connection with his service on the Company Board, with an exercise price $0.27 per share and vesting quarterly over the one year following the grant.

82.     On February 18, 2009, Singh and the Company entered into a new one year employment agreement that provided for an increase in his compensation, including:

> an annual base salary of $250,000, payable bi-weekly, and cash bonuses of (1) $50,000 if the Company completes a financing, a strategic alliance or a merger or acquisition that generates at least $2,500,000 of net proceeds (after commissions) during the term of the agreement; (2) $100,000 if the Company completes a financing, a strategic alliance or a merger or acquisition that generates at least $5,000,000 of net proceeds (after commissions) during the term of the agreement; or (3) $200,000 if the Company completes a financing, a strategic alliance or a merger or acquisition that generates at least $10,000,000 of net proceeds (after commissions) during the term of the agreement. The total cash bonus payable shall not exceed $200,000.

83.     Pursuant to this agreement, in February 2009, IMUC granted a seven-year non-qualified option to purchase 700,000 shares of IMUC common stock at an exercise price of $0.15 per share to Singh vesting: (i) 300,000 shares in twelve equal monthly installments of 25,000 shares each over the twelve month period from and immediately following the grant date, (ii) 200,000 shares if IMUC achieves during the term of the agreement either (a) a volume weighted average trading price for the Common Stock of greater than $1.00 for any 30-day period during the term of the agreement on average daily trading volume of at least 10,000 shares, or (b) working capital at the end of the term of the agreement of at least $5,000,000; and (iii) 200,000 shares if the Company achieves during term of the agreement either (a) a volume weighted average trading price for the common stock of greater than $1.50 for any 30-day period during the term of the agreement on average daily trading volume of at least 10,000 shares or (b) working capital at end of the term of the agreement of at least $8,000,000.

84.     Notably, the new employment agreement granted Singh additional equity in the Company through options at the significantly reduced strike price of $0.15 per share (the closing stock price for IMUC shares on February 18, 2009), as compared to the $1.00 strike price set in 2008, rendering these options immediately in the money, with some subject only to certain stock price-related vesting contingencies.

85.     Additionally, on September 14, 2009, Defendant Singh was granted a five-year non-qualified option to purchase 30,000 IMUC shares in connection with his service on the Company Board, with an exercise price $0.95 per share.

86.     On March 4, 2010, IMUC and Singh again entered into a new employment agreement, effective February 18, 2010.  In addition to granting Singh additional compensation, the 2010 agreement also adjusted certain milestones from the 2009 agreement:

> The 2010 Employment Agreement provides for an annual base salary of $300,000. In addition, provided that Dr. Singh continues to serve as the Company's President and Chief Executive Officer for the entire one-year term of the 2010 Employment Agreement, the Company will pay Dr. Singh a discretionary cash bonus of up to $50,000 upon completion of the one-year term.
>
> * * *
>
> The 2010 Employment Agreement amends the 2009 Employment Agreement to provide that the milestones described in [] paragraph [79] may be satisfied by including the net proceeds received by the Company at any time prior to August 17, 2010 from (1) a financing by the Socius Capital Group or (2) any private placement financing that is covered by a signed term sheet that was entered into by the Company prior to February 18, 2010 or from another source at the same or better terms as contemplated by such signed term sheet. Also, for purposes of determining whether the $8,000,000 working capital milestone in the preceding paragraph has been satisfied, the 2010 Employment Agreement provides that working capital will be calculated as of the date of the Company's receipt of the proceeds that are being included to satisfy the milestone.

87.     In addition, the 2010 agreement provided for additional equity to be granted to Singh in the form of an option to purchase 600,000 shares of Company common stock at an exercise price equal to $0.90 per share (the closing market price

of the common stock on the option grant date), vesting (1) 360,000 shares, in twelve equal monthly installments of 30,000 shares each over the twelve-month period from and immediately following the grant date, (2) 30,000 shares, if the Company achieves during the term of that agreement a volume-weighted average trading price for its common stock of greater than $1.60 for any consecutive 15-day trading period during the term on average daily trading volume of at least 20,000 shares, (3) 90,000 shares, if the Company achieves during the term of that agreement a volume-weighted average trading price for its common stock of greater than $2.00 for any consecutive 15-day trading period during the term on average daily trading volume of at least 20,000 shares, (4) 30,000 shares, upon treating during the term of that agreement the first patient in a Phase II clinical trial, and (5) 90,000 shares, if during the term of the agreement the Company completes a financing, a strategic alliance or a licensing agreement with upfront licensing payments to the Company or a merger or acquisition that generates at least $5,000,000 of net proceeds (after commissions) for the Company beyond the $10,000,000 achieved by August 17, 2010, with any financing proceeds received by the Company during the first six months of the 2010 Employment Agreement that are used to satisfy milestones under the 2009 Employment Agreement not being included as proceeds to satisfy the milestones described in this paragraph.

88.     On May 10, 2011, Singh entered into a new employment agreement with the Company for his continued service in the role of CEO and President,

effective as of February 18, 2011.  This new employment agreement provided for an annual base salary of $315,000 and a discretionary cash bonus of up to $100,000.  In addition, the 2011 agreement provided for a grant of options to purchase 270,000 shares of the Company's common stock having an exercise price of $2.25 per share (equal to the closing market price on the date of grant) and having a term of seven years from the date of grant and vesting: (i) 120,000 shares in three annual installments of 20,000 shares for the first annual installment and 50,000 shares each for the second and third annual installments, with the first vesting date to be February 17, 2012; (ii) 50,000 shares upon the Company attaining a market capitalization (defined for purposes of the agreement as the number of shares of the Company's common stock then outstanding times the average closing price of such common stock for ten consecutive trading days) of at least $100 million; (iii) 50,000 shares upon the Company attaining a market capitalization of at least $150 million; and (iv) 50,000 shares upon the Company attaining a market capitalization of at least $200 million.

89.     On February 18, 2012, the one year anniversary of the effective date of the 2011 agreement, the 2011 agreement automatically renewed pursuant to its terms for a one-year term.

90.     By December 31, 2011, Defendant Singh had leveraged his position to control options to purchase more than 1.46 million shares of the Company's common stock, with the option to purchase more than 1.15 million of those shares

immediately exercisable at that point, and the option to purchase an additional 20,000 vesting in April 2012:

| | Option Awards | | | | |
| | | Equity Incentive | | | |
| | Number of Securities Underlying Unexercised | Number of Securities Underlying Unexercised | Plan Awards:: Number of Securities Underlying Unearned | Option Exercise | Option Expiration |
| Name | Options (#) Exercisable | Options (#) Unexercisable | Options (#) | Price ($) | Date |
| Manish Singh, Ph.D. | 600,000(1) | — | — | $ 1.00 | 2-17-15 |
| | 25,000(2) | — | — | 0.27 | 9-28-15 |
| | 31,384(3) | — | — | 0.95 | 9-13-16 |
| | 360,000(4) | — | — | 0.90 | 2-17-17 |
| | 105,000(5) | 45,000(7) | — | 0.90 | 2-17-17 |
| | 30,000(6) | — | — | 0.90 | 9-26-17 |
| | — | 20,000(7) | — | 2.25 | 4-3-18 |
| | — | 100,000(8) | — | 2.25 | 4-3-18 |
| | — | 150,000(9) | — | 2.25 | 4-3-18 |

(1)   Vested monthly over one year following grant on February 18, 2008.
(2)   Vested 25% quarterly following grant on September 29, 2008.
(3)   Vested 25% quarterly following grant on September 14, 2009.
(4)   Vested monthly following grant on February 18, 2008.
(5)   Vests upon completion of milestones pursuant to contract.
(6)   Vested 25% quarterly following grant on September 27, 2010.
(7)   Vests one year from issuance on April 4, 2011.
(8)   Vests annually over two years following grant on April 4, 2011.
(9)   Vests upon completion of milestones pursuant to contract.

91.      Further, as reported in the 2011 Annual Report, as of February 15, 2012, Defendant Singh beneficially owned 1,870,223 shares in the Company (representing 4.76% of the outstanding shares), 1,171,384 of which were shares issuable upon exercise of vested or near-vested stock options, indicating that he held 698,839 shares of common stock at that point.

| Name and Address of Beneficial Owner [1] | Shares Beneficially Owned [2] | Percentage of Class |
|---|---|---|
| John S. Yu, M.D. | 6,549,909[3] | 14.67% |
| Manish Singh, Ph.D. | 1,870,223[4] | 4.76% |
| James Bender, Ph.D. | 184,000[10] | * |
| David Fractor | 39,004[5] | * |
| Jacqueline Brandwynne | 311,651[6] | * |
| Richard Chin, M.D. | 0 | * |
| Richard A. Cowell | 242,051[7] | * |
| Helen Kim | 33,334[8] | * |
| Rahul Singhvi, Sc.D. | 92,500[9] | * |
| All executive officers and directors as a group (8 persons) [11] | 9,322,672 | 20% |

* Less than 1%.

92.     By the end of 2012, Defendant Singh had been able to cash in on hundreds of thousands of his options, recognizing almost $2 million in value for options exercised between January 1, 2012 and December 31, 2012, alone:

| | Stock Option Awards | |
|---|---|---|
| | Number of Shares Acquired on | Value Realized on Exercise |
| Name | Exercise | ($) [1] |
| Manish Singh | 409,523 | 1,290,000 |
| Manish Singh | 354,455 | 765,625 |
| James Bender | 14,679 | 43,890 |

(1)   The value realized on the exercise of stock options reflects the price at which shares acquired upon exercise of the stock options were sold or valued for income tax purposes, net of the exercise price for acquiring the shares.

Our named executive officers do not have any equity awards outstanding other than stock options.

We do not maintain any pension benefit plans or any nonqualified deferred compensation plans.

93.     Singh's ownership of IMUC common stock and stock options was not reported in SEC filings after his termination in August 2012. However, in light of his participation in the fraudulent stock promotion scheme (described herein) and his termination from the Company, there is a strong inference that Singh exercised these options and sold the underlying shares into a market inflated by the stock promotion scheme and reaped the $2 million in unlawful profits.  Similarly, there is a strong inference that Singh sold the additional 698,839 shares that he held at the

end of 2011 into an inflated market with IMUC common stock trading above $3.00 a share at inflated prices, with additional unlawful profits exceeding another $2 million. All told, through direct payments and stock sales, Singh made well in excess of $5 million in unlawful profits from the stock promotion scheme.

### 3.    Defendants Seek to Exploit Seeking Alpha in their Scheme

94.    Seeking Alpha[4] is a financial news and analysis website. It publishes third party reports, analysis, and commentary as articles, and permits open discussion of the articles. Seeking Alpha allows authors to write about individual issuers and permits users to comment on these articles. As of November 2014, Seeking Alpha authors had written on approximately 5,000 companies.

95.    Seeking Alpha currently has approximately 4 million registered users, received 7 million monthly unique visitors and 85 million average page views in 2016. Seeking Alpha has approximately 2.4 million real-time alert users (email subscribers and application users with push notifications), which translates to approximately 200 million alerts sent monthly, and approximately 2.4 billion real-time alerts on an annual basis.

96.    Seeking Alpha provides a "Terms of Use" before contributors can publish articles on its website. As part of Seeking Alpha's Terms of Use in place during the Class Period, there is an "Online Rules of Conduct" for "User

---

[4] As used herein, "Seeking Alpha" refers to the website available for access at www.seekingalpha.com and operated by Seeking Alpha Inc.

Submissions" including the following:

> When you post any User Submission on the Site, you also agree to abide by the following disclosure rules:
>
> * * *
>
> You may not write about a stock with the intention to boost or reduce the stock's price and sell (or buy) the stock into the resulting strength or weakness.
>
> * * *
>
> Abide by the following conflict of interest rule: You will disclose any material relationships with companies whose stocks you write about in a User Submission or parties that stand to gain in any way from the viewpoint you are outlining.  Examples:  You must disclose if you are employed by a company whose stock you are writing about; perform consulting for a company you write about; receive paid advertising revenue or any other form of sponsorship fee from a company you write about.

### 4.    Defendants Singh and Bjorlin Lay the Groundwork for their Scheme

97.    In July 2011, Lavos was registered as a domestic limited liability company in Nevada.  Despite the fact that the Company's original registration papers named Defendant Singh's wife, Maria Santos, as that company's managing member and sole principal, she had no role in Lavos' business operation and, instead, it was Defendant Singh who was Lavos' only employee and controlled its operation.

98.    In reality, Lavos was a front from which Defendant Singh could operate a far-reaching stock promotion scheme on behalf of outside companies, including those at which he sat at the helm (IMUC and later, Lion Biotechnologies, Inc. ("Lion").

99.     Just one month after forming Lavos, Defendant Singh began directing Defendant Bjorlin, advising her on how to organize a stock promotion firm of her own.  The motivation for such was clear, as it would provide an additional layer of protection for Defendant Singh and would allow him to engage Bjorlin on behalf of IMUC and pay a kickback to himself.

100.     Bjorlin followed Singh's advice and in September 2011 founded Lidingo in Nevada as a domestic limited liability company and naming herself as managing member.

101.      The foundation for the stock promotion scheme business had been set, as Lidingo would operate as the client-facing entity, liaising with companies regarding their stock promotion services, running the day-to-day operations, paying expenses related to the various promotional campaigns (including to the authors), and collecting compensation – which it then shared with Singh.  In return, Singh, through Lavos, found various issuer clients and directed the promotional work by, among other things, providing ideas for articles, editing articles, and at times, directing which writer should draft an article and when and where the article should be published.

**F.     With the Foundation Now Set, Certain Defendants Execute the Active Manipulation Phase of the Scheme**

102.     After years as CEO of IMUC, by September 2011, Defendant Singh recognized that the Company had several near-term inflection points with respect to

ICT-107 that would make or break his financial future.

103.      For example, by the beginning of calendar year 2012, the Company had begun enrollment in its Phase II clinical study of ICT-107 – a double-blind, placebo-controlled, 2:1 randomized study with expected enrollment of approximately 200 patients designed to evaluate the safety and efficacy of ICT-107 in patients with newly diagnosed GBM.  The study represented a broad leap from the limited 16 patient Phase I study designed to test the safety and tolerability of ICT-107 and would for the first time test the efficacy of the vaccine.

104.      Given the Company's position at this crossroads, IMUC was the perfect guinea pig for defendants Singh and Bjorlin's stock promotion ploy, as Singh recognized the need to increase the Company's market capitalization and visibility in order to trigger his equity awards and possibly position the Company to be acquired.

105.      In September 2011, IMUC, though Singh, entered into a contract with Lidingo, through Bjorlin.  The contract provided that Lidingo would "develop and execute an online distribution campaign that will prominently place the [IMUC] investment opportunity in front of retail investors with an interest in early stage biotech companies."  Singh Order, ¶10.  Despite the fact that the IMUC/Lidingo contract required IMUC to pay Lidingo $5,000 a month for four months, the relationship would extend well past those terms, with IMUC paying Lidingo more than $230,000 between September 2011 and August 2012 for publishing over 60

articles on third party websites including Seeking Alpha. This total amount included at least two Class Period payments: (i) the May 18, 2012 payment from IMUC to Lidingo of $25,000; and (ii) a payment in an undetermined amount on August 15, 2012 payment.

106.    Lidingo would perform its end of the bargain by organizing the publication of dozens of positive articles about IMUC, touting ICT-107 as an effective breakthrough immunotherapy that separated IMUC from the rest of its competitors in the space, and often painting the Company as a peer to larger, more established biopharmaceutical companies for the purpose of inducing investment.

107.    The truth, however, which was concealed from Plaintiffs and the Class prior to, during, and after the Class Period, was that each of the IMUC Articles amounted to a paid advertisement for the Company, as each was being published with the direct approval of the Company through Defendant Singh.

108.    In actuality, the Company was using these articles to falsely say those things it could not otherwise say about itself and ICT-107, seeking to skirt the federal securities laws while artificially inflating the Company's stock price.

### 1.    The IMUC Articles Were the Product of a Calculated Scheme Planned by Defendants Singh and Bjorlin with One Goal: to Artificially Move the Company's Stock Price Upwards Without Detection by the Investing Public

109.    From the beginning, the overarching stock promotion scheme envisioned by Singh and Bjorlin was designed to influence investment into issuer

clients through the use of well-placed articles that appeared to be from a neutral author.

110.     Throughout the active manipulation phase of the execution of the scheme on behalf of IMUC, Defendant Singh sat at the top, exercising full editorial control over all IMUC-related articles, including the content and publication time of those articles, even controlling which authors would be assigned to pen them.

111.     Likewise, Defendant Bjorlin participated in the scheme through her day-to-day management of Lidingo and interfacing with those authors and scheme-collaborators for the perpetuation of the ruse.  As Bjorlin was the only member of Lidingo and the signatory to its bank accounts, she was directly responsible for the payment of fees to recruited writers, the collection of compensation from Lidingo clients, and the divvying up of profits between Lidingo and Singh.

112.     By December 2011, Defendant Hodge was brought on board to help run the day-to-day operations of Lidingo.  In his role with Lidingo, Hodge interacted with issuer clients (including with Defendant Singh), recruited writers for articles to be published under Lidingo's in-house pseudonyms, reviewed articles to ensure that they complied with Singh's strict no-disclosure policy, and even penned articles under his own name for the benefit of issuer clients, including IMUC.

113.     Beginning in February 2012, Defendant Nichols had joined the scheme, acting as a paid writer for Lidingo, for whom he published at least 90 articles about issuer clients under his own name, with over 25 additional paid articles published

under Lidingo-controlled pseudonyms.  Defendant Nichols' participation in the scheme went well beyond the non-disclosure of his compensation, as he did so purposely and created and employed pseudonyms in order to perpetuate the fraudulent scheme.

114.    Similarly, Defendant Cassano actively sought to misrepresent his participation in the scheme, acknowledging in an August 10, 2012 email to Defendant Bjorlin that he "won't use disclosures" related to receipt of compensation on Lidingo-sponsored articles, as directed by Defendant Bjorlin.

115.    Defendant French sought to keep his participation in the stock promotion scheme hidden from view by using pseudonyms, including the "Cris Frangold" name used to publish an article about IMUC during the Class Period.

116.    Likewise, Defendant Ramey employed the pseudonym "Chemistfrog" to write about IMUC and other issuer clients of Lidingo's during the Class Period.

117.    Defendants Nichols, Cassano, French and Ramey each either knew or were reckless in not knowing that Lidingo would not disclose the compensation is received from IMUC in exchange for publishing the articles each provided to Lidingo.  Each individually knew that Lidingo was in the business of getting articles published on Seeking Alpha's website during the Class Period and provided articles to Lidingo, with Lidingo paying each for their contributions.

118.    In the eyes of Defendant Singh, the success of Lidingo as a stock promotion company (and, relatedly, the success of the scheme to prop up IMUC's

stock price) was predicated on the non-disclosure of the fact that the articles were paid for by the subject company. These rules were set early in the process and were quickly subscribed to by the participant defendants, with Defendant Bjorlin referring to a writer who disclosed his receipt of compensation in an article as "the idiot we used in the beginning," and noting that "he will NOT post a disclosure again" in an April 2012 email to Singh; making similar comments about the same writer in an email to Singh on August 7, 2012 and in January 2013.

119.     In a February 20, 2012 email with Defendant Bjorlin, Singh noted his belief that disclosure of compensation from issuers would hurt the credibility of writers, providing draft language for Bjorlin to use in response to a writer who expressed concern about violating Seeking Alpha's policies (further exhibiting Singh's control over the overarching scheme). That draft language, as provided by Singh, clearly espoused the party line on the issue of disclosure and the scheme participants' willingness to flout Seeking Alpha's terms of use and the federal securities laws: "We understand [Seeking Alpha] policy. We would like to do a consulting agreement with you for research and investment advice, but there would be no disclosures associated with any article. Any such disclosures are damaging and discredit the validity of these articles."

120.     Singh reiterated his hardline stance against disclosure of payment during the Class Period when, in a May 1, 2012 email, he recommended that a writer not disclose compensation on his own website because "this would create a

red flag for investors or folks [who] would want to dent his credibility."

121.    What Singh did favor, however, was the strategic use of pseudonyms, encouraging Lidingo to use such when publishing articles ghost-written by other Lidingo writers and even going as far as to provide approval for which identity each should be published under.

122.    As he was the CEO of IMUC, Defendant Singh sought to disguise his involvement in Lidingo's broader promotional work by, among other ways, having the issuer company with Lidingo instead of Lavos, or by signing the name of his wife to Lavos contracts.  Others, too, made efforts to keep Singh's involvement in Lidingo's promotional schemes a secret, with Lidingo employees referring to Defendant Singh as "Charlie" when communicating about him – an identity that morphed into the "Charles Pelikan" moniker Singh adopted for promotional work beginning in 2013.

123.    Similarly, Lidingo employed a host of its own pseudonyms under which it would publish ghost-written articles or multiple articles by the same author, all in order to give the appearance of broader coverage of a company.  These Lidingo-controlled pseudonyms used to publish articles about IMUC during the Class Period included The Swiss Trader, A. John Hodge, and Amy Baldwin.

124.    Defendant Nichols would publish under these pseudonyms during the Class Period to deflect attention from himself, while Defendant Cassano instead published under his established handle, VFC's Stock House.  Similarly, Defendant

French would publish an article about IMUC during the Class Period under the pseudonym "Cris Frangold" while Defendant Ramey regularly published articles about IMUC and other Lidingo clients under the pseudonym "Chemistfrog."

> **2.     IMUC Maintained Ultimate Authority Over the Pre-Class Period and Class Period Articles Through its CEO, Defendant Singh**

125.     Prior to and during the Class Period, IMUC maintained ultimate authority over the published Lidingo articles by virtue of Singh's positioning atop the stock promotion scheme.

126.     In his role overseeing the process, Defendant Singh made it clear that he maintained "ultimate approval authority," writing to Defendant Bjorlin in a March 19, 2012 email that "[i]n the future, please let me review [the draft articles] even if it requires waiting a day or two extra."

127.     Defendant Singh also controlled who would write IMUC-related articles and what the topics of those articles would be.  For example, on March 21, 2012, Singh directed that Lidingo use Defendant Nichols to write an article about the Company's patent acquisitions.  Just one day later, Nichols published an article on Seeking Alpha entitled "Immunocellular Therapeutics Patent Acquisition Paradigm Shift."

128.     Defendant Singh likewise edited articles published prior to and during the Class Period.  For example, on February 8, 2012, Singh reviewed Defendant Nichols' article proposal, noting that the topic was a "very good idea as I think it

would move these stocks," while suggesting that IMUC be the second company named in the article's discussion.  That article would ultimately be published on Seeking Alpha eight days later with IMUC appearing as the second company discussed, as instructed by Singh.

129.     Such tight-fisted control over the process continued into the Class Period.  For example, on July 10, 2012, Defendant Bjorlin sent an article to Defendant Singh for approval, noting that "[w]e seriously need an imuc article," likely as a result of the several days of declining stock prices over the prior week. On July 11, 2012, Defendant Singh responded with his edits, directing that the writer revise the article accordingly.  Those changes were ultimately incorporated into the July 17, 2012 article published under Lidingo's "The Swiss Trader" pseudonym on Seeking Alpha, and entitled "3 Innovative Cancer Treatments . . . But Which is the Best Bet?"

130.     As Singh was acting in his capacity as IMUC's CEO, his conduct and state of mind are imputed to IMUC.  Thus, both Singh and IMUC exercised control over the content and publication of the Class Period IMUC Articles.

**G.**     **The Company Uses the IMUC Articles to Prop Up the Stock Price with Commentary About ICT-107 and the Likelihood of Success at Phase II that it Could Not Otherwise Say Itself**

131.     The purpose of the stock promotion scheme was simple: inject into the market commentary that the Company could not otherwise say itself without running afoul of the federal securities laws.  During the Class Period, these

statements were designed to tout the purported efficacy of ICT-107 and the likelihood of success at Phase II and, ultimately, the likelihood of the Company receiving the "breakthrough" designation under recently-adopted federal regulations. Each of these statements were made in articles that neglected to disclose that the author was being compensated by the Company for the so-called "opinions" set forth therein and even went so far as to misrepresent the by-line author's relationship with IMUC.

132.    To create the false inflation in stock price, the Company would authorize the publication of at least 65 articles on Seeking Alpha that failed to disclose the Company's oversight or payment for the publication:

| Date | Writer/Publisher | Pseudonym | Issuer Client | Title |
|---|---|---|---|---|
| 2011.11.08 | Ramey, Stephen | Chemistfrog | IMUC | ImmunoCellular Therapeutics' Cancer Stem Cell Drug Garnering Much Attention |
| 2011.11.16 | Ramey, Stephen | Chemistfrog | IMUC | 3 Cancer Immunotherapy Biotechs with Catalysts for 2012 |
| 2012.01.16 | Ramey, Stephen | Chemistfrog | IMUC | Pharma Leaders Emerging in Immunotherapy Approach to Fighting Glioblastoma |
| 2012.01.18 | Cassano, Vincent | VFC's Stock House | IMUC | Another Revival Could Be In Store for ImmunoCellular Therapeutics |

| | | | | |
|---|---|---|---|---|
| 2012.01.19 | Cassano, Vincent | VFC's Stock House | IMUC | Biopharma Stocks To Watch This Week |
| 2012.01.30 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks To Watch Week of Jan. 30 |
| 2012.01.30 | Ramey, Stephen | Chemistfrog | IMUC | Verastem IPO Validates Investor Interest in Cancer Stem Cell Approach |
| 2012.01.31 | Cassano, Vincent | VFC's Stock House | IMUC | ImmunoCellular: Pipeline Potential and Institutional Interest Fuel Rebound |
| 2012.02.02 | Cassano, Vincent | VFC's Stock House | IMUC | 5 Pharmaceuticals On The Move |
| 2012.02.06 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch Week of Feb. 6 |
| 2012.02.08 | Writer 2 | N/A | GALE, IMUC | ImmunoCellular and Cancer Treatment's Next Frontier |
| 2012.02.14 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: Feb. 13 Edition |
| 2012.02.14 | Cassano, Vincent | VFC's Stock House | IMUC | Stock Watch: Immunocellular's Push Toward Two Dollars |
| 2012.02.15 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Again Pushing to $2 |
| 2012.02.16 | Nichols, Brian | N/A | IMUC | 10 Biotech Stocks with Big Potential Upside in 2012: Part III |
| 2012.02.21 | Writer 2 | N/A | IMUC | A Roadmap for Immunotherapy Success in Oncology |

| | | | | |
|---|---|---|---|---|
| 2012.02.22 | Nichols, Brian | N/A | IMUC | Buy Biotech in Phase II for the Best Upside |
| 2012.03.01 | Nichols, Brian | N/A | GALE, IMUC | Dendreon's Woes Mask the Exciting Opportunities in Immunotherapy Companies |
| 2012.03.04 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: Feb 27 – March 2 |
| 2012.03.05 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Pending Catalysts Could Spark Share Price Run |
| 2012.03.06 | Ramey, Stephen | Chemistfrog | IMUC | Big Pharma's Growing Appetite for Cancer Stem Cell Biotechs |
| 2012.03.07 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Touches $3 on Continued Speculation |
| 2012.03.13 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: March 12-16 |
| 2012.03.13 | Nichols, Brian | N/A | IMUC | Upgrades Lead to Optimism in Cancer Stem Cell Therapy |
| 2012.03.19 | Lidingo | A. John Hodge | GALE, IMUC | Small Cap Biotech Stocks Trading Higher |
| 2012.03.21 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch: Week of March 19-23 |
| 2012.03.22 | Nichols, Brian | N/A | IMUC | Immunocellular Therapeutics Patent Acquisition Paradigm Shift |

CONSOLIDATED SECOND AMENDED COMPLAINT
49

| 2012.03.26 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Cementing Its Place as a Major Player in Cancer Immunotherapy |
|---|---|---|---|---|
| 2012.03.26 | Cassano, Vincent | VFC's Stock House | GALE, IMUC | Stocks to Watch: Week of March 26-30 |
| 2012.03.27 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: March 26-20 [sic] |
| 2012.03.28 | Ramey, Stephen | Chemistfrog | IMUC | ImmunoCellular's Intellectual Property Steadily Increases |
| 2012.03.28 | Ramey, Stephen | Chemistfrog | IMUC | ImmunoCellular Therapeutics' Growing Intellectional Property Garnering Attention |
| 2012.04.09 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 9-13 |
| 2012.04.10 | Nichols, Brian | N/A | IMUC | Breaking the Mold of Oncology Drug Development |
| 2012.04.11 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics May Be Immune to a Broad Market Downturn |
| 2012.04.12 | Nichols, Brian | N/A | IMUC | Which Q1 Biotech Movers Can Build off Momentum? Part II |
| 2012.04.16 | Nichols, Brian | N/A | IMUC | Successfully Profiting from Developmental Biotech |

| 2012.04.19 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch Mid-Week: April 18 |
|---|---|---|---|---|
| 2012.04.19 | Writer 2 | N/A | IMUC | Why the Markets Continue to Coalesce Around New Approaches to Treating Cancer |
| 2012.04.23 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 23-27 |
| 2012.04.24 | Ramey, Stephen | Chemistfrog | GALE, IMUC | Multiple Antigen Targeting Could Mean a Multiple Marketing for These Immunotherapy Drugs |
| 2012.04.25 | Ramey, Stephen | Chemistfrog | GALE, IMUC | Multiple Antigen Targeting Could Indicate Big Potential for Immunotherapy Drugs |
| 2012.04.29 | Cassano, Vincent | VFC's Stock House | IMUC | Weekly Stock Watch: April 30-May 4 |
| 2012.04.30 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics and the Benefits of a Large Exchange |
| 2012.05.01 | Cassano, Vincent | VFC's Stock House | IMUC | Immunocellular Therapeutics: Any Pullback May Mean Opportunity |
| 2012.05.02 | Lidingo | The Swiss Trader | IMUC | Finding an Oncology Player That Will Change the Rules of the Game |
| 2012.05.07 | Cassano, Vincent | VFC's Stock House | IMUC | Stocks to Watch: Week of May 7, 2012 |

| | | | | |
|---|---|---|---|---|
| 2012.05.10 | Nichols, Brian | N/A | IMUC | Pre-ASCO Interview with ImmunoCellular Therapeutics CEO Dr. Singh |
| 2012.05.18 | Lidingo | The Swiss Trader | GALE, IMUC | ASCO 2012 Abstracts: 4 Hopeful Overachievers |
| 2012.05.21 | Lidingo (Nichols) | A. John Hodge | IMUC | Interest Growing in Cancer Stem Cell Biotechs |
| 2012.05.29 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics' Uplisting to NYSE Could Immediately Open Many Doors |
| 2012.06.01 | Ramey, Stephen | Chemistfrog | IMUC | ImmunoCellular Therapeutics ICT-107 To Impress at ASCO 2012 |
| 2012.06.04 | Nichols, Brian | N/A | IMUC | 5 Biotech Stocks that Could Be Included in the Russell 2000 |
| 2012.06.11 | Nichols, Brian | N/A | IMUC | Russell Index Additions to Create Upside While Shares are Acquired in Open Market |
| 2012.06.13 | Ramey, Stephen | Chemistfrog | IMUC | Dendreon: Room for Improvement |
| 2012.06.18 | Lidingo | The Swiss Trader | IMUC | Immunotherapy Comes of Age at ASCO 2012 |
| 2012.06.27 | Lidingo | A. John Hodge | IMUC | ImmunoCellular: Cancer is Smart, But Could an Experimental Cancer Vaccine Be Smarter? |
| 2012.07.04 | Ramey, Stephen | Chemistfrog | IMUC | Dendritic Cell Evolution: Investment Potential |

| 2012.07.11 | Ramey, Stephen | Chemistfrog | IMUC | Intellectual Property of a Biotech: An Analysis |
|---|---|---|---|---|
| 2012.07.17 | Lidingo (Nichols) | The Swiss Trader | IMUC | 3 Innovative Cancer Treatments . . . But Which Is the Best Bet? |
| 2012.07.19 | Nichols, Brian | N/A | IMUC | New Legislation Speeds up FDA Approval Process for Immunocellular Therapeutics and Other Innovating Therapies |
| 2012.07.23 | Nichols, Brian | N/A | IMUC | ImmunoCellular Therapeutics: Explaining the Benefits of a Multiple Antigen Targeting Approach |
| 2012.07.26 | Lidingo | Baldwin, Amy | IMUC | 5 Momentum Stocks With Pullbacks That Could Be Your Opportunity |
| 2012.08.08 | French, Chris | Cris Frangold | IMUC | 3 Diverse Investment Grade Pharmaceuticals to Consider Today |
| 2012.08.15 | Nichols, Brian | N/A | IMUC | ICT-107 Into Perspective Part 1 |

133.     And inflate the Company's stock price these articles did, as from November 8, 2011 (the day the first IMUC-controlled Lidingo article about the Company was published) to April 30, 2012 (the last trading day prior to the commencement of the Class Period), the Company's stock price increased by 81%, from $1.43 to $2.60, and from November 8, 2011 to August 15, 2012 (the day the

last IMUC-controlled Lidingo article about IMUC was published), the Company's stock price more than doubled, from $1.43 per share to $3.02 per share.

> 1. **The Articles Misrepresent ICT-107 as a Trailblazing Drug that Will Drive IMUC Growth After a Successful Phase II**

134.     With Dendreon's Provenge receiving FDA approval and investors clamoring for the next immunotherapy play, IMUC (through Singh) and Lidingo focused their attention on painting the Company as the "next big thing;" often likening IMUC to other established publicly-traded companies to create some semblance of credibility through comparison.

135.     For example, in a May 21, 2012 article, Defendant Nichols, with the approval and under the control of the Company, made several materially false and misleading statements about ICT-107 as if it had been already proven effective through clinical trials, including claiming that, "[t]he secret behind ICT-107 and its ability to treat glioblastoma with such success revolves around its ability to treat root of cancer, the cancer stem cells which are primarily responsible for tumor progression."

136.     Similarly, a June 4, 2012 article by Nichols touted ICT-107's purported efficacy, claiming that, "[i]f you take the time to research the company's lead candidate, ICT-107, and its early data for treating glioblastoma, you might think that you are reading the information incorrectly, because it is so effective."

137.     In actuality, however, ICT-107 had not shown substantial evidence of

efficacy to that point at clinical trial, as known by the Company.

### 2.    The Articles Misrepresent the Company's NYSE Uplisting

138.    Throughout the Class Period, the Company (through Singh) oversaw numerous IMUC Articles that made reference to a then-forthcoming inflection point for the Company: its shedding of the stigma associated with OTC stocks and its uplisting to the NYSE Market – a purported sign that the Company was above any stock price related shenanigans or fraud often associated with penny stocks on the OTC market and lending further credibility to IMUC as a legitimate business preparing for a rise through the pharmaceutical industry.

139.    For example, on May 29, 2012, Defendant Nichols, at the direction of Lidingo and with the oversight of IMUC (through Defendant Singh) published an article on Seeking Alpha entitled "ImmunoCellular Therapeutics' Uplisting to NYSE Could Immediately Open Many Doors."  This article claimed that prior to the NYSE Market uplisting, "the company carried the burden of being an OTC stock, which restricts the company from certain investors and even disallows some from seeing its true potential due to the stigma that's attached to companies that trade on the OTC."  According to the article, however, "[n]ow that IMUC will be trading on the NYSE, a whole new door has been opened and the company will now have access to new investors without the burden of being an OTC stock."

140.    The OTC stock burden referenced in the article had been previously explored by Defendant Nichols in an April 30, 2012 article published on Seeking

Alpha entitled "ImmunoCellular Therapeutics and the Benefits of a Large Exchange" – an article incorporated by reference by Defendant Nichols into his May 29th publication.  The April 29th article summarized the view of OTC stocks:

> When a company trades on an OTC network it is usually looked down upon by investors.  These stocks are typically viewed as riskier investments to own, as they are not mandated by the same rules and regulations to which a company on a larger exchange would have to adhere.

141.     Yet that burden that had supposedly been lifted from the Company with the May 2012 announcement that IMUC stock would be uplisted to the NYSE Market.  The irony of the May 29th article, however, was that the very medium employed by the Company to claim that the uplisting would separate it from those "riskier investments" and escape the stigma associated with OTC-traded stocks was itself part of an illicit stock promotion scheme that violated the federal securities laws.

### 3.     The IMUC Articles Misrepresent the Likelihood of ICT-107 Receiving the Breakthrough Designation

142.     On July 19, 2012, the Company, by virtue of Defendant Singh's oversight over the IMUC Articles, caused to be published an article on Seeking Alpha by Brian Nichols entitled "New Legislation Speeds up FDA Approval Process for ImmunoCellular Therapeutics and Other Innovating Therapies."

143.     This article came just ten days after the Food and Drug Administration Safety and Innovation Act ("FDASIA") was signed into law.  Importantly, Section

902 of the FDASIA provided for a new designation by the FDA – the Breakthrough Therapy Designation.

144.     A "breakthrough therapy," as set forth in the FDASIA, is a drug: (i) intended alone or in combination with one or more drugs to treat a serious or life threatening disease or condition; and (ii) preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development.

145.     The benefit of receiving the "breakthrough" designation is that the FDA will expedite the development and review of such drug – an important process accelerant for companies seeking to race to the market with competing therapies.

146.     While the new statute presented a possible avenue towards approval for ICT-107 and IMUC, the Company remained outwardly silent – aware that ICT-107 would not meet breakthrough designation criteria until it could demonstrate an improvement over existing therapies at Phase II in a *clinically significant endpoint*, which it had yet to do.  However, this did not stop the Company (through the IMUC Articles) from seeking to capitalize on the recent enactment of the legislation and riding any public interest by touting the IMUC's likelihood of receipt of the designation.

147.     Viewed now with the understanding that the Company was directing the publication (a fact unknown to Plaintiffs and investors at the time), Defendant

Nichols' July 19, 2012 article represents a brazen attempt by IMUC to influence the investing public by assuring it of its future receipt of the breakthrough designation under the FDASIA and the accompanying expedited review of ICT-107:

> Therefore, drugs like ICT-107, in some ways, helped pave the way for this bill [the FDASIA] to be passed.  As a result, how could it not qualify for the accelerated program?
>
> * * *
>
> I used ICT-107 as an example of a therapy that could qualify for the accelerated approval program, partly because I am certain that it would qualify, and also because it shows the level of innovation that must be present in order to qualify.

### 4.     The Class Period Articles Were Timed to Amplify Good News and Mitigate Bad News

148.     As alleged herein, the purpose of the Class Period Articles was to effect the stock price of IMUC, both to artificially inflate the price to piggyback on good news by the Company or to mitigate downside when the Company or industry reported less than stellar results.

149.     Such calculated maneuvering is evidenced at several points throughout the Class Period where a related event can be directly tied to the release of a promotional article.

150.     For example, after the market closed on May 7, 2012, Dendreon Corp. ("Dendreon"), a pharmaceutical company which then had an FDA-approved dendritic cell vaccine for the treatment of prostate cancer, announced a reported loss despite modest growth in sales of its Provenge product.  Recognizing that investors interested in Dendreon would be seeking out information related to that company in

light of its earnings release, the Company arranged for Defendant Cassano to include in his May 7, 2012 "Stocks to Watch: Week of May 7, 2012" article published on Seeking Alpha a blurb extolling the buying opportunity presented by IMUC: "With numerous catalysts still pending this year, any pullback could mean a nice buying opportunity, as I discussed last week."

151.    The strategic maneuver was clear – to ride the wave of Dendreon's news release to either: (a) capitalize on positive Dendreon results to capture investors now interested in the viability of immunotherapies and out to find the "next" Dendreon; or (b) present a viable buying alternative to Dendreon on the basis of the differences in the companies, which the Class Period Articles would note time and again.  *See, e.g.*, Hodge, John A., "Interest Growing in Cancer Stem Cell Biotechs", May 21, 2012, Seeking Alpha (comparing ICT-107 to Dendreon's Provenge for the purpose of making IMUC look multiple times better since it attacked multiple antigens compared to Provenge's singular antigen).

152.    All told, it was clear that the Company sought to use the Class Period IMUC Articles to paint itself in a positive light as compared to its more established immunotherapy rival.

153.    On other occasions, the Company scrambled to inject further good news into the market, hoping to double-dip on a positive occurrence so as to further drive the price of the stock up.  For example, prior to the market opening on May 25, 2012, the Company announced that it had received approval for listing on the

NYSE Market, with trading expected to commence on May 30, 2012. The news sent the Company's stock price up approximately 8% by close of trading on May 25, 2012.

154.     Seeing the opportunity to gain further traction with investors prior to the uplisting, at approximately 3:00 a.m. on Tuesday May 29, 2012 (the first trading day of the week following the Memorial Day holiday), Defendant Nichols published an article on Seeking Alpha exalting the importance of the uplisting to the Company's future and the expectation that it would now be able to capitalize on institutional investor interest in IMUC. The effect was two-fold as it brought in interest from those individuals who may have missed the Friday-before-a-holiday press release by the Company, while also effectively hyping the Company in advance of its debut on the NYSE Market – encouraging investors to get in before the institutional investors who could not previously acquire the Company sent the price upwards. In the end, the stratagem worked, causing the stock price to increase an additional 9% by close of trading on May 29, 2012.

155.     Similarly, on June 18, 2012, prior to the market opening, the Company issued a press release announcing that its stock would be added to the Russell 3000 Global and Microcap indexes upon the reconstitutions of each on June 25, 2012. The prior strategic use of IMUC Articles on the subject was multifaceted as Russell announced on its website on June 8, 2012 additions and deletions from its index to which the Company responded by having a Lidingo article published at 4:49 am on

the morning of June 11, 2012 (the first trading day after the Russell website announcement).  This news and Lidingo article would eventually drive a nearly 5% increase in the Company's common stock by end of June 11, 2012.

156.     Then, following the Company's own announcement on the topic on June 18, 2012, a Lidingo article was published after the market closed that same day, grouping IMUC in with giants of the pharmaceutical industry, Bristol-Myers Squibb and GlaxoSmithKline, as generating "buzz" at the then-recent American Society of Clinical Oncology ("ASCO") conference and pointing to IMUC as a company that should be at the forefront of investor attention, particularly in the immunotherapy space.  The late news provided an additional bump for the Company the following trading day, who saw its closing price increase an additional 3% on the back of the prior day's touting on June 19, 2012.

**H.     The Active Stock Promotion Scheme is Cut Short When Singh is Forced to Resign, but the Fruits of the Scheme are Allowed to Remain in the Market by Company Management**

157.     As CEO and President of the Company, Defendant Singh acted as point person for IMUC with respect to the stock promotion scheme, overseeing the publication of the IMUC Articles.

158.     Yet, on August 20, 2012, the Company issued a press release, filed with the SEC on Form 8-K that same day, announcing Defendant Singh's resignation from the Board and his roles as President and Chief Executive Officer.

159.     The Company press release on the subject was terse, providing no

timeline of the events that resulted in Singh's resignation or reasoning for his departure.   Instead, the Company offered only that Defendant Yu had been appointed interim CEO by the Board and that the Company had initiated a search for a permanent CEO.

160.     The Form 8-K, however, while still vague, provided additional insights on Singh's departure:

> On August 14, 2012, Manish Singh tendered his resignation together with a claim that he was entitled to severance benefits under the terms of his existing employment agreement. The Company accepted his resignation, confirmed his termination of employment with the Company, including termination as the Company's President and Chief Executive Officer, and disputed any claims for severance benefits for Dr. Singh. The Company appointed John Yu, the Chairman of the Board of Directors, as Interim Chief Executive Officer while it conducts a search for a full-time Chief Executive Officer.

161.     The timing of Singh's purported resignation was particularly shocking given that after the market closed on August 14, 2012, the Company filed its Form 10-Q with the SEC, reporting financial results for the quarter ended June 30, 2012 that were signed by Defendant Singh as the President and Chief Executive Officer of IMUC.

162.     Similarly, on August 15, 2012, one day after Singh purportedly tendered his resignation, the Company issued a press release announcing its quarterly results, identifying Defendant Singh as the Company's chief executive officer, and attributing to him a comment about the Company's outlook for the future and the ongoing ICT-107 trial.

163.     The additional information provided in the Form 8-K about Singh's claim to severance benefits, a claim disputed by the Company, touched off a wave of investor concern that drove the Company's stock downwards.  As would be more fully evident later, Singh's departure from the Company was the direct result of his orchestration of the stock promotion scheme with Lidingo, a fact then known only to certain defendants.

164.     For example, as of August 2012, Defendant Singh was operating on the automatically renewed May 10, 2011 employment agreement with the Company (which was made effective as of February 18, 2011 and automatically renewed on February 18, 2012 by the terms of the agreement).  That employment agreement clearly delineated between termination with and without cause:

> 8.1 In addition to all other rights and remedies which the parties may have under applicable law, the Corporation may terminate this Agreement and the services of Executive, **effective upon the occurrence of any of the following events, any of which shall constitute a termination for "cause" under this Agreement**: (i) a failure by Executive to perform any of his material obligations under this Agreement or to execute and perform in a timely and cooperative manner any directions of the Board; (ii) the death of Executive or his disability resulting in his inability to perform his reasonable duties assigned hereunder for a period of three consecutive months; (iii) Executive's theft, dishonesty, or falsification of any Corporation documents or records; (iv) Executive's improper use or disclosure of the Corporation's confidential or proprietary information; or (v) Executive's conviction (including any plea of guilty or nolo contendere) of any criminal act which impairs Executive's ability to perform his or her duties hereunder or which in the Board's judgment may materially damage the business or reputation of the Corporation; provided, however, that prior to termination for cause arising under clause (i), Executive shall have a period of ten days after written notice

from Corporation to cure the event or grounds constituting such cause. Any notice of termination provided by Corporation to Executive under this Section 8 shall identify the events or conduct constituting the grounds for termination with sufficient specificity so as to enable Executive to take steps to cure the same if such default is a failure by Executive to perform any of his material obligations under this Agreement. **In the event Corporation terminates Executive for cause, (i) Executive shall be entitled as of the termination date to no further base salary other than such portion of Executive's base salary as shall have accrued but remain unpaid as of the termination date, which shall be due immediately upon termination, (ii) Executive shall be entitled to receive payment of any earned but unpaid bonus, as well as any expense reimbursement amounts owed by the Corporation to the Executive through the date of termination and (iii) any then unexercised but outstanding stock options granted to Executive shall be cancelled. The Corporation shall have no further obligations to Executive under this Agreement.**

8.2 The Corporation may terminate Executive without cause upon 60 days written notice delivered to Executive. In the event the Corporation terminates Executive's employment without cause, all of the following will apply: (i) immediately upon termination, the Corporation will pay to Executive any base salary as shall have accrued but remain unpaid as of the termination date, any earned but unpaid bonus and any expense reimbursement amounts owed by the Corporation to the Executive through the date of termination; (ii) immediately upon termination, the Corporation will pay to Executive severance compensation in a lump sum cash payment equal to Executive's then effective base salary for a period of six (6) months; (iii) any stock options granted to Executive, to the extent vested, will be retained by the Executive and will be exercisable as set forth in Section 4.2 hereof, the Plan and related stock option agreement (which shall reflect the terms set forth in Section 4.2 hereof); and (iv) the vesting of an additional number of shares subject to those options granted to Executive that vest solely based upon the passage of time equal to 50% of all such shares subject to such time vesting based options that have not already vested shall immediately accelerate and become fully vested and exercisable by Executive and will continue to be exercisable as provided in Section 4.2 hereof, the Plan and related stock option agreement (which shall reflect the terms set forth in Section 4.2 hereof).

(Emphasis added).

165.     Similarly, the employment agreement provided for Defendant Singh to terminate his employment with the Company at will and the compensation he would receive in such an event:

**8.3 Executive may terminate Executive's employment at will (without "Good Reason" as defined below) by giving 60 days' prior written notice to Corporation. Executive shall be entitled to (i) all base salary up to and through the 60-day period after Executive's notice of termination is given to Corporation, any earned but unpaid bonus and any expense reimbursement amounts owed by the Corporation to the Executive through the date of termination** and (ii) any stock options, to the extent vested, may be retained by Executive and will be exercisable as set forth in Section 4.2 hereof, the Plan and applicable stock option agreement (which shall reflect the terms set forth in Section 4.2 hereof). Executive has the right to terminate Executive's employment for "Good Reason" due to, and not less than 30 days following, the occurrence of any of the following: (i) Corporation's requirement that Executive's principal place of work relocate more than 50 miles from its location as of the Commencement Date without the written consent of Executive to such relocation, (ii) a material adverse change in Executive's duties and responsibilities; (iii) any failure by Corporation to pay, or any material reduction by Corporation of, the base salary or any failure by Corporation to pay any incentive compensation to which Executive is entitled pursuant to Section 4 hereof; or (iv) Corporation creates a work environment designed to constructively terminate Executive or to unlawfully harass or retaliate against Executive. In the event that Executive terminates his employment for Good Reason, all of the following will apply: (A) within five days after the termination date, Corporation will pay to Executive any base salary as shall have accrued but remain unpaid as of the termination date, any earned but unpaid bonus and any expense reimbursement amounts owed by the Corporation to the Executive through the date of termination; (B) within five days after the termination date, Corporation will pay to Executive severance compensation in a lump sum cash payment equal to Executive's base salary then in effect equal to six (6) months (or an amount equal to one year of the Executive's then base salary if the Good Reason

Termination is in connection with a Corporate Transaction in which the Corporation is not the surviving entity and the surviving entity fails to offer Executive an executive position at a compensation level at least equal to the Executive's then compensation level under this Agreement); (C) any stock options granted to Executive, to the extent vested, will be retained by the Executive and will be exercisable as set forth in Section 4.2 hereof, the Plan and related stock option agreement (which shall reflect the terms set forth in Section 4.2 hereof); and (D) the vesting of an additional number of shares subject to all options granted to Executive that vest solely based upon the passage of time equal to 50% of all such shares (or 100% of all such time vesting based option shares as well as all then outstanding unvested milestone based option shares shall vest if the Good Reason termination is in connection with a Corporate Transaction in which the Corporation is not the surviving entity and the surviving entity fails to offer Executive an executive position at a compensation level at least equal to Executive's then compensation level under this Agreement) subject to such time vesting based options that have not already vested shall immediately accelerate and become fully vested and exercisable by Executive and will continue to be exercisable as provided in Section 4.2 hereof, the Plan and related stock option agreement (which shall reflect the terms set forth in Section 4.2 hereof).

166.    A review of the Annual Report filed on Form 10-K by the Company with the SEC on March 11, 2013 for the year ended December 31, 2012 identifies Defendant Singh as having received a salary of $202,781 in 2012, including "$26,250 per month for the period January 1, 2012 to March 31, 2012 and $27,563 for the period April 1, 2012 to August 15, 2012 per month for services rendered to us as President and Chief Executive Officer":

**Summary Compensation Table**

| | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($)[9] | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|---|
| Andrew Gengos, President and Chief Executive Officer | 2012 | $ 33,333[1] | — | — | $791,429[10] | — | — | — |
| | 2011 | — | — | — | — | — | — | — |
| John Yu, MD, President and Chief Executive Officer | 2012 | $ 67,732[2] | $40,000 | — | $ 70,500[11] | — | — | $ 108,993[17] |
| | 2011 | — | — | — | — | — | — | — |
| Manish Singh, PhD., President and Chief Executive Officer | 2012 | $202,781[3] | $ — | — | — | — | — | — |
| | 2011 | $313,125[4] | $50,000 | — | $393,500[12] | — | — | — |
| David Fractor, Chief Financial Officer | 2012 | $116,417[5] | $20,000 | — | $ 10,300[13] | — | — | — |
| | 2011 | $ 62,000[6] | — | — | $ 52,180[14] | — | — | — |
| James Bender, Vice President - Product Development and Manufacturing | 2012 | $186,917[7] | $34,100 | — | $145,425[15] | — | — | — |
| | 2011 | $174,583[8] | $20,000 | — | $134,800[16] | — | — | — |

(1) Includes $33,333 for month of December 2012 for services rendered to us as President and Chief Executive Officer.
(2) Includes $19,352 for the period from August 15, 2012 through November 30, 2012 for services rendered to us as President and Chief Executive Officer.
(3) Includes $26,250 per month for the period January 1, 2012 to March 31, 2012 and $27,563 for the period April 1, 2012 to August 15, 2012 per month for services rendered to us as President and Chief Executive Officer.
(4) Includes $25,000 per month for the period from January 1, 2011 through February 18, 2011 and $26,250 from February 19, 2011 through December 31, 2011 for services rendered to us as President and Chief Executive Officer.

167.    Further, in the same document the Company identified the severance benefits actually received by Defendant Singh upon his resignation, showing that he did not receive any additional compensation after his departure from the Company:

| | Termination by the Company Without Cause or Involuntary Termination for Good Reason | | |
|---|---|---|---|
| | Salary Continuation ($)[1] | Continuation of COBRA ($) | Total ($) |
| Name | | | |
| Andrew Gengos | $ 400,000 | $ 26,352 | $426,352 |
| John Yu, MD | $ — | $ — | $ — |
| David Fractor | $ — | $ — | $ — |
| James Bender | $ 188,000 | $ — | $188,000 |
| Manish Singh [2] | $ — | $ — | $ — |

(1) Amounts in this column are based upon salary in effect as of December 31, 2012.
(2) Dr. Singh resigned from the Company on August 14, 2012. Amounts for Dr. Singh represent the actual amounts received in connection with his resignation.

168.    Even if Defendant Singh resigned from his post (regardless of whether his reasoning satisfied the "good reason" provisions of the employment agreement, triggering the attendant severance benefits related thereto) he was contractually entitled to a sixty-day notice period during which he would have continued receiving his salary.  Instead, as made clear in the 2012 Annual Report, Defendant

Singh's actual salary paid for the year ended on August 15, 2012 -- the day after the previously-filed Form 8-K indicated he tendered his resignation – thus supporting the inference that Singh's resignation was not one tendered willfully.

169.     Alternatively, had Singh been fired by the Company without cause, pursuant to the terms of his employment agreement, he would have been entitled to a similar 60 day notice period (during which he would have continued to receive his base salary) as well as, *inter alia*, a lump sum cash payment equal to six months salary as severance.  It is clear from the 2012 Annual Report that no such severance payment nor extension of salary payments were made, thus negating any inference that Singh's dismissal by IMUC was done without cause.

170.     Instead, it can be inferred from the facts when viewed holistically that Singh was terminated from his role as chief executive officer and president of IMUC because of the discovery of the stock promotion scheme by IMUC's Board.

171.     Further, without Singh at the helm of IMUC, the stock promotion scheme by Lidingo ground to a halt, with the final promotional article published on Seeking Alpha on August 15, 2012 – the same day IMUC made its last payment to Lidingo.

**I.**     **With the Need for Additional Financing on the Horizon, Company Management Painstakingly Seeks to Keep Any Connection Between IMUC and Lidingo Quiet**

172.     After the departure of Defendant Singh from the Company in August 2012, IMUC found itself at a crossroads.   IMUC Chief Scientific Officer and

cofounder, Defendant Yu, assumed the position of interim CEO, expecting to steer the Company through the completion of enrollment in the ICT-107 Phase II trial while also leading the search for a replacement CEO.

173.     Following the termination of Singh, Defendants Yu, Fractor and the Company were faced with an important decision that would ultimately impact the future of IMUC: (a) publicly disclose the truth related to Defendant Singh and the Company's participation in the stock promotion scheme, report the bad actors (who continued to orchestrate illicit stock promotion schemes using similar methods for a variety of other issuers) to the SEC, and deal with the public aftermath, including the expected stock price drop, thus jeopardizing any future clinical trials; or (b) issue a vague Form 8-K regarding Singh's departure and remain silent as to the securities law violations, allowing the violative articles to remain in the public domain while the Company engaged in multiple offerings so as to fill the Company's coffers with the funds needed to complete the ICT-107 Phase II study and simply await any punishment that could arise from the Company's engagement of Lidingo. Defendants Yu, Fractor, and IMUC chose the latter.

174.     By September 5, 2012, the Company announced that it had completed enrollment of 278 patients at 25 participating sites in the Phase II trial.

175.     On September 21, 2012, the Company filed with the SEC a Form S-3 Registration Statement announcing the offering of $50,000,000 in common stock, preferred stock, debt securities, and warrants in the Company.

176.     The offering was further fleshed out by the Final Prospectus filed pursuant to Rule 424(b)(5) on October 18, 2012, through which the Company offered for sale 10,000,000 shares of common stock and warrants to purchase 4,500,000 shares of common stock from which the Company would receive between $19 and 23 million after commissions and expenses.

177.     As set forth in the October 18, 2012 Final Prospectus, the proceeds of the offering were needed to continue funding the ICT-107 Phase II trial:

> We intend to use the net proceeds from this offering for our ongoing clinical development of ICT-107 and for general corporate purposes, including research and development activities for our other product candidates and any future product candidates that we may develop or acquire, as well as for general corporate purposes. We may also use a portion of the net proceeds to acquire or invest in businesses, products and technologies that are complementary to our own, although we currently are not planning or negotiating any such transactions. Pending these uses, we intend to invest our net proceeds from this offering primarily in investment grade, interest-bearing instruments. As of the date of this prospectus supplement, we cannot specify with certainty all of the particular uses for the net proceeds we will have upon completion of the offering. Accordingly, we will retain broad discretion over the use of these proceeds.

178.     Further, the Company's ability to continue testing ICT-107 at Phase II was dependent on the execution of this offering:

> We do not currently anticipate that we will derive any revenues from either product sales or licensing in the foreseeable future. We do not have any bank credit lines and have financed substantially all of our prior operations through the sale of securities, including an underwritten public offering completed in January 2012 that generated $10.4 million of gross proceeds (before commissions and offering expenses of approximately $1.1 million).

The estimated cost of completing the development of any of our current or potential vaccine candidates, including an estimated $10 million (including expenditures to date) needed to complete our Phase II trial of ICT-107, and of obtaining all required regulatory approvals to market any of those product candidates or potential product candidates is substantially greater than the amount of funds we currently have available.

179.    Given the stark outlook for the Company's future in the absence of any continued funding through the offering, IMUC, then headed by Defendants Yu and Fractor, recognized the need to keep the Company's violation of the federal securities laws with respect to stock promotion and related release of Defendant Singh under wraps or risk torpedoing the stock price and ICT-107's clinical prospects.

180.    IMUC continued to keep the Company's past transgressions under wraps when, in April 2013, the Company it entered into a Controlling Equity Offering Sales Agreement ("Sales Agreement") with Cantor Fitzgerald & Co. ("Cantor") where IMUC had the right to offer and sell shares of its common stock, from time to time through Cantor, for an aggregated offering price of up to $17 million.  By the end of September 30, 2013, IMUC sold 1,862,142 shares of its common stock under the Sales Agreement that resulted in proceeds to IMUC of nearly $5 million.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   The IMUC Articles Were Materially False and Misleading When Published Because they Affirmatively Misstated and/or Omitted Material Facts

181.   During the Class Period, at least 21 articles illegally touting IMUC were published by Lidingo-related authors on Seeking Alpha, under the editorial control and with the approval of the Company, through Defendant Singh.

182.   Each of the foregoing articles was materially false and misleading, and were known by IMUC, Defendant Singh, and the Lidingo Defendants to be so at the time they were disseminated to the market because they either affirmatively misstated that the writers were not paid for the articles and/or failed to disclose that: (i) IMUC had paid Lidingo to tout IMUC's performance and future prospects, often with the use of an alias; and (ii) that Defendant Singh directly reviewed, edited and approved every IMUC Article prior to its publication, editing and controlling the content that would ultimately be released to the market.

183.   Additionally, the statements in the paid-for Seeking Alpha articles were materially false and misleading for the following reasons (only certain of which are identified specifically with respect to each such article):

    a.   They failed to disclose that the authors were part of a scheme and were being paid to promote IMUC stock.

    b.   They misrepresented that the author was highlighting IMUC in the article on the basis of its data and technology and not because he was being paid by the Company to publicly tout the stock.

c.  Any improvement in IMUC's stock price was the result of the stock promotion scheme, not the success of Phase I.

d.  The Phase I was a study of drug tolerability.  The study results were not evidence of drug efficacy, particularly as there was no control arm in that study.

e.  IMUC's methodology for selecting participants in the Phase I study was not publicly disclosed and there is a likelihood that participants were "cherry-picked" in an effort to suggest a survival benefit.

f.  Most participants in the study did not achieve an immune response, and even those participants that did achieve an immune response at best only "trended toward longer overall survival," and even that disclosure was omitted from IMUC's SEC filings after 2009.

g.  The Company own characterization was that the Phase I results were at most "encouraging," which did not suggest substantial evidence of efficacy or a likelihood of FDA approval.

184.    As a result, the materially false and misleading statements identified herein materially altered the total mix of information available to stockholders.

**May 1, 2012 Article**

185.    On May 1, 2012, during the day, Cassano, utilizing his pseudonym VFC's Stock House, published an article on Seeking Alpha titled, "Immunocellular Therapeutics: Any Pullback May Mean Opportunity."

186.    Therein, the Company, through Cassano, misrepresented the Company's yearly stock movement to that point:

Much of the fuel behind the fire that sparked this year's dramatic price run is due to the success demonstrated by the company's immunotherapeutic cancer-fighting technology that trains one's immune system to attack cancer cells at the stem, thereby eliminating –

or at least greatly reducing – the threat that the cancer will grow and spread. This technology has been put to the test with ICT-107 in the treatment of glioblastoma, a very deadly form of brain cancer.

187.    The truth, however, as known by IMUC, Defendant Singh and the Lidingo Defendants, was that the Company's "price run" was not driven by any success of ICT-107, but instead by the very stock promotion scheme the article was a part of.

188.    Further, at that point the Company had no substantial evidence that ICT-107 "trains one's immune system to attack cancer cells at the stem, thereby eliminating – or at least greatly reducing – the threat that the cancer will grow and spread." Thus, the inclusion of such a statement was materially false and misleading, as known only by the Company, who to that point had only completed a Phase I study that demonstrated only tolerability among a small patient subgroup. In fact, the Company had stated in 2009 that only 5 in 10 or 6 in 15 patients "evaluated for immune response had a significant response to at least one tumor-associated antigen," and that "[p]atients demonstrating an immune response are exhibiting a trend toward longer overall survival." Even that statistic was omitted from IMUC's disclosure after 2009, presumably because patients "demonstrating an immune response" no longer exhibited this trend towards longer overall survival.

189.    As a result, the statements and other representations identified in ¶ 186 were false and misleading given that ICT-107 had not been proven successful to that point and that the Company's "dramatic price run" during the first half the year was

the result of a concerted effort to pump the stock price through the use of illegal articles.

**May 2, 2012 Article**

190.     On May 2, 2012, before the market opened, Nichols, utilizing his pseudonym The Swiss Trader, published an article on Seeking Alpha titled, "Finding An Oncology Player That Will Change the Rules of the Game."

191.     In this article, Nichols presented IMUC as the "next big game changer" in oncology:

> For both scientific and regulatory reasons then, spotting the next big game changer in oncology is a challenging task. One company, however, has both the technology and the early-stage data to suggest its potential to seriously change the way cancer is treated, and with a Phase II trial in progress and proof-of-concept data just a couple years away, there can be no doubt that prospective acquirers are keeping a close eye on it. The company is ImmunoCellular Therapeutics (NYSEMKT: IMUC), a Los Angeles-based biotech that, like Dendreon, is focused on developing dendritic cell-based vaccines. . . . Not only is IMUC targeting regular tumor cells (also known as daughter cells"), it is targeting cancer stem cells (CSCs), the particular cancer-cell type that is believed to be the main cause of tumor growth and recurrence. . . Early-stage clinical data indicate that this strategy is working.

192.     In actuality, it was not the Company's early-stage data or technology that was driving the author's purported interest in IMUC and leading it to crown it the next oncology "game changer," but instead the fact that IMUC was paying for the positive publicity as part of its stock promotion scheme.

193.     These statements made in ¶ 191 were materially false and misleading when made in that they misrepresented that the author was highlighting IMUC in

the article on the basis its data and technology and not because he was being paid by the Company to publicly tout it.

### May 21, 2012 Article

194.     On May 21, 2012, an author named A. John Hodge published an article on Seeking Alpha titled, "Interest Growing In Cancer Stem Cell Biotechs." A. John Hodge was one of the pseudonyms that Lidingo used when it published articles written by Nichols.

195.     In the May 21, 2012 article, Defendant Nichols, with the approval and under the control of the Company, made several materially false and misleading statements about ICT-107 as if it had been already proven effective through clinical trials:

> For those of you who are unfamiliar with the sub $110 million company, ImmunoCellular Therapeutics, allow me to provide some brief insight into what makes the company so special. Its lead candidate, ICT-107, is a Phase II drug that treats glioblastoma, which is a very deadly form of brain cancer. . . The secret behind ICT-107 and its ability to treat glioblastoma with such success revolves around its ability to treat the root of cancer, the cancer stem cells which are primarily responsible for tumor progression.

196.     The statement identified in ¶ 195 was false and misleading when made because the Company, Defendant Singh, and the Lidingo Defendants knew that there was no clinical evidence that ICT-107 was able to successfully treat "the root of cancer, the cancer stem cells," which to that point had only demonstrated tolerability among a small subgroup of carefully chosen patients.

197.     Furthermore, the May 21, 2012 article failed to make any mention of

the paid promotion scheme, instead claiming the author's optimism regarding the

company was driven by its technology:

> One of the primary reasons that I am bullish on the future of ICT-107 is because it has been developed to treat 6 antigens and IMUC is constantly upgrading its intellectual property with new antigens for testing in additional disease indications.

198.     The above statement was materially false and misleading when made

because it failed to address the true reason for the article's bullish-ness: the fact that

the Company was paying for the positive publicity.

**May 29, 2012 Article**

199.     On Tuesday, May 29, 2012, before the market opened and one day

before the listing of IMUC on the NYSE Market, Nichols published an article on

Seeking Alpha titled, "ImmunoCellular Therapeutics' Uplisting to NYSE Could

Immediately Open Many Doors."

200.     Therein, Nichols highlighted the Company's recent uplisting:

> [IMUC] has great clinical data to support a technology that is seemingly years ahead of all others in the space. However, until Friday, the company carried the burden of being an OTC stock, which restricts the company from certain investors and even disallows some from seeing its true potential due to the stigma that's attached to companies that trade on the OTC.

201.     First, the article's commentary on the Company's technology being

"great" and "seemingly years ahead of all others in the space" was materially false

and misleading when made as it had no basis in reality, as to that point, the

Company had only completed a limited Phase I study of ICT-107 among a small

1  patient group that had failed to demonstrate an immune response.

2  202.     Further, any claim of IMUC shedding the stigma associated with OTC

3  stocks (which included, according to Defendant Nichols' pre-Class Period April 30,

4  2012 article incorporated into the May 29, 2012 article by reference, the fact that

5  OTC stocks are viewed as riskier investments to own, as they are not mandated by

6  the same rules and regulations to which a company on a larger exchange would have

7  to adhere) was directly belied by the fact that the very article was part of an illicit

8  stock promotion scheme orchestrated, in part, by the Company in violation of the

9  federal securities laws.

10  203.     Upon publication of this article, IMUC common stock gained nearly

11  9%, on more than 1.1 million shares traded, to close at $3.32 per share on May 29,

12  2012, compared to gains 1.9% and 0.1% for Agenus[5] and NBI;[6] and unchanged for

13  Cytokinetics.[7]

**June 1, 2012 Article**

204.     On June 1, 2012, during the day, in the run up to the ASCO annual

meeting on June 2, 2012, Ramey, under the pseudonym Chemistfrog, published an

---

[5] "Agenus" refers to Agenus Inc., a company identified by IMUC in its proxy statement filed with the SEC on Form 14A on April 30, 2014 as a "peer company."

[6] "Cytokinetic" refers to Cytokinetics Inc., a company identified by IMUC in its proxy statement filed with the SEC on Form 14A on April 30, 2014 as a "peer company."

[7] "NBI" refers to the Nasdaq Biotechnology Index, a market weighted index that measures the performance of all NASDAQ stocks in the biotechnology sector.

article about IMUC on Seeking Alpha titled "ImmunoCellular Therapeutics ICT-107 to Impress at ASCO 2012."

205.    Therein, Ramey promoted the "eye-opening Phase I data" as being "astounding" as "6 of the 16 newly-diagnosed GBM patients showed no signs of tumor recurrence" which represented "a 38% survival rate at over 4 years, a substantial improvement over the 10% seen with the standard of care regimen."  As such, Ramey stated that the "data set is simply too good to ignore, and any indication whatsoever on comparable interim data for the Phase II trial underway in the future will quickly garner the attention of investors and large pharmaceutical suitors."

206.    The above statements were materially false and misleading when made because the Phase I data was not "eye opening," "astounding", or "too good to ignore," but at most "encouraging."

207.    The article sought to place the incomplete picture of the Phase I results front and center by referring to them as "too good to ignore" in hopes of inducing stockholder investment in the Company based on the misrepresentation of the clinical trial data and purported certainty of future clinical success.

208.    As a result of the article's publication, IMUC stock gained nearly 5%, on volume of 1,656,573 shares traded, and closed at a Class Period high of $3.88 per share on June 1, 2012, compared to declines of 2.9%, 2.2%, and 3.1% for Agenus, Cytokinetics and NBI, respectively.

**June 4, 2012 Article**

209.     On June 4, 2012, before the market opened, Nichols published an article on Seeking Alpha titled, "5 Biotech Stocks That Could Be Included in the Russell 2000."

210.     Therein, Nichols made separate misstatements about the reasoning for the Company's stock price "momentum" and the efficacy of ICT-107.

211.     First, with respect to the Company's stock price momentum, the article stated:

> It has been an eventful year for IMUC. The stock began the year with a market cap of $50 million, but now trades with a market cap of $147 million as of May 31st. The reason for its momentum has been the early results from its seemingly transcendent vaccine [ICT-107] that treats glioblastoma, one of the most deadly forms of cancer.

212.     This statement was false and misleading when made because the Company's yearly stock momentum to that point was not attributable to any early results from ICT-107, but instead was the result of the illegal stock promotion scheme orchestrated and overseen by IMUC, through Defendant Singh – the very same promotion this article was a part of, unbeknownst to the investing public.

213.     Additionally, the June 4, 2012 article materially misrepresented the Company's Phase I ICT-107 results by failing to mention any details related to the small sample size or targeted patient demographic:

> If you take the time to research the company's lead candidate, ICT-107, and its early data for treating glioblastoma, you might think that you are reading the information incorrectly, because it is so effective. In the treatment of cancer, success is measured in months, but IMUC is

CONSOLIDATED SECOND AMENDED COMPLAINT
80

rewriting all the books with a vaccine that is providing the best hope yet for glioblastoma patients.  Its latest data, presented at last week's ASCO meeting, showed survival rates *over four years*. The results show that 38% of patients treated with ICT-107 survived over four years compared to 10% with standard care alone.

214.     The above statement was materially false and misleading when made because it purposely omitted any reference that the Company itself had characterized the data as only "encouraging," and that fewer than 50% of patients had exhibited an immune response and even those patients (apparently) had failed to exhibit a survival benefit.

## June 13, 2012 Article

215.     On June 13, 2012, during the day, Ramey, utilizing the pseudonym Chemistfrog, published an article on Seeking Alpha titled, "Dendreon: Room for Improvement."

216.     Therein, Ramey represented that IMUC "has been receiving a lot of attention from bloggers, investors, healthcare providers and large pharmaceuticals after a follow up presentation of phase I data for ICT-107 indicated highly impressive results for newly diagnosed glioblastoma."  Ramey further represented that Phase I "[d]ata indicated a median overall survival rate of 38.4 months with 6 of 16 patients showing no recurrence of the cancer at 44-63 months, both phenomenal improvements over historical norms in which median overall survival is 14.6 months and 5 year survival is roughly 5%."

217.     These statements that the Phase I results were "highly impressive" and

"phenomenal improvements over historical norms" were materially false and misleading as they omitted any reference that the Company itself had characterized the data as only "encouraging" and that fewer than 50% of patients had exhibited an immune response and even those patients (apparently) had failed to achieve a survival benefit.

218.    As a result, IMUC stock gained 4.5% over two days, on combined volume of 864,589 shares traded, to close at $3.45 per share on June 14, 2012, compared to gains of 2%, 1% and 0.2% for Agenus, Cytokinetics and NBI, respectively.

**June 18, 2012 Article**

219.    On June 18, 2012, after the market closed, Lidingo, utilizing the pseudonym The Swiss Trader, published an article on Seeking Alpha titled, "Immunotherapy Comes of Age At ASCO 2012."

220.    The article touted expected sales of ICT-107 from purported analyst projections: "Analysts anticipate peak sales of ICT-107 would be over $500 million once obtaining marketing approval for newly diagnosed GBM alone. However, with its multi-antigen approach to fighting cancer, ICT-107's GBM success could be the first of many as the multiple antigens targeted are found on many cancer types."

221.    These statements were materially false and misleading as they misrepresented the commercialization prospects of ICT-107 despite the fact that the Company knew at this point that success at Phase II was unlikely, and that at this

point Phase I's results were only "encouraging" – as publicly described by IMUC in its own press releases.

222.     On this news, IMUC common stock gained 3%, on volume of 535,535 shares traded, to close at $3.71 per share on June 19, 2012, compared to a decline of 5.9% for Cytokinetics; unchanged for Agenus; and a gain of 1.3% for NBI.

**July 4, 2012 Article**

223.     On July 4, 2012, during the trading day, defendant Ramey, using his Chemistfrog pseudonym, published an article on Seeking Alpha titled "Dendritic Cell Evolution: Investment Potential."

224.     Therein, the article states:

> While DVax has been showing some efficacy in prostate and GBM cancers, ICT-107's plausible future indications include any cancers with the targeted antigens.  Adding another twist in the treatment approach, ICT-107 also addresses the cancer stem cells [CSC] as well. . . ImmunoCellular Therapeutics' major catalysts are behind them with ASCO and 4/5 year data on their phase I GBM data mostly revealed with substantial improvement over the standard of care for GBM.  ICT 107's third generation therapy is likely not the pinnacle of the immunotherapy approach but does represent substantial hope for cancer sufferers and substantial value to shareholders if the phase II data shows even a portion of the efficacy of the phase I success.

225.     These statements were materially false and misleading as they omitted any reference to that the Phase I results did not "mostly reveal" a "substantial improvement over the standard of care" but were, at best, encouraging, as described outwardly by the Company, thus undercutting any claim of efficacy.

**July 11, 2012 Article**

226.     On July 11, 2012, before the market opened, Ramey, using his pseudonym Chemistfrog, published an article on Seeking Alpha titled "Intellectual Property of a Biotech: An Analysis."

227.     The article purported to discuss IMUC's patent portfolio and the importance of technology to biotechnology companies.  Therein, the article stated:

> Interim data analysis is expected in Q4 2012 or Q1 2013, and the company as well as investors are hopeful with the trial garnering much attention as evident from the common stock's price run up from January 10th's $1.05 to the current price hovering around $3.50 per share.

228.     These statements were materially false and misleading when made because, in actuality, the Company's stock price increase for the year to that point was not based on the hopefulness of investors for interim phase II results for ICT-107, but instead was the result of a concerted effort to pump the stock price through the use of an illegal stock promotion scheme overseen by the Company.

**July 17, 2012 Article**

229.     On July 17, 2012, before the market opened, Lidingo using the pseudonym The Swiss Trader, published an article on Seeking Alpha titled "3 Innovative Cancer Treatments…But Which is the Best Bet?."

230.     Therein, the article states:

> The company's phase 2 vaccine, ICT-107, uses the body's own immune system to seek and destroy cancer cells in glioblastoma, one of the most deadly forms of cancer. . . ImmunoCellular is much different from the other two companies on this list because its excitement is

developing late.  The company didn't begin trading with some massive valuation, but through positive results and the acquisitions of new intellectual property, the stock has developed a following.

231.     The above statement was false and misleading when made because it was not positive results and the acquisitions of intellectual property, but the employing of an illicit and undisclosed stock promotion scheme that drove Company valuation and its development of a purported following.

232.     Further, in discussing IMUC's Phase I trial, the article states that "37% of patients with glioblastoma had no signs of recurrence after 44-63 months and all exceeded one year of life following treatment" and "nearly 40% are still alive and well five years later as opposed to 5% with the current standard of care."  Lidingo concluded that "[w]hen you compare this data to the fact that only 5% of those diagnosed with glioblastoma live three years disease-free then it's easy to see why investors and physicians are so excited about ICT-107."

233.     Finally, the article concluded with a prediction of future approval for ICT-107, even upon achieving a portion of the purported "success" of phase I: "if ICT-107 results from its phase 2 trial are even a fraction of its phase 1 results, then you can rest assured that ICT-107 is on the fast-track for approval and will be warmly welcomed among the medical community."

234.     These statements were materially false and misleading as they omitted any reference to the fact that ICT-107 results to that point did not show substantial evidence of efficacy, thus undercutting any claimed likelihood of its success at

Phase II and receipt of FDA approval.

**July 19, 2012 Article**

235.     On July 19, 2012, before the market opened, Nichols published an article on Seeking Alpha titled, "New Legislation Speeds Up FDA Approval Process for ImmunoCellular Therapeutics And Other Innovating Therapies."

236.     Therein, Nichols attributed the Company's purported 135% return in 2012 to ICT-107:

> The reason for the company's momentum is its lead candidate, ICT-107, that treats glioblastoma, which is among the most deadly forms of cancer.

237.     The above statement was materially false and misleading when made because it was not ICT-107 that was driving the Company's "momentum" during 2012 to that point, but instead IMUC's use of an illicit and undisclosed stock promotion scheme.

238.     Further, the article also sought to paint ICT-107 and the Company as a surefire recipient of the breakthrough designation under the newly-enacted FDASIA:

> Therefore, drugs like ICT-107, in some ways, helped pave the way for this bill to be passed. As a result, how could it not qualify for the accelerated program? . . . I used ICT-107 as an example of a therapy that could qualify for the accelerated approval program, partly because I am certain that it would qualify, and also because it shows the level of innovation that must be present in order to qualify.

239.     The above statements were materially false and misleading when made because the Company, who oversaw the publication of the article through the

editorial oversight maintained by its then-CEO Defendant Singh, had no reasonable basis to believe that ICT-107 would qualify for breakthrough designation under FDASIA based on the limited Phase I data it maintained that only exhibited tolerability among a targeted demographic; with no clinical data demonstrating the actual efficacy of ICT-107.

**July 23, 2012 Article**

240.    On July 23, 2012, before the market opened, Nichols published an article on Seeking Alpha titled, "ImmunoCellular Therapeutics: Explaining the Benefits of a Multiple Antigen Targeting Approach."

241.    Therein, the article stated that, "by targeting six antigens, ICT-107 has more ways to kill the cancer cells and form different areas of attack.  This is why I have often said that ICT-107 could not only be largely successful at treating glioblastoma multiforme, but also a one-stop-shop to treating a number of different cancers over the next few years."

242.    The above statement was materially false and misleading when made because the Company, Defendant Singh, and the Lidingo Defendants were aware that ICT-107 had yet to exhibit any efficacy in terms of successfully treating even GBM, let alone treatment of any other different cancers.

243.    In support of its claim of ICT-107's efficaciousness in treating GBM and possibly other forms of cancer, the article states that "IMUC's ICT-107 targets the cancer from multiple points, and prevents it from metastasizing into other

cancers of the body, therefore blocking many avenues for the cancer to evolve."

244.     The above statement was materially false and misleading when made because it attempts to pass off the intended function of ICT-107 (preventing cancer from metastasizing by attacking different antigens) with what it had actually shown to do in clinical trials to that point (little besides exhibiting tolerability in a small group of patients).

245.     Finally, the article attempted to portray ICT-107's approval as a certainty while evidencing the Company's continued drive to improve in the immunotherapy space:

> ImmunoCellular Therapeutics hasn't stopped in its goal to create the best possible vaccine.  The company could easily be satisfied, finish clinical trials, and if the results are even 25% as good as early trials then it would be awarded an approval and be considered the best treatment in the market.

246.     The above statements were materially false and misleading when made because the Company, who oversaw the publication of the article through the editorial oversight maintained by its then-CEO Defendant Singh, had no reasonable basis to believe that ICT-107 could surely gain FDA approval based on the limited Phase I data it maintained that only exhibited tolerability among a targeted demographic; with no clinical data demonstrating the actual efficacy of ICT-107.

**August 8, 2012**

247.     On August 8, 2012, during the trading day, an article was published by Cris Frangold, a pseudonym employed by defendant French for his Lidingo work,

titled "3 Diverse Investment-Grade Pharmaceuticals to Consider Today."

248.     Therein, the article stated:

> Adding to its impressive year, ImmunoCellular has recently uplisted to the New York Stock Exchange.  Up to this point, the company has had to bear the burden of being an OTC stock, complete with the associated stigma and investor distrust. The uplisting opens the doors to a new universe of investors the company could not reach earlier by eliminating the restrictions inherent to investor participation in OTC stocks.

249.     The above statement was materially false and misleading when made because it placed the Company above reproach based on its uplisting to the NYSE Market, which purportedly provided a cleansing effect of the "associated stigma and investor distrust." Yet, at the same time the Company was uplisted and supposedly ripe for investment by an investing public who would no longer have to concern itself with the Company's trustworthiness, IMUC, through Defendant Singh, had orchestrated and was overseeing an undisclosed and illegal stock promotion scheme designed to pump the market cap of the Company.

## August 15, 2012 Article

250.     On August 15, 2012, after the market closed, one day after IMUC's filing of the quarterly report for the second quarter of 2012 on Form 10-Q, Nichols published an article titled, "ICT-107 Into Perspective: Part 1."

251.     Therein, the article made several materially false and misleading statements about the Company, ICT-107's phase I results, and the potential for the drug for approval in the future.

252.     With respect to the Company, the article stated that "IMUC has had an exciting year so far; . . . The Company's valuation has mainly been drive by data from its Phase 1 trial in patients with glioblastoma multiforme (GBM)."

253.     The above statement was materially false and misleading when made because the Company's valuation had not been driven by clinical data from the Phase I trial to that point, but instead by the illicit stock promotion scheme overseen by the Company.

254.     With respect to ICT-107's phase II trial, the article further stated that there was "no reason to believe that [the ICT-107 Phase II trial] won't at least have 10 patients from 100 achieve similar results, or show significant improvements over [standard of care], and if so, it would be considered the most effective vaccine in the market."

255.     The above statement was materially false and misleading when made because at that point in time, there *was* reason to believe that the Phase II trial would *not* achieve significant improvements over the standard of care given that the entire set of clinical data to that point (the Phase I results) was reliant on a 16 patient sample that did not exhibit substantial evidence of efficacy.

256.     Finally, the article attempted to paint a bright future for the ICT-107 phase II trial by convincing investors that any level of success would likely propel the drug to FDA approval:

Sometimes a clinical stage biotechnology company will cherry pick

data and use patients with early stages of a disease to make results appear more encouraging.  However, with GBM, it doesn't matter if it's 10, 20, 30, or 40 patients, the disease is extremely aggressive, and must surpass three other stages of brain cancer in order to be labeled as GBM, which is the most deadly form of brain cancer, and it is a disease where life simply ends. And although ICT-107's Phase 2 results will not likely be as impressive as in Phase 1, investors should remember that it doesn't need to be as effective in order to eventually receive an approval from the FDA. Just look at the data for currently approved drugs, and you will see just how much room for error ICT-107 has in this Phase 2 trial. If results from the Phase 2 trial are as good as the Phase 1 trial, I believe the approval of ICT-107 could be much sooner than we anticipate.

257.     The statements identified in ¶ 256 were materially false and misleading when made because they had no basis in reality, as neither the Company nor Lidingo Defendants could predict the likelihood of FDA approval based on Phase II results for ICT-107, thus the statements were simply self-serving window-dressing bought and paid for by IMUC in an effort to provide a buffer should Phase II results come back less than stellar (which they ultimately did).

**B.**     **The IMUC Officer Defendants Made Materially False and Misleading Statements in IMUC's SEC Filings**

258.     While the Company clandestinely used the IMUC Articles to publicly tout, *inter alia,* ICT-107 and its stock momentum to that point, it and its officers also made several public statements through its SEC filings that were materially false and misleading when made, unbeknownst to the investing public.

**May 11, 2012 Quarterly Report**

259.     On May 11, 2012, the Company filed its quarterly report on Form 10-Q

for the quarterly period ended March 31, 2012.

260.     The May 11, 2012 Form 10-Q was signed by Defendant Singh as the Company's President and Chief Executive Officer.

261.     The May 11, 2012 Form 10-Q did not disclose that: (i) IMUC was paying Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock; or (ii) that Defendant Singh had directly reviewed, edited and approved some or all of the articles.  As a result, the May 11, 2012 Form 10-Q was materially false and misleading when made.

262.     On the topic of expenses, the May 11, 2012 Form 10-Q stated that:

> General and administrative expenses during the three months ended March 31, 2012 were $805,798 compared to $553,721 during the same period in 2011. The increase in expenses reflects the expansion of the Company's infrastructure during the latter half of 2011 including the hiring of additional personnel. Additionally, during the three months ended March 31, 2012 the Company incurred additional expenses in the areas of board fees, travel and investor relations.

263.     The above statement was materially false and misleading because they failed to address the root cause of the increased expenses with respect to investor relations: the retention of Lidingo and the payments made to that company for its assistance in the illicit stock promotion scheme.

264.     Further, with respect to the Company's existing controls and procedures, the May 11, 2012 Form 10-Q stated:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the

effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of March 31, 2012, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

265.     The above statements were materially false and misleading when made because the Company did not have adequate or effective disclosure controls and procedures, as the Company abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet purposely withheld the disclosure of such from any SEC filing.

266.     In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act, the May 11, 2012 Form 10-Q was certified by Defendants Singh and Fractor, and each declared that:

1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

* * *

CONSOLIDATED SECOND AMENDED COMPLAINT
93

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

* * *

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

267.    The foregoing certifications were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and was overseeing an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC was paying Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result of the foregoing, the

1    Company's SOX certifications filed with the SEC on May 11, 2012 were materially

2    false and misleading at all relevant times.

3         **The First May 14, 2012 Prospectus**

4

5    268.      On May 14, 2012, the Company filed with the SEC a Final Prospectus

6    related to the resale of up to 13,471,326 shares of Company common stock by

7    existing stockholders and warrantholders of the Company (the "First May 14, 2012

8

9    Prospectus").

10   269.      The First May 14, 2012 Prospectus was not signed by any officer of the

11   Company, but was filed by IMUC with the SEC.

12

13   270.      The First May 14, 2012 Prospectus did not disclose that: (i) IMUC was

14   paying Lidingo to issue articles, often under aliases, designed to inflate the price of

15   IMUC common stock; or (ii) that Defendant Singh had directly reviewed, edited and

16

17   approved some or all of the articles.  As a result, the First May 11, 2012 Prospectus

18   was materially false and misleading when made.

19

20   271.      Further, in the First May 14, 2012 Prospectus, IMUC identified

21   possible fluctuations in its stock price as a potential event, but failed to disclose that

22   IMUC had significantly inflated its share price by engaging Lidingo and overseeing

23
     an illicit stock promotion scheme:
24

25      The market price of our common stock is likely to be volatile and could
        fluctuate widely in response to many factors, including:
26

27      •    announcements of the results of clinical trials by us or our competitors;

28

- developments with respect to patents or proprietary rights;

- announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- new accounting standards;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this report.

272.     The risk disclosures identified above were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and was overseeing an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC was paying Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; (v) the Company, through Defendant Singh, participated in the

orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result, the First May 14, 2012 Prospectus filed with the SEC was materially false and misleading at all relevant times.

**The Second May 14, 2012 Prospectus**

273.     On May 14, 2012, the Company filed with the SEC a Final Prospectus related to the resale of up to 6,524,809 shares of Company common stock by existing stockholders and warrantholders of the Company, separate and apart from those identified in the First May 14, 2012 Prospectus (the "Second May 14, 2012 Prospectus").

274.     The Second May 14, 2012 Prospectus was not signed by any officer of the Company, but was filed by IMUC with the SEC.

275.     The Second May 14, 2012 Prospectus did not disclose that: (i) IMUC was paying Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock; or (ii) that Defendant Singh had directly reviewed, edited and approved some or all of the articles.  As a result, the Second May 11, 2012 Prospectus was materially false and misleading when made.

276.     Further, in the Second May 14, 2012 Prospectus, IMUC identified

possible fluctuations in its stock price as a potential event, but failed to disclose that IMUC had significantly inflated its share price by engaging Lidingo and overseeing an illicit stock promotion scheme:

> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:

- announcements of the results of clinical trials by us or our competitors;

- developments with respect to patents or proprietary rights;

- announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- new accounting standards;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this report.

277.     The risk disclosures identified above were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and was overseeing an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC was paying Lidingo for these promotional articles, thus increasing expenses

categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC. As a result, the Second May 14, 2012 Prospectus filed with the SEC was materially false and misleading at all relevant times.

### The Third May 14, 2012 Prospectus

278.     On May 14, 2012, the Company filed with the SEC a Final Prospectus related to the resale of up to 6,799,178 shares of Company common stock by existing stockholders and warrantholders of the Company, separate and apart from those identified in the First May 14, 2012 Prospectus and Second May 14, 2012 Prospectus (the "Third May 14, 2012 Prospectus").

279.     The Third May 14, 2012 Prospectus was not signed by any officer of the Company, but was filed by IMUC with the SEC.

280.     The Third May 14, 2012 Prospectus did not disclose that: (i) IMUC

was paying Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock; or (ii) that Defendant Singh had directly reviewed, edited and approved some or all of the articles.  As a result, the Third May 11, 2012 Prospectus was materially false and misleading when made.

281.     Further, in the Third May 14, 2012 Prospectus, IMUC identified possible fluctuations in its stock price as a potential event, but failed to disclose that IMUC had significantly inflated its share price by engaging Lidingo and overseeing an illicit stock promotion scheme:

> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:

- announcements of the results of clinical trials by us or our competitors;

- developments with respect to patents or proprietary rights;

- announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- new accounting standards;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this report.

282.     The risk disclosures identified above were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and was overseeing an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC was paying Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result, the Third May 14, 2012 Prospectus filed with the SEC was materially false and misleading at all relevant times.

**The June 27, 2012 Prospectus**

283.     On June 27, 2012, the Company filed with the SEC a Final Prospectus related to the resale of up to 4,249,625 shares of Company common stock issuable upon exercise of outstanding warrants by existing warrantholders of the Company.

284.     The June 27, 2012 Prospectus was not signed by any officer of the Company, but was filed by IMUC with the SEC.

285.     The June 27, 2012 Prospectus did not disclose that: (i) IMUC was paying Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock; or (ii) that Defendant Singh had directly reviewed, edited and approved some or all of the articles.  As a result, the June 27, 2012 Prospectus was materially false and misleading when made.

286.     Further, in the June 27, 2012 Prospectus, IMUC identified possible fluctuations in its stock price as a potential event, but failed to disclose that IMUC had significantly inflated its share price by engaging Lidingo and overseeing an illicit stock promotion scheme:

The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:

• announcements of the results of clinical trials by us or our competitors;

• developments with respect to patents or proprietary rights;

• announcements of technological innovations by us or our competitors;

• announcements of new products or new contracts by us or our competitors;

• actual or anticipated variations in our operating results due to the level of development expenses and other factors;

• changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

• conditions and trends in the pharmaceutical and other industries;

- new accounting standards;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this report.

287.     The risk disclosures identified above were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and was overseeing an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC was paying Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result, the June 27, 2012 Prospectus filed with the SEC was materially false and misleading at all relevant times.

1

**August 14, 2012 Quarterly Report**

2   288.    On August 14, 2012, the Company filed with the SEC its quarterly

3   report on Form 10-Q for the quarterly period ended June 30, 2012.

4

5   289.    The August 14, 2012 Form 10-Q was signed by Defendant Singh as the

6   Company's President and Chief Executive Officer.

7   290.    The August 14, 2012 Form 10-Q did not disclose that: (i) IMUC was

8

9   paying Lidingo to issue articles, often under aliases, designed to inflate the price of

10  IMUC common stock; or (ii) that Defendant Singh had directly reviewed, edited and

11

12  approved some or all of the articles.  As a result, the August 14, 2012 Form 10-Q

13  was materially false and misleading when made.

14  291.    On the topic of expenses, the August 14, 2012 Form 10-Q stated that:

15

16      General and administrative expenses for the three months ended
        June 30, 2012 and 2011 were $837,322 and $579,889, respectively. The
17      increase in expenses reflects the expansion of our infrastructure during
        the latter half of 2011 including the hiring of additional personnel.
18      Additionally, we incurred additional expenses in the areas of investor
        relations, travel and professional fees.
19
                                    * * *
20
        General and administrative expenses for the six months ended June 30,
21      2012 and 2011 were $1,643,120 and $1,133,610, respectively. The
22      increase in expenses reflects the expansion of our infrastructure during
        the latter half of 2011 including the hiring of additional personnel.
23      Additionally, we incurred additional expenses in the areas of investor
24      relations, travel and board fees.

25  292.    The above statements were materially false and misleading because

26  they failed to address the root cause of the increased expenses with respect to

27

28

investor relations: the retention of Lidingo and the payments made to that company for its assistance in the illicit stock promotion scheme.

293.     Further, with respect to the Company's existing controls and procedures, the August 14, 2012 Form 10-Q stated:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of June 30, 2012, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

294.     The above statements were materially false and misleading when made because the Company did not have adequate or effective disclosure controls and procedures, as the Company abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet purposely withheld the disclosure of such from any SEC filing.

295.     In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act, the August 14, 2012 Form 10-Q was certified by Defendants Singh and Fractor, and

each declared that:

> 1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

> * * *

> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> * * *

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

296.    The foregoing certifications were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and was overseeing an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC was paying Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme;

(v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC. As a result of the foregoing, the Company's SOX certifications filed with the SEC on August 14, 2012 were materially false and misleading at all relevant times.

### The August 20, 2012 Form 8-K

297.     On August 20, 2012, the Company filed a Form 8-K with the SEC announcing the purported resignation of Defendant Singh from the Company.

298.     The August 20, 2012 Form 8-K was signed by Defendant Yu as Interim Chief Executive Officer of the Company.

299.     With respect to Defendant Singh's resignation, the August 20, 2012 Form 8-K stated:

> On August 14, 2012, Manish Singh tendered his resignation together with a claim that he was entitled to severance benefits under the terms of his existing employment agreement. The Company accepted his resignation, confirmed his termination of employment with the Company, including termination as the Company's President and Chief Executive Officer, and disputed any claims for severance benefits for Dr. Singh. The Company appointed John Yu, the Chairman of the Board of Directors, as Interim Chief Executive Officer while it conducts a search for a full-time Chief Executive Officer.

300.     The above disclosures were materially false and misleading in because

they failed to disclose that, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; (vi) Lidingo often employed false aliases to publish its articles about IMUC; and (vii) Singh was being terminated from his position with cause for his participation in the scheme, which explained why he was not entitled to any severance pay.

### Exhibit 99.1 to the October 18, 2012 Form 8-K

301.     On October 18, 2012, the Company filed with the SEC a current report on Form 8-K for the stated purpose of updating the description of its business in the Company's Annual Report for Form 10-K for the year ended December 31, 2011, and also to supplement the "Risk Facts" description included in the Company's Quarterly Report filed on Form 10-Q for the quarter ended June 30, 2012, filed with

SEC on August 14, 2012.

302.     The October 18, 2012 Form 8-K was signed by Defendant Yu as Interim Chief Executive Officer of the Company.

303.     In Exhibit 99.1 to the October 18, 2012 Form 8-K, the Company identified several risks related to its stock price:

> The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

- the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;

- the receipt or failure to receive the additional funding necessary to conduct our business;

- selling by large stockholders;

- presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;

- announcements of technological innovations or new commercial products by our competitors or us;

- developments concerning proprietary rights, including patents by our competitors or us;

- developments concerning our collaborations;

- publicity regarding actual or potential medical results relating to products under development by our competitors or us;

- regulatory developments in the United States and foreign countries;

- manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;

- litigation or arbitration;

- economic and other external factors or other disaster or crisis; and

- period-to-period fluctuations in financial results.

304. The risk disclosures identified above were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; (vi) Lidingo often employed false aliases to publish its articles about IMUC; and (vii) that the risk

factor related to the "publicity regarding actual or potential medical results relating to products under development by our competitors or us" had already materialized as a result of the Company's engagement of Lidingo and the perpetuation of the fraudulent stock promotion scheme.  As a result, Exhibit 99.1 to the October 18, 2012 Form 8-K filed with the SEC was materially false and misleading at all relevant times.

### October 19, 2012 Final Prospectus

305.     On October 19, 2012, the Company filed with the SEC a Final Prospectus related to the issuance of 10,000,000 shares of common stock and warrants to purchase 4,500,000 shares of common stock.

306.     The October 19, 2012 Final Prospectus supplemented the preliminary prospectus previously filed on October 9, 2012, which was incorporated by reference therein.

307.     In the October 19, 2012 Final Prospectus, the Company identified several risks related to its stock price:

> The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:
>
> • the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;

- the receipt or failure to receive the additional funding necessary to conduct our business;

- selling by large stockholders;

- presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;

- announcements of technological innovations or new commercial products by our competitors or us;

- developments concerning proprietary rights, including patents by our competitors or us;

- developments concerning our collaborations;

- publicity regarding actual or potential medical results relating to products under development by our competitors or us;

- regulatory developments in the United States and foreign countries;

- manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;

- litigation or arbitration;

- economic and other external factors or other disaster or crisis; and

- period-to-period fluctuations in financial results.

308.     The risk disclosures identified above were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that

IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; (vi) Lidingo often employed false aliases to publish its articles about IMUC; and (vii) that the risk factor related to the "publicity regarding actual or potential medical results relating to products under development by our competitors or us" had already materialized as a result of the Company's engagement of Lidingo and the perpetuation of the fraudulent stock promotion scheme.   As a result, the October 19, 2012 Final Prospectus filed with the SEC was materially false and misleading at all relevant times.

**November 9, 2012 Quarterly Report**

309.     On November 9, 2012, the Company filed its quarterly report on Form 10-Q for the quarterly period ended September 30, 2012.

310.     The November 9, 2012 Form 10-Q was signed by Defendant Yu as the

Company's Interim Chief Executive Officer.

311.     The November 9, 2012 Form 10-Q did not disclose that: (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles; and (iii) as a result of Defendant Singh's orchestration in the scheme while CEO of the Company, he was terminated with cause.   As a result, the November 9, 2012 Form 10-Q was materially false and misleading when made.

312.     On the topic of expenses, the November 9, 2012 Form 10-Q stated that:

> General and administrative expenses for the three months ended September 30, 2012 and 2011 were $1,004,181 and $634,241, respectively. The increase in expenses reflects the expansion of our infrastructure during the latter half of 2011 including the hiring of additional personnel. Additionally, we incurred additional expenses in the areas of investor relations, travel, professional fees and listing fees for the NYSE MKT.

313.     Likewise, for the nine month period ended September 30, 2012, the Company stated:

> General and administrative expenses for the nine months ended September 30, 2012 and 2011 were $2,647,301 and $1,767,852, respectively. The increase in expenses reflects the expansion of our infrastructure during the latter half of 2011 including the hiring of additional personnel. Additionally, we incurred additional expenses in the areas of investor relations, travel, professional fees and listing fees for the NYSE MKT.

314.     The above statements were materially false and misleading because they failed to address the root cause of the increased expenses with respect to

investor relations: the retention of Lidingo and the payments made to that company for its assistance in the illicit stock promotion scheme.

315.    Further, with respect to the Company's existing controls and procedures, the November 9, 2012 Form 10-Q stated:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of September 30, 2012, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

316.    The above statements were materially false and misleading when made because the Company did not have adequate or effective disclosure controls and procedures, as the Company abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet purposely withheld the disclosure of such from any SEC filing.

317.    In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act, the November 9, 2012 Form 10-Q was certified by Defendants Yu and Fractor, and

each declared that:

1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

* * *

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

* * *

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

318.    The foregoing certifications were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to

disclose that they were the product of a paid promotional scheme; and (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result of the foregoing, the Company's SOX certifications filed with the SEC on November 9, 2012 were materially false and misleading at all relevant times.

### 2012 Annual Report

319.    On March 11, 2013, the Company filed its Annual Report for the year ended December 31, 2012 on Form 10-K with the SEC (the "2012 Annual Report").

320.    The 2012 Annual Report was signed by, among others, defendants Gengos, Fractor and Yu.

321.    The 2012 Annual Report did not disclose that from September 2011 to August 2012: (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; (ii) Defendant Singh, while CEO of the Company, had directly reviewed, edited and approved some or all of the articles; and (iii) as a result of Defendant Singh's participation in the scheme while CEO of the Company, he was terminated with cause.  As a result, the 2012 Annual Report was materially false and misleading

when made.

322.     With respect to increases in investor relations expenses, the 2012 Annual Report stated:

> Our general and administrative expenses for the years ended December 31, 2012 and 2011 were $3,619,291 and $2,446,757 respectively. During the latter half of 2011, we incurred additional expenses in the areas of investor relations, travel, personnel, board and professional fees to expand our infrastructure. During 2012, our expenses in these areas continued to increase.

323.     The above statements were materially false and misleading because they failed to address the root cause of the increased expenses with respect to investor relations: the retention of Lidingo and the payments made to that company for its assistance in the illicit stock promotion scheme, which commenced in the latter half of 2011 (the same time the Company "incurred additional expenses in the areas of relations") and continued through much of the first three quarters of 2012.

324.     At three separate instances in the 2012 Annual Report, the Company also represented that Defendant Singh resigned from the Company ("…Manish Singh, PhD., our former President and Chief Executive Officer who resigned in August 2012…"; "Dr. Singh resigned from the Company on August 14, 2012"; "Dr. Singh resigned from the Company on August 14, 2012.").

325.     Each of these statements was materially false and misleading because Defendant Singh did not resign from the Company, but rather was terminated with cause, as indicated by his non-receipt of any severance package and salary cut-off

dates reported in the 2012 Annual Report.  *See supra* Section IV.H.

326.     With respect to the Company's internal disclosure controls and procedures, the 2012 Annual Report stated:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file with the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate, to allow for timely decisions regarding required disclosure. As required by SEC Rule 15d-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our principal executive and financial officers, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2012, which is the end of the period covered by this report. Based on the foregoing, our principal executive and financial officers concluded that our disclosure controls and procedures were effective as of December 31, 2012.
>
> * * *
>
> Management, with the participation of our principal executive and financial officers, conducted an evaluation of the effectiveness of our internal control over financial reporting, as of December 31, 2012, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon its evaluation, management concluded that, as of December 31, 2012, our internal control over financial reporting was effective.

327.     The above statements were materially false and misleading when made because the Company did not have adequate or effective disclosure controls and procedures, as the Company had previously abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet

purposely withheld the disclosure of such from any SEC filing.

328.     In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act, the 2012 Annual Report was certified by Defendants Gengos and Fractor, and each declared that:

> 1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;
>
> \* \* \*
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> \* \* \*
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

329.     The foregoing certifications were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv)

the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; and (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result of the foregoing, the Company's SOX certifications filed with the SEC on March 11, 2013 were materially false and misleading at all relevant times.

**May 10, 2013 Quarterly Report**

330.     On May 10, 2013, the Company filed its quarterly report on Form 10-Q for the quarterly period ended March 31, 2013.

331.     The May 10, 2013 Form 10-Q was signed by Defendants Gengos and Fractor.

332.     The May 10, 2013 Form 10-Q did not disclose that: (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles; and (iii) as a result of Defendant Singh's orchestration in the scheme while CEO of the Company, he was terminated with cause.  As a result, the May 10, 2013 Form 10-Q was materially

false and misleading when made.

333.     On the topic of expenses, the May 10, 2013 Form 10-Q stated that:

General and administrative expenses for the three months ended March 31, 2013 and 2012 were $769,267 and $805,798, respectively. During the three months ended March 31, 2013, we reduced our expenses in the areas of investor relations, travel and legal expenses. These decreases were partially offset by additional wages.

334.     The above statements were materially false and misleading because they failed to address the root cause of the decrease in expenses with respect to investor relations: the Company was no longer paying Lidingo in connection with the illicit stock promotion scheme.

335.     Further, with respect to the Company's existing controls and procedures, the May 10, 2013 Form 10-Q stated:

As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of March 31, 2013, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

336.     The above statements were materially false and misleading when made

because the Company did not have adequate or effective disclosure controls and procedures, as the Company abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet purposely withheld the disclosure of such from any SEC filing.

337.     In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act, the May 10, 2013 Form 10-Q was certified by Defendants Gengos and Fractor, and each declared that:

> 1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;
>
> * * *
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> * * *
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

338.     The foregoing certifications were materially false and misleading when

made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; and (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result of the foregoing, the Company's SOX certifications filed with the SEC on May 10, 2013 were materially false and misleading at all relevant times.

**August 8, 2013 Quarterly Report**

339.    On August 8, 2013, the Company filed its quarterly report on Form 10-Q for the quarterly period ended June 30, 2013.

340.    The August 8, 2013 Form 10-Q was signed by Defendants Gengos and Fractor.

341.     The August 8, 2013 Form 10-Q did not disclose that: (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles; and (iii) as a result of Defendant Singh's orchestration in the scheme while CEO of the Company, he was terminated with cause.  As a result, the August 8, 2013 Form 10-Q was materially false and misleading when made.

342.     On the topic of expenses, the August 8, 2013 Form 10-Q stated that:

> General and administrative expenses for the three months ended June 30, 2013 and 2012 were $788,420 and $837,322, respectively. During the three months ended June 30, 2013, we reduced our expenses in the areas of investor relations, travel and legal expenses. These decreases were partially offset by additional wages.
>
> * * *
>
> General and administrative expenses for the six months ended June 30, 2013 and 2012 were $1,557,687 and $1,643,120, respectively. During the six months ended June 30, 2013, we reduced our expenses in the areas of investor relations, travel and legal expenses.  These decreases were partially offset by additional wages.

343.     The above statements were materially false and misleading because they failed to address the root cause of the decrease in expenses with respect to investor relations: the Company was no longer paying Lidingo in connection with the illicit stock promotion scheme.

344.     Further, with respect to the Company's existing controls and procedures, the August 8, 2013 Form 10-Q stated:

As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of June 30, 2013, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

345.    The above statements were materially false and misleading when made because the Company did not have adequate or effective disclosure controls and procedures, as the Company abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet purposely withheld the disclosure of such from any SEC filing.

346.    In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act, the August 8, 2013 Form 10-Q was certified by Defendants Gengos and Fractor, and each declared that:

1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact necessary to make the statements made, in light of the circumstances under which*

***such statements were made, not misleading*** with respect to the period covered by this report;

\* \* \*

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

\* \* \*

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

347.     The foregoing certifications were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; and (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were

specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC. As a result of the foregoing, the Company's SOX certifications filed with the SEC on August 8, 2013 were materially false and misleading at all relevant times.

**November 7, 2013 Quarterly Report**

348. On November 7, 2013, the Company filed its quarterly report on Form 10-Q for the quarterly period ended September 30, 2013.

349. The November 7, 2013 Form 10-Q was signed by Defendants Gengos and Fractor.

350. The November 7, 2013 Form 10-Q did not disclose that: (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles; and (iii) as a result of Defendant Singh's orchestration in the scheme while CEO of the Company, he was terminated with cause. As a result, the November 7, 2013 Form 10-Q was materially false and misleading when made.

351. On the topic of expenses, the November 7, 2013 Form 10-Q stated that:

General and administrative expenses for the three months ended September 30, 2013 and 2012 were $985,107 and $1,004,181, respectively. During the three months ended September 30, 2013, we optimized our spending in the areas of investor relations, travel and professional fees, which resulted in a decrease in expense.

* * *

General and administrative expenses for the nine months ended September 30, 2013 and 2012 were $2,542,794 and $2,647,301, respectively. During the three months ended September 30, 2013, we optimized our spending in the areas of investor relations, travel and professional fees, which resulted in a decrease in expense.

352.    The above statements were materially false and misleading because they failed to address the root cause of the decrease in expenses with respect to investor relations: the Company was no longer paying Lidingo in connection with the illicit stock promotion scheme.

353.    Further, with respect to the Company's existing controls and procedures, the November 7, 2013 Form 10-Q stated:

As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of September 30, 2013, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

354.    The above statements were materially false and misleading when made because the Company did not have adequate or effective disclosure controls and

procedures, as the Company abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet purposely withheld the disclosure of such from any SEC filing.

355.     In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act, the November 7, 2013 Form 10-Q was certified by Defendants Gengos and Fractor, and each declared that:

> 1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;
>
> * * *
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> * * *
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

356.     The foregoing certifications were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the

Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv) the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; and (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result of the foregoing, the Company's SOX certifications filed with the SEC on November 7, 2013 were materially false and misleading at all relevant times.

**2013 Annual Report**

357.     On March 14, 2014, the Company filed its Annual Report for the year ended December 31, 2013 on Form 10-K with the SEC (the "2013 Annual Report").

358.     The 2013 Annual Report was signed by, among others, defendants Gengos, Fractor and Yu.

359.     The 2013 Annual Report did not disclose that from September 2011 to

August 2012: (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; (ii) Defendant Singh, while CEO of the Company, had directly reviewed, edited and approved some or all of the articles; and (iii) as a result of Defendant Singh's participation in the scheme while CEO of the Company, he was terminated with cause.  As a result, the 2013 Annual Report was materially false and misleading when made.

360.     With respect to increases in investor relations expenses, the 2013 Annual Report stated:

> Our general and administrative expenses for the years ended December 31, 2013 and 2012 were $3,396,391 and $3,619,291, respectively, a decrease of $222,900. During 2012, our expenses in the areas of investor relations, travel, board and professional fees increased to expand our infrastructure. During 2013, we optimized our spending in the areas of investor relations, travel and professional fees, which resulted in a decrease in expense.  These decreases were partially offset by increases in personnel related expenses as we hired additional employees and we concluded a litigation matter.

361.     The above statements were materially false and misleading because they failed to address the root cause of the increased expenses with respect to investor relations in 2012: the retention of Lidingo and the payments made to that company for its assistance in the illicit stock promotion scheme, which commenced in the latter half of 2011 (the same time the Company "incurred additional expenses in the areas of relations") and continued through much of the first three quarters of 2012, the discontinuation of such accounted for nearly the entire $222,900 decrease

in expenses for 2013.

362.     With respect to the Company's internal disclosure controls and procedures, the 2013 Annual Report stated:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file with the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate, to allow for timely decisions regarding required disclosure. As required by SEC Rule 15d-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our principal executive and financial officers, of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2013, which is the end of the period covered by this report. Based on the foregoing, our principal executive and financial officers concluded that our disclosure controls and procedures were effective as of December 31, 2013.
>
> * * *
>
> Management, with the participation of our principal executive and financial officers, conducted an evaluation of the effectiveness of our internal control over financial reporting, as of December 31, 2013, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 1992. Based upon its evaluation, management concluded that, as of December 31, 2013, our internal control over financial reporting was effective.

363.     The above statements were materially false and misleading when made because the Company did not have adequate or effective disclosure controls and procedures, as the Company had previously abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet

purposely withheld the disclosure of such from any SEC filing.

364.    In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act, the 2013 Annual Report was certified by Defendants Gengos and Fractor, and each declared that:

> 1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact *or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;
>
>                           * * *
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
>                           * * *
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

365.    The foregoing certifications were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv)

the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; and (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result of the foregoing, the Company's SOX certifications filed with the SEC on March 14, 2014 were materially false and misleading at all relevant times.

**May 9, 2014 Quarterly Report**

366.    On May 9, 2014, the Company filed its quarterly report on Form 10-Q for the quarterly period ended March 31, 2014.

367.    The May 9, 2014 Form 10-Q was signed by Defendants Gengos and Fractor.

368.    The May 9, 2014 Form 10-Q did not disclose that: (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; (ii) Defendant Singh had directly reviewed, edited and approved some or all of the articles; and (iii) as a result of Defendant Singh's orchestration in the scheme while CEO of the Company, he was terminated with cause.  As a result, the May 9, 2014 Form 10-Q was materially false

and misleading when made.

369.    Further, with respect to the Company's existing controls and procedures, the May 9, 2014 Form 10-Q stated:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of March 31, 2014, (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized, reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure. There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

370.    The above statements were materially false and misleading when made because the Company did not have adequate or effective disclosure controls and procedures, as the Company abdicated responsibility for SEC filings to Defendant Singh, who was aware of the Company's retention of Lidingo and his and the Company's participation in the illegal stock promotion scheme, yet purposely withheld the disclosure of such from any SEC filing.

371.    In accordance with Section 302 of the Sarbanes-Oxley ("SOX") Act,

the May 9, 2014 Form 10-Q was certified by Defendants Gengos and Fractor, and

each declared that:

> 1. I have reviewed this report on Form 10-Q of ImmunoCellular Therapeutics, Ltd.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact ***or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report;
>
> * * *
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> * * *
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

372.    The foregoing certifications were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*: (i) the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price; (ii) that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;" (iii) the Company, through Defendant Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point; (iv)

the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme; and (v) the Company, through Defendant Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Defendant Singh and directed to refrain from making any disclosures related to compensation; and (vi) Lidingo often employed false aliases to publish its articles about IMUC.  As a result of the foregoing, the Company's SOX certifications filed with the SEC on May 9, 2014 were materially false and misleading at all relevant times.

## VI.   THE TRUTH IS REVEALED WHEN THE COMPANY ANNOUNCES NEGATIVE PHASE II RESULTS, THEREBY REMOVING FROM THE MARKET THE INFLATION CAUSED BY THE LIDINGO ARTICLES

373.     As set forth herein, throughout the Class Period, the Company directed Lidingo to publish touting articles about the Company that made ICT-107 appear to be a groundbreaking drug poised to drive IMUC to greatness.  In the process, the Company (unbeknownst to the investing public) explicitly acknowledged the difficulty biotech investors face when attempting to decipher purposely misrepresentative information from issuer companies:

> For biotech investors, there is little as frustrating as digging through mounds of medical journals and browsing websites in an attempt to interpret clinical trial results, trial timelines and potential drug market values.  Presented clinical data can be confusing, complicated, biased

and even contradictory at times.  Biotech companies often purposely delay both positive and negative data for their own purposes and may only report a portion of the data from their trials. . . The deeper a biotech investor digs for data and marketing potential the more questions than answers can often be found.

"Intellectual Property of a Biotech: An Analysis," Seeking Alpha, Brian Nichols, Jul. 11, 2012.

374.    The Company, through Lidingo, also seized the opportunity to anonymously cast aspersions on other immunotherapy competitors (*e.g.* competitor companies that someone looking to invest in the immunotherapy space might choose to invest in over IMUC).  In particular, an IMUC Article, published with the oversight by the Company, attacked the trial design of Northwest Therapeutics – a rival biotech company that was then also developing its own immunotherapy treatment option for newly diagnosed GBM patients:

[Northwest Biotherapeutics] has taken steps to speed up enrollment, however the author has concerns about any trial's target patient set and/or efficacy with enrollment at a crawl . . .Trial design should always be considered when comparing data against other competing drugs, and it should also be viewed to ascertain its impact on the FDA's final decision for drug approval. The trial's primary endpoint is progression free survival, a variable endpoint due to pseudo-progression.  OS is a secondary endpoint, but is complicated by the trial's "crossover policy" which was likely partly implemented to attract additional clinics that may not otherwise be interested in having its patients possibly permanently assigned to the placebo group with very poor prognoses.  Ultimately, there may be many questions asked about trial design, true efficacy due to crossover complications, and the primary endpoint.

"ImmunoCellular Therapeutics ICT-107 to Impress at ASCO 2012," Seeking Alpha, June 1, 2012 ChemistFrog.

375.     Importantly, at this point in time, Northwest had transitioned its Phase II trial (which was initiated in 2006) to a Phase III trial and had Phase I data exhibiting a median OS survival of 33.8 months (nearing IMUC's purported Phase I median OS survival of 38.4 months), thus that company was well ahead of IMUC in its development as IMUC was still enrolling its Phase II patients.

376.     Yet despite the Company's own warnings about reliance on complex clinical data, purposeful misinformation released by biotech companies, and issues about trial design and primary endpoints, throughout the Class Period, the Company still sought to present itself and ICT-107 as on the forefront of an immunotherapy breakthrough with positive phase II results assured.

377.     *First*, as set forth *supra*, Section V.A, several articles during the Class Period referenced the relatively low bar that the Company would have to clear with its ICT-107 Phase II results in order to be considered a success.  While the Phase I results did meet its primary endpoint of immunogenicity[8] for sixteen of the individuals in the study, the relatively low bar was purposely designed for testing tolerability in patients, not efficacy of the drug. The Company was aware that these Phase I results had limited utility in terms of predicting Phase II success.  However, this did not stop IMUC, through Singh as its CEO, from overseeing dozens of

---

[8] Immunogenicity is the ability of a particular substance, such as an antigen or epitope, to provoke an immune response in the body of a human or animal. In other words, immunogenicity is the ability to induce a humoral and/or cell-mediated immune responses.

1
2

IMUC Articles both prior to and during the Class Period that falsely touted the Phase I results as a precursor to Phase II success.

3
4
5
6
7
8

378.    These false representations were allowed to remain in the market even after Singh's departure from the Company and IMUC's discontinuation of any relationship with Lidingo, as they represented strategic and purportedly neutral commentary on the viability of ICT-107.

9
10
11
12
13
14
15
16
17
18
19
20

379.    The truth about ICT-107's lack of efficacy based on its results from Phase I and Phase II, however, began to emerge on December 11, 2013 when, after the market closed, the Company issued a press release disclosing that its ICT-107 Phase II study failed to meet the "gold standard primary endpoint of overall survival" as the intent-to-treat population did not reach statistical significance with respect to overall survival ("OS"). Despite what amounted to a failure of the study, the Company attempted to contort the results into a positive in order to avail themselves further to the misinformation placed into the market by the IMUC Articles:

21
22
23
24
25
26
27
28

LOS ANGELES--(BUSINESS WIRE)-- ImmunoCellular Therapeutics, Ltd. ("ImmunoCellular") (NYSE MKT:IMUC) announced that ICT-107, its dendritic cell-based vaccine, demonstrated a statistically significant increase in progression-free survival (PFS) in patients with newly diagnosed glioblastoma multiforme (GBM) in its randomized, placebo-controlled phase II trial. A comparison of PFS between ICT-107 and placebo showed a statistically significant difference in the Kaplan-Meier (K-M) curves favoring ICT-107 (p=0.014 two-sided, hazard ratio (HR)=0.56) in the intent-to-treat population of all 124 randomized patients. The difference in the median progression-free survival times between ICT-107 and placebo favored ICT-107 and was

two months in duration. For the per-protocol population (117 of 124 patients receiving at least four induction vaccinations), the K-M comparison p-value improved in treated patients to 0.0074 two-sided (HR=0.53) and the difference in median progression-free survival times increased to three months in favor of ICT-107.

The differences in the overall survival (OS) K-M curves did not reach statistical significance in the intent-to-treat population (the primary endpoint) or the per-protocol population, with p-values and HRs of p=0.58 two-sided, HR=0.87, and p=0.40 two-sided, HR=0.79, respectively. However, there were numerical differences in the median survivals favoring ICT-107 of two months in the intent-to-treat population and three months in the per-protocol population.

The OS analysis includes data on 67 events (patient deaths) out of a possible 124, whereas the PFS analysis includes data from 103 events. ImmunoCellular Therapeutics plans to continue following patients in this trial to collect more mature OS data. In the matured data from the open label, phase I trial, the Company observed a consistent benefit in both PFS and OS compared with historical controls, and on this basis thinks that it is possible that the primary OS benefit could be clarified as the phase II data mature.

In this phase II study, ICT-107 was generally safe and well tolerated, with no imbalance of adverse events between the active and placebo groups.

* * *

380.    Despite the Company's best efforts at spin, there was no escaping the truth that the Company's Phase II trial: ICT-107 failed to meet its primary endpoint of overall survival.  To distract from these results, IMUC pointed to the increase in progression free survival – *the very endpoint the Company highlighted in order to cast doubt on Northwest Therapeutics in the June 1, 2012 article*.  *See supra* ¶ 374.  Despite the fact that the Company was aware of the limited utility of the variable endpoint of progression free survival, it hoped to paint the Phase II results

in the best light while continuing to receive the benefits of the IMUC Articles.

381.     The IMUC Articles regularly touted ICT-107's Phase I results as unprecedented and indicated that if Phase II was even fractionally as good, the Company was poised for great success.  With this in mind (and without ever having corrected the falsely-optimistic IMUC Articles placed into the market at the Company's direction), Company management was motivated to perpetuate the ruse until the trial data could no longer support it.  This was especially true after the December 2013 release of Phase II results after the market closed, as the announcement sent the Company's stock careening downwards almost 60% on December 12, 2013 – from $2.72 per share to just $1.10.

382.     The plug was finally pulled on the IMUC Articles on Sunday, June 1, 2014, when the Company reported updated efficacy and safety results from the Phase II ICT-107 trial, giving up the ruse with respect to any claim to statistical significance of the drug for the entire patient group and instead focused on the small subgroup of individuals who exhibited the HLA-A2 gene within each of the two major MGMT subgroups (the same individuals from Phase I who were predisposed to better results on the basis of their genetic markers):

> LOS ANGELES, June 1, 2014 /PRNewswire/ -- ImmunoCellular Therapeutics, Ltd. ("ImmunoCellular") (NYSE MKT:IMUC) announced that updated efficacy and safety data from the phase II trial of dendritic cell-based immunotherapeutic vaccine ICT-107 in patients with newly diagnosed glioblastoma multiforme (GBM) were presented at the 2014 American Society for Clinical Oncology (ASCO) annual meeting in Chicago.

CONSOLIDATED SECOND AMENDED COMPLAINT
143

When overall survival (OS) and progression-free survival (PFS) were assessed in pre-specified patient subgroups, results favored treatment with ICT-107 over control in HLA-A2 patients within each of the two major MGMT subgroups (unmethylated and methylated). While the subgroups were small in size, and not powered to show statistical significance, the numeric advantages in favor of ICT-107 treated patients were shown to be large and clinically meaningful.

HLA (human leukocyte antigens) are cell-surface antigen-presenting proteins. These molecules are on dendritic cells and present the tumor-associated antigens to T-cells to induce the immune response to the ICT-107 vaccine. HLA-A2 was one of two HLA types that were treated in the phase II trial. Of the two types, HLA-A2 is twice as common in the population as HLA-A1, and is the most common HLA type in North America and the EU.

In the per-protocol (PP) analysis of data from HLA-A2 patients with unmethylated MGMT:

- The control and treated median OS times were 11.8 and 15.8 months, respectively, indicating about a 4-month or 33% numeric survival increase for treated patients (HR=0.612, log-rank p-value=0.175);
- The median PFS times for control and treated patients were 6.0 and 10.5 months, respectively, indicating about a 4.5-month or 75% numeric PFS increase for treated patients (HR=0.758, log-rank p-value=0.442);
- There were also signs of a potential long-term survival benefit for ICT-107-treated patients, with 21% of treated patients still alive compared to only 7% of controls.

In the PP analysis of data from HLA-A2 patients with methylated MGMT:

- The control and treated groups had still not reached median survival times as of the time of data analysis, with the majority of patients still alive (65% of treated compared to 57% of control patients);
- However, the median PFS times for control and treated patients were 8.5 and 24.1 months, respectively, indicating about a 15.6-month or 184% statistically significant PFS increase for treated patients (HR=0.259, log-rank p-value=0.005).

CONSOLIDATED SECOND AMENDED COMPLAINT
144

The updated data from the phase II ICT-107 trial were presented in an oral session by Patrick Y. Wen, MD, Director of the Center for Neuro-Oncology at The Dana Farber Cancer Institute and Professor of Neurology at Harvard Medical School, and principal investigator on the trial. The presentation was titled "A randomized, double-blind, placebo-controlled phase 2 trial of dendritic cell (DC) vaccination with ICT-107 in newly diagnosed glioblastoma (GBM) patients."

"We think that the maturing data from the phase II trial demonstrate a compelling rationale for phase III development of ICT-107 in patients with newly diagnosed glioblastoma," said Dr. Wen. "Standard-of-care chemotherapy, temozolomide, has little or no treatment benefit for newly diagnosed GBM patients with unmethylated MGMT, which is the majority of patients. ICT-107 has shown the potential to meaningfully extend both OS and PFS without significant side effects in this patient population which has the poorest prognosis for survival. Furthermore, the early evidence of a potential long-term survival "tail," even in this small phase II trial, is promising, and indicative of what we would expect to see in a highly active immunotherapeutic agent. As the methylated MGMT group is followed further, I am optimistic that the already very large increase in PFS for treated patients ultimately may translate into a survival benefit."

"The pre-specified subgroup analyses in our phase II trial indicate the potential value of a targeted population approach going forward, as the demonstration of treatment benefit in HLA-A2 patients presents a favorable case for selecting these patients for the population to be studied in phase III clinical testing," said Andrew Gengos, ImmunoCellular's Chief Executive Officer. "HLA-A2 patients comprise the majority of the overall GBM patient population in the US and Europe. These new results will provide a strong basis for conducting registration discussions with US and EU regulatory authorities, which we intend to start within the next few months. We want to express our appreciation to the patients, investigators and clinical teams who have participated in the ICT-107 phase II trial. We look forward to potentially advancing this promising cancer vaccine toward the market."

383.    With no hope for ICT-107 based on these mature results, the market reacted swiftly, sending the Company's stock down more than 14%, from $1.34 on

Friday, May 30, 2014 (the last trading day prior to the announcement) to $1.15 per share on June 2, 2014.

## VII.   POST-CLASS PERIOD EVENTS

### A.   A Defeated IMUC Begins to Publicly Acknowledge its Role in the Stock Promotion Scheme Through a Pair of Partial Disclosures

384.    With ICT-107 a bust and the Company unable to get any of its other pipeline drugs off the ground, the Company partially and belatedly acknowledged the stock promotion scheme in its Form 10-K filed on March 30, 2016 with the SEC, and that it had agreed in principle with the staff of the SEC on a proposed settlement framework related to the stock promotion scheme:

> We have agreed in principle with the staff of the SEC on a proposed settlement framework related to an investigation principally of our former Chief Executive Officer involving conduct between November 2011 and August 2012 regarding the publication of articles without disclosing that they were paid for by us or investor relations firms hired by us. We would consent to the entry of an administrative order requiring that we cease and desist from any future violations of Sections 5, 17(a), and 17 (b) of the Securities Act of 1933, as amended, and Section 10(b) of the Securities Exchange Act of 1934, as amended, subject to approval by the Commissioners of the SEC, without admitting or denying any allegations. The proposed settlement also involves the adoption of certain corporate governance amendments to our policies and practices, in particular as it relates to the retention of investor relations and public relations firms.   The proposed settlement is contingent upon execution of a formal offer of settlement and approval by the Commissioners of the SEC, neither of which can be assured.   Based upon the settlement framework with the staff of the SEC,  we have not accrued and does not currently expect to accrue a liability related to this matter.   However, any final settlement must be approved by the Commission.   If the Commission does not approve the settlement, we may need to enter into further discussions with the SEC to resolve the investigated matters on different terms and conditions. As a result, there can be no assurance as to the final terms of any

CONSOLIDATED SECOND AMENDED COMPLAINT

146

settlement including its financial impact or any future adjustment to the financial statements.

385.     Notably, at no point prior to this annual report did the Company ever announce that it had any knowledge of any investigation by the SEC that would necessitate such a settlement agreement.  In fact, in the quarterly report filed on Form 10-Q on November 9, 2015, the Company specifically represented that there were no outstanding legal proceedings.

386.     Further, even in the face of public admissions of investigations by other companies later implicated by the SEC (including Lion) that each had received subpoenas from the SEC with respect to an investigation into illegal stock promotion activity, IMUC remained coy.

387.     In its annual report filed on Form 10-K with the SEC on March 9, 2017, the Company added more color to the proposed SEC settlement, while still failing to disclose details related to the entire scheme or even name Defendant Singh or Lidingo.  Therein, the Company stated:

> On December 8, 2016, we signed an offer of settlement with the SEC related to an investigation principally of a former Chief Executive Officer involving conduct between November 2011 and August 2012 regarding the publication of articles without disclosing that they were paid for by us or investor relations firms hired by us. The offer of settlement provided that, without admitting or denying allegations, we would consent to the entry of an administrative order requiring that we cease and desist from any future violations of Sections 17(a) and 17(b) of the Securities Act of 1933, as amended, and Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder, subject to approval by the Commissioners of the SEC. The proposed settlement also involves the adoption of certain corporate

governance amendments to our policies and practices, in particular as it relates to the retention of investor relations and public relations firms. The proposed settlement is contingent upon approval by the Commissioners of the SEC, which cannot be assured. Based upon the offer of settlement, we have not accrued and do not currently expect to accrue a liability related to this matter. However, the settlement must be approved by the Commissioners of the SEC. If the Commissioners of the SEC do not approve the settlement, we may need to enter into further discussions with the SEC to resolve the investigated matters on different terms and conditions. As a result, there can be no assurance as to the final terms of any settlement including its financial impact or any future adjustment to the financial statements.

**B.** **The SEC Reveals the Full Relationship with IMUC and Lidingo, Bringing to Light the Company's Role in the Materially False and Misleading IMUC Articles**

388. After years of effort by the Company to simply sweep under the rug IMUC's involvement in the illicit stock promotion scheme, the far reaching details about the Company's involvement in the web of fraud related to the IMUC Articles was fully made public on April 10, 2017 when the SEC (not the Company) announced enforcement actions against 27 individuals and entities behind various alleged stock promotion schemes. Among those who consented to the entry of a cease-and-desist order were defendants IMUC, Singh, Lavos, Ramey, and French.

389. In the Order Instituting Cease-and-Desist Proceedings against IMUC, the SEC revealed that:

From September 2011 to August 2012, IMUC through its Former Chief Executive Officer, Manish Singh, engaged in a scheme to mislead investors by commissioning over 50 internet publications promoting IMUC on investment websites that purported to be independent from the company when, in fact, they were paid promotions. Singh engaged Lidingo Holdings, a stock promotion firm, to pay writers to publish

articles about IMUC on investment websites. Singh oversaw Lidingo's promotional work for IMUC and directed that Lidingo not use writers who disclosed in their articles that IMUC was indirectly compensating them for their publications. These omissions about IMUC's indirect payments to writers created the misleading impression that the views contained in the publications were objective and independently formed. As a consequence of this conduct, IMUC violated the anti-fraud and caused violations of the anti-touting provisions of the federal securities laws.

390.      Similarly, the Order Instituting Cease and Desist Proceedings against Manish Singh revealed:

From August 2011 to March 2014, Singh engaged in a paid stock-touting scheme involving 12 issuers, at least 10 writers, over 400 internet publications, and the distribution of emails to thousands of potential investors. At different points during this time period, Singh, who used his firm Lavos to engage in much of the stock promotion activity, was also the CEO of two publicly traded companies, ImmunoCellular Therapeutics, Ltd. ("IMUC") and Lion Biotechnologies, Inc. Singh worked with stock promotion firm Lidingo Holdings, LLC to pay writers to publish articles about public company clients on investment websites as well as to coordinate the distribution of articles to thousands of electronic mailboxes. In addition, while he was their CEO, Singh hired Lidingo to perform promotional work for IMUC and Lion. The scheme was lucrative— entitling Singh to receive at least $1.75 million in cash and equity. Singh knew or was reckless in not knowing that none of the over 400 publications appropriately disclosed the receipt of compensation and that at least 200 of the articles affirmatively misrepresented that the author was not receiving compensation. These omissions and affirmative misstatements created the misleading impression that the views contained in the publications were objective and independently formed.

391.      Relatedly, Defendants Lidingo, Bjorlin, Hodge, Nichols and Cassano were each charged in an SEC complaint the same day for violation of the federal securities laws related to their overarching participation in stock promotion schemes

on behalf of IMUC, Galena, and Lion, among others companies.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

392.     As alleged herein, each of the Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company or with the Company's assent were materially false and misleading, knew or acted with deliberate recklessness in disregard that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

### A.      Manish Singh

393.     During the Class Period, Manish Singh was: (i) the CEO of IMUC; (ii) the day-to-day manager and controller of Lavos; and (iii) an absolute authority over Lidingo with respect to its publication of the IMUC Articles.

394.     Under his arrangement with Lidingo, Singh performed day-to-day promotional work, including interfacing with writers, coordinating and authorizing publications, providing ideas for articles, and editing articles.

395.     Singh had final authority over the content, location and timing of most, if not all of the IMUC Articles.

396.     Of the 21 articles promoting IMUC during the Class Period, none contained a disclosure indicating the writer, or person identified in the byline, had

1  been compensated or the amount of his compensation.

2  397.    This lack of disclosure was purposeful and orchestrated by Singh,

3  Bjorlin, and Hodge, as evidenced by communications prior to and throughout the

4  Class Period.

5

6  398.    Singh was also a strong proponent of the use of pseudonyms,

7  encouraging Lidingo to use such when publishing articles ghost-written by other

8  Lidingo writers and even going as far as to provide approval for which identity each

9

10  should be published under.

11  399.    As he was the CEO of IMUC (then a Lidingo client), Singh sought to

12

13  disguise his involvement in promotional work by, among other ways, assisting

14  Bjorlin in her creation of Lidingo and having IMUC contract with Lidingo instead

15

16  of Lavos.   Others, too, made efforts to keep Singh's involvement in Lidingo's

17  promotional schemes a secret, with Lidingo employees referring to Singh as

18  "Charlie" when communicating about him – an identity that morphed into the

19

20  "Charles Pelikan" moniker Singh adopted for promotional work beginning in 2013.

21  400.    Despite his best efforts to conceal his involvement in the promotional

22  scheme, Singh made no secret about his intention in pushing these articles,

23

24  commenting in email on February 8, 2012 that a Lidingo's writer's idea for an

25  article on IMUC was a ***"[v]ery good idea as I think it would move these stocks"***

26  (emphasis added) and suggesting that IMUC be the second company mentioned in

27

28  the article's discussion.   That article would ultimately be published on Seeking

Alpha eight days later with IMUC appearing as the second company discussed, as instructed by Singh.

401.     Further, in April 2012, Bjorlin emailed Singh a list of potential writers for approval for use in the stock promotion scheme of IMUC and other clients of Lidingo and Lavos.  With respect to one writer, Bjorlin disqualified him from participation on the basis that "he wants to disclose as he is a CFA.  No disclosures allowed."  Singh confirmed Bjorlin's assessment in his April 17, 2012 response, confirming this writer to be a "no" while also instructing Bjorlin to only try another potential writer "if no disclosure."

402.     In another brazen exchange that directly acknowledged the risk writers were undertaking without disclosing compensation, in early February 2013, Bjorlin emailed Singh about a writer who had stated he would disclose compensation, stating that he "will NOT write [without] disclosure, you sure he used to write for pay?"  Singh replied: "he has been spooked by [a promoter with whom he previously worked] that the SEC may monitor him so he will never agree to anything not proper in writing.  Unless we get to know him he won't [sic] write."

403.     Through his participation in the stock promotion schemes of Lidingo, Singh received at least $1.75 million in cash and equity.

404.     On August 20, 2012, the Company filed with the SEC a Form 8-K announcing the resignation of Singh from his post as Chief Executive Officer, President, and a director of the Company.

CONSOLIDATED SECOND AMENDED COMPLAINT
152

405.     On August 15, 2012, just one day after Singh purportedly tendered his resignation, IMUC made its last payment to Lidingo and an article was published by Brian Nichols on Seeking Alpha titled "ICT-107 Into Perspective Part 1."  This article, like every IMUC-sponsored article before it, omitted any reference to the receipt of payment for its publishing and affirmatively misrepresented that no payment had been received.

406.     The suspicious timing of Defendant Singh's "resignation," along with the final payment from IMUC to Lidingo being made so closely thereafter and a halting to Lidingo-authored articles about the Company are all probative of Singh's scienter.

407.     Further, the Company's reference to a dispute regarding Singh's entitlement to severance payment further creates an inference of scienter related to the bad acts alleged herein.

408.     Besides the obvious monetary kickback Singh received from Lidingo as a result of engaging that company to promote IMUC (IMUC paid Lidingo, who, in turn, paid Singh, Singh was also motivated by his own incentive structure at IMUC that used the Company's market capitalization as a trigger for the vesting of Singh's stock options.

409.     For 2010, of the 200,000 option shares awarded to Singh contingent on a triggering factor for vesting, only 10% (200,000 shares that would vest only upon enrollment of the Company's first patient in a phase II clinical trial) were contingent

on the Company's performance as a pharmaceutical company. The remaining 180,000 awarded during 2010 were based on the Company's market capitalization and stock price, providing Singh the motive necessary to engage with Lidingo in the illegal stock promotion scheme.

410. This was similar for the awards granted in 2009, where 50% of his contingent option awards were based on the Company's volume weighted average trading price, as compared to just 12.5% that were contingent on the Company's pharmacological successes, and the remaining contingent on the Company securing a financing, strategic alliance, or licensing agreement.

411. Further, as CEO of the Company at the time the analysis of the Phase I clinical data for ICT-107 was completed and submitted for publication, Defendant Singh had actual knowledge that: (1) the Phase I ICT-107 clinical trial results failed to demonstrate that the ICT-107 vaccine in patients with newly diagnosed glioblastoma was effective in increasing progression-free and overall survival, because of the lack of an appropriate control group and the design and the conduct of the study not being aimed at demonstrating efficacy; (2) of the six patients who had survived for four years or more, there was no clear correlation with the presence of immune response to ICT-107, a step necessary for the vaccine to work against GBM; (3) in five of the six patients, an apparently favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened

survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; (4) given that promising results in early studies are frequently not confirmed in later, more well-controlled and conducted clinical trials, the Phase I trial results did not indicate "impressive survival data," and, thus (5) IMUC's business and prospects were far worse than represented.

412.     These allegations support a strong inference of Defendant Singh's scienter, as they show that Singh: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); (iii) knew these articles did not contain the required paid disclaimers; and (iv) knew that the Phase I ICT-107 results were not nearly as positive or encouraging as the IMUC Articles led the investing public to believe with his approval.  Additionally, Singh's efforts to coordinate with Bjorlin so as to hire only those writers that would not disclose the receipt of payments, even in the face of SEC and Seeking Alpha policy concerns, supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper.  Further, Singh's continuous efforts to keep his involvement in the promotional schemes hidden further supports an inference of scienter.

## B.     <u>David Fractor</u>

413.     At various points throughout the Class Period, Fractor was just one of a small group of Company executive officers, along with Singh, Yu, Gengos, and

James Bender, Vice President of Product Development and Manufacturing.

414.     As the only financial officer for the Company, Fractor was privy to any outside contracts made between the Company and a third-party, like the September 2011 agreement between IMUC and Lidingo.  Given the substantial amounts paid by IMUC to Lidingo, and Fractor's role within IMUC, Singh's resignation and the excessive payments to Lidingo increasing the Company's "investor relations" expense, Fractor either knew or but for his deliberate recklessness should have known the true facts concerning the services performed by Lidingo.

415.     Further, Fractor was in charge of the Company's finances in August 2012 when the Company made its final payment to Lidingo (a day after Defendant Singh's resignation) and continued as a member of the executive team throughout the remainder of the Class Period, during which the Company made no effort to bring to light its past association with Lidingo or atone for its participation in the stock promotion scheme.

416.     Fractor, as the Company's Treasurer and Chief Financial Officer since April 2011, knew or was deliberately reckless in not knowing about the stock promotion scheme and the payments of more than $230,000 by IMUC to Lidingo. The $230,000 in payments were material to IMUC's income statement and business. Fractor, as Treasurer and CFO either knew or was deliberately reckless in failing to know the true purpose of those payments.  Accordingly, there is a strong, reasonable inference that Fractor reviewed the contract with Lidingo that called to make

monthly payments of $5,000, and then continued to issue payments well above this amount and after the expiration of the term of the contract, to Lidingo and therefore, he either knew or was deliberately reckless in not knowing that IMUC had retained promotional firm Lidingo to inflate the market price of IMUC common stock and was making illegal payments to Lidingo for hiring and paying authors to publish promotional articles about IMUC.

417.    Additionally, in his role as chief financial officer, Fractor signed a Certification Under Section 302 of the Sarbanes-Oxley Act on May 11, 2012, August 14, 2012, November 9, 2012, March 11, 2013, May 10, 2013, August 8, 2013, November 7, 2013, and March 14, 2014 filed with the SEC as an exhibit to the Company's annual and quarterly, that indicated he reported to the Company's auditors and audit committee "[a]ny fraud, whether or not material, that involves management" of IMUC.   As set forth herein, those SOX certifications were materially false and Fractor either knew or was reckless in not knowing that the Company was then employing, or had previously employed, Lidingo to orchestrate an illicit stock promotion scheme.

**C.    John S. Yu**

418.    Yu is a cofounder of the Company, acting as Chief Scientific Officer from November 2006 and Chairman of the IMUC Board since January 2007.

419.    In his role as interim CEO, Yu signed a Certification Under Section 302 of the Sarbanes-Oxley Act on November 11, 2012, filed with the SEC as an

exhibit to the Company's quarterly report, that indicated he reported to the Company's auditors and audit committee "[a]ny fraud, whether or not material, that involves management" of IMUC.  As set forth herein, those SOX certifications were materially false and Fractor either knew or was reckless in not knowing that the Company was then employing, or had previously employed, Lidingo to orchestrate an illicit stock promotion scheme.

420.    By virtue of his position as an executive officer of a company consisting of only five full-time and two part-time management employees, and as Chairman of the Board throughout the Class Period, Yu knew or was reckless in not knowing that the Company had: (i) engaged and paid Lidingo to publish articles about IMUC in order to artificially inflate IMUC's stock price; (ii) that those articles did not disclose compensation; (iii) that the IMUC Articles mispresented the Phase I ICT-107 clinical data; and (iv) that the Company in its SEC filings was actively misrepresented the non-existence of any fraudulent schemes involving IMUC management.

**D.    Andrew Gengos**

421.    Gengos was appointed CEO of IMUC on December 3, 2012, assuming the position immediately upon his appointment, and holding the post until his resignation on December 13, 2016.

422.    In his role as CEO, Gengos signed a Certification Under Section 302 of the Sarbanes-Oxley Act on March 11, 2013, May 10, 2013, August 8, 2013,

November 7, 2013, and March 14, 2013, filed with the SEC as an exhibit to the Company's quarterly and annual reports, that indicated he reported to the Company's auditors and audit committee "[a]ny fraud, whether or not material, that involves management" of IMUC.  As set forth herein, those SOX certifications were materially false and Fractor either knew or was reckless in not knowing that the Company was then employing, or had previously employed, Lidingo to orchestrate an illicit stock promotion scheme.

423.     By virtue of his position as an executive officer of the Company consisting of only five full-time and two part-time management employees, and as Chief Executive Officer during the Class Period, Gengos knew or was reckless in not knowing that the Company had: (i) engaged and paid Lidingo to publish articles about IMUC in order to artificially inflate IMUC's stock price; (ii) that those articles did not disclose compensation; (iii) that those articles mispresented the Phase I ICT-107 clinical data; (iv) that the Company allowed the misrepresentative IMUC Articles to remain in the market without correction; and (v) the Company made no efforts to disclose the existence of the Company and its former CEO's participation in the fraud and affirmatively misrepresented that no such fraud existed in its SEC filings.

### E.     IMUC

424.     As alleged herein, Singh was acting in his capacity as the Chief Executive Officer of IMUC when he engaged Lidingo to illegally promote the

Company's stock through the use of several authors who failed to make any disclosure related to their receipt of compensation.

425.     Furthermore, during the Class Period, Fractor acted with the requisite scienter when, as CFO for the Company, he approved or recklessly disregarded the payments to Lidingo, evidencing either knowledge of the scheme or a reckless disregard to the fact that Lidingo had been engaged to unlawfully promote the Company.  Fractor also signed several SOX certifications attesting to the absence or full disclosure of any known frauds at that time, yet failed to include the stock promotion fraud alleged herein the relevant SEC documents.

426.     Additionally, Yu, as Chairman of the Board of IMUC and interim CEO of the Company at the time it made its last payment to Lidingo (on the same date an illegal stock promotion article was published on Seeking Alpha) either knew or was reckless in not knowing that Lidingo's articles about the Company did not disclose compensation, given the nature of the Company's relationship with Lidingo in the past and the unceremonious departure of Defendant Singh. Yu also a SOX certification attesting to the absence or full disclosure of any known frauds at that time, yet failed to include the stock promotion fraud alleged herein the relevant SEC documents.

427.     Gengos also signed several SOX certifications attesting to the absence or full disclosure of any known frauds at that time, yet failed to include the stock promotion fraud alleged herein the relevant SEC documents.  As set forth herein,

that SOX certification was materially false and Gengos either knew or was reckless in not knowing that the Company had previously employed Lidingo to orchestrate an illicit stock promotion scheme.

428.    Further, IMUC contracted with Lidingo as an agent throughout the Class Period in order to oversee the stock promotion scheme.  As set forth herein, as Lidingo was acting within its contractual relationship and perpetuated the fraud on behalf of, and with the oversight of IMUC, the scienter of Lidingo is imputed onto that company under common law principles of agency.

429.    The scienter of IMUC's employees and agents (including Singh, Fractor, Yu, and Gengos) is imputed to IMUC under the doctrine of *respondeat superior* and common law principles of agency.  IMUC is liable for the acts of these defendants, as well as Lidingo and its employees and agents under these common law principles.

## F.    <u>Kamilla Bjorlin</u>

430.    As alleged herein, Bjorlin was the day-to-day manager and owner of Lidingo's illicit stock promotion scheme business, recruiting writers to pen articles on behalf of Lidingo's clients, including IMUC, and paying these authors out of Lidingo's bank accounts.  Bjorlin was also the only member of Lidingo and the only signatory to its bank accounts.

431.    Bjorlin and Singh commenced their stock promotion relationship in September 2011 when Singh assisted Bjorlin in her organization of Lidingo.

432.     In September 2011, Singh, on behalf of IMUC, entered into a promotional contract with Lidingo whereby Lidingo would "develop and execute an online distribution campaign that will prominently place the [IMUC] investment opportunity in front of retail investors."  Bjorlin executed this promotional contract on behalf of Lidingo.

433.     As discussed above, during the period of September 2011 through at least August 2012, Lidingo provided its stock promotion services to IMUC, arranging for at least 50 articles or blog entries to be written and published about IMUC.  Of the 21 IMUC Articles released during the Class Period promoting IMUC, none contained a disclosure indicating the writer, or person identified in the byline, had been compensated or the amount of his compensation.

434.     This lack of disclosure was purposeful and orchestrated by Bjorlin (and Hodge and Singh), as evidenced by communications prior to and during the Class Period.  For example, in October 2011, a writer hired by Lidingo to write an article about IMUC on Seeking Alpha disclosed in the article that he had been paid. Bjorlin subsequently referred to this author in an April 17, 2012 email to Singh as "the idiot we used in the beginning, he will NOT post a disclosure again," making similar comments about the writer in an email to Singh on August 7, 2012 and in January 2013.

435.     Further, in April 2012, Bjorlin emailed Singh a list of potential writers for approval for use in the stock promotion scheme of IMUC and other clients of

Lidingo and Lavos.  With respect to one writer, Bjorlin disqualified him from participation on the basis that "he wants to disclose as he is a CFA.  No disclosures allowed."  Singh confirmed Bjorlin's assessment in his April 17, 2012 response, confirming this writer to be a "no" while also instructing Bjorlin to only try another potential writer "if no disclosure."

436.   Bjorlin was aware that Lidingo and its paid writers were violating the terms of Seeking Alpha's disclosure policies.  On September 17, 2013, a writer emailed Bjorlin expressing concern because Seeking Alpha had contacted him saying that they had obtained information that he was writing articles for payment. Bjorlin responded the same day, stating that the email was "a carbon copy of what several writers have gotten" and that Seeking Alpha was "simply fishing," following up the next day to instruct that same author to continue writing for Seeking Alpha. Bjorlin's cavalier response to the author's concern, as well as her admission of knowledge of similar letters received by other Lidingo authors, evidences a clear understanding of the policies related to disclosure of paid promotional articles and a calculated response to skirt those policies.

437.   These allegations support a strong inference of Defendant Bjorlin's scienter.  Bjorlin: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); (iii) knew that the IMUC Articles misrepresented the Phase I test results and created a misleading impression that the Phase I test results were indicative of anticipated

success of the Phase II results; and (iv) knew the IMUC Articles did not contain the required paid disclaimers.  Further, Bjorlin's efforts to coordinate with Singh so as to hire only those writers that would not disclose, even in the face of SEC and Seeking Alpha policy concerns, supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper, as Bjorlin would not have chastised and continuously insulted the writer who included a compensation disclosure in his published article nor would she have been so dismissive of any writer that wanted to comply with Seeking Alpha's policies.

### G.   <u>Andrew Hodge</u>

438.    Hodge was employed by Lidingo from no later than December 2011 through at least March 2014, where he assisted Bjorlin in Lidingo's day-to-day stock promotion work, including interacting with issuer clients and providing direction to writers drafting articles on behalf of those clients.

439.    In his capacity as a Lidingo employee, Hodge recruited writers to assist in the company's promotional schemes.

440.    Between December 2011 and March 2014, Hodge received a salary for his Lidingo promotion work, receiving payments totaling at least $340,000 from Lidingo.

441.    Throughout the Class Period, Hodge was aware of the illicit stock promotion scheme and worked with Bjorlin and Singh to ensure that Lidingo's

1
2
3
4
5

authors remained silent about the payment they were receiving for their published endorsements.  For example, on April 16, 2013, Bjorlin emailed Singh about a potential author who Hodge voiced opposition to, feeling he was "no good because he 'advertises' he has a website that pays for writing."

6
7
8
9
10
11
12
13
14

442.    In fact, Hodge was often the conduit between potential writers and Bjorlin and Singh, with Bjorlin reporting on an interaction between Hodge and one such writer who "told [Hodge] on several occasions that he would disclose."  The result was Singh directing that Lidingo not use the writer, indicating that he was unlikely to agree to anything improper through email: "He has been spooked by [promoter] that the SEC may monitor him so he will never agree to anything not proper in writing.  Unless we get to know him he won't [sic] write."

15
16
17

443.    Further, Hodge regularly provided editorial comments to Lidingo's writers.

18
19
20
21
22
23
24
25
26
27
28

444.    Hodge was also a known member of Lidingo's management team, conversing with representatives of other Lidingo issuer clients (through emails on which both defendants Bjorlin and Singh were copied) about, *inter alia*, strategies for publication release dates in order to get the most effective stock price bump (*e.g.* the January 18, 2013 email from Hodge to the CEO of NeoStem, Inc. ("NBS"), copying Bjorlin and Singh, in which Hodge informed her that Lidingo was delaying promotional efforts planned for the day because the market was closed the following Monday on the basis that that the promotion will "have much better results on

Tuesday with emails and new article than on a Friday") and discussions about payments (*e.g.* the November 20, 2013 email from Hodge to Galena's CEO and CFO, copying Bjorlin regarding the receipt of outstanding Galena options owed to Lidingo, stating that "[p]lease understand that [Lidingo's] costs over the last 3+ months have exceeded the amount received, and that the equity stake is where [Lidingo] generates [its] income.").

445.     These allegations support a strong inference of Defendant Hodge's scienter as they show that Hodge: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); and (iii) knew these articles did not contain the required paid disclaimers. Further, Hodge's efforts to coordinate with Bjorlin and Singh so as to hire only those writers that would not disclose (going as far as to require a non-disclosure agreement), even in the face of SEC and Seeking Alpha policy concerns, supports a strong inference that any campaign conducted by Lidingo (including the one orchestrated on behalf of IMUC) was improper.

## H.     Brian Nichols

446.     Nichols worked as a Lidingo writer from no later than February 2012 through at least March 2014, publishing articles about issuer clients, including IMUC, from whom he indirectly received compensation through Lidingo.

447.     During this time period, Defendant Nichols received at least $200,000 in total compensation, including bonuses, from Lidingo, for his contribution to

Lidingo's stock promotion schemes.

448.     During the Class Period, Nichols published 9 articles about IMUC where Lidingo was the promoter, either under his own name or under a pseudonym, on the website Seeking Alpha in which he omitted any reference to the receipt of payment and made the material misrepresentation that he was not receiving compensation for the article.

449.     Nichols further financially benefited from a pump-and-dump through his own trading account, acquiring 1,100 shares of IMUC on March 22, 2012 (the same day he published an article on Seeking Alpha in which he noted "I believe that the company's decision to focus on acquiring rights to these antigens is its best move at the moment, and could have several long lasting effects that we are yet to realize.") before unloading 1,090 of the shares the following day for a quick profit of approximately $500.   Unsurprisingly, while the article did mention Nichols' holding in IMUC, it declined to make any mention of his intention to sell 99% of those same shares the next day.

450.     These allegations support a strong inference of Defendant Nichols' scienter, as they show that Nichols: (i) knew Lidingo paid writers, as he himself was in receipt of payments; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); and (iii) knew that the IMUC Articles did not contain the required paid disclaimers, at the direction of the Company and Lidingo.   Further, Nichols' use of pseudonyms to further the

promotional scheme supports a strong inference that in participation in any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper and required clandestine efforts to skirt detection by the investing public.

### I. Vincent Cassano

451.    From no later than August 2011 through at least November 2011, Cassano was a paid writer for Lavos.

452.    For his work for Lavos, Cassano received at least $6,700 in total compensation.

453.    From no later than November 2011 through at least April 2013, Cassano was a paid writer for Lidingo, publishing at least 35 articles about issuer clients, under the same pseudonym, from whom he indirectly received compensation through Lidingo.

454.    During this time period, Cassano received at last $27,000 in total compensation, including bonuses, from Lidingo for his contribution to Lidingo's stock promotion scheme.

455.    During the Class Period, Cassano caused to be published at least 2 articles about IMUC where Lidingo was the promoter, in which he omitted any reference to the receipt of payment and made the material misrepresentation that he was not receiving compensation for the article.

456.    Cassano's failure to include any adequate disclosure related to the pay

he received for publishing the IMUC Articles was a deliberate choice made by Cassano, with input from other defendants.  For example, in August 2011, Cassano emailed a non-party promoter working with Defendant Singh, asking "regarding disclosure for [the client] how do you want it."  Singh responded, recommending that the article "be silent on any disclosure" -- a directive that Cassano took to heart, instead claiming that "VFC's Stock House has not been compensated to provide coverage" of the client.

457.     In or around March 2012, Cassano began including a general disclosure on his Seeking Alpha profile, indicating that "VFC's Stock House has started taking compensation from third parties to research and cover certain companies that VFC believes have potential and also fit the profile of what readers of this website are looking for."  This purposely vague disclosure failed to identify the third parties compensating Cassano and made no mention that these third parties were ultimately themselves being compensated by the issuers for whom he was writing.

458.     Recognizing the insufficiency of such a disclosure, Cassano sought to expand the language employed, emailing Bjorlin on April 2012 to advise that he would be "tightening up [his] compensation disclosures" to include the language "VFC's Stock House has received compensation from a third party, xxx, to provide research and coverage of xxx for a period of xxx month[s]."  Along with the proposed language, Cassano asked Defendant Bjorlin to "let [him] know if this poses a problem" for Lidingo.

459.    Bjorlin responded that same day, indicating that "[Lidingo] unfortunately cannot have the disclosure on there," to which Cassano responded by agreeing to "keep doing you guys without it," which he did throughout the Class Period as no IMUC Article published by Cassano contains a disclosure.

460.    Bjorlin reiterated the non-disclosure mandate several months later when, on August 10, 2012, she emailed Cassano asking whether he would be interested in writing for three additional Lidingo clients and following up with a reminder that "[a]gain we can't have any disclosures." Cassano again assented to the requirement, agreeing that he "won't use disclosure with u [sic] guys."

461.    These allegations support a strong inference of Cassano's scienter in that they show they show that Cassano: (i) knew Lidingo paid writers, as he himself was in receipt of payments; and (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles).   Further, Cassano's efforts to coordinate with Bjorlin so as to eliminate any compensation disclosure for any article written on behalf of Lidingo supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper and required clandestine efforts to skirt detection by the investing public.

**J.      Stephen Ramey**

462.    From no later than November 2011 and November 2013, Ramey was a paid writer for Lidingo or affiliated stock promotion firms, publishing at least 60

articles about issuer clients, under the pseudonym Chemistfrog, from whom he indirectly received compensation through Lidingo.

463.    During this time period, Cassano received at last $35,000 in total compensation, including bonuses, from Lidingo for his contribution to Lidingo's stock promotion scheme.

464.    During the Class Period, Cassano caused to be published at least 4 articles about IMUC where Lidingo was the promoter, in which he omitted any reference to the receipt of payment.

465.    Ramey's failure to include any adequate disclosure related to the pay he received for publishing the IMUC Articles was a deliberate choice made by Ramey, with input from other defendants.

466.    These allegations support a strong inference of Ramey's scienter in that they show they show that Ramey: (i) knew Lidingo paid writers, as he himself was in receipt of payments; and (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles).

### K.    Christopher French

467.    Between August and November 2012, French was a paid writer for Lidingo, publishing at least 1 article about IMUC, under the pseudonym Cris Frangold, from whom he indirectly received compensation through Lidingo.

468.    During this time period, French received at last $16,100 in total compensation, including bonuses, from Lidingo for his contribution to Lidingo's

multiple stock promotion schemes, of which the IMUC scheme was one.

469.     French's failure to include any adequate disclosure related to the pay he received for publishing the IMUC Articles was a deliberate choice made by French, with input from other defendants.

470.     These allegations support a strong inference of French's scienter in that they show they show that French: (i) knew Lidingo paid writers, as he himself was in receipt of payments; and (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles).  .

### L.     Lavos LLC

471.     As alleged herein, Lavos was a stock promotion firm that assisted Lidingo throughout the IMUC stock promotion scheme.  Through its agent, Singh, Lavos engaged in a concerted effort to generate positive articles about IMUC in exchange for financial compensation, all the while failing to disclose any connection between the articles and the subject company through the direct efforts of Singh and Lidingo.

472.     The scienter of Lavos' employees and agents (including Singh) is imputed to Lavos under the doctrine of *respondeat superior* and common law principles of agency.  Lavos is liable for the acts of these defendants and their employees and agents under these common law principles.

### M.     Lidingo

473.     As alleged herein, Lidingo was the stock promotion firm at the center

of the IMUC stock promotion scheme, facilitating the publication of 21 Class Period articles about IMUC that omitted any mention of the receipt of payment and affirmatively misrepresented that no payment had been received from the article, despite the fact that Lidingo was providing compensation derived from its agreement with IMUC.

474.   Through its agents, Bjorlin, Hodge, Nichols Cassano, French, and Ramey, Lidingo engaged in a concerted effort to generate positive articles about IMUC in exchange for financial compensation, all the while forbidding the disclosure of any connection between the articles and the subject company through the direct efforts of Bjorlin, Hodge and Singh.

475.   The scienter of Lidingo's employees and agents (including Bjorlin, Hodge, Nichols, Cassano, French and Ramey) is imputed to Lidingo under the doctrine of *respondeat superior* and common law principles of agency.  Lidingo is liable for the acts of these defendants and their employees and agents under these common law principles.

## IX.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

476.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired IMUC common stock on the open market during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

477.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, IMUC common stock was actively traded on the NYSE Market or OTCBB, efficient markets.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by IMUC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

478.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

479.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

480.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the

Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IMUC;

- whether defendants acted knowingly or recklessly in failing to convey material facts or to correct material facts previously disseminated;

- whether defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

- whether defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

- whether the prices of IMUC common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

481.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

482.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- IMUC common stock are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE Market or OTCBB and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired and/or sold IMUC common stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were fully disclosed, without knowledge of the omitted or misrepresented facts.

483.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## X.   LOSS CAUSATION

484.   As alleged herein, Defendants either (i) actively engaged in a scheme to deceive investors during the Class Period by misrepresenting and omitting material facts concerning the stock promotion scheme in which IMUC paid Lidingo to publish on behalf of IMUC; or (ii) upon learning of the Company's participation in the scheme, made no efforts to correct the misinformation placed into the market and instead perpetuated the falsity that the Company had engaged in no fraudulent acts.

485.      From November 8, 2011 (the day the first IMUC-controlled Lidingo article about the Company was published) to August 15, 2012 (the day the last IMUC-controlled Lidingo article about IMUC was published), the Company's stock price *more than doubled*, from $1.43 per share to $3.02 per share, reaching as high as $3.88 per share on June 1, 2012 (an in Class Period date on which an IMUC Article was published).

486.      As such, Defendants' materially false and misleading statements and omissions of material fact, as alleged above in Section V, caused the price of IMUC's common stock to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiffs and other Class Period purchasers of IMUC common stock.

487.      Relying upon the integrity of the market price of IMUC common stock and public information relating to the Company, Plaintiffs and the other Class Members purchased or otherwise acquired IMUC common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact, as alleged herein.

488.      Plaintiffs and the Class suffered actual economic loss and were damaged when the foreseeable risks of Defendants' fraudulent stock promotion scheme and concealment by Defendants' misstatements and omissions materialized through the public disclosure of new information concerning the efficacy of ICT-107 (which the IMUC Articles had improperly touted with the Company's oversight

through the misrepresentation of limited clinical data) through two partial disclosures, and the existence of the scheme itself through both in-Class Period partial disclosures and a post-Class Period announcement by the SEC.

489.     As alleged above in Sections IV.H and VI and in this section, these partial corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' fraud caused foreseeable declines in the price of IMUC common stock by removing portions of the artificial inflation in the price of IMUC common stock that resulted from Defendants' fraud.  The timing and magnitude of the declines in the price of IMUC common stock is in response to the public disclosure of new, Company-specific news on each of the foregoing days, as alleged herein, negating any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraud.

490.     As set forth in detail above, a partial disclosure occurred on August 20, 2012, after the market closed, the Company filed a Form 8-K announcing the supposed resignation of Defendant Singh, with no further details other than the fact that the Company disputed Singh's claim to severance.  *See supra* Section IV.H.

491.     In actuality, Defendant Singh had been terminated with cause by the Company for his involvement in the stock promotion scheme, a fact supported by his ultimate non-receipt of any severance pay and the immediate halting to his salary as of the day his purported resignation was accepted; an occurrence only explainable

under his then-operative employment agreement in a situation where he is terminated with cause. This initial disclosure partially, but incompletely, revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning IMUC's involvement in the illegal stock promotion activities. Thus, the August 20, 2012 disclosure also partially, but incompletely, revealed the materialization of the known foreseeable risks surrounding the Company's illegal stock promotion activities that Defendants knowingly and/or recklessly engaged in and/or concealed from investors.

492.     As a direct and proximate result of the August 20, 2012 partial disclosure, the price of IMUC's common stock declined by approximately 16.5% on August 21, 2012 (the first trading day following the announcement) –from $2.91 per share to $2.43. The revelation that Singh had been exited from the Company thereby removed a portion of the artificial inflation cause by the stock promotion scheme from the price of IMUC's common stock, yet the stock price remained inflated as a result of: (i) the continued presence of the illicit articles in the market for consumption by the investing public; and (ii) the Company's efforts to conceal the fraud by withholding any pertinent public information regarding IMUC's and Singh's scheme participation.

493.     As set forth above, on March 11, 2013, a partial disclosure occurred after the close of trading in the form of the Company's Annual Report for 2012 filed with the SEC. *See supra* Section IV.H.

494.     Therein, the Company presented executive compensation for the year ended December 31, 2013, noting that, despite his purported resignation, Defendant Singh's salary ceased to be paid as of August 15, 2012 and that he received no severance benefits, whether in the form of a salary continuation or continued COBRA health care coverage.

495.     In actuality, Defendant Singh had been terminated with cause by the Company for his involvement in the stock promotion scheme, a fact supported by his ultimate non-receipt of any severance pay and the immediate halting of his salary as of the day his purported resignation was accepted; an occurrence only explainable under his then-operative employment agreement in a situation where he is terminated with cause.  This disclosure partially, but incompletely, revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning IMUC's involvement in the illegal stock promotion activities.  Thus, the March 11, 2013 disclosure also partially, but incompletely, revealed the materialization of the known foreseeable risks surrounding the Company's illegal stock promotion activities that Defendants knowingly and/or recklessly engaged in and/or concealed from investors.

496.     As a direct and proximate result of the March 11, 2013 partial disclosure, the price of IMUC's common stock declined by approximately 3.5% on March 12, 2013–from $2.78 per share to $2.69.  The further revelation that Singh had been exited from the Company with cause thereby removed a portion of the

artificial inflation cause by the stock promotion scheme from the price of IMUC's common stock, yet the stock price remained inflated as a result of: (i) the continued presence of the illicit articles in the market for consumption by the investing public; and (ii) the Company's efforts to conceal the fraud by withholding any pertinent public information regarding IMUC's and Singh's scheme participation.

497.    A partial disclosure occurred after the market closed on December 11, 2013, when the Company announced its clinical results from its Phase II study for ICT-107. *See supra* Section VII.A.

498.    Therein, the Company announced that ICT-107 had failed to meet its primary endpoint of statistically significant overall survival in its Phase II study.

499.    As alleged herein, the lackluster results partially negated the dozens of Class Period IMUC Articles (which were released at the Company's direction and with its editorial approval), evidencing that ICT-107 exhibited no efficacy as a treatment for GBM.

500.    As a direct and proximate result of the December 11, 2013 partial disclosure, the price of IMUC's common stock declined by approximately 60% on December 12, 2013–from $2.72 per share to $1.10.  The revelation that ICT-107 showed limited, if any efficacy in treating GBM, and thus it was not the "miracle drug" that the IMUC Articles touted it to be, thereby removed a portion of the artificial inflation cause by the stock promotion scheme from the price of IMUC's common stock, yet the stock price remained inflated as a result of: (i) the continued

presence of the illicit articles in the market for consumption by the investing public that stressed *any phase II positive results,* would be a sign of forthcoming approval by the FDA and efficacy; and (ii) the Company's efforts to conceal the fraud by withholding any pertinent public information regarding IMUC's and Singh's participation.

501.     A partial disclosure occurred on June 1, 2014, when the Company issued a press release updating its ICT-107 Phase II data, disclosing that ICT-107 only showed *non-statistical significance* in a small subgroup of patients at Phase II.

502.     This revelation, that the Company's primary drug candidate was not even able to elicit a positive response among the same small subgroup of individuals predisposed to positive reactions to the standard of care for GBM, let alone in the larger patient group, finally and fully negated the Class Period IMUC Articles to the extent that the article contained misrepresentations about ICT-107's efficacy and likelihood of success at Phase II and ultimate FDA approval.

503.     As a direct and proximate result of the June 1, 2014 partial disclosure, the price of IMUC's common stock declined by approximately 14% on June 2, 2014–from $1.34 per share to $1.15.   The revelation that ICT-107 showed insignificant efficacy for even the targeted subgroup that was most likely to response, and thus it was not the "miracle drug" that the IMUC Articles touted it to be, thereby removed a portion of the artificial inflation related to the articles' touting of ICT-107, yet the stock price remained inflated as a result of: (i) the continued

presence of the illicit articles in the market for consumption by the investing public to the extent that they touted the Company's listing on the NYSE Market (and no longer on the OTC) as evidence of its trustworthiness as an investment; and (ii) the Company's efforts to conceal the fraud by withholding any pertinent public information regarding IMUC's and Singh's scheme participation.

504.    A post-Class Period announcement related to the fraudulent scheme occurred after the market closed on March 30, 2016, when the Company filed is 2015 Annual Report on Form 10-K with the SEC.  *See supra* Section VII.A.

505.    Therein, *and for the first time*, the Company disclosed that the Company had agreed in principle with the staff of the SEC on a proposed settlement framework related to an investigation into its former CEO, Defendant Singh (who was not named in the annual report) and his use of the undisclosed stock promotion scheme while CEO of IMUC, and the Company's required adoption of certain internal controls as part of the settlement.

506.    This revelation, that the Company's internal controls were deficient and that IMUC, through Singh, had been an active participant in a stock promotion scheme that had previously gone undisclosed to the investing public, constituted a partial correction to any past claim in the IMUC Articles that the Company was above the "stigma" associated with OTC stocks.  However, the stock price remained inflated as a result of the Company's efforts to conceal the fraud by withholding all pertinent public information regarding IMUC's and Singh's participation, including,

but not limited to: (i) the total amount of money the Company paid in the stock promotion scheme; (ii) the self-dealing nature of the stock promotion scheme with respect to Defendant Singh, including the pecuniary benefits he reaped at the expense of the Company; (iii) the fact that IMUC not only paid for the articles (which was undisclosed), but also exercised absolute editorial control over the content; and (iv)  the name of the stock promotion firm the Company employed during the Class Period.

507.     As a direct and proximate result of the March 30, 2016 partial disclosure, the price of IMUC's common stock declined by approximately 3% on March 31, 2016.

508.     A post-Class Period announcement related to the fraudulent scheme occurred on March 9, 2017 when the Company, in an annual report for the year ended December 31, 2016 filed with the SEC on Form 10-K, announced the December 2016 signing of the settlement with the SEC related to the involvement of the Company in the stock promotion scheme, including the Company's consent to the entry of a cease-and-desist order and the implementation of internal controls. *See supra* Section VII.A.

509.     This revelation, that the Company's internal controls were deficient and that IMUC, through Singh, had been an active participant in a stock promotion scheme that had previously gone undisclosed to the investing public, constituted a partial correction to any past claim in the IMUC Articles that the Company was

above the "stigma" associated with OTC stocks.  However, the stock price remained inflated as a result of the Company's efforts to conceal the fraud by withholding all pertinent public information regarding IMUC's and Singh's participation, including, but not limited to: (i) the total amount of money the Company paid in the stock promotion scheme; (ii) the self-dealing nature of the stock promotion scheme with respect to Defendant Singh, including the pecuniary benefits he reaped at the expense of the Company; (iii) the fact that IMUC not only paid for the articles (which was undisclosed), but also exercised absolute editorial control over the content; and (iv)  the name of the stock promotion firm the Company employed during the Class Period.

510.    As a direct and proximate result of the March 9, 2017 partial disclosure, the price of IMUC's common stock declined by approximately 2% over the following two trading days.

511.    On April 10, 2017, the SEC (not the Company) finally and fully revealed the extent of the fraud when it publicly announced the entry of cease-and-desist orders related to illegal stock promotion schemes against several individuals, including defendants IMUC, Singh, and Lavos, and commenced an action against the Lidingo Defendants for their participation in an overarching stock promotion scheme that includes the acts complained of herein.  *See supra* Section VII.B,

512.    The disclosure of the SEC's issuance of a consented-to cease and desist order against IMUC, Singh and Lavos in connection with the illegal stock

promotion activities undertaken on behalf of IMUC, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning IMUC's involvement in the illegal stock promotion activities.

513.     Moreover, it was only following the SEC's public release of information on April 10, 2017 that new information previously concealed from the investing public by IMUC and its officers was publicly revealed, including, but not limited to: (i) the total amount of money the Company paid to Lidingo in the stock promotion scheme; (ii) the self-dealing nature of the stock promotion scheme with respect to Defendant Singh, including the pecuniary benefits he reaped at the expense of the Company; (iii) the fact that IMUC not only paid for the articles (which was undisclosed), but also exercised absolute editorial control over the content; (iv)  the name of the stock promotion firm the Company employed during the Class Period; and (iv) the pervasiveness of the fraud outside of IMUC.

514.     As a direct and proximate result of these corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of IMUC common stock declined by approximately 5% on April 11, 2017 and almost 7% over the five-trading period following the SEC announcement as multiple financial sites picked up the news, with some issuing statements on their own exploitation in the scheme.

515.     In total, from the first partial disclosure (the August 20, 2012

announcement of Singh's resignation) to the last (the April 10, 2017 SEC announcement), the Company's stock price (adjusted for the 40:1 reverse stock split that occurred on November 21, 2016), the Company's stock price declined from $2.91 per share to approximately $0.065 per share – representing a 98% loss in total value.

516.    As set forth herein, Defendants' wrongful conduct directly and proximately caused the damages suffered by Plaintiffs and the Class.  Throughout the Class Period, the prices at which Plaintiffs and the Class purchased IMUC common stock were artificially inflated as a result of Defendants' materially false and misleading statements and omissions of material fact concerning IMUC's involvement in an illegal stock promotion scheme. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and the Class would have not purchased or otherwise acquired IMUC common stock at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that engaging in an illicit stock promotion scheme designed to tout the Company's prospects and investment worthiness through the release of seemingly neutral third-party articles and then concealing the existence of such from the public would cause the prices of IMUC common stock to be artificially inflated, or maintain existing artificial inflation.  It is also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omission, would cause

the price of IMUC stock to decline, as the inflation resulting from Defendants' earlier materially false and misleading statements and omissions of material fact was removed from the price of IMUC common stock.

517.    Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and the Class who purchased or otherwise acquired IMUC common stock during the Class Period.

518.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the Class are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact; (ii) the perpetuation of the illicit scheme; and (iii) the subsequent significant decline in the price of IMUC common stock when the truth was gradually revealed and/or the risks previously concealed by Defendants' fraud gradually materialized, as set forth herein.

## XI.    PRESUMPTION OF RELIANCE

519.    At all relevant times, the market for IMUC common stock was efficient for the following reasons:

a. IMUC stock met the requirements for listing, and were listed and actively traded on the NYSE Market or OTCBB, a highly efficient and automated market;

b. IMUC filed periodic reports with the SEC; and

c. IMUC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services.

520.     As a result of the foregoing, the market for IMUC stock promptly digested current material information regarding IMUC from all publicly available sources and reflected such information in IMUC's stock price. Under these circumstances, all purchasers of IMUC stock during the Class Period suffered similar injury through their purchase of IMUC stock at artificially inflated prices, and a presumption of reliance applies.

521.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

522.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

523.     None of the statements complained of herein was a forward-looking statement. Rather, each was historical a statement or a statement of purportedly current facts and conditions at the time such statement was made.

524.     To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not

accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements, rendering any generalized risk disclosures made by IMUC insufficient to insulate Defendants from liability for their materially false or misleading statements.

525.    To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

## XIII.  CLAIMS FOR RELIEF

### COUNT I

### (Against Defendants IMUC, Singh, Fractor, Yu, Gengos, Bjorlin and Lidingo for Violations of Section 10(b) And Rule 10b-5(b) Promulgated Thereunder)

526.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

527.    This Count is asserted against defendants IMUC, Singh, Fractor, Yu, Gengos, Bjorlin and Lidingo (the "Count I Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

528.    During the Class Period, the Count I Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements

specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

529.    The Count I Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, conspiracies, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of IMUC common stock during the Class Period.

530.    Defendant Singh is named as a defendant for this count for all false statements made in the IMUC Articles during the Class Period until his resignation, and for all false statements contained in the Company's SEC filings signed by him. Defendant IMUC is named as a defendant for all false statements made during the Class Period alleged herein.  Defendants Yu, Fractor, and Gengos are named herein as defendants for this count for all statements they made in the name of IMUC via the Company's SEC filings.  They are not named as primary defendants on Count I for the statements alleged to be false herein contained in the IMUC Articles. Defendant Bjorlin is named as a defendant in this count for all statements alleged to

be false herein contained in the IMUC Articles.

531. The Count I Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of IMUC, and/or Lidingo were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Count I Defendants, by virtue of their receipt of information reflecting the true facts of IMUC, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning IMUC, participated in the fraudulent scheme alleged herein.

532. Defendant IMUC is liable for false statements issued in the name of the Company, including its SEC filings and statements issued with its consent. Further, IMUC is liable for the false statements contained in the IMUC Articles, as authorized by Defendant Singh while acting in his capacity as CEO of the Company, under the doctrine of *respondeat superior*. Alternatively, for any false statements that Singh did not authorize, Defendant IMUC is directly liable for the false statements of its contractual agent, Lidingo, under common law theories of principal and agency, who was acting within the scope of its relationship with IMUC when it carried out the fraud complained of herein through its role as an authority over the

IMUC Articles.

533.     Defendant Singh, as CEO of IMUC, in addition to being liable for false statements in signed documents submitted to the SEC, is also liable for the false statements contained in the IMUC Articles by virtue of his role as an absolute authority over the issuance of those false statements, including his approval of the statements themselves and control over the process.

534.     In the alternative, if Defendant Singh did not exercise absolute authority over the issuance of the false statements contained in the IMUC Articles, defendant Bjorlin did by virtue of her position as sole managing member of Lidingo, her control over workflow, including the assignment of articles to which writers, and her control over the financial aspects of the fraud, including receipt and distribution of funds received from IMUC.

535.     Pursuant to this alternative, if Defendant Bjorlin is found to have controlled the release of the IMUC Articles, Lidingo is also liable under the theory of *respondeat superior*, as Defendant Bjorlin was acting within her capacity as sole managing member of Lidingo when overseeing the fraud alleged herein.

536.     Defendants Fractor, Yu, and Gengos, who were the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with extreme reckless disregard for the truth when they failed to ascertain and disclose the true facts in the

statements made by the Company, themselves, other IMUC personnel, or the Lidingo Defendants to members of the investing public, including Plaintiffs and the Class.

537.    As a result of the foregoing, the market price of IMUC common stock was artificially inflated during the Class Period.  Unaware of the falsity of the statements by the Count I Defendants, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of IMUC common stock during the Class Period in purchasing IMUC common stock at prices that were artificially inflated as a result of the false and misleading statements by Defendants.

538.    Had Plaintiffs and the other members of the Class been aware that the market price of IMUC common stock had been artificially and falsely inflated by the Count I Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased IMUC common stock at the artificially inflated prices that they did, or at all.

539.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

540.    By reason of the foregoing, the Count I Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of IMUC common

stock during the Class Period.

## COUNT II
### (Violations of Section 10(b) of the Exchange Age and Rule 10b-5(a) & (c) Against IMUC, Singh, Lavos, and the Lidingo Defendants)

541.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

542.     During the Class Period, defendants IMUC, Singh, Lavos, Bjorlin, Lidingo, Hodge, Nichols, Cassano, French, and Ramey (the "Count II Defendants") violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of IMUC publicly traded common stock during the Class Period as alleged in.

543.     The Count II Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IMUC's value, performance, and continued substantial growth. AS set forth more particularly herein, these acts included: (i) making, or participating in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements about IMUC and its business operations in light of the circumstances under which they were made, not misleading; (ii) hiring Lidingo to promote IMUC; (iii) paying Lidingo $230,000;

(iv) paying writers, through Lidingo, to write promotional articles about IMUC; (v) concealing writers' compensation or relationship with Lidingo and IMUC from investors; (vi) using pseudonyms to conceal author's identifies; and (vii) reviewing and approving the promotional articles. These practices and course of business operated as a fraud and deceit upon the purchasers of IMUC securities during the Class Period.

544.    As a result of the Count II Defendants' fraudulent scheme, and failure to disclose material facts, as set forth above, the market price of IMUC's securities was artificially inflated during the Class Period.

545.    During the Class Period, the Count II Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

546.    The Count II Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. The Count II Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing IMUC's true financial condition from the investing public and supporting the artificially inflated price of IMUC common

stock.

547.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IMUC publicly traded common stock.  Plaintiffs and the Class would not have purchased IMUC publicly traded common stock at the prices they paid, or at all, had they been aware that the market prices for IMUC common stock had been artificially inflated by the Count II Defendants' materially false and misleading statements and omissions and the attendant scheme or artifice designed to defraud.

<u>**COUNT III**</u>
**(Violations of Section 20(a) of the**
<u>**Exchange Act Against Defendants Singh, Fractor, Yu, and Gengos)**</u>

548.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

549.     Defendants Singh, Fractor, Yu and Gengos (the "Count III Defendants") acted as controlling persons of IMUC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of IMUC's operations and/or intimate knowledge of the Company's actual performance, the Count III Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein.

550.     During the Class Period, the Count III Defendants participated in the operation and management of IMUC, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement and false statements.

551.     As officers and/or directors of a publicly owned company, the Count III Defendants had a duty to disseminate accurate and truthful information with respect to IMUC financial condition and results of operations, and to correct promptly any public statements issued by IMUC which had become materially false or misleading.

552.     Each of the Count III Defendants, therefore, acted as a controlling person of IMUC.  By reason of their senior management positions and/or being directors of IMUC, the Count III Defendants had the power to direct the actions of, and exercised the same to cause, IMUC to engage in the unlawful acts and conduct complained of herein.  The Count III Defendants exercised control over the general operations of IMUC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

553.     By reason of the above conduct, the Count III Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by IMUC.

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XV. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  October 13, 2017          **GLANCY PRONGAY & MURRAY LLP**


By:  *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  lglancy@glancylaw.com

**WOLF POPPER LLP**
Robert C. Finkel
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile:  (212) 486-2093
E-mail: rfinkel@wolfpopper.com

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins
(to be admitted pro hac vice)
Sebastiano Tornatore
(to be admitted pro hac vice)
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
E-mail: shopkins@zlk.com
            stornatore@zlk.com

*Co-Lead Counsel for Plaintiffs and the Class*

1

**PROOF OF SERVICE BY ELECTRONIC POSTING**

2

I, the undersigned say:

3

I am not a party to the above case, and am over eighteen years old.  On October

4

13, 2017, I served true and correct copies of the foregoing document, by posting the

5

document electronically to the ECF website of the United States District Court for the

6

Central District of California, for receipt electronically by the parties listed on the

7

Court's Service List.

8

I affirm under penalty of perjury under the laws of the United States of America

9

that the foregoing is true and correct.  Executed on October 13, 2017, at Los Angeles,

10

California.

11

12

*s/ Lionel Z. Glancy*
Lionel Z. Glancy

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 2:17-cv-03250-FMO-SK Arthur Kaye IRA FCC as Custodian DTD 6-8-00 v. ImmunoCellular Therapeutics, Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Angela L Dunning**
  adunning@cooley.com

- **John C Dwyer**
  jdwyer@cooley.com,bgiovannoni@cooley.com

- **Robert C Finkel**
  rfinkel@wolfpopper.com,cdunleavy@wolfpopper.com

- **Edward Gartenberg**
  egartenberg@gghslaw.com,smelara@gghslaw.com,mdolukhanyan@gghslaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Jeffrey M Kaban**
  jkaban@cooley.com,lalmanza@cooley.com

- **Jessie A R Simpson Lagoy**
  jsimpsonlagoy@cooley.com,galancr@cooley.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Francisca M Mok**
  fmok@reedsmith.com,mgutierrez@reedsmith.com,lking@reedsmith.com,lstevens@reedsmith.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Rosemary M Rivas**
  rrivas@zlk.com,qroberts@zlk.com,ebigelow@zlk.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **James L Sanders**
  jsanders@reedsmith.com,mgutierrez@reedsmith.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)