GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Lesley F. Portnoy (#304851)
Charles H. Linehan (#307439)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel On Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARTHUR KAYE IRA FCC AS CUSTODIAN DTD 6-8-00 and HAYDEN LEASON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>IMMUNOCELLULAR THERAPEUTICS, LTD., DAVID FRACTOR, MANISH SINGH, LAVOS, LLC, LIDINGO HOLDINGS, LLC, KAMILLA BJORLIN, ANDREW HODGE, and BRIAN NICHOLS,<br><br>Defendants. | Case No. 2:17-cv-03250-FMO (SKx)<br><br>**<u>CLASS ACTION</u>**<br><br>**CONSOLIDATED THIRD AMENDED COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION .....2

II. JURISDICTION AND VENUE .....7

III. PARTIES .....8

A. Plaintiffs .....8

B. Defendants .....8

1. The Scheme Defendants .....8

2. The IMUC Defendants .....11

C. Relevant Non-Parties .....12

IV. SUBSTANTIVE ALLEGATIONS .....15

A. Company Background .....15

B. The FDA's Requirements for Demonstrating Effectiveness .....15

C. ICT-107 – the Supposed GBM Miracle Drug .....17

D. The Stock Promotion Scheme in Violation of Securities Laws .....22

1. The Securities Laws on Stock Promotion Prohibit Non-Disclosure of Payments Received for Promotional Publications .....23

2. Seeking Alpha Required Disclosure of Compensation .....24

3. Singh, Lavos, Bjorlin, and Lidingo Set Up the Illicit Scheme .....27

4. The Scheme Defendants' Roles in the Promotion Scheme .....30

5. Singh Instructs the Scheme Defendants That Writers Cannot Disclose Their Compensation in Articles .....32

6. The Scheme Defendants and the IMUC Writers Further the Scheme Through the Use of Pseudonyms and Fake Profiles .....35

7. IMUC Maintained Ultimate Authority Over the IMUC Articles and Other Pre-Class Period Articles Through Singh's Actions ....36

8. In the Alternative, the Lidingo Defendants Maintained Ultimate Authority Over the IMUC Writers....39

9. The Scheme Was Used to Counteract the Tepid Phase 1 Results ....44

10. Singh and IMUC Use the IMUC Articles to Prop Up the Stock Price with Commentary About ICT-107 and the Likelihood of Success at Phase 2 That IMUC Could Not Otherwise Say Itself ....47

11. The IMUC Articles Were Timed to Amplify Good News and Mitigate Bad News ....52

E. Materially False and Misleading Statements and Omissions in the Articles ....54

1. All of the IMUC Articles Were Materially False and Misleading....54

2. False and Misleading Statements in IMUC Articles Published or Written by Nichols....56

3. False and Misleading Statements in IMUC Articles Published or Written by Lidingo ....72

4. False and Misleading Statements in IMUC Articles Published or Written by Cassano....79

5. False and Misleading Statements in IMUC Articles Published or Written by French....84

6. False and Misleading Statements in IMUC Articles Published or Written by Ramey....87

F. The Active Stock Promotion Scheme is Cut Short When Singh is Forced to Resign, but the Fruits of the Scheme are Allowed to Remain in the Market by Company Management ....94

G. With the Need for Additional Financing on the Horizon, Company Management Painstakingly Seeks to Keep Any Connection Between IMUC and Lidingo Quiet ....99

H. Materially False and Misleading Statements in IMUC's SEC Filings102

1. Relevant SEC Filings ....102

2. Materially False and Misleading Statements Concerning Expenses....104

3. Materially False and Misleading Statements Concerning IMUC's Internal Controls and Procedures ....109

4. Materially False and Misleading Statements in SOX Certifications ....111

5. Materially False and Misleading Risk Disclosures Concerning Possible Fluctuations in IMUC's Stock Price ....113

6. Materially False and Misleading Statements and Omissions Concerning the Stock Promotion Scheme ....118

7. Materially False and Misleading Statements Concerning Phase 1 and Phase 2 Test Results ....120

V. THE TRUTH IS REVEALED WITH RESPECT TO THE PHASE 2 STUDY, THEREBY REMOVING FROM THE MARKET THE INFLATION CAUSED BY THE LIDINGO ARTICLES....121

VI. POST-CLASS PERIOD EVENTS ....123

A. The SEC Settlement and Enforcement Orders....123

VII. ADDITIONAL SCIENTER ALLEGATIONS....126

A. Manish Singh....126

B. David Fractor....130

C. IMUC....133

D. Lavos LLC....133

VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................134

IX. LOSS CAUSATION ....................................137

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....................................143

XI. CLAIMS FOR RELIEF ....................................144

COUNT I ....................................144

(Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Against Singh, IMUC, Lavos, Bjorlin, and Lidingo) ....................................144

COUNT II ....................................148

(Violations of §10(b) of the Exchange Age and Rule 10b-5(a) & (c) Against the Scheme Defendants) ....................................148

COUNT III ....................................151

(Violations of §20(a) of the Exchange Act Against Defendants Singh and Fractor) ....................................151

COUNT IV ....................................152

(Violations of §20(a) of the Exchange Act Against Defendants Singh and Lavos) ....................................152

COUNT V ....................................154

(Violations of §20(a) of the Exchange Act Against Defendants Bjorlin, Lidingo, and Hodge) ....................................154

XII. PRAYER FOR RELIEF ....................................155

XIII. DEMAND FOR TRIAL BY JURY ....................................155

Arthur Kaye IRA FCC as Custodian DTD 6-8-00 and Hayden Leason, the Court-appointed Co-Lead Plaintiffs ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Third Amended Complaint ("Complaint") against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things: (a) analyses of regulatory filings made by ImmunoCellular Therapeutics, Ltd. ("IMUC," "ImmunoCellular," or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) analyses of press releases, investor presentations, and conference calls issued or disseminated by IMUC; (c) analyses of news stories, internet postings and other publicly available information concerning IMUC; (d) articles published on seekingalpha.com and benzinga.com about IMUC; (e) analysts' reports and advisories about the Company; and (f) review of documents from and concerning non-parties Stephen Ramey, Christopher French, and Vincent Cassano.

This Complaint also incorporates by reference the following court documents: (a) the cease-and-desist orders in (i) *In the Matter of Manish Singh and Lavos, LLC*, File No. 3-17920 (SEC Apr. 10, 2017) ("Singh Order"); (ii) *In the Matter of ImmunoCellular Therapeutics, Ltd.* File No. 3-17912 (SEC Apr. 10, 2017) ("IMUC Order"); (iii) *In the Matter of Stephen Ramey*, File No. 3-17916 (SEC Apr. 10, 2017) ("Ramey Order"); and (iv) *In re Matter of Christopher French*, File No. 3-17921 (SEC Apr. 10, 2017) ("French Order"); and (b) all filings in *SEC v. Kamilla Bjorlin, Andrew Hodge, and Brian Nichols*, No. 17-cv-1600

(W.D. Wash.) ("SEC Action"), including (i) the Order Granting in Part and Denying in Part Motions to Dismiss (ECF No. 73, May 11, 2018) ("SEC MTD Order"), (ii) the Amended Complaint and Appendix A thereto (ECF No. 77, May 25, 2018) ("SEC Amended Complaint"), (iii) Kamilla Bjorlin's Motion to Dismiss the Amended Complaint (ECF No. 81, June 8, 2018) ("Bjorlin MTD"), (iv) the Answer of Andrew Hodge (ECF No. 80, June 8, 2018) ("Hodge Answer"), (v) the Answer of Brian Nichols (ECF No. 82, June 11, 2018) ("Nichols Answer"), (vi) the Consent of *Pro Se* Defendant Vincent Cassano to Final Judgment (ECF No. 71-1, Apr. 4, 2018) ("Cassano Consent"), and (vii) the Final Judgment as to *Pro Se* Defendant Vincent Cassano (ECF No. 72, Apr. 10, 2018) ("Cassano Judgment").

This Complaint is filed in response to the Court's May 29, 2018 Order Re: Motion to Dismiss (ECF No. 98, May 29, 2018), in which the Court stated "the court is skeptical that the Consolidated Second Amended Complaint adequately pleads loss causation and scienter, particularly as to the individual defendants other than Singh, Bjorlin, and Hodge." The Complaint, among other things, (a) does not name as defendants the previously named defendants Christopher French, Stephen Ramey, Vincent Cassano, John Yu, and Andrew Gengos; (b) adds allegations concerning scienter; (c) adds allegations concerning loss causation; and (d) removes allegations concerning certain previously alleged loss causation events.

## I. NATURE OF THE ACTION

1. This is a federal securities fraud class action on behalf of a class consisting of all persons who purchased or otherwise acquired IMUC common stock on the open market from May 1, 2012 through May 30, 2014, both dates inclusive

(the "Class Period"), who were damaged by Defendants'[1] violations of the federal securities laws and who seek to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rules 10b-5(a), (b), and (c) promulgated thereunder (the "Class").[2]

2. IMUC is a development stage company that seeks to develop and commercialize new therapeutics by using the body's own immune system for the treatment of cancer, such as brain, ovarian and other solid cancer tumors. During the Class Period, the Company's lead product candidate was ICT-107, a dendritic cell ("DC") based vaccine targeting multiple tumor associated antigens for glioblastoma multiforme ("GBM"), the most common type of brain cancer.

3. IMUC, on December 23, 2008, released its initial results from its Phase 1 study of ICT-107. The results were tepid, with only five of the ten patients studied exhibiting an immune response to treatment.

4. In an effort to manipulate the market and cause a rise in IMUC's stock price, in July 2011, IMUC, through its then-Chief Executive Officer ("CEO"), Defendant Manish Singh, entered into a written contract with Defendant Kamilla Bjorlin and her firm, Lidingo Holdings, LLC, a stock promotion company with a history of orchestrating illicit stock promotion schemes. The agreement, which was

---

[1] As used herein, "Defendants" collectively refer to: IMUC, David Fractor ("Fractor"); Manish Singh ("Singh"); Lavos, LLC ("Lavos"); Lidingo Holdings, LLC ("Lidingo"); Kamilla Bjorlin ("Bjorlin"); Andrew Hodge ("Hodge"); and Brian Nichols ("Nichols").

[2] Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors or assigns; any entity in which Defendants have or had a controlling interest; and the IMUC Writers (as defined herein).

not publicly disclosed, was for Lidingo to facilitate the fraud by injecting into the market dozens of materially false and misleading articles about IMUC and its vaccines.

5. Lidingo orchestrated the publication of article after article on popular investor websites such as Seeking Alpha and Benzinga raving fraudulently about, *inter alia*, the Phase 1 test results and the prospects that clinical results from Phase 2 would lead to a major partnership or acquisition by a larger pharmaceutical company. IMUC's stock price and market cap increased, from $1.43 per share on November 8, 2011 (the day the first article was published) to $3.02 per share on August 15, 2012 (the day the last article was published).

6. The reality, however, was that the IMUC Articles[3] were written by just a handful of Lidingo-paid writers (including defendants Andrew Hodge and Brian Nichols), and posted under several different pseudonyms.

7. Further, each IMUC Article was meticulously crafted and edited with the oversight of Singh, who exercised managerial authority and editorial control over the entire process and who was receiving a $1.7 million kickback of his own from Lidingo through his own wholly-controlled stock promotion firm, Defendant Lavos.

8. Singh directed and required that the writers could not disclose that they were being compensated, let alone compensated by IMUC, to publish the IMUC Articles. Failure to make such a disclosure was a violation of Seeking Alpha's terms of service and the federal securities laws. As a result, ***every article*** published by a

---

[3] "IMUC Articles" refers to the articles published by Lidingo and Lavos-affiliated writers or under Lidingo pseudonyms on behalf of IMUC during the Class Period.

Lidingo-affiliated author about IMUC during the Class Period failed to disclose that the author or individual identified in the byline had been compensated for publication or the amount of any such compensation.

9. Thus, as set forth herein, the statements made in the IMUC Articles, which are imputed onto IMUC by virtue of the doctrine of *respondeat superior* as each was made under the control of IMUC's then-CEO Singh, were materially false and misleading when made because, among other reasons: (a) they failed to disclose that the writer was being compensated by IMUC to write and publish the article, and (b) that Singh and IMUC crafted, edited, and approved the content of the IMUC Articles and the timing of their publication.

10. These omissions created the materially false and misleading impression that the views contained in the IMUC Articles, the likelihood of success of Phase 2 and an acquisition or stock price increase, were objective and independently formed, not bought and paid for by IMUC.

11. On July 31, 2012, an article concerning the ICT-107 Phase 1 test results was published in the journal *Cancer Immunology Immunotherapy* titled *Phase I Trial of a Multi-Epitope-Pulsed Dendritic Cell Vaccine for Patients with Newly Diagnosed Glioblastoma* (the "July 2012 Article"). That article, however, failed to dissipate the impact of the previous, fraudulent statements. Moreover, at least two IMUC Articles were published after this date, on August 8 and 15, 2012, which continued the false and misleading statements concerning IMUC, its prospects, and the likelihood of success of Phase 2 trials for ICT-107.

12. On August 20, 2012, IMUC disclosed in a Form 8-K, filed with the SEC after the stock markets closed, that Singh had resigned as IMUC's CEO and President

effective August 14, 2012. The Company explained in the Form 8-K that Singh had "tendered his resignation together with a claim that he was entitled to severance benefits," and that IMUC "accepted his resignation, confirmed his termination of employment [and] disputed any claims for severance benefits."

13. On August 21, 2012, Cowen & Company ("Cowen") published a report that stated, among other things, that (a) the disagreement over severance "makes it likely this wasn't a truly voluntary departure;" (b) "given that it is very hard to get the absolute truth from either party, due to liability and personal reputation concerns, investors should consider any and all scenarios, from the worst case scenario to the most benign, as potentially viable;" and (c) "[s]ome of our long discussions with both parties last night hinted that the departure was related to direction the company was moving towards, financing needs, corporate governance, compensation and reporting structure and relationship between the Board and the CEO."

14. Singh's resignation, and IMUC's unwillingness to pay Singh severance payments (evidencing Singh did not resign but was terminated for cause), caused IMUC stock to decline $0.48 per share (or more than 16%) on August 21, 2012, and an additional $0.13 per share (or 5%) on August 22, 2012, to close at $2.30 per share as the market continued to digest Singh's resignation and questions from Cowen.

15. Yet even after Singh's resignation, IMUC failed to reveal that the IMUC Articles were part of a paid promotion scheme originally orchestrated by IMUC and Singh, nor correct the misrepresentations made in the IMUC Articles.

16. Accordingly, the Company was able to complete secondary stock offerings on October 2012 and April 2013, raising $24 million.

17. On December 11, 2013, after the market closed, the Company released its Phase 2 clinical study of ICT-107, revealing that the "differences in the overall survival (OS K-M) curves did not reach statistical significance in the intent-to-treat population (the primary endpoint) or the per-protocol population."

18. The revelation of the failure of Phase 2 conflicted with the paid stock promoters' continually positive statements concerning the prospects for Phase 2's success and revealed the truth (objectively) that the Phase 2 study was not likely to be successful and exposed the false and misleading statements in the IMUC Articles. As a result of this further disclosure, IMUC stock declined $1.62 per share or nearly 60%, to close at $1.10 per share on December 12, 2013.

19. As a result of Defendants' wrongful acts and misleading statements and omissions, and the precipitous decline in the market value of IMUC common stock, Plaintiffs and other Class members have suffered damages.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5(a), (b), and (c) promulgated thereunder (17 C.F.R. §240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

22. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as IMUC's principal place of business is located within this District.

23. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

24. As set forth in their certifications previously filed with the Court (ECF Nos. 27-2 and 28-2), Arthur Kaye IRA FCC as Custodian DTD 6-8-00 and Hayden Leason purchased IMUC common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts, and on the integrity of the market for IMUC common stock, at artificially inflated prices during the Class Period, and were damaged when the truth about IMUC was revealed to the market.

### B. Defendants

#### 1. The Scheme Defendants

25. Defendant Singh was IMUC's President, CEO, and a director from February 2008 through August 14, 2012. As stated in IMUC's Form DEF 14A dated August 10, 2012 ("2012 Proxy"), Singh purported to have "extensive knowledge and experience" "in the biotechnology field" and "financing early stage healthcare companies through his prior work in the venture capital field." As alleged herein, during the Class Period, Singh signed several Company SEC filings on behalf of IMUC and the accompanying Sarbanes-Oxley ("SOX") certifications, and Singh, as CEO of IMUC, exercised editorial control and complete authority over the publication of IMUC Articles both prior to and during the Class Period. Singh has settled related charges the SEC brought against him arising out of the facts alleged herein, including agreeing to pay disgorgement of $1.75 million, prejudgment interest

of $151,676.94 and a civil monetary penalty of $1 million to the SEC. *See* Singh Order.

26. Defendant Lavos was registered as a domestic limited liability company in Nevada in July 2011 by Singh "with his wife as the managing member and sole principal." Singh Order, ¶2 n.2. However, Singh's wife "did not have an operational role." *Id.* Singh "was Lavos' only employee and controlled its operations." *Id.* From 2011 to 2014, Lavos was controlled and operated by Singh, and provided promotional services to issuers that included the publication of more than 400 articles promoting securities on various investment websites. *See id.*, ¶2. Lavos has settled related charges that the SEC brought against it arising out of the facts alleged herein, agreeing to cease and desist from violations of the federal securities laws. *See Id.*

27. Defendant Lidingo was a Nevada limited liability company formed in 2011 and dissolved in 2014. Lidingo was owned and operated by Bjorlin. During its existence, Lidingo provided promotional services to issuers including IMUC, and facilitated the publication on various investment websites of over 400 articles about its issuer clients and the clients of Lavos, with which it was affiliated and shared compensation. *See* SEC Amended Complaint, ¶¶11, 24, 63. During the Class Period, at least five of the IMUC Articles were published by Lidingo under pseudonyms including Amy Baldwin, A. John Hodge, and The Swiss Trader.

28. Defendant Bjorlin organized and operated Lidingo. From no later than September 2011 through at least March 2014, Bjorlin facilitated Lidingo's stock promotion services on behalf of publicly-traded issuer clients, often using her stage name, Milla Bjorlin. *Id.*, ¶¶8, 40-48. "Bjorlin and Lidingo received cash and equity

of at least $1 million from the promotional scheme" on behalf of clients during Lidingo's operational period. *Id.*, ¶27.

29. Defendant Andrew Hodge, from no later than December 2011 through at least March 2014, was employed by Lidingo and assisted Bjorlin in Lidingo's stock promotion work, including interacting with issuer clients, providing direction to writers drafting articles on behalf of those clients, and receiving compensation totaling at least $340,000 from Lidingo. *Id.*, ¶55; Hodge Answer, ¶¶9, 49-55. In his capacity as a Lidingo employee, Hodge recruited writers to assist in the company's promotional schemes.

30. Defendant Brian Nichols, from no later than February 2012 through at least March 2014, was a paid writer for Lidingo, publishing articles about issuer clients on various investment websites under his own name. SEC Amended Complaint, ¶¶10, 56-62. As part of his Seeking Alpha profile, Nichols describes himself as a research analyst. At times relevant hereto, Nichols had approximately 5,000 followers[4] on his Seeking Alpha account. In total, "Nichols received at least $200,000 in total compensation, including bonuses, from Lidingo for his services in the stock promotion scheme" on behalf of all Lidingo clients during that company's operational period. SEC Amended Complaint, ¶56. Nichols also wrote paid articles that Lidingo published under its own pseudonyms, including A. John Hodge (which had approximately 300 followers), The Swiss Trader (which had approximately 300 followers), and Amy Baldwin (which had approximately 300 followers). During the Class Period, at least eight of the IMUC Articles were published by Nichols.

[4] A follower of an author on Seeking Alpha is able to read the author's articles and instablogs in his/her "Authors You Follow" section of Seeking Alpha's website.

31. Defendants Lidingo, Bjorlin, Hodge, and Nichols are collectively referred to herein as the "Lidingo Defendants."

32. On April 10, 2017, the SEC filed suit against the Lidingo Defendants arising out of the facts alleged herein. The Lidingo Defendants moved to dismiss, which was granted in part and denied in part. SEC MTD Order. Significantly, while Lidingo was dismissed from the SEC Action, the Court sustained the claims asserted against Bjorlin, Nichols, and Hodge for violations of Rule 10b-5(a), (b), and (c). After the SEC filed the SEC Amended Complaint, Nichols and Hodge answered and Bjorlin renewed her motion to dismiss. Briefing on that motion is ongoing.

33. Defendant ImmunoCellular is a Delaware corporation with principal executive offices located in Calabasas, California. Since May 30, 2012, IMUC common stock traded on the NYSE American (formerly known as the American Stock Exchange and, during the Class Period, the NYSE MKT) ("NYSE Market"), a domestic exchange, under the ticker symbol "IMUC." Prior to May 30, 2012, IMUC common stock traded on the over-the-counter bulletin board ("OTCBB"), a domestic exchange, under the ticker symbol "IMUC." IMUC has settled related charges that the SEC brought against it arising out of the facts alleged herein, agreeing to cease and desist from violations of the federal securities laws. IMUC Order.

34. Defendants IMUC, Singh, Lavos, and the Lidingo Defendants are collectively referred to herein as the "Scheme Defendants."

**2. <u>The IMUC Defendants</u>**

35. Defendant Fractor has served as the Company's Treasurer and Chief Financial Officer ("CFO") from April 2011 to the present and as its Vice President of Finance and Principal Accounting Officer from March 2013 to the present. As

identified herein, during the Class Period, Fractor signed SEC filings on behalf of IMUC and the accompanying SOX certifications. It was part of Fractor's employment as IMUC's CFO to identify any internal control and disclosures issues, illegal activities in the Company, and any illegal payments to third parties.

36. Defendants IMUC, Singh, and Fractor are collectively referred to herein as the "IMUC Defendants."

**C. <u>Relevant Non-Parties</u>**

37. John S. Yu ("Yu"), a founder of the Company, served as Chairman of IMUC's Board of Directors ("Board") and as its Chief Scientific Officer from January 2007 until September 2015. Yu served as Interim CEO from August 2012 until November 2012. Yu has served as a director from November 2006 to the present. Within two months before the Phase 2 results for ICT-107 were disclosed on December 11, 2013, Yu sold approximately 300,000 shares of IMUC common stock, for gross proceeds of approximately $870,000. Prior to these sales, Yu did not sell any shares, making these sales unusual in timing. Specifically, on October 18, 2013, Yu sold 231,381 IMUC shares, at $2.91 per share for gross proceeds of $673,226. On October 21, 2013, Yu sold 36,003 IMUC shares, at $2.92 per share for gross proceeds of $105,071. On November 25, 2013, Yu sold 32,613 IMUC shares, at $2.85 per share for gross proceeds of $92,875.

38. Andrew Gengos ("Gengos") served as the Company's President, CEO, and director from December 2012 through December 2016.

39. Vincent Cassano ("Cassano"), from no later than August 2011 through at least November 2011, was a paid writer for Lavos, publishing articles about issuer clients of Lavos on investment websites under the pseudonym VFC's Stock House.

Cassano received at least $6,700 in total compensation from Lavos for his services in the stock promotion scheme. In addition, from no later than November 2011 through at least April 2013, Cassano was a paid writer for Lidingo, publishing articles about issuer clients on investment websites, also under the pseudonym VFC's Stock House, and received at least $27,000 in total compensation from Lidingo for his services in publishing paid promotional articles. SEC Action Initial Complaint (ECF No. 1, Apr. 10, 2017) ("SEC Initial Complaint"), ¶¶61, 63. From 2011 to 2014, Cassano's pseudonym VFC's Stock House had approximately 2,000 followers on Seeking Alpha. During the Class Period, at least two of the IMUC Articles were published by Cassano. Cassano consented to final judgment against him in the SEC Action, through which he was ordered to disgorge $15,139 and prejudgment interest of $2,579 for violating §§17(a) and (b) of the Securities Act and §10(b) of the Exchange Act and Rule 10b-5. *See* Cassano Consent and Cassano Order.

40. Stephen Ramey ("Ramey"), from no later than November 2011 through at least November 2013, was a paid writer for Lidingo and Dunedin, Inc. (another stock promotion firm). Ramey published at least 60 articles on investment websites under the pseudonym "Chemistfrog." Ramey's articles concerned 11 issuers, including IMUC. Ramey Order, ¶4. Ramey received at least $35,000 in total compensation from Lidingo and Dunedin for his services. Ramey "wrote articles for a stock promotion firm [Lidingo] when he knew the stock promotion firm would publish the articles without disclosure of compensation." Ramey Order, at p. 2. During the Class Period, at least four of the IMUC Articles were published by Ramey. During the period of the promotion scheme, Ramey's pseudonym Chemistfrog's Seeking Alpha account had approximately 900 followers. Ramey

settled with the SEC and agreed to disgorge $35,000, prejudgment interest of $3,538, and a civil money penalty of $24,000 in 21 installments to the SEC as part of his settlement for violating §§17(a) and (b) of the Securities Act and §10(b) of the Exchange Act and Rule 10b-5. *See id.*

41. Christopher French ("French"), from August to November 2012, paid "freelance writers to write purportedly independent articles describing securities that he then published on investment websites without disclosing that they were paid promotions." French Order, at p. 2. Lidingo paid French for these articles. The articles French published concerned four issuers, including IMUC. French Order, ¶3. During the Class Period, at least one of the IMUC Articles was published by French under the pseudonym "Cris Frangold." French also paid freelance writers to write another nine articles about five issuers, which French then sold to Lidingo. *Id.* French received at least $16,100 in total compensation from Lidingo for his services. *Id.*, ¶9. During the period of the promotion scheme, French had approximately 500 followers on his Seeking Alpha account. French settled with the SEC and agreed to disgorge $16,100, prejudgment interest of $2,105, and a civil penalty of $20,000 in 13 installments to the SEC as part of his settlement for violating §§17(a) and (b) of the Securities Act and §10(b) of the Exchange Act and Rule 10b-5. *See* French Order.

42. Cassano, French, and Ramey are collectively referred to herein as the "IMUC Writers."

# IV. SUBSTANTIVE ALLEGATIONS

## A. Company Background

43. IMUC purports to develop and commercialize immunotherapy drugs to fight cancer by stimulating a patient's own immune system to target tumor antigens. Antigens are molecular signals that the immune system uses to identify foreign bodies.

44. During the Class Period, IMUC's lead pipeline product was ICT-107, which is a patient-specific, dendritic cell-based vaccine that purportedly targets six different tumor-associated antigens for the treatment of newly diagnosed GBM.

45. As reported in IMUC's Annual Report on Form 10-K filed with the SEC on March 21, 2012 (the "2011 10-K"), at that point in time IMUC had four full-time employees, including Singh, and Fractor was categorized as a part-time employee.

46. As reported in IMUC's Annual Report on Form 10-K filed with the SEC on March 11, 2013 (the "2012 10-K"), at that point in time IMUC had five full-time employees, including Singh, and Fractor was categorized as a part-time employee.

47. As reported in IMUC's Annual Report on Form 10-K filed with the SEC on March 14, 2014 (the "2013 10-K"), at that point in time IMUC had three full-time employees, and Fractor was categorized as a part-time employee.

## B. The FDA's Requirements for Demonstrating Effectiveness

48. For purposes of drug approval, "effectiveness" is not an abstract term of puffery to be bandied about with disregard. Instead, the U.S. Food and Drug Administration ("FDA") has set forth stringent criteria for demonstrating effectiveness at a clinical trial.

49. "Effectiveness" is defined by statute as "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. §355(d). Substantial evidence is defined as "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." *Id.*

50. The characteristics of an "adequate and well-controlled investigation" are intended "to distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation." 21 C.F.R. §314.126(a). Furthermore, "[u]ncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness." 21 C.F.R. §314.126(e).

51. Determining whether a drug is effective generally occurs in three phases. 21 C.F.R. §312.21. Phase 1 studies are "designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." *Id.* Phase 2 studies consist of "controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug." *Id.* Finally, Phase 3 studies are "expanded

controlled and uncontrolled trials...and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id.*

52. As such, while an individual trial phase may be able to present some evidence towards the consideration of effectiveness, substantial evidence taken from a holistic assessment is required before any drug passes regulatory scrutiny.

**C. <u>ICT-107 – the Supposed GBM Miracle Drug</u>**

53. GBM is the most common malignant primary brain tumor in adults with a yearly incidence rate of between 3 and 4 out of every 100,000 adults.

54. At all relevant times, the standard of treatment options for these highly invasive and aggressive tumors generally involves surgical resection (to the extent that it is safe and feasible) in addition to symptomatic therapies (focused on relieving symptoms and improving the patient's neurological functions, such as anticonvulsants and corticosteroids) and/or additional palliative therapies, including radiation and chemotherapy.

55. GBM was and is particularly difficult to treat for several reasons, including because: (1) the tumor cells are very resistant to conventional therapies; (2) the brain is susceptible to damage during conventional therapy; (3) the brain has a limited capacity to repair itself; and (4) many drugs cannot cross the blood-brain barrier to act on the tumor. As a result, the common length of survival following diagnosis and with the standard of care is just 12 to 15 months, with survival for those who do not receive treatment at just 3 months.

56. IMUC, like many other biotechnology companies, sought to address GBM and other solid tumor cancers through the use of immune-response based therapies.

57. Prior to and throughout the Class Period, IMUC, through the IMUC Articles, touted ICT-107 as its breakthrough drug for the treatment of GBM – the most aggressive form of brain cancer.

58. In 2008 IMUC began its Phase 1 study of ICT-107 for the treatment of GBM, seeking to stimulate the patient's own "immune response" in response to at least one tumor-associated antigen to kill the tumor cells from the inside. The study was conducted to evaluate the safety and tolerability of ICT-107 in patients with GBM.

59. According to IMUC, "ICT-107 is designed to activate a patient's immune system against specific tumor-associated antigens. ICT-107 activates a patient's immune system by extracting dendritic cells from that patient, loading the dendritic cells with the antigens and reintroducing those cells [intravenously] to the patient's body to trigger an immune response." 2011 Form 1-K, at p.2.

60. Dendritic cells "act as first responders that trigger the systems that help the body fight infection or foreign bodies, by initiating a T cell or T cell response to the infection or foreign body. The dendritic cells do this by recognizing, processing and presenting foreign antigens (substances that stimulate the production of antibodies and combine specifically with them) to the T cells, which then effectuate the immune response. The goal of a cell-based vaccine is to (i) make use of and enhance the dendritic cell's ability to trigger the T cell response and (ii) to stimulate

the dendritic cell to focus the T cell response to specifically target the cancer cells for destruction." *Id.*

61. According to IMUC's December 23, 2008 press release, "[t]he Phase [1] clinical trial of ICT-107 was conducted to evaluate the safety and tolerability of the cancer vaccine in patients with [GBM]…"

62. In that same press release, IMUC went on to report what it viewed as "promising" preliminary results:

> Of the 19 patients enrolled, seventeen patients are still alive, with eight patients surviving at least one year after the surgery that preceded their vaccine treatment. Ten patients were evaluated for immune responses, and five of them had a significant immune response to at least one tumor-associated antigen. Patients demonstrating an immune response are exhibiting a trend toward longer overall survival.

63. At the time of the December 23, 2008 release, there was limited analyst coverage or research on IMUC. There was essentially no reaction in the market for IMUC shares to this press release, with the shares continuing to trade at approximately $0.26 per share.

64. In SEC filings dated April 23, 2009, May 14, 2009, June 12, 2009, and June 19, 2009, IMUC similarly disclosed the number of patients in the Phase 1 study who exhibited an immune response and whether those patients achieved a survival benefit:

> Ten patients were evaluated for immune responses, and five of them had a significant response to at least one tumor-associated antigen.

> Patients demonstrating an immune response are exhibiting a trend toward longer overall survival. The preliminary data from our ICT-107 trial is encouraging and supports our view that immune therapies can potentially provide survival benefits for brain tumor patients.

65. In a press release dated June 4, 2009, filed with the SEC, IMUC added:

> Fifteen patients in the trial were evaluated for immune responses, and six of them had a significant immune response to at least one tumor-associated antigen. Patients demonstrating an immune response are exhibiting a trend toward longer overall survival.

66. The disclosures with respect to an immune response were material to investors. ICT-107 was intended to stimulate an immune response and the theory behind the treatment was that patients who exhibited immune response would outlive those patients who did not. If only half or fewer of the patients in the study exhibited an immune response and those patients did not demonstrate a survival benefit, then the data concerning an overall survival benefit of patients in the study would be random and not attributable to the drug.

67. These disclosures with respect to the immune response of patients in the Phase 1 study and the survival benefit exhibited by those patients, was omitted from IMUC's subsequent SEC filings and press releases, no doubt because as the Phase 1 study progressed it failed to validate either a correlation between ICT-107 and an immune response or a survival benefit.

68. Throughout 2009 and 2010, IMUC shares continued to trade at around $1.00 per share, closing at $0.99 per share on December 31, 2009 and at $1.26 per share on December 31, 2010.

69. On January 4, 2011, the Company announced that it had received approval from the FDA to commence enrollment in its Phase 2 ICT-107 trial. Unlike the small open-label Phase 1 study, Phase 2 would be a double-blind, placebo-controlled, 2:1 randomized study designed to evaluate the safety and efficacy of ICT-107 patients with newly diagnosed GBM. FDA approval of a Phase 2 study is not an endorsement of the science or prospects of the study, but rather is just an indication that the study is not anticipated to impose an unreasonable or significant risk to volunteers.

70. On February 2, 2011, the Company announced the first patient enrolling in its Phase 2 study.

71. The Phase 2 trial randomized a total of 124 patients to standard of care treatment plus ICT-107 or standard of care plus placebo. 43 patients were treated with placebo (their own dendritic cells not exposed to antigen), and the treatment arm of 81 patients received the ICT-107 vaccine. The regimen was four induction doses after radiation and chemotherapy, and then maintenance doses until the patient relapsed.

72. The primary endpoint of the Phase 2 trial was Overall Survival ("OS") in patients when treated with ICT-107 versus a control group. Another second endpoint was OS in a predefined subpopulation of patients with HLA-A2. "HLA" types refers to a patient's human leukocyte antigen status, which corresponds to a family of genes that regulate the immune system. HLA-A2 is an antigen within the HLA group that is linked to the development of cancer. All randomized patients were included in the intent to treat population.

73. Secondary endpoints included progression free survival ("PFS") and the rates of OS and PFS at six months after surgery, then assessed every three months until the end of the study. Safety and immune response were additional secondary endpoints.

74. The study represented a broad leap from the limited Phase 1 study designed to test the safety and tolerability of ICT-107 and would for the first time test the efficacy of the vaccine.

75. IMUC shares closed on December 31, 2011 at $1.36 per share, unchanged from their year-end 2010 price.

**D. <u>The Stock Promotion Scheme in Violation of Securities Laws</u>**

76. As of December 2010, ICT-107 was one of just three drugs in IMUC's development pipeline, and the only one that had completed a Phase 1 trial.

77. With no drugs on the market, IMUC was generating zero revenue and was reliant on grants and equity sales to fund its future studies. IMUC's ability to raise money was dependent on the public's perception of the success of the Phase 1 study and the likelihood of success of Phase 2.

78. In July 2011, IMUC common stock was still listed OTC, and its shares traded at approximately $2.00 per share.

79. By July 2011, the Phase 1 test results had not generated sufficient investor interest in IMUC to allow IMUC to trade on the NYSE MKT or to justify a secondary offering of stock necessary to raise financing for the Phase 2 study. Accordingly, in July 2011, Singh devised a paid stock promotion scheme when he founded Lavos while he was the CEO of IMUC.

80. Recognizing that IMUC would need to boost its total market capitalization to attract outside investment interest in the Company, whether in the form of a partnership or acquisition and thus personally benefitting him through the triggering of equity contingencies, Singh on behalf of IMUC, with the assistance of the other Scheme Defendants, implemented a stock promotion scheme designed to artificially inflate IMUC's value through the use of strategically timed purportedly neutral analyst investment articles published on Seeking Alpha.

### 1. <u>The Securities Laws on Stock Promotion Prohibit Non-Disclosure of Payments Received for Promotional Publications</u>

81. The U.S. securities laws prohibit publicizing information about a security without "fully disclosing" any "consideration received or to be received, directly or indirectly, from an issuer." *See* §17(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77q(b).

82. Congress enacted this anti-touting provision to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for." *S.E.C. v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

83. An investor publication issued by the SEC explains the role of paid promotions under the federal securities laws and that the failure of an author to disclose that s/he is being paid by the company to promote its stock is materially misleading to investors:

> Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent

> and unbiased investment newsletters, research reports, or radio and television shows.… The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment. But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.

U.S. Securities and Exchange Commission, *Microcap Stock: A Guide for Investors* (Sept. 18, 2013).

84. Despite and in violation of clear SEC rules, the Scheme Defendants engaged in an illicit stock promotion scheme in which they failed to disclose that the promotional articles released prior to and during the Class Period were paid for by IMUC, and prohibited writers, including the IMUC Writers, from making such disclosures.[5]

85. Given that there was an almost total absence of independent, non-fraudulent commentary on Seeking Alpha concerning IMUC, and limited other analyst coverage of IMUC, the significance to the market of the biased, fraudulent commentary was amplified.

**2. <u>Seeking Alpha Required Disclosure of Compensation</u>**

86. Seeking Alpha[6] is a financial news and analysis website. It publishes third party reports, analysis, and commentary as articles, and permits open discussion

---

[5] The Class Period starts on May 1, 2012 only because of the five year statute of repose from the filing of the initial complaint in this action. *See* 28 U.S.C. §1658. The scheme alleged herein predates the Class Period.

[6] As used herein, "Seeking Alpha" refers to the website available for access at www.seekingalpha.com and operated by Seeking Alpha Inc.

of the articles. Seeking Alpha allows authors to write about individual issuers and permits users to comment on these articles.

87. During the Class Period, Seeking Alpha was a significant source of information and analysis concerning public companies. For example, in May 2012, Seeking Alpha had over 5,500 contributors, published approximately 250 articles daily, and had over 333,000 articles in total.[7]

88. At or before the beginning of the Class Period, Seeking Alpha permitted the publication of articles for which a writer had been compensated, and required that the writer disclose that compensation in or as part of the article.

89. Seeking Alpha also provided a "Terms of Use" before contributors can publish articles on its website. As part of Seeking Alpha's Terms of Use in place at the beginning of the Class Period, there is an "Online Rules of Conduct" for "User Submissions" including the following:

> When you post any User Submission on the Site, you also agree to abide by the following disclosure rules:
>
> * * *
>
> You may not write about a stock with the intention to boost or reduce the stock's price and sell (or buy) the stock into the resulting strength or weakness.
>
> * * *
>
> Abide by the following conflict of interest rule: You will disclose any material relationships with companies whose stocks you write about

---

[7] web.archive.org/web/20120502102608/seekingalpha.com/page/about_us.

> in a User Submission or parties that stand to gain in any way from the viewpoint you are outlining. Examples: You must disclose if you are employed by a company whose stock you are writing about; perform consulting for a company you write about; receive paid advertising revenue or any other form of sponsorship fee from a company you write about.

90. In or around June 2012, Seeking Alpha announced it would no longer permit the publication of articles for which compensation had been paid. Writers were subsequently required to select one of two radio/choice buttons during the article submission process.

- "The author wrote the article themselves, and it expresses their own opinions. The author is not receiving compensation for it. The author has no business relationship with any company whose stock is mentioned in this article;" or
- "The article was written by a third party, and/or the author is receiving compensation to write this article, or has a business relationship with a company whose stock is mentioned in this article."

SEC Amended Complaint, ¶19.

91. Selecting the radio button indicating no compensation caused articles published on Seeking Alpha's website to include an author disclosure immediately before or after the article saying in some form "I am not receiving compensation" for the article. An example of this disclosure was:

> Disclosure: I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.

SEC Amended Complaint, ¶19.

**3. <u>Singh, Lavos, Bjorlin, and Lidingo Set Up the Illicit Scheme</u>**

92. IMUC's stock price closed on July 27, 2011 at $2.08 per share.

93. After years as CEO of IMUC, by September 2011, Singh recognized that IMUC had several near-term inflection points with respect to ICT-107 that would make or break his financial future, including the Phase 2 study, in which IMUC was, at that time, enrolling patients.

94. Given IMUC's position at this crossroads, it was the perfect guinea pig for Singh and Bjorlin's stock promotion ploy, as Singh recognized the need to increase IMUC's market capitalization and visibility in order to trigger his equity awards and possibly position the Company to be acquired.

95. Despite the fact that Lavos's original registration papers named Singh's wife, Maria Santos, as its managing member and sole principal, she had no role in Lavos' business operation. Singh was Lavos' only employee and controlled its operation. Singh Order, ¶2 n.2. In reality, Lavos was a front from which Singh could operate a far-reaching stock promotion scheme on behalf of outside companies, including those at which he sat at the helm (IMUC and later, Lion Biotechnologies, Inc. ("Lion")). *Id.*, ¶¶21-23

96. Just one month after forming Lavos, Singh began directing Bjorlin, advising her on how to organize a stock promotion firm of her own. *Id.*, ¶6. The motivation for such was clear, as it would provide an additional layer of protection for Singh and would allow him to engage Bjorlin on behalf of IMUC and pay a kickback to himself. *Id.*, ¶21.

97. Bjorlin followed Singh's advice and in September 2011 founded Lidingo, naming herself as managing member. *Id.*, ¶¶3, 10.

98. The foundation for the stock promotion scheme had been set. Lidingo would operate as the client-facing entity, liaising with companies regarding their stock promotion services, running the day-to-day operations, paying expenses related to the various promotional campaigns (including to the authors), and collecting compensation – which it then shared with Singh. SEC Amended Complaint, ¶¶11, 25-27; Singh Order, ¶¶7, 9, 12; Hodge Answer, ¶¶16, 24, 28.

99. In return, Singh, through Lavos, found various issuer clients and directed the promotional work by, among other things, providing ideas for articles, editing articles, and at times, directing which writer should draft an article and when and where the article should be published. Singh Order, ¶¶6-7, 14; Hodge Answer, ¶¶16, 28. Singh also directed Lidingo. *Id.*

100. Singh, through Lavos, worked with Lidingo to publish articles for IMUC and ten other publicly traded companies. Pursuant to his direction, over 400 total articles were published, none of which disclosed compensation from the public company clients, and at least 200 of which affirmatively misrepresented that the author did not receive compensation. Singh Order, at p. 2.

101. As a result of the stock promotion scheme, Singh and/or Lavos received $1.75 million in cash and equity, and Bjorlin and Lidingo received at least $1 million in cash and equity. *Id*.

102. In September 2011, IMUC, though Singh, entered into a contract with Lidingo, through Bjorlin. The contract provided that Lidingo would "develop and execute an online distribution campaign that will prominently place the [IMUC] investment opportunity in front of retail investors with an interest in early stage biotech companies." *Id.*, ¶10. Despite the fact that the IMUC/Lidingo contract required IMUC to pay Lidingo $5,000 a month for four months, the relationship would extend well past those terms, with IMUC paying Lidingo more than $230,000 between September 2011 and August 2012 for publishing over 60 articles on third party websites including Seeking Alpha. This total amount included at least three Class Period payments: (i) the May 18, 2012 and July 2, 2012 payments from IMUC to Lidingo of $25,000 each; and (ii) a payment in an undetermined amount on August 15, 2012. *Id.*, ¶¶13, 17; IMUC Order, ¶¶6, 17..

103. Lidingo performed its end of the bargain by organizing the publication of at least 65 positive articles about IMUC, touting ICT-107 as an effective breakthrough immunotherapy that separated IMUC from the rest of its competitors in the space, and often painting IMUC as a peer to larger, more established biopharmaceutical companies for the purpose of inducing investment. IMUC Order, ¶5.

104. The truth, however, which was concealed from Plaintiffs and the Class prior to, during, and after the Class Period, was that each of the IMUC Articles

amounted to a paid advertisement for IMUC, as each was being published with the direct approval of IMUC through Singh.

105. In actuality, Singh and IMUC were using these articles to falsely say those things it could not otherwise say about itself and ICT-107, seeking to skirt the federal securities laws while artificially inflating IMUC's stock price.

**4. The Scheme Defendants' Roles in the Promotion Scheme**

106. Throughout the active manipulation phase of the execution of the scheme on behalf of IMUC, Singh sat at the top, exercising full editorial control over all IMUC Articles, including the content and publication time of those articles, even controlling which authors would be assigned to pen them. Singh Order, ¶¶6-7, 14.

107. Bjorlin participated in the scheme through her day-to-day management of Lidingo, interfacing with the writers and scheme-collaborators, and coordinating publication of articles about issuer clients. As Bjorlin was the only member of Lidingo and the signatory to its bank accounts, she was directly responsible for the payment of fees to recruited writers, the collection of compensation from Lidingo clients, and the divvying up of profits between Lidingo and Singh. Bjorlin also communicated with issuer clients, including Singh and IMUC, about articles. *Id.*, ¶¶6-8, 25; SEC Amended Complaint, ¶¶11, 28, 46.

108. Bjorlin also communicated with writers to give instructions, received from Singh and IMUC, on ideas for articles or publication timing. For example, on January 14, 2012, Bjorlin emailed Cassano asking if he could publish an article about IMUC by that coming Tuesday and instructing him to focus on how IMUC's financing was a "game changer." *Id.*, ¶¶41-42. On January 18, 2012, Cassano, writing and publishing under his pseudonym VFC's Stock House, published

"Another Revival Could Be In Store For ImmunoCellular Therapeutics" on Seeking Alpha. Consistent with Bjorlin's instruction on January 14, 2012, Cassano wrote that "tide could be shifting again…with financing concerns now out of the way, IMUC could be shaping up for another revival." Despite being paid to write the article, Cassano did not disclose he had received compensation from IMUC through Lidingo or the amount he received. *Id.*

109. On January 19, 2012, Cassano writing and publishing under his pseudonym VFC's Stock House, published "Biopharma Stocks To Watch This Week." Similar to the January 18, 2012 article, Cassano continued to focus on IMUC's financing situation, "The anticipated financing deal which weighed heavily on the share price over the past months is now out of the way and investors are free to look forward to interim results from the Phase [2] trial that could start rolling in within the year."

110. By December 2011, Hodge was brought on board by Lidingo and Bjorlin to help run the day-to-day operations of Lidingo. In his role with Lidingo, Hodge interacted with writers and issuer clients (including Singh), recruited writers for articles to be published under Lidingo's in-house pseudonyms, reviewed articles to ensure that they complied with Singh's strict no-disclosure policy, and even penned articles under his own name for the benefit of issuer clients, including IMUC. Hodge also oversaw the writers' drafts by providing assignments, input, content, and edits, and gave instructions on when and where to publish. *Id.*, ¶¶9, 24, 49-55; Hodge Answer, ¶¶24, 28, 53-54, 97.

111. Beginning in February 2012, Nichols joined the scheme, acting as a paid writer for Lidingo, for whom he published at least 90 articles about issuer clients

under his own name, with over 25 additional paid articles published under Lidingo-controlled pseudonyms, including The Swiss Trader, Amy Baldwin, and A. John Hodge. Defendant Nichols' participation in the scheme went well beyond the non-disclosure of his compensation, as he did so purposely and created and employed pseudonyms in order to perpetuate the fraudulent scheme. SEC Amended Complaint, ¶¶10, 56-62; Hodge Answer, ¶¶25, 56.

**5. <u>Singh Instructs the Scheme Defendants That Writers Cannot Disclose Their Compensation in Articles</u>**

112. Singh had knowledge that the IMUC Writers and the Lidingo Defendants were required to make disclosure of compensation in the IMUC Articles. For example, in a brazen exchange that directly acknowledged the risk writers were undertaking without disclosing compensation, in early February 2013, Bjorlin emailed Singh about a writer who had stated he would disclose compensation, stating that he "will NOT write [without] disclosure, you sure he used to write for pay?" Singh replied: "he has been spooked by [a promoter with whom he previously worked] that the SEC may monitor him so he will never agree to anything not proper in writing. Unless we get to know him he won't [sic] write." SEC Amended Complaint, ¶35. In an April 18, 2013 email, about another writer, Singh told Bjorlin "[j]ust make sure he understands NO disclosure." SEC Amended Complaint, ¶36.

113. In the eyes of Singh, the success of Lidingo as a stock promotion company (and, relatedly, the success of the scheme to prop up IMUC's stock price) was predicated on the non-disclosure of the fact that the articles were paid for by the subject company. These rules were set early in the process and were quickly subscribed to by the Lidingo Defendants.

114. Singh directed Bjorlin and Lidingo to tell writers not to disclose their compensation when publishing articles. For example, in a February 20, 2012 email with Bjorlin, Singh noted his belief that disclosure of compensation from issuers would hurt the credibility of writers, providing draft language for Bjorlin to use in response to a writer who expressed concern about violating Seeking Alpha's policies (further exhibiting Singh's control over the overarching scheme):

> We understand [Seeking Alpha] policy. We would like to do a consulting agreement with you for research and investment advice, but there would be no disclosures associated with any article. Any such disclosures are damaging and discredit the validity of these articles. [Singh Order, ¶9; SEC Amended Complaint, ¶36.]

115. Singh reiterated his hardline stance against disclosure of payment during the Class Period when, in a May 1, 2012 email, he directed that a writer not disclose compensation on his own website because "this would create a red flag for investors or folks [who] would want to dent his credibility." Singh Order ¶10; SEC Amended Complaint, ¶36.

116. Lidingo, Bjorlin, and Hodge sought Singh's approval when vetting and hiring new writers, and continuously identified as problematic those writers who disclosed compensation. SEC Amended Complaint, ¶34; Hodge Answer, ¶34. For example, in October 2011, a writer hired by Lidingo to write about IMUC on Seeking Alpha disclosed in that article that he had been paid. Bjorlin did not hire that writer again. In emails to Singh dated April 17, 2012, August 7, 2012, and again in January 2013, Bjorlin referred to the writer as "the idiot we used in the beginning," and noted that "he will NOT post a disclosure again." SEC Amended Complaint, ¶33.

117. In April 2012, Bjorlin emailed Singh a list of potential writers for approval for use in the stock promotion scheme of IMUC and other clients of Lidingo and Lavos. With respect to one writer, Bjorlin disqualified him from participation on the basis that "he wants to disclose as he is a CFA. No disclosures allowed." Singh confirmed Bjorlin's assessment in his April 17, 2012 response, confirming this writer to be a "no" while also instructing Bjorlin to only try another potential writer "if no disclosure." SEC Amended Complaint, ¶34.

118. On August 7, 2012, Bjorlin emailed Singh with a list of "potential writers revisited." Bjorlin told Singh that one writer had told Lidingo "he is legit and would have to disclose" and another writer who previously signed a Lidingo non-disclosure agreement ("NDA") changed his mind and "decided he needed to disclose." Neither writer was hired. SEC Amended Complaint, ¶34.

119. Bjorlin and Lidingo instructed writers, including the IMUC Writers, that they could not disclose their compensation. For example, on April 3, 2012, Cassano emailed Bjorlin and said he would be "tightening up my compensation disclosures." Bjorlin responded that day, asking what happened to make him want to disclose, and telling him "[w]e unfortunately cannot have the disclosure on there." Cassano responded that his "legal guy" advised him to "keep [his] stuff air tight to avoid future problems, after all it's the writer that's on the hook." However, he agreed that, for the time being, he would not disclose in Lidingo articles. SEC Amended Complaint, ¶38. In August 2012, Bjorlin again told Cassano that "we can't have any disclosures." Cassano responded that he "won't use disclosures with u guys." SEC Amended Complaint, ¶38.

120. Defendant Nichols and the IMUC Writers each either knew or were reckless in not knowing that Lidingo would not disclose the compensation it received from IMUC in exchange for publishing the articles each provided to Lidingo. Each individually knew that Lidingo was in the business of getting articles published on Seeking Alpha's website during the Class Period and provided articles to Lidingo, with Lidingo paying each for their contributions.

**6. <u>The Scheme Defendants and the IMUC Writers Further the Scheme Through the Use of Pseudonyms and Fake Profiles</u>**

121. Singh favored and was a proponent of the strategic use of pseudonyms, encouraging Lidingo to use such when publishing articles ghost-written by other Lidingo writers and even going as far as to provide approval for which identity each should be published under. Singh Order, ¶7.

122. As he was the CEO of IMUC, Singh sought to disguise his involvement in Lidingo's broader promotional work by, among other ways, having the issuer contract with Lidingo instead of Lavos, or by signing his wife's name to Lavos contracts. *Id.* Others, too, made efforts to keep Singh's involvement in Lidingo's promotional schemes a secret, with Lidingo employees referring to Singh as "Charlie" when communicating about him – an identity that morphed into the "Charles Pelikan" moniker he adopted for promotional work beginning in 2013. *Id.*

123. Similarly, Lidingo employed a host of its own pseudonyms under which it would publish ghost-written articles or multiple articles by the same author, all in order to give the appearance of broader coverage of a company. *Id.*, ¶19. These Lidingo-controlled pseudonyms used to publish articles about IMUC during the Class Period included The Swiss Trader, A. John Hodge, and Amy Baldwin.

124. The Lidingo-controlled pseudonyms also had their own false profiles on Seeking Alpha. For example, The Swiss Trader profile claimed he had both an "MBA in Finance" and a degree in Physics. The Amy Baldwin profile claimed at times "I am currently employed by a Fortune 20 company, on any given day I am assessing risk management and the financial health of various companies." There was no real person at Lidingo with such credentials. SEC Amended Complaint, ¶30.

125. Defendant Nichols would publish under these pseudonyms during the Class Period to deflect attention from himself, while Cassano instead published under his established handle, VFC's Stock House. Similarly, French would publish an article about IMUC during the Class Period under the pseudonym "Cris Frangold" while Ramey regularly published articles about IMUC and other Lidingo clients under the pseudonym "Chemistfrog."

**7. <u>IMUC Maintained Ultimate Authority Over the IMUC Articles and Other Pre-Class Period Articles Through Singh's Actions</u>**

126. Prior to and during the Class Period, IMUC maintained ultimate authority over the published Lidingo articles by virtue of Singh's positioning atop the stock promotion scheme.

127. In a March 19, 2012 email to Bjorlin, Singh stated that he wanted "ultimate approval authority," and that "[i]n the future, please let me review [the draft articles] even if it requires waiting a day or two extra." IMUC Order, ¶7.

128. Singh also controlled who would write IMUC-related articles and what the topics of those articles would be. For example, on March 21, 2012, Singh directed that Lidingo use Nichols and Ramey to write two articles. He instructed that Nichols write about the Company's patent acquisitions, and that Ramey write a

longer “more technical piece” to be published the following week. Just one day later, Nichols published an article on Seeking Alpha entitled “Immunocellular Therapeutics Patent Acquisition Paradigm Shift.” On March 28, 2012, Ramey, using a pseudonym, published an article on Seeking Alpha entitled “ImmunoCellular Therapeutics’ Growing Intellectual Property Garnering Attention.” Singh Order, ¶15; IMUC Order, ¶7.

129. On January 20, 2012, Singh emailed Cassano with “some food for the next week’s write-up on IMUC which should tie very well with your write-up from this week.” Specifically, Singh instructed Cassano to include a discussion in his next article about “one of the best known healthcare hedge funds” “Ayer Capital [taking] 7.3% position in the company in the last financing.” Indeed, ten days later on January 30, 2012, as part of his regular “Stocks to Watch” articles, Cassano represented that “it could be anticipation of [Phase 2] results that led Ayer Capital Management to take a seven percent position in IMUC during the latest round of financing.”

130. In fact, Cassano published a series of articles with the title, “Stocks to Watch.” In these articles, Cassano discussed well-known stocks as part of his weekly stocks to watch in order to generate interests in small cap stocks such as IMUC and get more views from investors of those larges companies. In an article dated April 9, 2012 titled, “Weekly Stock Watch: April 9-13,” besides mentioning IMUC, Cassano also discussed McDonald’s (MCD), Starbucks (SBUX), and other “powerhouses like Google (GOOG), JPMorgan Chase (JPM) and Wells Fargo (WFC).” In an article dated April 23, 2012 titled, “Weekly Stock Watch: April 23-27,” besides picking stocks such as IMUC, Cassano also included brief mentions about large cap stocks

such as McDonald's, General Electric, Apple, Amazon, and Starbucks. In an article dated April 29, 2012 titled, "Weekly Stock Watch: April 30-May 4," Cassano added large cap stocks' recent earnings such as Apple, Amazon, AT&T, Merck, Expedia, Exxon Mobile and Netflix, along with discussions about less well-known stocks such as IMUC.

131. Singh likewise edited articles published prior to and during the Class Period. For example, on February 8, 2012, Singh reviewed Nichols' article proposal, noting that the topic was a "very good idea as I think it would move these stocks," while suggesting that IMUC be the second company named in the article's discussion. That article would ultimately be published on Seeking Alpha eight days later with IMUC appearing as the second company discussed, as instructed by Singh. Singh Order, ¶16.

132. Such tight-fisted control over the process continued into the Class Period. For example, on July 10, 2012, Bjorlin sent an article to Singh for approval, noting that "[w]e seriously need an imuc article," likely as a result of the several days of declining stock prices over the prior week. On July 11, 2012, Singh responded with his edits, directing that the writer revise the article accordingly. Those changes were ultimately incorporated into the July 17, 2012 article published under Lidingo's "The Swiss Trader" pseudonym on Seeking Alpha, and entitled "3 Innovative Cancer Treatments…But Which is the Best Bet?" Singh's edits were incorporated into the published article. SEC Amended Complaint, ¶70.

133. As Singh was acting in his capacity as IMUC's CEO, his conduct and state of mind are imputed to IMUC. Thus, both Singh and IMUC exercised control over the content and publication of the Class Period IMUC Articles.

**8. In the Alternative, the Lidingo Defendants Maintained Ultimate Authority Over the IMUC Writers**

134. The Lidingo Defendants maintained absolute control over Cassano, French, and Ramey

**a) Cassano**

135. In 2011, while Cassano was posting articles on Seeking Alpha and vfcstockhouse.com, Bjorlin approached him via email saying that he was a good writer and wanted to know if Cassano was interested in writing for her.

136. Bjorlin gave specific instructions to Cassano as to the content of articles about IMUC. For example, on November 30, 2011, Bjorlin emailed Cassano, "I have a bit of an emergency" as "i have a rushed request for IMUC. They are announcing a S1 filing tomorrow and i bee[n] to try to control negative fall… I need it to close to 1.40 or around. Again, I'm truly sorry for such rushed request but if you could help it will be greatly appreciated. I will wire you first thing in the am. I do need something out tomorrow though."

137. Similarly, on January 14, 2012, Bjorlin emailed Cassano directing and instructing him to "[f]ocus[] on how this financing is a game changer for IMUC. Bad news is out and huge upside now? How this capital raise takes financing risk out and interim data in 12 months created a big opportunity. This should be included in your weekly write up and not a stand alone piece, please." As a result, Cassano published an article on Seeking Alpha, titled, "Another Revival Could Be In Store For Immunocellular Therapeutics" on January 18, 2012, incorporating all of Bjorlin's suggestions.

138. One month later on February 13, 2012, in an email to Cassano, Bjorlin sent "an outline for what we would like the next piece to be. We would like a stand alone IMUC piece please." The outline from Bjorlin was for Cassano to "[f]ocus on possible AMEX listing."

139. On March 22, 2012, Bjorlin emailed Cassano indicating that "today's news may be big enough to write about" despite previously telling him "not to have anything come out on IMUC yet." The news that Bjorlin was referring to was the announcement of an exclusive license agreement with the University of Pittsburgh. Four days later, Cassano published an article titled, "Immunocellular Therapeutics: Cementing Its Place As a Major Player In Cancer Immunotherapy" where he discussed "a licensing deal with the University of Pittsburgh."

**b) <u>French</u>**

140. While working for his brother, Jordan French, at his brother's company called InvestmentUnderground.com ("IU"), as an editor-at-large and a manager for writers, Lidingo reached out to French and IU in the summer of 2012 to write articles for Lidingo because IU had a staff of writers that wrote articles for promotional firms.

141. Bjorlin and Hodge were French's primary contacts at Lidingo. As part of the writing process, Bjorlin or Hodge emailed or called French with a new assignment that included the company name with additional information such as a press release. Bjorlin or Hodge instructed French with an overview of what theme topics or issuers they wanted discussed in the article. From there, French gave instructions to a writer at IU about the assignment. An IU writer was compensated between $20 and $40 for each article that he or she wrote. After the draft article was

emailed to Bjorlin, she emailed back a revised or edited article to French within 24 to 48 hours. The edits would give a more scientific bent to the article.

142. When French started writing for Lidingo, on July 24, 2012, Hodge emailed French instructions for his first article where Lidingo wanted French to write his first "piece on ImmunoCellular Therapeutics IMUC. Tremendous company here that has had a very exciting year with NYSE MKT listing. IP has been strengthened, and added to Russell indexes."

143. On July 25, 2012, after one of his writers, Ramu Iyers, drafted the article, French submitted the draft of the August 8, 2012 Article to Bjorlin and Hodge via email. The draft included discussions about IMUC "recently uplisted to the New York Stock Exchange," being "ready to be included in the US broad market Russell 3000, Russell Global, and Russell Microcap Indexes," and "protecting its intellectual property quite aggressively" as it "currently has been granted 10 patents with another 20 applied for and awaiting approval."

144. On July 31, 2012, Bjorlin emailed French an edited draft of his article, with comments from a person who Bjorlin simply referred to as the "Editor":

> Attached is my preliminary edit/rewrite for Chris' IMUC article. The original made some good points and had good, factual information, although in a poorly organized format.
>
> Anyway, after some major revisions including insertion of opening and closing paragraphs, attached is my revision. I would not post this as-is, however.

145. In discussing ICT-107's potential results in Phase 2, the "Editor's" revised draft stated, "Phase 2 interim data are to be reported when 32 patient-related

events occur, meaning that longer it is before the data are announced, the more promising the drug will likely be. Positive data at this point in the trial would likely be a huge catalyst for the company and a strong share-price driver." The published version of the article dated August 8, 2012 did indeed incorporate these additions.

146. The revised draft from the "Editor" is consistent and confirms French's understanding of the writing process with Lidingo, that after a draft article was sent to Lidingo, Bjorlin sent back with a more scientific bent. As such, French knew that the edits from the "Editor" were false and misleading as they were part of an undisclosed and illegal stock promotion scheme designed to get investors to invest in IMUC and pump the market cap of IMUC.

147. Prior to actually publishing the August 8, 2012 Article, French had to wait to receive authorization to publish from Bjorlin after she had received approval from someone else. Indeed, on August 3, 2012, Bjorlin emailed French about the draft August 8, 2012 Article, "hello, it looks like it finally got approved."

148. On August 16, 2012, French sent Bjorlin an email, telling her that he had "attached invoices for the first two articles: (IMUC) and (NBS). I have noted that payment has already been received on both." Lidingo paid French $1,000 on August 8, 2012 for writing and publishing the August 8, 2012 Article.

149. The relationship between Lidingo and French continued after the publication of the August 8, 2012 Article. In an email specifically between French and Bjorlin, on August 27, 2012, Bjorlin tells French, "We haven't been doing too well and have lost a company as well. Certainly, if we see positive movement in the stocks, it's easier to ask for more money or bonuses."

150. Besides writing articles about issuer clients, Bjorlin directed French to check his Seeking Alpha articles daily because replies to comments would drum up more views.

**c) <u>Ramey</u>**

151. In late 2010, Ramey created the handle Chemistfrog, and started posting on Seeking Alpha. Ramey also had a Twitter account, @Chemistfrog with approximately 1000 followers. The Twitter account has since been deleted.

152. In 2011, Bjorlin contacted him via email at his Chemistfrog account after locating him on Seeking Alpha. Bjorlin represented to Ramey that Lidingo was an investor relations firm. Bjorlin wanted Ramey to establish an LLC and write articles on biotech companies for Lidingo. Bjorlin was Ramey's point of contact at Lidingo.

153. As part of the writing process, Ramey participated on four or five conference calls organized by Lidingo. On the conference call, Bjorlin would be one of the participants, with at least a couple of writers who would be identified simply by numbers. Hodge participated on some of the conference calls. There would be an unnamed person from the issuer client. There was at least one conference call to discuss IMUC, with Bjorlin and Hodge, and an unnamed person who discussed ideas for IMUC articles and answered questions about IMUC.

154. Lidingo gave Ramey topics to write about for a given issuer client. Ramey also experienced time pressure to write an article from Lidingo. For example, if the article was drafted on late Sunday, Lidingo would instruct Ramey, without explanation to publish it on Monday, Tuesday or Wednesday. Ramey assumed that articles published at the beginning of the week would get more page views, compared

to publishing an article on Friday where the article would get buried right before the weekend.

155. Consistent with Cassano's weekly stock watch articles, Ramey also linked IMUC to other more established drug companies for the purpose of generating more page views of the IMUC article. For example, Ramey discussed GlaxoSmithKline in his March 6, 2012 Article.

**9. <u>The Scheme Was Used to Counteract the Tepid Phase 1 Results</u>**

156. Prior to and throughout the Class Period, the IMUC Defendants made materially false and misleading statements concerning the success of the Phase 1 study. For example, a January 23, 2012 press release stated:

> The Phase [1] clinical study of ICT-107 in GBM, 16 newly diagnosed patients who received the vaccine in addition to standard of care of surgery, radiation and chemotherapy demonstrated two year overall survival of 80 percent and a three year survival of 55 percent. These figures compare favorably to the 26 percent two-year and 16 percent three-year survival based on the historical standard of care treatment alone.

The press release compared the results of the Phase 1 study with the results from Phase 3 studies of the standard of care for GBM, falsely implying that the Phase 1 study established that ICT-107 was superior to the standard of care.

157. In addition, an article published on Seeking Alpha on July 23, 2012 by Nichols and edited and approved by Singh and IMUC states that the results of the Phase 1 trial “prov[e] the effectiveness of attacking cancer from various points.”[8]

158. These statements were materially false and misleading because: (a) the design of the Phase 1 study did not meet the FDA’s requirements for showing effectiveness; and (b) the actual results of Phase 1 did not demonstrate effectiveness.

159. Scientists customarily publish clinic study data in peer reviewed journals. The results of the Phase 1 study were submitted on March 1, 2012 for publication in the journal *Cancer Immunology and Immunotherapy*, and published in that journal on July 31, 2012 (the July 2012 Article).

160. Although the Phase 1 study wasn’t controlled or statistically powered to prove efficacy, the data reported in the study failed to demonstrate a statistically significant correlation between immune response and progression free or overall survival. As stated in the study, there was no correlation between immune response and survival benefit and the “[v]accine responders exhibited a *non-significant* trend toward increased progression-free survival, but not overall survival.” *See* July 2012 Article, at p. 131 (emphasis added).

161. In those patients where a survival benefit was achieved, the patients had other genomic characteristics that made it more likely that they would respond positively to standard of care treatment, regardless of whether they subsequently received the ICT-107 vaccine. The article was complex and concluded that the Phase

[8] Nichols, B., ImmunoCellular Therapeutics: Explaining the Benefits of A *Multiple Antigen Targeting Approach* (July 23, 2012).

1 study was "encouraging." The authors of the study were motivated to present the Phase 1 study in the best possible light given the otherwise disappointing data.

162. The Phase 1 study's actual, tempered results conflicted with the overly optimistic and misleading language employed by IMUC and its representatives in SEC filings and press releases and is particularly stark in comparison to the descriptions of the Phase 1 results proffered by the scheme articles published during the Class Period.

163. In fact, the scheme itself was orchestrated by Singh and his confederates to counter-act the implications of the tepid Phase 1 study.

164. *First*, as set forth *supra*, Section IV.D.9, several articles during the Class Period referenced the relatively low bar that IMUC would have to clear with its ICT-107 Phase 2 results in order to be considered a success. While the Phase 1 results did meet its primary endpoint of immunogenicity[9] for sixteen of the individuals in the study, the relatively low bar was purposely designed for testing tolerability in patients, not efficacy of the drug. IMUC was aware that these Phase 1 results had limited utility in terms of predicting Phase 2 success. However, this did not stop IMUC, through Singh as its CEO, from overseeing dozens of IMUC Articles both prior to and during the Class Period that falsely touted the Phase 1 results as a precursor to Phase 2 success.

[9] Immunogenicity is the ability of a particular substance, such as an antigen or epitope, to provoke an immune response in the body of a human or animal. In other words, immunogenicity is the ability to induce a humoral and/or cell-mediated immune responses.

165. These false representations were allowed to remain in the market even after Singh's departure from IMUC and IMUC's discontinuation of any relationship with Lidingo, as they represented strategic and purportedly neutral commentary on the viability of ICT-107.

**10. Singh and IMUC Use the IMUC Articles to Prop Up the Stock Price with Commentary About ICT-107 and the Likelihood of Success at Phase 2 That IMUC Could Not Otherwise Say Itself**

166. To create the false inflation in stock price, Singh and IMUC authorized, through Lidingo and with the assistance of the Lidingo Defendants, the publication of at least 65 articles concerning IMUC on Seeking Alpha that failed to disclose Singh and IMUC's oversight or payment for their writing and publication.

167. 44 of the 65 articles were published before the start of the Class Period, however they remained published and available into the Class Period.

| # | Date | Writer/ Publisher | Pseudonym | Title |
|---|---|---|---|---|
| 1 | 11/8/2011 | Ramey | Chemistfrog | ImmunoCellular Therapeutics' Cancer Stem Cell Drug Garnering Much Attention |
| 2 | 11/16/2011 | Ramey | Chemistfrog | 3 Cancer Immunotherapy Biotechs with Catalysts for 2012 |
| 3 | 1/16/2012 | Ramey | Chemistfrog | Pharma Leaders Emerging in Immunotherapy Approach to Fighting Glioblastoma |
| 4 | 1/18/2012 | Cassano | VFC's Stock House | Another Revival Could Be In Store for ImmunoCellular Therapeutics |
| 5 | 1/19/2012 | Cassano | VFC's Stock House | Biopharma Stocks To Watch This Week |
| 6 | 1/30/2012 | Cassano | VFC's Stock House | Stocks To Watch Week of Jan. 30 |
| 7 | 1/30/2012 | Ramey | Chemistfrog | Verastem IPO Validates Investor Interest in Cancer Stem Cell Approach |

| # | Date | Writer/ Publisher | Pseudonym | Title |
|---|---|---|---|---|
| 8 | 1/31/2012 | Cassano | VFC's Stock House | ImmunoCellular: Pipeline Potential and Institutional Interest Fuel Rebound |
| 9 | 2/2/2012 | Cassano | VFC's Stock House | 5 Pharmaceuticals On The Move |
| 10 | 2/6/2012 | Cassano | VFC's Stock House | Stocks to Watch Week of Feb. 6 |
| 11 | 2/8/2012 | Writer 2 | N/A | ImmunoCellular and Cancer Treatment's Next Frontier |
| 12 | 2/14/2012 | Cassano | VFC's Stock House | Weekly Stock Watch: Feb. 13 Edition |
| 13 | 2/14/2012 | Cassano | VFC's Stock House | Stock Watch: Immunocellular's Push Toward Two Dollars |
| 14 | 2/15/2012 | Cassano | VFC's Stock House | Immunocellular Again Pushing to $2 |
| 15 | 2/16/2012 | Nichols | N/A | 10 Biotech Stocks with Big Potential Upside in 2012: Part III |
| 16 | 2/21/2012 | Writer 2 | N/A | A Roadmap for Immunotherapy Success in Oncology |
| 17 | 2/22/2012 | Nichols | N/A | Buy Biotech in Phase [2] for the Best Upside |
| 18 | 3/1/2012 | Nichols | N/A | Dendreon's Woes Mask the Exciting Opportunities in Immunotherapy Companies |
| 19 | 3/4/2012 | Cassano | VFC's Stock House | Weekly Stock Watch: Feb 27 – March 2 |
| 20 | 3/5/2012 | Cassano | VFC's Stock House | Immunocellular Therapeutics: Pending Catalysts Could Spark Share Price Run |
| 21 | 3/6/2012 | Ramey | Chemistfrog | Big Pharma's Growing Appetite for Cancer Stem Cell Biotechs |
| 22 | 3/7/2012 | Cassano | VFC's Stock House | Immunocellular Touches $3 on Continued Speculation |
| 23 | 3/13/2012 | Cassano | VFC's Stock House | Weekly Stock Watch: March 12-16 |
| 24 | 3/13/2012 | Nichols | N/A | Upgrades Lead to Optimism in Cancer Stem Cell Therapy |
| 25 | 3/19/2012 | Lidingo | A. John Hodge | Small Cap Biotech Stocks Trading Higher |
| 26 | 3/21/2012 | Cassano | VFC's Stock House | Stocks to Watch: Week of March 19-23 |

| # | Date | Writer/ Publisher | Pseudonym | Title |
|---|---|---|---|---|
| 27 | 3/22/2012 | Nichols | N/A | Immunocellular Therapeutics Patent Acquisition Paradigm Shift |
| 28 | 3/26/2012 | Cassano | VFC's Stock House | Immunocellular Therapeutics: Cementing Its Place as a Major Player in Cancer Immunotherapy |
| 29 | 3/26/2012 | Cassano | VFC's Stock House | Stocks to Watch: Week of March 26-30 |
| 30 | 3/27/2012 | Cassano | VFC's Stock House | Weekly Stock Watch: March 26-20 [sic] |
| 31 | 3/28/2012 | Ramey | Chemistfrog | ImmunoCellular's Intellectual Property Steadily Increases |
| 32 | 3/28/2012 | Ramey | Chemistfrog | ImmunoCellular Therapeutics' Growing Intellectional Property Garnering Attention |
| 33 | 4/9/2012 | Cassano | VFC's Stock House | Weekly Stock Watch: April 9-13 |
| 34 | 4/10/2012 | Nichols | N/A | Breaking the Mold of Oncology Drug Development |
| 35 | 4/11/2012 | Cassano | VFC's Stock House | Immunocellular Therapeutics May Be Immune to a Broad Market Downturn |
| 36 | 4/12/2012 | Nichols | N/A | Which Q1 Biotech Movers Can Build off Momentum? Part II |
| 37 | 4/16/2012 | Nichols | N/A | Successfully Profiting from Developmental Biotech |
| 38 | 4/19/2012 | Cassano | VFC's Stock House | Stocks to Watch Mid-Week: April 18 |
| 39 | 4/19/2012 | Writer 2 | N/A | Why the Markets Continue to Coalesce Around New Approaches to Treating Cancer |
| 40 | 4/23/2012 | Cassano | VFC's Stock House | Weekly Stock Watch: April 23-27 |
| 41 | 4/24/2012 | Ramey | Chemistfrog | Multiple Antigen Targeting Could Mean a Multiple Marketing for These Immunotherapy Drugs |
| 42 | 4/25/2012 | Ramey | Chemistfrog | Multiple Antigen Targeting Could Indicate Big Potential for Immunotherapy Drugs |
| 43 | 4/29/2012 | Cassano | VFC's Stock House | Weekly Stock Watch: April 30-May 4 |

| # | Date | Writer/ Publisher | Pseudonym | Title |
|---|---|---|---|---|
| 44 | 4/30/2012 | Nichols | N/A | ImmunoCellular Therapeutics and the Benefits of a Large Exchange |

168. 21 of the 65 articles concerning IMUC were published during the Class Period (the IMUC Articles):

| # | Date | Writer/ Publisher | Pseudonym | Title |
|---|---|---|---|---|
| 1 | 5/1/2012 | Cassano | VFC's Stock House | Immunocellular Therapeutics: Any Pullback May Mean Opportunity |
| 2 | 5/2/2012 | Lidingo | The Swiss Trader | Finding an Oncology Player That Will Change the Rules of the Game |
| 3 | 5/7/2012 | Cassano | VFC's Stock House | Stocks to Watch: Week of May 7, 2012 |
| 4 | 5/10/2012 | Nichols | N/A | Pre-ASCO Interview with ImmunoCellular Therapeutics CEO Dr. Singh |
| 5 | 5/18/2012 | Lidingo | The Swiss Trader | ASCO 2012 Abstracts: 4 Hopeful Overachievers |
| 6 | 5/21/2012 | Lidingo (Nichols) | A. John Hodge | Interest Growing in Cancer Stem Cell Biotechs |
| 7 | 5/29/2012 | Nichols | N/A | ImmunoCellular Therapeutics' Uplisting to NYSE Could Immediately Open Many Doors |
| 8 | 6/1/2012 | Ramey | Chemistfrog | ImmunoCellular Therapeutics ICT-107 To Impress at ASCO 2012 |
| 9 | 6/4/2012 | Nichols | N/A | 5 Biotech Stocks that Could Be Included in the Russell 2000 |
| 10 | 6/11/2012 | Nichols | N/A | Russell Index Additions to Create Upside While Shares are Acquired in Open Market |
| 11 | 6/13/2012 | Ramey | Chemistfrog | Dendreon: Room for Improvement |
| 12 | 6/18/2012 | Lidingo | The Swiss Trader | Immunotherapy Comes of Age at ASCO 2012 |
| 13 | 6/27/2012 | Lidingo | A. John Hodge | ImmunoCellular: Cancer is Smart, But Could an Experimental Cancer Vaccine Be Smarter? |
| 14 | 7/4/2012 | Ramey | Chemistfrog | Dendritic Cell Evolution: Investment Potential |

| # | Date | Writer/ Publisher | Pseudonym | Title |
|---|---|---|---|---|
| 15 | 7/11/2012 | Ramey | Chemistfrog | Intellectual Property of a Biotech: An Analysis |
| 16 | 7/17/2012 | Lidingo (Nichols) | The Swiss Trader | 3 Innovative Cancer Treatments… But Which Is the Best Bet? |
| 17 | 7/19/2012 | Nichols | N/A | New Legislation Speeds up FDA Approval Process for Immunocellular Therapeutics and Other Innovating Therapies |
| 18 | 7/23/2012 | Nichols | N/A | ImmunoCellular Therapeutics: Explaining the Benefits of a Multiple Antigen Targeting Approach |
| 19 | 7/26/2012 | Lidingo | Amy Baldwin | 5 Momentum Stocks With Pullbacks That Could Be Your Opportunity |
| 20 | 8/8/2012 | French | Cris Frangold | 3 Diverse Investment Grade Pharmaceuticals to Consider Today |
| 21 | 8/15/2012 | Nichols | N/A | ICT-107 Into Perspective Part 1 |

169. None of the 65 articles contained the required disclosure concerning the compensation received by the writers, and were materially false and misleading for the reasons stated in ¶¶177-78. This lack of disclosure was purposeful and orchestrated by the Scheme Defendants, as evidenced by communications prior to and throughout the Class Period. Singh, Lavos, and IMUC gave instructions and orders that no disclosure of paid compensation could be made, and the Lidingo Defendants effected those orders.

170. From November 8, 2011 (the day the first IMUC-controlled Lidingo article about IMUC was published) to April 30, 2012 (the last trading day prior to the commencement of the Class Period), IMUC's stock price increased by 81%, from $1.43 to $2.60, and from November 8, 2011 to August 15, 2012 (the day the last IMUC-controlled Lidingo article about IMUC was published), IMUC's stock price more than doubled, from $1.43 per share to $3.02 per share.

**11. <u>The IMUC Articles Were Timed to Amplify Good News and Mitigate Bad News</u>**

171. As alleged herein, the purpose of the Class Period Articles was to effect the stock price of IMUC, both to artificially inflate the price to piggyback on good news by IMUC or to mitigate downside when IMUC or industry reported less than stellar results.

172. Such calculated maneuvering is evidenced at several points throughout the Class Period where a related event can be directly tied to the release of a promotional article.

173. For example, after the market closed on May 7, 2012, Dendreon Corp. ("Dendreon"), a pharmaceutical company which then had an FDA-approved dendritic cell vaccine for the treatment of prostate cancer, announced a reported loss despite modest growth in sales of its Provenge product. Recognizing that investors interested in Dendreon would be seeking out information related to that company in light of its earnings release, IMUC and Singh arranged for Cassano to include in his May 7, 2012 "Stocks to Watch: Week of May 7, 2012" article published on Seeking Alpha a blurb extolling the buying opportunity presented by IMUC: "With numerous catalysts still pending this year, any pullback could mean a nice buying opportunity, as I discussed last week."

174. The strategic maneuver was clear – to ride the wave of Dendreon's news release to either: (a) capitalize on positive Dendreon results to capture investors now interested in the viability of immunotherapies and out to find the "next" Dendreon; or (b) present a viable buying alternative to Dendreon on the basis of the differences in the companies, which the Class Period Articles would note time and again. *See, e.g.*,

Hodge, John A., "Interest Growing in Cancer Stem Cell Biotechs", May 21, 2012, Seeking Alpha (comparing ICT-107 to Dendreon's Provenge for the purpose of making IMUC look multiple times better since it attacked multiple antigens compared to Provenge's singular antigen).

175. On other occasions, IMUC and Singh scrambled to inject further good news into the market, hoping to double-dip on a positive occurrence so as to further drive the price of the stock up. For example, prior to the market opening on May 25, 2012, IMUC announced that it had received approval for listing on the NYSE Market, with trading expected to commence on May 30, 2012. The news sent the Company's stock price up approximately 8% by close of trading on May 25, 2012.

176. Seeing the opportunity to gain further traction with investors prior to the uplisting, at approximately 3:00 a.m. on Tuesday May 29, 2012 (the first trading day of the week following the Memorial Day holiday), Nichols published an article on Seeking Alpha exalting the importance of the uplisting to IMUC's future and the expectation that it would now be able to capitalize on institutional investor interest in IMUC. The effect was two-fold as it brought in interest from those individuals who may have missed the Friday-before-a-holiday press release by IMUC, while also effectively hyping IMUC in advance of its debut on the NYSE Market – encouraging investors to get in before the institutional investors who could not previously acquire IMUC sent the price upwards. In the end, the stratagem worked, causing the stock price to increase an additional 9% by close of trading on May 29, 2012.

**E. Materially False and Misleading Statements and Omissions in the Articles**

**1. All of the IMUC Articles Were Materially False and Misleading**

177. Each of the IMUC Articles were materially false and misleading, and were known by the Scheme Defendants and the IMUC Writers to be so at the time they were disseminated to the market, because the Scheme Defendants and the IMUC Writers made affirmative false and misleading misstatements or failed to disclose facts necessary to make the statements made in the IMUC Articles not materially false and misleading.

178. The IMUC Articles failed to disclose, or affirmatively misstated, that:

a. The writers and publishers of the IMUC Articles were paid to tout IMUC's performance and future prospects, often with the use of an alias;

b. Who the true authors and makers of the statements in the IMUC Articles were. Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants) directly reviewed, edited and approved every IMUC Article prior to its publication, editing and controlling the content that would ultimately be released to the market; and

c. The IMUC Articles were part of an illicit stock promotion scheme.

179. Further, the IMUC Articles falsely interjected rumors and gossip into the market by representing that IMUC may receive acquisition interests from big pharmaceutical companies or may conduct joint ventures with other companies, and thereby, caused an artificial inflation in the price of IMUC common stock. By way

of example, on January 30 and 31, 2012, Cassano published two articles on Seeking Alpha promoting IMUC as an "attractive buyout candidate."

180. On Cassano's two articles promoting IMUC as an "attractive buyout candidate," IMUC shares gained over 21% on January 30 and 31, 2012, on combined volume of more than 1.3 million shares traded.

181. The IMUC Articles also misrepresented the success of the Phase 1 trials and the prospects for success of the ongoing Phase 2 trials.

182. The articles written prior to the Class Period were similarly materially false and misleading. See, *e.g.*, Nichols article published on Seeking Alpha dated February 6, 2012 (the "initial results from [IMUC]'s phase 1 trial of ICT-107 were incredible").

183. Nichols, and the other IMUC Writers, only expressed positive opinions concerning the Phase 1 test and Phase 2 potential because they were being paid to write positive commentary on IMUC, and lacked an objective belief as to the truth of their statements. They failed to conduct adequate due diligence necessary to have a reasonable belief in the truth of their statements. Among other things, the writers of the IMUC Articles published subsequent to July 31, 2012 did not consider in their articles the Phase 1 test results that had been published on July 31, 2012, including that the 16 patients studied had a genetic predisposition in favor of survival and that there was no proven association between an immune response and survival. No reasonable person could have objectively held the opinions expressed by the Nichols and the IMUC Writers. Significantly, they failed to disclose that they were being paid to write the IMUC Articles and only wrote the IMUC Articles with a bias towards efficacy because they were being paid. That Nichols and the IMUC Writers

were being paid for the study and had a bias towards concluding that the Phase 1 study demonstrated proof of efficacy made their statements materially false and misleading and was a material fact that a reasonable investor would have wanted to know.

184. Certain other IMUC Articles were materially false and misleading for the reasons stated below. Disclosure of these facts was necessary to make the above false statements not materially false and misleading.

185. As a result, the materially false and misleading statements identified herein materially altered the total mix of information available to stockholders.

**2. False and Misleading Statements in IMUC Articles Published or Written by Nichols**

**a) May 10, 2012 Article**

186. On May 10, 2012, during the day, Nichols, using his own name, published an article on Seeking Alpha titled "Pre-ASCO Interview with ImmunoCellular Therapeutics CEO Dr. Singh."

187. Singh represented during the interview that "[i]f the Phase [2] data is even half as good as Phase [1], this would create a potential huge opportunity for partnering."

188. Also, in the interview, Nichols asked Singh "for such a small company, to what do you attribute your success?" Singh responded:

> This culture plays a huge role in why we have been able to do so much with so little. When I joined IMUC as the first employee back in 2008, the market cap was only $6 million. Today it is close to $100 million, and to a large extent I attribute it to this fantastic management

> team that has executed at every step even if it meant working 24/7. These guys are ALL IN!

189. These statements were materially false and misleading because Singh failed to disclose, as known by Singh, the increase in market cap was due to the illegal stock promotion scheme that he organized and oversaw, not due to IMUC's management team. Singh also knew and failed to disclose that the Phase 1 data was not "good" for the reasons stated in ¶¶160-62, and that if Phase 2 was only "half as good as Phase 1, " Phase 2 would be a failure and would not "create a potential huge opportunity for partnering."

190. Disclosure of these facts was necessary to make the statements made in the article not misleading. As a result, the article was false and misleading when made.

191. As a result, IMUC shares gained 12% on May 10 and 11, 2012, on combined volume of 651,204 shares traded.

**b) <u>May 29, 2012 Article</u>**

192. On Tuesday, May 29, 2012, before the market opened and one day before the listing of IMUC on the NYSE Market, Nichols published an article under his own name on Seeking Alpha titled, "ImmunoCellular Therapeutics' Uplisting to NYSE Could Immediately Open Many Doors."

193. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Nichols, highlighted the Company's recent uplisting:

> [IMUC] has great clinical data to support a technology that is seemingly years ahead of all others in the space. However, until Friday, the company carried the burden of being an OTC stock, which

> restricts the company from certain investors and even disallows some from seeing its true potential due to the stigma that's attached to companies that trade on the OTC.

194. Nichols' pre-Class Period April 30, 2012 article incorporated into the May 29, 2012 article by reference, stated that one of the stigma's faced by OTC stocks was the fact that OTC stocks are viewed as riskier investments to own, as they are not mandated by the same rules and regulations to which a company on a larger exchange would have to adhere.

195. Throughout the Class Period, IMUC (through Singh) oversaw numerous IMUC Articles such as the May 29, 2012 article that made reference to a then-forthcoming inflection point for IMUC: its shedding of the stigma associated with OTC stocks and its uplisting to the NYSE Market – a purported sign that the Company was above any stock price related shenanigans or fraud often associated with penny stocks on the OTC market and lending further credibility to IMUC as a legitimate business preparing for a rise through the pharmaceutical industry.

196. Yet that burden had supposedly been lifted from the Company with the May 2012 announcement that IMUC stock would be uplisted to the NYSE Market. The irony of the May 29th article, however, was that the very medium employed by the Company to claim that the uplisting would separate it from those "riskier investments" and escape the stigma associated with OTC-traded stocks was itself part of an illicit stock promotion scheme that violated the federal securities laws.

197. These statements were materially false and misleading because of the failure to disclose the fact, known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), that the article was part of an illicit stock promotion

scheme. Any claim of IMUC shedding the stigma associated with OTC stocks was directly belied by the fact that the very article was part of an illicit stock promotion scheme orchestrated, in part, by IMUC in violation of the federal securities laws.

198. Moreover, the Phase 1 clinical data was not "great" and did not evidence that IMUC was "seemingly years ahead of all others in the space."

199. Disclosure of these facts was necessary to make the statements made in the article not misleading. As a result, the article was false and misleading when made.

200. Upon publication of this article, IMUC common stock gained nearly 9%, on more than 1.1 million shares traded, to close at $3.32 per share on May 29, 2012, compared to gains 1.9% and 0.1% for Agenus[10] and NBI;[11] and unchanged for Cytokinetics.[12]

c) **<u>June 4, 2012 Article</u>**

201. On June 4, 2012, before the market opened, Nichols published an article under his own name on Seeking Alpha titled, "5 Biotech Stocks That Could Be Included in the Russell 2000."

---

[10] "Agenus" refers to Agenus Inc., a company identified by IMUC in its proxy statement filed with the SEC on Form 14A on April 30, 2014 as a "peer company."

[11] "Cytokinetic" refers to Cytokinetics Inc., a company identified by IMUC in its proxy statement filed with the SEC on Form 14A on April 30, 2014 as a "peer company."

[12] "NBI" refers to the Nasdaq Biotechnology Index, a market weighted index that measures the performance of all NASDAQ stocks in the biotechnology sector.

202. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Nichols, made material misstatements and omissions about the reasoning for IMUC's stock price "momentum."

> It has been an eventful year for IMUC. The stock began the year with a market cap of $50 million, but now trades with a market cap of $147 million as of May 31st. The reason for its momentum has been the early results from its seemingly transcendent vaccine [ICT-107] that treats glioblastoma, one of the most deadly forms of cancer.

203. This statement was materially false and misleading when made because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), IMUC's yearly stock momentum to that point was not attributable to any early results from ICT-107, but instead was the result of the illegal stock promotion scheme orchestrated and overseen by IMUC, through Singh – the very same promotion this article was a part of, unbeknownst to the investing public.

204. Additionally, the statements were materially false and misleading because Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), did not and could not hold the opinions that the reason for the momentum was the "seemingly transcendent vaccine." The opinion was untrue and not supported by the underlying facts. The results of the Phase 1 trial were not successful and not transcendent, for the reasons stated above at ¶¶160-62.

**d) <u>June 27, 2012 Article</u>**

205. On June 27, 2012, an author named A. John Hodge published an article on Seeking Alpha titled, "ImmunoCellular: Cancer is Smart, But Could An

Experimental Cancer Vaccine Be Smarter?" A. John Hodge was one of the pseudonyms that Lidingo used when it published articles written by Nichols.

206. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Nichols, stated:

> Having recently listed on the NYSE, there can be no doubt that a lot more smart money will be flowing into this company's stock. If value-oriented investors are smart, they'll beat them to it. This is a company with a valuation of under $150 million – a true hidden gem despite YTD gains larger than 100%. As many investors often say, "volume precedes price." The uplisting to the NYSE gives the company exposure to a different group of retail investors as well as institutional investors. Volume cometh and could precede additional gains? Only time will tell what this company, its lead product and its common stock will do in 2012 and beyond.

207. This statement was materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), the reason IMUC's common stock, market cap, and trading volume had increased was due to the illicit and illegal stock promotion scheme. Further, the stock was not a "hidden gem" in that the Phase 1 results failed to demonstrate any correlation between immune response and survival benefit.

**e) <u>July 19, 2012 Article</u>**

208. On July 19, 2012, before the market opened, Nichols published an article under his own name on Seeking Alpha titled, "New Legislation Speeds Up

FDA Approval Process for ImmunoCellular Therapeutics And Other Innovating Therapies."

209. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Nichols, attributed the Company's purported 135% return in 2012 to ICT-107:

> The reason for the company's momentum is its lead candidate, ICT-107, that treats glioblastoma, which is among the most deadly forms of cancer.

210. The above statement was materially false and misleading when made because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), it was not ICT-107 that was driving the Company's "momentum" during 2012 to that point, but instead IMUC's use of an illicit and undisclosed stock promotion scheme.

211. Additionally, the statements were materially false and misleading because Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), did not and could not hold the opinions that the reason for IMUC's momentum was ICT-107, as they could not hold that opinions as the opinion was untrue and not supported by the underlying facts. The results of the Phase 1 trial were tepid, for the reasons stated above at ¶¶160-62.

**f) <u>July 23, 2012 Article</u>**

212. On July 23, 2012, before the market opened, Nichols published under his own name an article on Seeking Alpha titled, "ImmunoCellular Therapeutics: Explaining the Benefits of a Multiple Antigen Targeting Approach."

213. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Nichols, stated IMUC

> Has become one of the better performing biotechnology stocks of 2012, with a YTD gain of 165% thanks to its intellectual property acquisitions, buy-out rumors, and study results from its immunotherapy vaccine ICT-107 for the treatment of glioblastoma. And the reason that other investors and I are so optimistic about the future of this vaccine is because of the potential for a cancer therapy with a multiple antigen targeting approach combined with the focus on cancer stem cells (CSCs).

214. These statements were materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), the increase in IMUC's stock price was not due to the enumerated reasons, but due to the illicit stock promotion scheme overseen by IMUC and Singh. Further, the reason for excitement was not the potential cancer therapy, but the fact they he was being paid to promote IMUC and ICT-107.

215. The article attempted to portray ICT-107's approval as a certainty while evidencing the Company's continued drive to improve in the immunotherapy space:

> ImmunoCellular Therapeutics hasn't stopped in its goal to create the best possible vaccine. The company could easily be satisfied, finish clinical trials, and if the results are even 25% as good as early trials then it would be awarded an approval and be considered the best treatment in the market.

216. The above statements were materially false and misleading when made because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), had no reasonable basis to believe that ICT-107 could surely gain FDA approval based on the limited Phase 1 data it maintained that only exhibited tolerability among a targeted demographic; with no clinical data demonstrating the actual efficacy of ICT-107; and Phase 2 not complete.

**g) <u>August 15, 2012 Article</u>**

217. On August 15, 2012, after the market closed, one day after IMUC's filing of the quarterly report for the second quarter of 2012 on Form 10-Q, Nichols published under his own name an article titled, "ICT-107 Into Perspective: Part 1."

218. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Nichols, stated with respect to IMUC that "IMUC has had an exciting year so far;…The Company's valuation has mainly been drive by data from its Phase 1 trial in patients with [GBM]."

219. The above statement was materially false and misleading when made because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), IMUC's valuation had not been driven by clinical data from the Phase 1 trial to that point, but instead by the illicit stock promotion scheme overseen by IMUC.

220. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Nichols, stated with respect to ICT-107's Phase 2 trial that there was "no reason to believe that [the ICT-107 Phase 2 trial] won't at least have 10 patients from 100 achieve similar results, or show significant improvements

over [standard of care], and if so, it would be considered the most effective vaccine in the market."

221. The above statement was materially false and misleading when made because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), at that point in time, there *was* reason to believe that the Phase 2 trial would *not* achieve significant improvements over the standard of care given that the entire set of clinical data to that point (the Phase 1 results) was reliant on a 16 patient sample that did not exhibit substantial evidence of efficacy.

222. Finally, in the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Nichols, attempted to paint a bright future for the ICT-107 Phase 2 trial by convincing investors that any level of success would likely propel the drug to FDA approval:

> Sometimes a clinical stage biotechnology company will cherry pick data and use patients with early stages of a disease to make results appear more encouraging. However, with GBM, it doesn't matter if it's 10, 20, 30, or 40 patients, the disease is extremely aggressive, and must surpass three other stages of brain cancer in order to be labeled as GBM, which is the most deadly form of brain cancer, and it is a disease where life simply ends. And although ICT-107's Phase 2 results will not likely be as impressive as in Phase 1, investors should remember that it doesn't need to be as effective in order to eventually receive an approval from the FDA. Just look at the data for currently approved drugs, and you will see just how much room for error ICT-107 has in this Phase 2 trial. If results from the Phase 2 trial are as

good as the Phase 1 trial, I believe the approval of ICT-107 could be much sooner than we anticipate.

223. These statements were materially false and misleading when made because, as known to IMUC (or in the alternative, the Lidingo Defendants), they had no basis in reality, as neither IMUC nor Lidingo Defendants could predict the likelihood of FDA approval based on Phase 2 results for ICT-107, thus the statements were simply self-serving window-dressing bought and paid for by IMUC in an effort to provide a buffer should Phase 2 results come back less than stellar (which they ultimately did). Nichols expressed his opinion only because he was being paid, and he had no objective reason to believe that "[i]f results from the Phase 2 trial are as good as the Phase 1 trial, I believe the approval of ICT-107 could be much sooner than we anticipate."

224. Nichols made a similar statement in an article published on Seeking Alpha dated August 14, 2012: "if [Phase 2] results are even a fraction of Phase 1 results, then ICT-107 will be on the fast-track to approval." This statement is materially false and misleading for the reasons stated in ¶223.

**h) <u>August 20, 2012 Article</u>**

225. On August 20, 2012, after the market closed, the same day IMUC announced Singh's "resignation," Nichols published under his own name an article titled "ImmunoCellular CEO Steps Down But Leaves Company Well Positioned."

226. This article was not alleged to have been part of the paid stock promotion scheme by the SEC. However, given the timing of this article on the same day IMUC announced Singh's departure, and the subject matter, there is a strong

inference that the article was directed by Singh, Lavos, and/or the Lidingo Defendants.

227. In the article, Nichols sought to temper the impact of Singh's resignation/termination by emphasizing the "success" of the Phase 1 data.

> Dr. Singh has been critical to the success of IMUC in terms of building awareness around the company, raising capital and executing on its business plan. During his tenure, since February 2008, the company has gone from a $7 million market capitalization to over $100 million today. However, one needs to make a clear distinction that IMUC's success has been primarily driven by the clinical data and its product concept to target roots of the cancer. As the existing clinical geniuses and inventors at IMUC will continue to lead the execution of their clinical development, the value associated with its product platform and its lead product remains unchanged.
>
> ***
>
> The clinical data, low costs to manufacture ICT-107, and its undervalued price tag are second to none in the biotechnology arena. However, the loss of Dr. Singh could create short-term panic among shareholders. Unfortunately, this is the nature of a clinical stage biotechnology company, we simply don't know how it will react to news. There is always some event or headline that causes massive movement in its stock. Earlier this year, it was clinical data, uplisting to the NYSE, being added to the Russell indexes, and the acquisition of intellectual property that drove the stock higher. But today,

> regardless of the reasons why, investors will speculate as to why Dr. Singh is stepping down, and will think the worst case scenario - that the vaccine doesn't work, despite the fact that it was just showcased on CNN with Dr. Sanjay Gupta, and just began its Phase 2 study, making it impossible to have any clear picture to the success of the vaccine in this larger trial.
>
> ***
>
> The only thing that drives the valuation of a clinical stage biotech company is rumors and speculation. For example, anytime something that could be meaningful to a candidate's chances of approval is announced, the stock will go higher, or visa versa. It doesn't always mean that the market's reaction is correct. In fact, the reaction is often wrong, but this is the nature of a biotechnology stock.

228. This statement was materially false and misleading because failed to state that IMUC's market capitalization had increased due to the paid promotion scheme by the Scheme Defendants, which was how Singh "built awareness around" IMUC. Nichols was aware of this scheme because, as a Scheme Defendant, he was a participant in it.

229. In fact, Nichols acknowledged in his August 20, 2012 article that "rumors and speculation" that he and other paid authors had introduced into the market had "driven" IMUC's valuation.

230. In fact, Nichols repeated the false statement in his August 20, 2012 article that "IMUC's success has been primarily driven by the clinical data…."

231. Nichols also stated in the article that:

> This is a significant development, and at this point there is no way of knowing why Dr. Singh has decided to step down. Some will immediately speculate that Dr. Singh is stepping down because the vaccine doesn't work. However, there has already been well documented proof that the vaccine does work, and it is still way too early to have any indication of the results from its Phase 2 trial.
>
> ***
>
> The drug has still shown incredible survival with 8 of the original 16 patients still alive after four years with treatment, and 6 of the 8 patients are showing no signs of disease progression.
>
> ***
>
> when compared to other new innovative companies such as Verastem (NASDAQ:VSTM) and OncoMed, [ICT-107] is light years ahead of both in the approval process and has legitimate clinical data to back its performance despite being valued much less than either VSTM or OncoMed.
>
> ***
>
> with IMUC, it's a definite head-scratcher as to why Dr. Singh would leave such a promising company. This is definitely a development in which I will seek answers and will probe until someone slips and provides some reason as to why Dr. Singh would leave.

232. This statement was materially false and misleading for a number of reasons. First, Nichols, as a participant in the stock promotion scheme, should have known, or was reckless in not knowing, that Singh left IMUC because of his

involvement in the stock promotion scheme. Second, there was no "documented proof" that ICT-107 "does work" or "legitimate clinical data to back its performance." In fact, as alleged above, the results of the Phase 1 study were tepid at best.

233. Nichols also referenced his August 15, 2012 article, stating that:

> In an article I wrote last week, I compared ICT- 107 with currently approved treatments for glioblastoma, which include Merck's (NYSE:MRK) Temodar and Genentech's (OTCQX:RHHBY) Avastin, and showed an incredibly wide margin of error on behalf of ICT-107 because it's far superior to current treatments. For this reason, it needs its Phase 2 results to yield only a small percentage of its Phase 1 success results, which will lead to ICT-107 being approved (and will almost certainly bypass Phase 3 testing).
>
> ***
>
> And if results are even a fraction of Phase 1 data, then ICT-107 will be on the fast-track to approval and treating patients with this very deadly disease (glioblastoma multiforme)

234. These statements were materially false and misleading for the reasons stated in ¶223.

**i) <u>Nichols's Scienter</u>**

235. To the extent Nichols made statements, he made them with knowledge of their falsity or with recklessness.

236. Nichols knew that disclosure of his paid compensation was required, either due to the terms of service on Seeking Alpha or when he was asked, when

publishing an article on Seeking Alpha, to affirmatively select whether he had received paid compensation.

237. During the Class Period, Nichols published 9 articles about IMUC where Lidingo was the promoter, either under his own name or under a pseudonym, on the website Seeking Alpha in which he omitted any reference to the receipt of payment and made the material misrepresentation that he was not receiving compensation for the article.

238. Nichols further financially benefited from a pump-and-dump through his own trading account, acquiring 1,100 shares of IMUC on March 22, 2012 (the same day he published an article on Seeking Alpha in which he noted “I believe that the company’s decision to focus on acquiring rights to these antigens is its best move at the moment, and could have several long lasting effects that we are yet to realize.”) before unloading 1,090 of the shares the following day for a quick profit of approximately $500. SEC Amended Complaint, ¶62. Unsurprisingly, while the article did mention Nichols’ holding in IMUC, it declined to make any mention of his intention to sell 99% of those shares the next day. Also on March 21, 2012, Nichols purchased 1,000 shares of another issuer that was the subject of an article(s) he published that day, and sold 990 shares the following day for a $1,000 profit. *Id.*, ¶61.

239. These allegations support a strong inference of Nichols’ scienter, as they show that Nichols: (i) knew Lidingo paid writers, as he himself was in receipt of payments; (ii) knew Lidingo published articles on Seeking Alpha, which required disclosure of paid compensation or prohibited paid compensation; and (iii) knew that the IMUC Articles did not contain the required pay disclaimers or affirmatively

misstated that no compensation had been received, at the direction of Singh, Lavos, IMUC, Bjorlin, Lidingo, and Hodge.

240. In addition, Nichols did not have the scientific background necessary to properly analyze and discuss the Phase 1 trial results or the potential success of the Phase 2 trial, making the statements he made concerning these subjects reckless or knowingly false.

241. Further, Nichols' use of pseudonyms to further the promotional scheme supports a strong inference that his participation in any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper and required clandestine efforts to skirt detection by the investing public.

### 3. False and Misleading Statements in IMUC Articles Published or Written by Lidingo

#### a) June 18, 2012 Article

242. On June 18, 2012, after the market closed, Lidingo, utilizing the pseudonym The Swiss Trader, published an article on Seeking Alpha titled, "Immunotherapy Comes of Age At ASCO 2012."

243. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Lidingo, touted expected sales of ICT-107 from purported analyst projections: "Analysts anticipate peak sales of ICT-107 would be over $500 million once obtaining marketing approval for newly diagnosed GBM alone. However, with its multi-antigen approach in fighting cancer, ICT-107's GBM success could be the first of many as the multiple antigens targeted are found on many types of cancer."

244. These statements were materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), they misrepresented the commercialization prospects of ICT-107 despite the fact that Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants) had no basis or support to draw any conclusions concerning the potential success or outcome of Phase 2 trials.

245. After publication of the article, IMUC common stock gained 3%, on volume of 535,535 shares traded, to close at $3.71 per share on June 19, 2012, compared to a decline of 5.9% for Cytokinetics; unchanged for Agenus; and a gain of 1.3% for NBI.

**b) <u>July 17, 2012 Article</u>**

246. On July 17, 2012, before the market opened, Lidingo using the pseudonym The Swiss Trader, published an article on Seeking Alpha titled "3 Innovative Cancer Treatments…But Which is the Best Bet?."

247. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Lidingo, stated:

> The company's [P]hase 2 vaccine, ICT-107, uses the body's own immune system to seek and destroy cancer cells in glioblastoma, one of the most deadly forms of cancer. The technology is often compared to Dendreon's (DNDN) Provenge. However, there are several differences that qualify it for this list of innovative cancer treatments. The therapy's largest difference is that it targets six antigens versus only one (like many clinical trials). The reason investors have been so excited is because the antigens that ICT-107 target are also highly

> expressed in other cancers, thus making it possible that ICT-107 could become a one treatment approach to fighting several different cancers. ImmunoCellular is much different from the other two companies on this list because its excitement is developing late. The company didn't begin trading with some massive valuation, but through positive results and the acquisitions of new intellectual property, the stock has developed a following.

248. The above statement was materially false and misleading when made because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), it was not positive results and the acquisitions of intellectual property, but the employing of an illicit and undisclosed stock promotion scheme that drove Company valuation and its development of a purported following.

249. The article concluded with a prediction of future approval for ICT-107, even upon achieving a portion of the purported "success" of Phase 1: "if ICT-107 results from its [P]hase 2 trial are even a fraction of its [P]hase 1 results, then you can rest assured that ICT-107 is on the fast-track for approval and will be warmly welcomed among the medical community."

250. These statements were materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), there was basis to state that ICT-107 would receive fast-track approval if the Phase 2 results were "even a fraction" of the Phase 1 results.

**c) <u>July 26, 2012 Article</u>**

251. On July 26, 2012, before the market opened, Amy Baldwin published an article on Seeking Alpha titled, "5 Momentum Stocks with Pullbacks That Could Be

Your Opportunity." Amy Baldwin was a pseudonym used by Lidingo to publish articles as part of the illicit scheme.

252. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Lidingo, stated:

> I believe, because of its potential, that the recent price action is nothing more than a healthy pullback, because if you look at the one-year chart, it appears to be following the same bullish trend that has led to its large YTD gains. Throughout April, and into early May, the stock fell from $3 to under $2.30 (which created fear among investors). Yet just as quickly as the stock fell, it recovered, and over the following three weeks the stock traded to new highs at $4.00; it is possible that we are simply seeing a continuation of this trend, and that this pullback will lead to new highs in the coming weeks, because after all there is strong support at $2.75, which means the price could be presenting the perfect opportunity.

253. This statement was materially false and misleading because the "recovery" of IMUC stock, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), was due to the illicit stock promotion scheme.

**d) <u>Lidingo's, Bjorlin's, and Hodge's Scienter</u>**

254. To the extent Lidingo, Bjorlin, and Hodge made statements, they made them with knowledge of their falsity or with recklessness.

255. Lidingo was the stock promotion firm at the center of the IMUC stock promotion scheme, facilitating the publication of 21 Class Period articles about IMUC that omitted any mention of the receipt of payment and affirmatively

misrepresented that no payment had been received from the article, despite the fact that Lidingo was providing compensation derived from its agreement with IMUC.

256. Through its agents, Bjorlin, Hodge, Nichols, Cassano, French, and Ramey, Lidingo engaged in a concerted effort to generate positive articles about IMUC in exchange for financial compensation, all the while forbidding the disclosure of any connection between the articles and the subject company through the direct efforts of Bjorlin, Hodge and Singh.

257. The scienter of Lidingo's employees and agents (including Bjorlin, Hodge, Nichols, Cassano, French and Ramey) is imputed to Lidingo under the doctrine of *respondeat superior* and common law principles of agency. Lidingo is liable for the acts of these defendants and their employees and agents under these common law principles.

258. Bjorlin was aware of the illicit stock promotion scheme, that disclosure of paid compensation was required, and that Lidingo and its paid writers were violating the terms of Seeking Alpha's disclosure policies. On September 17, 2013, a writer emailed Bjorlin expressing concern because Seeking Alpha had contacted him saying that they had obtained information that he was writing articles for payment. Bjorlin responded the same day, stating that the email was "a carbon copy of what several writers have gotten" and that Seeking Alpha was "simply fishing," following up the next day to instruct that same author to continue writing for Seeking Alpha. SEC Amended Complaint, ¶45. Bjorlin's cavalier response to the author's concern, as well as her admission of knowledge of similar letters received by other Lidingo authors, evidences a clear understanding of the policies related to disclosure of paid promotional articles and a calculated response to skirt those policies.

259. There is a strong inference of Bjorlin's scienter, because, among other things, Bjorlin: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha, which required disclosure of paid compensation or prohibited paid compensation; (iii) knew that the IMUC Articles did not contain the required disclosures, at the direction of her, Lidingo, Singh, Lavos, IMUC, and Hodge. Bjorlin also knew that the IMUC Articles misrepresented the Phase 1 test results and created a misleading impression that the Phase 1 test results were indicative of anticipated success of the Phase 2 results.

260. Further, Bjorlin's efforts to coordinate with Singh so as to hire only those writers that would not disclose paid compensation supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper, as Bjorlin would not have chastised and continuously insulted the writer who included a compensation disclosure in his published article nor would she have been so dismissive of any writer that wanted to comply with Seeking Alpha's policies.

261. Throughout the Class Period, Hodge was aware of the illicit stock promotion scheme and worked with Bjorlin and Singh to ensure that Lidingo's authors remained silent about the payment they were receiving for their published endorsements. For example, on April 16, 2013, Bjorlin emailed Singh about a potential author who Hodge voiced opposition to, feeling he was "no good because he 'advertises' he has a website that pays for writing." SEC Amended Complaint, ¶34.

262. In fact, Hodge was often the conduit between potential writers and Bjorlin and Singh, with Bjorlin reporting on an interaction between Hodge and one

such writer who "told [Hodge] on several occasions that he would disclose." The result was Singh directing that Lidingo not use the writer. SEC Amended Complaint, ¶35; *see* above at ¶112.

263. Hodge was also a known member of Lidingo's management team, conversing with representatives of other Lidingo issuer clients (through emails on which both defendants Bjorlin and Singh were copied) about, *inter alia*, strategies for publication release dates in order to get the most effective stock price bump (*e.g.* the January 18, 2013 email from Hodge to the CEO of NeoStem, Inc. ("NBS"), copying Bjorlin and Singh, in which Hodge informed her that Lidingo was delaying promotional efforts planned for the day because the market was closed the following Monday on the basis that that the promotion will "have much better results on Tuesday with emails and new article than on a Friday") and discussions about payments (*e.g.* the November 20, 2013 email from Hodge to Galena's CEO and CFO, copying Bjorlin regarding the receipt of outstanding Galena options owed to Lidingo, stating that "[p]lease understand that [Lidingo's] costs over the last 3+ months have exceeded the amount received, and that the equity stake is where [Lidingo] generates [its] income."). *Id.*, ¶54.

264. Further, Hodge regularly provided editorial comments to Lidingo's writers.

265. These allegations support a strong inference of Defendant Hodge's scienter as they show that Hodge: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha, which required disclosure of paid compensation or prohibited paid compensation; (iii) knew that the IMUC Articles did not contain the require disclosures, at the direction of him, Bjorlin, Lidingo, Singh, Lavos, and

IMUC. Further, Hodge's efforts to coordinate with Bjorlin and Singh so as to hire only those writers that would not disclose (going as far as to require a non-disclosure agreement), even in the face of SEC and Seeking Alpha policy concerns, supports a strong inference that any campaign conducted by Lidingo (including the one orchestrated on behalf of IMUC) was improper.

**4. <u>False and Misleading Statements in IMUC Articles Published or Written by Cassano</u>**

**a) <u>January 18, 2012 Article</u>**

266. On January 18, 2012 before the market opened, Cassano, using his pseudonym VFC's Stock House published an article on Seeking Alpha titled, "Another Revival Could Be In Store for ImmunoCellular Therapeutics" and represented, "Long IMUC." Cassano represented that ICT-107 is "a potentially ground-breaking immunotherapeutic treatment for glioblastoma" and it has "already proven to be very successful in Phase [1]" and should Phase 2 trial results "come with the similar success of the Phase [1] trials, there's little doubt that a new round of investor interest would come the way of IMUC." Cassano disseminated and added to the gossip the possibility that "big" pharmaceuticals are on "the prowl" for smaller pharmaceutical companies, and "IMUC could also benefit from the occasional buyout speculation that has been dominating the industry these days."

267. The above statements were materially false and misleading because, the article failed to disclose, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), that IMUC's stock price was not correlated to "a potential ground-breaking immunotherapeutic treatment for glioblastoma" or driven by any success of Phase 1 trials or potential success of Phase 2 trials, but instead driven by

the illegal stock promotion scheme, overseen by Singh. Similarly, ICT-107 had not "proven to be very successful in Phase 1."

**b) <u>May 1, 2012 Article</u>**

268. On May 1, 2012, during the day, Cassano, utilizing his pseudonym VFC's Stock House, published an article on Seeking Alpha titled, "Immunocellular Therapeutics: Any Pullback May Mean Opportunity."

269. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Cassano, materially misrepresented the Company's yearly stock movement to that point:

> Much of the fuel behind the fire that sparked this year's dramatic price run is due to the success demonstrated by the company's immunotherapeutic cancer-fighting technology that trains one's immune system to attack cancer cells at the stem, thereby eliminating – or at least greatly reducing – the threat that the cancer will grow and spread. This technology has been put to the test with ICT-107 in the treatment of glioblastoma, a very deadly form of brain cancer.
>
> ***
>
> Other solid developments on the stock side have also augmented the anticipation of the clinical results, such as the infusion of institutional interest earlier this year and a pending move to one of the larger trading exchanges that would add additional credibility to the company and attract a broader scope of investors.

270. These statements were materially false and misleading because the article failed to disclose, as known by IMUC, Singh, Lavos, and the Lidingo

Defendants, that the Company's "price run" was not driven by any success of ICT-107, "the infusion of institutional interest," or a pending uplisting, but instead by the very stock promotion scheme the article was a part of. In fact, the Phase 1 study had not been a success. Rather, five out of the ten patients studied lacked any immune response to ICT-107, and those five patients only "trended towards" a survival benefit as of 2009.

**c) Cassano's Scienter**

271. To the extent Cassano made statements, he made them with knowledge of their falsity or with recklessness.

272. Cassano's failure to include any adequate disclosure related to the pay he received for publishing the IMUC Articles was a deliberate choice made by Cassano, with input from other defendants and with knowledge that such disclosure was required. For example, in August 2011, Cassano emailed a non-party promoter working with Singh, asking "regarding disclosure for [the client] how do you want it." Singh responded, recommending that the article "be silent on any disclosure" -- a directive that Cassano took to heart, instead claiming that "VFC's Stock House has not been compensated to provide coverage" of the client. SEC Initial Complaint, ¶62.

273. In or around March 2012, Cassano began including a general disclosure on his Seeking Alpha profile, indicating that "VFC's Stock House has started taking compensation from third parties to research and cover certain companies that VFC believes have potential and also fit the profile of what readers of this website are looking for." *Id.*, ¶65. This purposely vague disclosure failed to identify the third

parties compensating Cassano and made no mention that these third parties were ultimately themselves being compensated by the issuers for whom he was writing.

274. Recognizing the insufficiency of such a disclosure, Cassano sought to expand the language employed, emailing Bjorlin on April 3, 2012 to advise that he would be "tightening up [his] compensation disclosures" to include the language "VFC's Stock House has received compensation from a third party, xxx, to provide research and coverage of xxx for a period of xxx month[s]." SEC Initial Complaint, ¶66; SEC Amended Complaint, ¶38. Along with the proposed language, Cassano asked Bjorlin to "let [him] know if this poses a problem" for Lidingo. SEC Initial Complaint, ¶66.

275. Bjorlin responded that same day, indicating that "[Lidingo] unfortunately cannot have the disclosure on there," to which Cassano responded by agreeing to "keep doing you guys without it," which he did throughout the Class Period as no IMUC Article published by Cassano contains a disclosure. SEC Amended Complaint, ¶38.

276. Bjorlin reiterated the non-disclosure mandate several months later when, on August 10, 2012, she emailed Cassano asking whether he would be interested in writing for three additional Lidingo clients and following up with a reminder that "[a]gain we can't have any disclosures." Cassano again assented to the requirement, agreeing that he "won't use disclosure with u guys."

277. In an article Cassano dated January 31, 2012, Cassano wrote, "Another item to consider is that should ICT-107's Phase II results look as encouraging as the results from earlier studies, then a much larger market cap would be justified –based on future potential and in comparison with other Phase III companies in the

sector…." This statement was materially false and misleading when made because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), IMUC's stock price increase was not based on Phase II results looking "as encouraging as the results" from Phase 1 results, the hopefulness of investors for interim Phase 2 results for ICT-107, but instead was the result of a concerted effort to pump the stock price through the use of an illegal stock promotion scheme overseen by Singh and IMUC.

278. In addition, Cassano did not have the scientific background necessary to properly analyze and discuss the Phase 1 trial results or the potential success of the Phase 2 trial, making the statements he made concerning these subjects reckless or knowingly false.

279. These allegations support a strong inference of Cassano's scienter in that they show that Cassano: (i) knew Lidingo paid writers, as he himself was in receipt of payments; (ii) knew Lidingo published articles on Seeking Alpha, which required disclosure of paid compensation or prohibited paid compensation; and (iii) knew that the IMUC Articles he wrote did not contain the required paid disclaimers or affirmatively misstated that no compensation had been received, at the direction of the Scheme Defendants. Further, Cassano's efforts to coordinate with Bjorlin so as to eliminate any compensation disclosure for any article written on behalf of Lidingo supports a strong inference that any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper and required clandestine efforts to skirt detection by the investing public.

**5. <u>False and Misleading Statements in IMUC Articles Published or Written by French</u>**

**a) <u>August 8, 2012 Article</u>**

280. On August 8, 2012, during the trading day, an article was published by Cris Frangold, a pseudonym employed by French for his Lidingo work, titled "3 Diverse Investment-Grade Pharmaceuticals to Consider Today."

281. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through French, stated:

> Adding to its impressive year, ImmunoCellular has recently uplisted to the [NYSE]. Up to this point, the company has had to bear the burden of being an OTC stock, complete with the associated stigma and investor distrust. The uplisting opens the doors to a new universe of investors the company could not reach earlier by eliminating the restrictions inherent to investor participation in OTC stocks.

282. The above statement was materially false and misleading when made because it placed IMUC above reproach based on its uplisting to the NYSE Market, which purportedly provided a cleansing effect of the "associated stigma and investor distrust." Yet, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), at the same time IMUC was uplisted and supposedly ripe for investment by an investing public who would no longer have to concern itself with IMUC's trustworthiness, IMUC, through Singh, had orchestrated and was overseeing an undisclosed and illegal stock promotion scheme designed to pump the market cap of IMUC.

**b) French's Scienter**

283. To the extent French made statements, he made them with knowledge of their falsity or with recklessness.

284. French studied English Literature in college, with the intention of teaching high school level grades. He did not take any technical or scientific writing courses in college. Subsequently, he graduated from a 12-month accelerated condensed Master of Business Administration program. After graduate school, he worked at different retail jobs in Ohio, and eventually moved to Florida where he worked as a bank teller from 2009 through 2011.

285. French did not perform any background research on Bjorlin and Lidingo because they he did not want to them down. As he did not invest in stocks, French did not know any SEC rules on compensation, and he never researched any legal or SEC regulatory issues on compensation.

286. French's failure to include an adequate disclosure related to the pay he received for publishing the IMUC Article was a deliberate choice made by French, with input from other defendants and with knowledge that such disclosure was required. French understood that Lidingo did not want him to disclose that he and IU were getting paid to write articles by the companies they were writing about because if you disclose that compensation, the article might not get published on Seeking Alpha, and the measure of success for an article for Lidingo was whether the article was moving the stock price.

287. French knew it was against Seeking Alpha's policy that as a writer and an account holder who was getting undisclosed compensation from Lidingo, by clicking the box, French was affirming to Seeking Alpha that he was in compliance

with Seeking Alpha's disclosure of compensation. Furthermore, French was also well aware of the risk involving the stock promotion scheme as he asked for more compensation. Specifically, on August 25, 2012, French emailed Bjorlin, "Milla, I would like to continue on with you as a full-time writer. Due to the risk involved, I'd like to go back to $1000 per article if possible."

288. Also, while French did not initially consider how Lidingo was being paid, he eventually understood that companies were paying Lidingo for the articles for which French was compensated.

289. French understood the articles were written in a manner intended to confer a high level of credibility with the express purpose of causing readers to invest in IMUC on the basis of that supposed credibility.

290. These allegations support a strong inference of French's scienter in that they show that French: (i) knew Lidingo paid writers, as he himself was in receipt of payments; (ii) knew Lidingo published articles on Seeking Alpha, which required disclosure of paid compensation or prohibited paid compensation; and (iii) knew that the IMUC Articles did not contain the required paid disclaimers or affirmatively misstated that no compensation had been received, at the direction of the scheme defendants.

291. In addition, French did not have the scientific background necessary to properly analyze and discuss the Phase 1 trial results or the potential success of the Phase 2 trial, making the statements he made concerning these subjects reckless or knowingly false.

**6. <u>False and Misleading Statements in IMUC Articles Published or Written by Ramey</u>**

**a) <u>November 8, 2011 Article</u>**

292. On November 8, 2011, during the day, Ramey using his pseudonym Chemistfrog published an article on Seeking Alpha titled, "ImmunoCellular Therapeutics' Cancer Stem Cell Drug Garnering Much Attention." Ramey praised the Phase 1 study as "unprecedented… with incredible clinical efficacy, side-effects were minimal" as "[s]ix of the 16 patients in the Phase [1] trial remain free of disease recurrence over three years; one patient is approaching five years of progression free survival." Ramey concluded that "[i]f the Phase [2] data is even half as good as the Phase [1] data, it is almost certain the company will be acquired for significant multiples…."

293. The above statements were materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), it was not IMUC's Phase 2 results or even the potential success of Phase 2 that were gaining IMUC investor attention, but the illicit stock promotion scheme that they were perpetrating.

**b) <u>January 16, 2012 Article</u>**

294. On January 16, 2012, before the market opened, Ramey using his pseudonym Chemistfrog published an article on Seeking Alpha titled, "Pharma Leaders Emerging in Immunotherapy Approach to Fighting Glioblastoma" and represented, "I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours." Ramey promoted the "impressive" and "stellar" Phase 1 results as "three-year OS for the patient set was 55% with 6 patients having

no recurrence of the tumor after three years." Ramey continued, "ICT-107 phase [1] data are currently superior with a larger patient population." Ramey also stated that "[w]ith hopes high due to the stellar phase 1 data behind it, [IMUC] will start capturing attention as 2012 catalysts approach" and "vault the company into the spotlight and world of Big Pharma."

295. The above statements were materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), any interest by big pharmaceutical companies of IMUC was driven by the illegal stock promotion scheme overseen by Singh, which included false interjection into the market of interest by big pharmaceutical companies, and not by "impressive" and "stellar" Phase 1 results.

**c) <u>March 6, 2012 Article</u>**

296. On March 6, 2012, during the day, Ramey, utilizing his pseudonym Chemistfrog, published an article on Seeking Alpha titled, "Big Pharma's Growing Appetite For Cancer Stem Cell Biotechs."

297. In the article, Singh and the Company (or, in the alternative, the Lidingo Defendants), through Ramey, represented, in part, the following:

> Big Pharma is likely eyeing the company and trying to ascertain if the risk/reward says to buy now or risk waiting for Q1 2013 interim data and the premium they would be forced to pay as investors drive the price up and competitors bid against them.

298. The above statement was materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), any interest by big pharmaceutical companies of IMUC was driven by the illegal

stock promotion scheme overseen by Singh, which included false interjection into the market of interest by big pharmaceutical companies, and not by investors driving IMUC common stock up.

**d) <u>June 1, 2012 Article</u>**

299. On June 1, 2012, during the day, in the run up to the ASCO annual meeting on June 2, 2012, Ramey, under the pseudonym Chemistfrog, published an article about IMUC on Seeking Alpha titled "ImmunoCellular Therapeutics ICT-107 to Impress at ASCO 2012."

300. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Ramey, promoted the "eye-opening Phase [1] data" as being "astounding" as "6 of the 16 newly-diagnosed GBM patients showed no signs of tumor recurrence" which represented "a 38% survival rate at over 4 years, a substantial improvement over the 10% seen with the standard of care regimen." As such, Ramey stated that the "data set is simply too good to ignore, and any indication whatsoever on comparable interim data for the Phase [2] trial underway in the future will quickly garner the attention of investors and large pharmaceutical suitors."

301. The above statements were materially false and misleading when made because, known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), had no basis or support to promote (1) that the Phase 1 results could be mined to demonstrate efficacy and (2) the potential results of Phase 2 would quickly garner the attention of investors and large pharmaceutical suitors, and as such, they were severely reckless in making such statements.

302. Ramey also represented that "ImmunoCellular announced approval to begin a Phase [2] trial in January of this year and hopes its adjuvant vaccine that targets 6 tumor antigens will yield similar results to the Phase [1] data."

303. The above statement was materially false and misleading when made because Singh and IMUC, or in the alternative the Lidingo Defendants, through Ramey, had no basis to represent that targeting "6 tumor antigens will yield similar results to the Phase [1] data."

304. As a result of the article's publication, IMUC stock gained nearly 5%, on volume of 1,656,573 shares traded, and closed at a Class Period high of $3.88 per share on June 1, 2012, compared to declines of 2.9%, 2.2%, and 3.1% for Agenus, Cytokinetics and NBI, respectively.

**e) <u>June 13, 2012 Article</u>**

305. On June 13, 2012, during the day, Ramey, utilizing the pseudonym Chemistfrog, published an article on Seeking Alpha titled, "Dendreon: Room for Improvement."

306. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Ramey, represented that IMUC "has been receiving a lot of attention from bloggers, investors, healthcare providers and large pharmaceuticals after a follow up presentation of [P]hase [1] data for ICT-107 indicated highly impressive results for newly diagnosed glioblastoma."

307. This statement was materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), it was the illegal stock promotion scheme, overseen by Singh, that caused IMUC to receive attention.

308. As a result, IMUC stock gained 4.5% over two days, on combined volume of 864,589 shares traded, to close at $3.45 per share on June 14, 2012, compared to gains of 2%, 1% and 0.2% for Agenus, Cytokinetics and NBI, respectively.

**f) <u>July 4, 2012 Article</u>**

309. On July 4, 2012, during the trading day, Ramey, using his Chemistfrog pseudonym, published an article on Seeking Alpha titled "Dendritic Cell Evolution: Investment Potential."

310. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Ramey, stated:

> ICT-107 has been gaining more investor, and most likely, large pharmaceutical interest lately, with their [P]hase [1] trial for newly-diagnosed glioblastoma.
>
> ***
>
> ImmunoCellular Therapeutics' major catalysts are behind them with ASCO and 4/5 year data on their [P]hase [1] GBM data mostly revealed with substantial improvement over the standard of care for GBM.
>
> ***
>
> ICT-107's third generation therapy is likely not the pinnacle of the immunotherapy approach but does represent substantial hope for cancer sufferers and substantial value to shareholders if the [P]hase [2] data shows even a portion of the efficacy of the Phase [1] success.

311. These statements were materially false and misleading because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), it was not IMUC's Phase 1 results that were gaining IMUC investor attention, but the illicit stock promotion scheme that they were perpetrating.

312. Further, they knew that IMUC's "major catalysts" were not behind them, as Phase 2 was not complete at the time, and they had no basis to represent that there would be "substantial value to shareholders if [Phase 2] data shows even a portion of the efficacy of the [Phase 1] success."

**g) <u>July 11, 2012 Article</u>**

313. On July 11, 2012, before the market opened, Ramey, using his pseudonym Chemistfrog, published an article on Seeking Alpha titled "Intellectual Property of a Biotech: An Analysis."

314. In the article, Singh, IMUC, and Lavos (or, in the alternative, the Lidingo Defendants), through Ramey, discussed IMUC's patent portfolio and the importance of technology to biotechnology companies.

> Interim data analysis is expected in Q4 2012 or Q1 2013, and the company as well as investors are hopeful with the trial garnering much attention as evident from the common stock's price run up from January 10th's $1.05 to the current price hovering around $3.50 per share.

315. These statements were materially false and misleading when made because, as known to Singh, Lavos, and IMUC (or in the alternative, the Lidingo Defendants), IMUC's stock price increase for the year to that point was not based on the hopefulness of investors for interim Phase 2 results for ICT-107, but instead was

the result of a concerted effort to pump the stock price through the use of an illegal stock promotion scheme overseen by Singh and IMUC.

**h) <u>Ramey's Scienter</u>**

316. To the extent Ramey made these statements, he made them with knowledge of their falsity or with recklessness.

317. Ramey has an educational background in chemistry and business administration focused on human relations and management. In college, Ramey did not take finance or accounting courses. Ramey did not have a background in pharmaceuticals or medical devices, and did not have the capability, scientific training or understanding to objectively evaluate IMUC's ICT-107.

318. Ramey's failure to include any adequate disclosure related to the pay he received for publishing the IMUC Articles was a deliberate choice made by Ramey, with input from other defendants, and with knowledge that such disclosure was required. Ramey knew that Seeking Alpha would not let you publish an article if you were paid to do so.

319. Ramey did not properly research his articles. If he truly did his due diligence and independently researched IMUC's Phase 1 study, he would have discovered that on December 23, 2008, IMUC issued a press release stating, "[t]en patients were evaluated for immune responses, and five of them had a significant immune response to at least one tumor-associated antigen."

320. These allegations support a strong inference of Ramey's scienter in that they show that Ramey: (i) knew Lidingo paid writers, as he himself was in receipt of payments; and (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles).

### F. <u>The Active Stock Promotion Scheme is Cut Short When Singh is Forced to Resign, but the Fruits of the Scheme are Allowed to Remain in the Market by Company Management</u>

321. On August 20, 2012, IMUC issued a press release, filed with the SEC on Form 8-K that same day, announcing Singh's resignation from the Board and his roles as President and CEO. The press release provided no reasoning for Singh's departure. The Form 8-K provided little insight on Singh's departure:

> On August 14, 2012, Manish Singh tendered his resignation together ***with a claim that he was entitled to severance benefits*** under the terms of his existing employment agreement. The Company accepted his resignation, ***confirmed his termination of employment with the Company, including termination as the Company's President and [CEO], and disputed any claims for severance benefits*** for Dr. Singh. [emphasis added]

322. On August 21, 2012, a blogger, Larry Smith, who Plaintiffs presume is unrelated to Defendants, posted an article questioning Singh's resignation and defendants' public statements regarding ICT-107, Smith stated that based on the "8-K, there was a disclosure that there is a disagreement regarding whether Mr. Singh is entitled to severance, which implies that he may have been forced to resign."[13]

323. On August 21, 2012, Cowen issued an analyst report that questioned whether Singh truly resigned:

---

[13] smithonstocks.com/manish-singh-resigns-as-ceo-of-immunocellular-therapeutics-implications-for-northwest-biotherapeutics-and-immunocellular/

It was also disclosed that there's disagreement between the two parties regarding whether the former CEO is entitled to severance, which makes it likely this wasn't a truly voluntary departure.… We see the news as an added risk in an already high-risk stock and we reiterate our Neutral rating and continue to recommend that investors avoid IMUC shares, given 1) valuation, 2) expectation of a near-term financing, and 3) the newly introduced risk of the sudden CEO departure.

***

We spoke with both parties last night…and, boy, does it sound messy…: We spoke with former CEO Singh, interim CEO John Yu and director of business development Peter Ho. Our take on the situation after spending quite a bit of time talking with both parties is that it is practically impossible to tell whether what most investors may be worried about took place, i.e. *"does the CEO departure have anything to do with data or trial conduct, either Phase [1] or Phase [2]"*. ***Our view is that given that it is very hard to get the absolute truth from either party, due to liability and personal reputation concerns, investors should consider any and all scenarios, from the worst case scenario to the most benign, as potentially viable.***

***

Tidbits from our conversations last night: We heard the standard "he did not get fired" and "he left to pursue other opportunities", but when asked whether Singh has another "opportunity" lined up the answer

> was "No". We asked whether the departure is related to Singh's conduct in regards to the data, the running of the trials, and whether there is or will be an internal or external investigation of any sort about the data. The answer to all these questions was also "No". Some of our long discussions with both parties last night hinted that the departure was related to direction the company was moving towards, financing needs, corporate governance, compensation and reporting structure and relationship between the Board and the CEO. [emphasis added]

324. As of August 2012, Singh was operating under an employment agreement made as of May 10, 2011 (effective as of February 18, 2011), which automatically renewed by its terms on February 18, 2012 (the "May 10, 2011 Employment Agreement"). This employment agreement was attached to IMUC's quarterly report on Form 10-Q for the quarterly period ended June 30, 2011 ("2Q 2011 10-Q").[14] That employment agreement clearly delineated when Singh was entitled to receive severance.

325. If Singh was terminated for cause (the grounds for which included "theft, dishonesty, or falsification of any Corporation documents or records"), he was entitled to no further compensation, including base salary or severance. May 10, 2011 Employment Agreement, ¶8.1.

---

[14] *See* www.sec.gov/Archives/edgar/data/822411/000119312511226657/0001193125-11-226657-index.htm.

326. If Singh was terminated without cause, then he was entitled to severance equivalent to six months of base salary and the accelerated vesting of certain stock options. *Id.*, ¶8.2.

327. Similarly, Singh was only entitled to severance benefits if he resigned for "Good Reason" or with sixty days prior written notice. *Id.*, ¶8.3.

328. Even if Singh resigned from his post without "good reason," he was contractually entitled to a sixty-day notice period during which he would have continued receiving his salary. *Id.*, ¶8.1. Had Singh been fired by IMUC without cause, pursuant to the terms of his employment agreement, he would have been entitled to a similar 60 day notice period (during which he would have continued to receive his base salary) as well as, *inter alia*, a lump sum cash payment equal to six months' salary as severance. It is clear from the 2012 10-K that no such severance payment nor extension of salary payments were made, thus negating any inference that Singh's dismissal by IMUC was done without cause.

329. IMUC's 2012 10-K identified Singh as having received a salary of $202,781 in 2012, including "$26,250 per month for the period January 1, 2012 to March 31, 2012 and $27,563 for the period April 1, 2012 to August 15, 2012 per month for services rendered to us as President and [CEO]."[15]

330. IMUC's 2012 10-K also identified the severance benefits actually received by Singh upon his resignation, showing that he did not receive any additional compensation after his departure from IMUC.

---

[15] www.sec.gov/Archives/edgar/data/822411/000119312513101316/d444328d10k.htm, at p. 49.

331. The timing of Singh's purported resignation was particularly shocking given that after the market closed on August 14, 2012, IMUC filed its Form 10-Q with the SEC, reporting financial results for the quarter ended June 30, 2012 that was signed by Singh as President and CEO.

332. Similarly, on August 15, 2012, one day after Singh purportedly tendered his resignation, IMUC issued a press release announcing its quarterly results, identifying Singh as IMUC's CEO, and attributing to him a comment about IMUC's outlook for the future and the ongoing ICT-107 trial.

333. The additional information provided in the Form 8-K about Singh's claim to severance benefits, a claim disputed by IMUC, touched off a wave of investor concern that drove IMUC's stock downwards. As would be more fully evident later, Singh's departure from IMUC was the direct result of his orchestration of the stock promotion scheme with Lidingo, a fact then known only to certain defendants.

334. The fact that Singh received no salary after August 15, 2012, and received no severance benefits upon his departure from IMUC, when he was entitled to both if he had simply given sixty-days written notice (or been terminated without cause), combined with the fact that, as reported by Cowen, Singh has no other employment lined up when he departed IMUC, supports the inference that Singh's resignation was not one tendered willfully and that he was terminated for cause. In the absence of any other justification, there is a strong inference that the termination was related to the stock promotion scheme.

335. Further, without Singh at the helm of IMUC, the stock promotion scheme by Lidingo ground to a halt, with the final promotional article published on

Seeking Alpha on August 15, 2012 – the same day IMUC made its last payment to Lidingo.

336. The suspicious timing of Singh's "resignation," the final payment from IMUC to Lidingo and a halting to Lidingo-authorized articles about IMUC being made very close thereafter, and the dispute concerning Singh's severance, are all probative of Singh's scienter and create a strong inference thereof.

**G. <u>With the Need for Additional Financing on the Horizon, Company Management Painstakingly Seeks to Keep Any Connection Between IMUC and Lidingo Quiet</u>**

337. After the departure of Singh from the Company in August 2012, IMUC found itself at a crossroads.

338. Following the termination of Singh, Fractor and IMUC were faced with an important decision that would ultimately impact the future of IMUC: (a) publicly disclose the truth related to Singh and IMUC's participation in the stock promotion scheme, report the bad actors (who continued to orchestrate illicit stock promotion schemes using similar methods for a variety of other issuers) to the SEC, and deal with the public aftermath, including the expected stock price drop, thus jeopardizing any future clinical trials; or (b) issue a vague Form 8-K regarding Singh's departure and remain silent as to the securities law violations, allowing the violative articles to remain in the public domain while IMUC engaged in multiple offerings so as to fill its coffers with the funds needed to complete the ICT-107 Phase 2 study and simply await any punishment that could arise from IMUC's engagement of Lidingo. Fractor and IMUC chose the latter.

339. The Defendants' stock promotion scheme enabled IMUC prior to and during the Class Period, to raise necessary capital using artificially inflated shares of IMUC's common stock in ***three*** stock offerings where the net proceeds of approximately $35 million were used for, among other things, financing IMUC's "ongoing clinical development of ICT-107."

340. Just two months after the start of the stock promotion scheme, in January 2012, IMUC was able to institute a critical offering of 9,489,436 units consisting of one share of IMUC common stock and a warrant exercisable at a strike price of $1.41 per share, enabling IMUC to raise nearly $10 million from IMUC investors.

341. On September 5, 2012, IMUC announced in a press release issued before the opening of the market that it had completed enrollment for the Phase 2 study.

342. On September 21, 2012, IMUC filed with the SEC a Form S-3 Registration Statement announcing the offering of $50,000,000 in common stock, preferred stock, debt securities, and warrants in the Company.

343. The offering was further fleshed out by the Final Prospectus filed pursuant to Rule 424(b)(5) on October 19, 2012, through which IMUC offered for sale 10,000,000 shares of common stock and warrants to purchase 4,500,000 shares of common stock ("10/19/2012 Final Prospectus") from which IMUC would receive between $19 and $23 million after commissions and expenses.

344. The 10/19/2012 Final Prospectus supplemented the preliminary prospectus previously filed on October 9, 2012, which was incorporated by reference therein.

345. As set forth in the 10/19/2012 Final Prospectus, the proceeds of the offering were essential to continue funding the ICT-107 Phase 2 trial.[16]

346. Given the stark outlook for IMUC's future in the absence of any continued funding through the offering, IMUC and Fractor recognized the need to keep IMUC's violation of the federal securities laws with respect to stock promotion and related release of Singh under wraps or risk torpedoing the stock price and ICT-107's clinical prospects.

347. IMUC continued to keep its past transgressions under wraps when, in April 2013, IMUC entered into a Controlling Equity Offering Sales Agreement ("Sales Agreement") with Cantor Fitzgerald & Co. ("Cantor") where IMUC had the right to offer and sell shares of its common stock, from time to time through Cantor, for an aggregated offering price of up to $17 million. By the end of September 30, 2013, IMUC sold 1,862,142 shares of its common stock under the Sales Agreement that resulted in proceeds to IMUC of nearly $5 million.

348. Even after Singh's resignation, certain of the Authors continued to write materially false and misleading articles on Seeking Alpha. Nichols, on February 12, 2013, wrote on Seeking Alpha that IMUC is "a stock [IMUC] that I consider to be one of the more promising biotech stocks in the market;" "[IMUC] doesn't need to achieve anywhere near its Phase 1 results to earn an approval, only a fraction to be a success;" and "there is no way the company cherry picked patients." None of these statements were objectively true.

[16] www.sec.gov/Archives/edgar/data/822411/000119312512427585/d424614d424b5.htm, at p. 6.

**H. Materially False and Misleading Statements in IMUC's SEC Filings**

349. While the Company clandestinely used the IMUC Articles to publicly tout, *inter alia*, ICT-107 and its stock momentum to that point, it and its officers also made several public statements through IMUC's SEC filings, that were materially false and misleading when made, unbeknownst to the investing public.

**1. Relevant SEC Filings**

350. Plaintiffs allege the IMUC Defendants made materially false and misleading statements in violation of the Exchange Act.

351. On May 11, 2012, the Company filed its quarterly report on Form 10-Q for the quarterly period ended March 31, 2012 ("1Q 2012 10-Q"). The 1Q 2012 10-Q was signed by Defendant Singh as the Company's President and CEO.

352. On May 14, 2012, the Company filed with the SEC a Final Prospectus related to the resale of up to 13,471,326 shares of Company common stock by existing stockholders and warrantholders of the Company ("First 5/14/2012 Prospectus").

353. On May 14, 2012, the Company filed with the SEC a Final Prospectus related to the resale of up to 6,524,809 shares of Company common stock by existing stockholders and warrantholders of the Company, separate and apart from those identified in the First 5/14/2012 Prospectus ("Second 5/14/2012 Prospectus").

354. On May 14, 2012, the Company filed with the SEC a Final Prospectus related to the resale of up to 6,799,178 shares of Company common stock by existing stockholders and warrantholders of the Company, separate and apart from those identified in the First 5/14/2012 Prospectus and Second 5/14/2012 Prospectus ("Third 5/14/2012 Prospectus").

355. The First, Second, and Third 5/14/2012 Prospectuses are collectively referred to herein as the "May 14, 2012 Prospectuses." The May 14, 2012 Prospectuses were not signed by any officer of the Company, but were filed by IMUC with the SEC.

356. On June 27, 2012, the Company filed with the SEC a Final Prospectus related to the resale of up to 4,249,625 shares of Company common stock issuable upon exercise of outstanding warrants by existing warrant-holders of the Company ("6/27/2012 Final Prospectus"). The 6/27/2012 Final Prospectus was not signed by any officer of the Company, but was filed by IMUC with the SEC.

357. On August 14, 2012, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2012 ("2Q 2012 10-Q"). The 2Q 2012 10-Q was signed by Singh as the Company's President and CEO.

358. On August 20, 2012, IMUC filed a Form 8-K with the SEC announcing the purported resignation of Singh from the Company. ("5/20/2012 8-K"). The 5/20/2012 8-K was signed by Yu as Interim CEO of the Company.

359. On October 18, 2012, IMUC filed with the SEC a current report on Form 8-K for the stated purpose of updating the description of its business in the Company's 2011 10-K, and also to supplement the "Risk Factors" description included in the August 14, 2012 Form 10-Q ("10/18/2012 8-K"). The 10/18/2012 Form 8-K was signed by Yu as Interim CEO of the Company.

360. On November 9, 2012, the Company filed its quarterly report on Form 10-Q for the quarterly period ended September 30, 2012 ("3Q 2012 10-Q"). The 3Q 2012 10-Q was signed by Yu as the Company's Interim CEO.

361. On March 11, 2013, the Company filed the 2012 10-K. The 2012 10-K was signed by, among others, Yu, Gengos, and Defendant Fractor.

362. On May 10, 2013, the Company filed its quarterly report on Form 10-Q for the quarterly period ended March 31, 2013 ("1Q 2013 10-Q"). The 1Q 2013 10-Q was signed by Gengos and Defendant Fractor.

363. On August 8, 2013, the Company filed its quarterly report on Form 10-Q for the quarterly period ended June 30, 2013 ("2Q 2013 10-Q"). The 2Q 2013 10-Q was signed by Gengos and Defendant Fractor.

364. On November 7, 2013, the Company filed its quarterly report on Form 10-Q for the quarterly period ended September 30, 2013 ("3Q 2013 10-Q"). The 3Q 2013 10-Q was signed by Gengos and Defendant Fractor.

365. On March 14, 2014, the Company filed the 2013 10-K. The 2013 10-K was signed by, among others, Yu, Gengos, and Defendant Fractor.

366. On May 9, 2014, the Company filed its quarterly report on Form 10-Q for the quarterly period ended March 31, 2014 ("1Q 2014 10-Q"). The 1Q 2014 10-Q was signed by Gengos and Defendant Fractor.

367. The 1Q 2012 10-Q, 2Q 2012 10-Q, 3Q 2012 10-Q, 1Q 2013 10-Q, 2Q 2013 10-Q, 3Q 2013 10-Q, and 1Q 2014 10-Q are referred to herein as the "Quarterly Reports."

368. The 2012 10-K and the 2013 10-K are referred to herein as the "10-Ks."

**2. Materially False and Misleading Statements Concerning Expenses**

369. Concerning the topic of expenses, the 1Q 2012 10-Q stated that:

> General and administrative expenses during the three months ended March 31, 2012 were $805,798 compared to $553,721 during the

same period in 2011. The increase in expenses reflects the expansion of the Company's infrastructure during the latter half of 2011 including the hiring of additional personnel. Additionally, during the three months ended March 31, 2012 the Company incurred additional expenses in the areas of board fees, travel and investor relations.

370. Concerning the topic of expenses, the 2Q 2012 10-Q stated that:

General and administrative expenses for the three months ended June 30, 2012 and 2011 were $837,322 and $579,889, respectively. The increase in expenses reflects the expansion of our infrastructure during the latter half of 2011 including the hiring of additional personnel. Additionally, we incurred additional expenses in the areas of investor relations, travel and professional fees.

* * *

General and administrative expenses for the six months ended June 30, 2012 and 2011 were $1,643,120 and $1,133,610, respectively. The increase in expenses reflects the expansion of our infrastructure during the latter half of 2011 including the hiring of additional personnel. Additionally, we incurred additional expenses in the areas of investor relations, travel and board fees.

371. Concerning the topic of expenses, the 3Q 2012 10-Q stated that:

General and administrative expenses for the three months ended September 30, 2012 and 2011 were $1,004,181 and $634,241, respectively.

***

> General and administrative expenses for the nine months ended September 30, 2012 and 2011 were $2,647,301 and $1,767,852, respectively. The increase in expenses reflects the expansion of our infrastructure during the latter half of 2011 including the hiring of additional personnel. Additionally, we incurred additional expenses in the areas of investor relations, travel, professional fees and listing fees for the NYSE MKT.

372. These above statements in the 1Q 2012 10-Q, 2Q 2012 10-Q, and 3Q 2012 10-Q were materially false and misleading because they failed to disclose the root cause of the increased expenses with respect to investor relations: the retention of Lidingo and the payments made to that company for its assistance in the illicit stock promotion scheme.

373. Disclosure of these facts was necessary to make the statements made in the 1Q 2012 10-Q, 2Q 2012 10-Q, and 3Q 2012 10-Q not materially false and misleading. As a result, these quarterly reports were materially false and misleading when made.

374. Concerning the topic of expenses, the 1Q 2013 10-Q and 2Q 2013 10-Q stated that IMUC had "reduced our expenses in the areas of investor relations, travel and legal expenses."

375. Concerning the topic of expenses, the 3Q 2013 10-Q stated that IMUC "optimized our spending in the areas of investor relations, travel and professional fees, which resulted in a decrease in expense."

376. The statements in the 1Q 2013 10-Q, 2Q 2013 10-Q, and 3Q 2013 10-Q were materially false and misleading because they failed to disclose the root cause of

the decrease in expenses with respect to investor relations: the Company was no longer paying Lidingo in connection with the illicit stock promotion scheme.

377. Disclosure of these facts was necessary to make the statements made in the 1Q 2013 10-Q, 2Q 2013 10-Q, 3Q 2013 10-Q, and 1Q 2014 10-Q not materially false and misleading. As a result, these quarterly reports were materially false and misleading when made.

378. With respect to increases in investor relations expenses, the 2012 10-K stated:

> Our general and administrative expenses for the years ended December 31, 2012 and 2011 were $3,619,291 and $2,446,757 respectively. During the latter half of 2011, we incurred additional expenses in the areas of investor relations, travel, personnel, board and professional fees to expand our infrastructure. During 2012, our expenses in these areas continued to increase.

379. The above statements in the 2012 10-K were materially false and misleading because they failed to disclose the root cause of the increased expenses with respect to investor relations: the retention of Lidingo and the payments made to that company for its assistance in the illicit stock promotion scheme, which commenced in the latter half of 2011 (the same time the Company "incurred additional expenses in the areas of investor relations") and continued through much of the first three quarters of 2012.

380. Disclosure of these facts was necessary to make the statements made in the 2012 10-K not materially false and misleading. As a result, the 2012 10-K was materially false and misleading when made.

381. With respect to increases in investor relations expenses, the 2013 10-K stated:

> Our general and administrative expenses for the years ended December 31, 2013 and 2012 were $3,396,391 and $3,619,291, respectively, a decrease of $222,900. During 2012, our expenses in the areas of investor relations, travel, board and professional fees increased to expand our infrastructure. During 2013, we optimized our spending in the areas of investor relations, travel and professional fees, which resulted in a decrease in expense. These decreases were partially offset by increases in personnel related expenses as we hired additional employees and we concluded a litigation matter.

382. The above statements in the 2013 10-K were materially false and misleading because they failed to disclose the root cause of the increased expenses with respect to investor relations in 2012: the retention of Lidingo and the payments made to that company for its assistance in the illicit stock promotion scheme, which commenced in the latter half of 2011 (the same time the Company "incurred additional expenses in the areas of relations") and continued through much of the first three quarters of 2012, the discontinuation of such accounted for nearly the entire $222,900 decrease in expenses for 2013.

383. Disclosure of these facts was necessary to make the statements made in the 2013 10-K not materially false and misleading. As a result, the 2013 10-K was materially false and misleading when made.

**3. Materially False and Misleading Statements Concerning IMUC's Internal Controls and Procedures**

384. With respect to IMUC's existing controls and procedures, the Quarterly Reports each stated:

> As of the end of the fiscal quarter covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, regarding the effectiveness of the design and operation of our disclosure controls and procedures pursuant to SEC Rule 15d-15(b) of the Exchange Act. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of [the as of date of the Quarterly Report], (i) our disclosure controls and procedures were effective to ensure that information that is required to be disclosed by us in reports that we file under the Exchange Act is recorded, processed, summarized and reported or submitted within the time period specified in the rules and forms of the SEC and (ii) our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in the reports we file or submit under the Exchange Act was accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

385. With respect to IMUC's internal disclosure controls and procedures, the 10-Ks stated:

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file with the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate, to allow for timely decisions regarding required disclosure. As required by SEC Rule 15d-15(b), we carried out an evaluation, under the supervision and with the participation of our management, including our principal executive and financial officers, of the effectiveness of the design and operation of our disclosure controls and procedures as of [the as of date of the Annual Report], which is the end of the period covered by this report. Based on the foregoing, our principal executive and financial officers concluded that our disclosure controls and procedures were effective as of [the as of date of the Annual Report].

* * *

Management, with the participation of our principal executive and financial officers, conducted an evaluation of the effectiveness of our internal control over financial reporting, as of [the as of date of the Annual Report], based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon its evaluation, management concluded that, as of [the as of date of the

> Annual Report], our internal control over financial reporting was effective.

386. The above statements in the Quarterly Reports and 10-Ks were materially false and misleading when made because IMUC did not have adequate or effective disclosure controls and procedures, as the Company abdicated responsibility for SEC filings to Singh, who was aware of IMUC's retention of Lidingo and his and IMUC participation in the illegal stock promotion scheme, yet purposely withheld the disclosure of such from any SEC filing.

**4. <u>Materially False and Misleading Statements in SOX Certifications</u>**

387. In accordance with Section 302 of SOX, the 1Q 2012 10-Q and 2Q 2012 10-Q were certified by Singh and Fractor.

388. In accordance with Section 302 of the SOX, the 3Q 2012 10-Q was certified by Yu and Fractor.

389. In accordance with Section 302 of SOX, the 1Q 2013 10-Q, 2Q 2013 10-Q, 3Q 2013 10-Q, 1Q 2014 10-Q, 2012 10-K, and 2013 10-K were certified by Gengos and Fractor.

390. The signers/certifiers of each of these SOX certifications for the Quarterly Reports and the 10-Ks declared that:

> 1. I have reviewed this report on Form 10-[K/Q] of ImmunoCellular Therapeutics, Ltd.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under

> which such statements were made, not misleading with respect to the period covered by this report;
>
> * * *
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> * * *
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

391. The foregoing SOX certifications to the 10-Qs and 10-Ks were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*:

a. the Company had engaged Lidingo and was overseeing an illicit stock promotion scheme that was materially affecting IMUC's market price;

b. that IMUC was paying Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;"

c. the Company, through Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point;

d. the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme;

e. the Company, through Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Singh and directed to refrain from making any disclosures related to compensation; and

f. Lidingo often employed false aliases to publish its articles about IMUC.

392. Disclosure of these facts was necessary to make the statements made in the SOX certifications not materially false and misleading. As a result, the SOX Certifications and the Quarterly Reports and 10-Ks to which they were attached were materially false and misleading when made.

**5. Materially False and Misleading Risk Disclosures Concerning Possible Fluctuations in IMUC's Stock Price**

393. In the 5/14/2012 Prospectuses and the 6/27/2012 Final Prospectus, IMUC identified possible fluctuations in its stock price as a potential event, but failed to disclose that IMUC had significantly inflated its share price by engaging Lidingo and overseeing an illicit stock promotion scheme:

> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:

- announcements of the results of clinical trials by us or our competitors;
- developments with respect to patents or proprietary rights;
- announcements of technological innovations by us or our competitors;
- announcements of new products or new contracts by us or our competitors;
- actual or anticipated variations in our operating results due to the level of development expenses and other factors;
- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;
- conditions and trends in the pharmaceutical and other industries;
- new accounting standards;
- general economic, political and market conditions and other factors; and
- the occurrence of any of the risks described in this report.

394. The risk disclosures identified above were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*:

a. the Company had engaged Lidingo and was overseeing an illicit stock promotion scheme that was materially affecting IMUC's market price;

b. that IMUC was paying Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;"

c. the Company, through Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point;

d. the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme;

e. the Company, through Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Singh and directed to refrain from making any disclosures related to compensation; and

f. Lidingo often employed false aliases to publish its articles about IMUC.

395. Disclosure of these facts was necessary to make the statements made in the 5/14/2012 Prospectuses and the 6/27/2012 Final Prospectus not materially false and misleading. As a result, these prospectuses were materially false and misleading at all relevant times.

396. In Exhibit 99.1 to the 10/18/2012 8-K and the 8/19/2012 Final Prospectus, the Company identified several risks related to its stock price:

The market prices for our common stock and the securities of other development state pharmaceutical or biotechnology companies have been highly volatile and may continue to be highly volatile in the future. If the market price of our common stock declines, the per share value of the common stock you purchase will decline. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

- the progress and success of clinical trials and preclinical activities (including studies and manufacture of materials) of our product candidates conducted by us or our collaborative partners or licensees;
- the receipt or failure to receive the additional funding necessary to conduct our business;
- selling by large stockholders;
- presentations of detailed clinical trial data at medical and scientific conferences and investor perception thereof;
- announcements of technological innovations or new commercial products by our competitors or us;
- developments concerning proprietary rights, including patents by our competitors or us;
- developments concerning our collaborations;
- publicity regarding actual or potential medical results relating to products under development by our competitors or us;

- regulatory developments in the United States and foreign countries;
- manufacturing or supply disruptions at our contract manufacturers, or failure by our contract manufacturers to obtain or maintain approval of the FDA or comparable regulatory authorities;
- litigation or arbitration;
- economic and other external factors or other disaster or crisis; and
- period-to-period fluctuations in financial results.

397. The risk disclosures identified above were materially false and misleading when made because they failed to disclose the following material facts, *inter alia*:

a. the Company had engaged Lidingo and oversaw an illicit stock promotion scheme that was materially affecting IMUC's market price;

b. that IMUC paid Lidingo for these promotional articles, thus increasing expenses categorized broadly as "investor relations;"

c. the Company, through Singh, had directly reviewed, edited, and approved some or all of the IMUC Articles published to that point;

d. the IMUC Articles themselves violated the federal securities laws as they failed to disclose that they were the product of a paid promotional scheme;

e. the Company, through Singh, participated in the orchestration of the entire stock promotion scheme that went well beyond the statements made in the IMUC Articles, including, but not limited to, the meticulous oversight of writers who were specifically chosen by Singh and directed to refrain from making any disclosures related to compensation;

f. Lidingo often employed false aliases to publish its articles about IMUC; and

g. that the risk factor related to the "publicity regarding actual or potential medical results relating to products under development by our competitors or us" had already materialized as a result of the Company's engagement of Lidingo and the perpetuation of the fraudulent stock promotion scheme.

398. Disclosure of these facts was necessary to make the statements made in the Exhibit 99.1 to the 10/18/2012 8-K and the 8/19/2012 Final Prospectus not materially false and misleading. As a result, the Exhibit 99.1 to the 10/18/2012 8-K and the 8/19/2012 Final Prospectus were materially false and misleading at all relevant times.

**6. <u>Materially False and Misleading Statements and Omissions Concerning the Stock Promotion Scheme</u>**

399. The 1Q 2012 10-Q and 2Q 2012 Quarterly Reports failed to disclose that that: (i) IMUC was paying Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock; or (ii) that Singh had directly reviewed, edited and approved some or all of the articles.

400. The 3Q 2012 10-Q, 1Q 2013 10-Q, 2Q 2013 10-Q, 3Q 2013 10-Q, and 1Q 2014 10-Q failed to disclose that from September 2011 to August 2012 (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; and (ii) Singh, while CEO of the Company, had directly reviewed, edited and approved some or all of the articles. In addition, these quarterly reports failed to disclose that as a result of Singh's orchestration in the scheme while CEO of the Company, he was terminated with cause.

401. Disclosure of these facts was necessary to make the statements made in the Quarterly Reports not materially false and misleading. As a result, the Quarterly Reports were materially false and misleading when made.

402. The 10-Ks failed to disclose that from September 2011 to August 2012 (i) IMUC had paid Lidingo to issue articles, often under aliases, designed to inflate the price of IMUC common stock during the reported period; and (ii) Singh, while CEO of the Company, had directly reviewed, edited and approved some or all of the articles. In addition, the 10-Ks failed to disclose that as a result of Singh's participation in the scheme while CEO of the Company, he was terminated with cause.

403. Disclosure of these facts was necessary to make the statements made in the 10-Ks not materially false and misleading. As a result, the 10-Ks were materially false and misleading when made.

404. The 5/14/2012 Prospectuses and the 6/27/2012 Final Prospectus failed to disclose that: (i) IMUC was paying Lidingo to issue articles, often under aliases,

designed to inflate the price of IMUC common stock; or (ii) that Singh had directly reviewed, edited and approved some or all of the articles.

405. Disclosure of these facts was necessary to make the statements made in the 5/14/2012 Prospectuses and the 6/27/2012 Final Prospectus not materially false and misleading. As a result, these prospectuses were materially false and misleading when made.

**7. <u>Materially False and Misleading Statements Concerning Phase 1 and Phase 2 Test Results</u>**

406. Throughout the Class Period, Singh, acting within the scope of their employment at IMUC, made a number of materially false, positive statements concerning the Phase 1 test results that conditioned the market to anticipate positive, Phase 2 test results, as follows:

a. Singh, on a May 31, 2012 press release: "the continued impressive survival data we have seen to date and the timely enrollment in our ongoing Phase II trial, further build out confidence that targeting CSCs may provide a breakthrough in the treatment of GBM." Emphasis added.

b. Singh, on a July 25, 2012 press release: "Given the highly encouraging survival benefit we have observed to date in GBM patients treated with ICT-107, we are especially eager to continue evaluating this promising immunotherapeutic approach to cancer treatment with this new study of our second vaccine formulation." Emphasis added.

407. These statements were materially false and misleading because the Phase 1 study was at best "encouraging," and in fact there was no demonstrated

survival benefit of patients in the trial, and those patients living longer without progression of disease were genetically predisposed to succeed in a one-armed trial, and there was no correlation for patients in the trial between immune response and success in the trial.

## V. THE TRUTH IS REVEALED WITH RESPECT TO THE PHASE 2 STUDY, THEREBY REMOVING FROM THE MARKET THE INFLATION CAUSED BY THE LIDINGO ARTICLES

408. The truth about ICT-107's lack of efficacy, which had been evidenced in the Phase 1 test results, however, continued to emerge on December 11, 2013, when, after the market closed, IMUC issued a press release disclosing that its ICT-107 Phase 2 study failed to meet the "gold standard primary endpoint of overall survival" as the intent-to-treat population did not reach statistical significance with respect to overall survival (OS). Despite what amounted to a failure of the study, IMUC attempted to contort the results into positive information in order to avail itself further to the misinformation placed into the market by the IMUC Articles:

> ICT-107…demonstrated a statistically significant increase in progression-free survival (PFS) in patients with newly diagnosed [GBM] in its randomized, placebo-controlled [P]hase [2] trial.
>
> ***
>
> The differences in the overall survival (OS) K-M curves did not reach statistical significance in the intent-to-treat population (the primary endpoint) or the per-protocol population, with p-values and HRs of p=0.58 two-sided, HR=0.87, and p=0.40 two-sided, HR=0.79, respectively. However, there were numerical differences in the

> median survivals favoring ICT-107 of two months in the intent-to-treat population and three months in the per-protocol population.
>
> The OS analysis includes data on 67 events (patient deaths) out of a possible 124, whereas the PFS analysis includes data from 103 events. ImmunoCellular Therapeutics plans to continue following patients in this trial to collect more mature OS data. In the matured data from the open label, [P]hase [1] trial, the Company observed a consistent benefit in both PFS and OS compared with historical controls, and on this basis thinks that it is possible that the primary OS benefit could be clarified as the [P]hase [2] data mature.
>
> In this [P]hase [2] study, ICT-107 was generally safe and well tolerated, with no imbalance of adverse events between the active and placebo groups.

409. The December 2013 release of Phase 2 results sent IMUC's stock careening downwards almost 60% on December 12, 2013 – from $2.72 per share to just $1.10.

410. The plug was finally pulled on the IMUC Articles on Sunday, June 1, 2014, when IMUC reported updated efficacy and safety results from the Phase 2 ICT-107 trial, giving up the ruse with respect to any claim to statistical significance of the drug for the entire patient group and instead focused on the small subgroup of individuals who exhibited the HLA-A2 gene within each of the two major MGMT subgroups (the same individuals from Phase 1 who were predisposed to better results on the basis of their genetic markers):

> When overall survival (OS) and progression-free survival (PFS) were assessed in pre-specified patient subgroups, results favored treatment with ICT-107 over control in HLA-A2 patients within each of the two major MGMT subgroups (unmethylated and methylated). While the subgroups were small in size, and not powered to show statistical significance, the numeric advantages in favor of ICT-107 treated patients were shown to be large and clinically meaningful.

411. With no hope for ICT-107 based on these mature results, the market reacted swiftly, sending IMUC's stock down more than 14%, from $1.34 on Friday, May 30, 2014 (the last trading day prior to the announcement) to $1.15 per share on June 2, 2014.

## VI. POST-CLASS PERIOD EVENTS

### A. The SEC Settlement and Enforcement Orders

412. In IMUC's annual report for 2015 filed on Form 10-K with the SEC on March 30, 2016, IMUC first acknowledged the stock promotion scheme, and that it had

> agreed in principle with the staff of the SEC on a proposed settlement framework related to an investigation principally of our former [CEO] involving conduct between November 2011 and August 2012 regarding the publication of articles without disclosing that they were paid for by us or investor relations firms hired by us.

413. In IMUC's annual report for 2016 filed on Form 10-K with the SEC on March 9, 2017, IMUC stated that it had signed an offer of settlement with the SEC

related to the stock promotion scheme, but still failed to disclose details related to the entire scheme or even name Singh or Lidingo.

414. On April 10, 2017, the SEC announced enforcement actions against 27 individuals and entities behind stock promotion schemes, including the SEC Action against Bjorlin, Nichols, Hodge, and Cassano. Lidingo's motion to dismiss was subsequently granted due to a matter of Nevada LLC law. Cassano has since consented to final judgment against him.

415. Also on April 10, 2017, the SEC announced agreed to cease-and desist and/or sanctions orders against Singh and Lavos, IMUC, Ramey, and French.

416. IMUC agreed to cease and desist from violations of the federal securities laws, including §§17(a) and 17(b) of the Securities Act, and §10(b) of the Exchange Act and Rule 10b-5 (a) and (c) promulgated thereunder. In the IMUC Order, the SEC revealed that:

> From September 2011 to August 2012, IMUC through its Former [CEO], Manish Singh, engaged in a scheme to mislead investors by commissioning over 50 internet publications promoting IMUC on investment websites that purported to be independent from the company when, in fact, they were paid promotions. Singh engaged Lidingo Holdings, a stock promotion firm, to pay writers to publish articles about IMUC on investment websites. Singh oversaw Lidingo's promotional work for IMUC and directed that Lidingo not use writers who disclosed in their articles that IMUC was indirectly compensating them for their publications. These omissions about IMUC's indirect payments to writers created the misleading

> impression that the views contained in the publications were objective and independently formed. As a consequence of this conduct, IMUC violated the anti-fraud and caused violations of the anti-touting provisions of the federal securities laws.

417. Singh and Lavos also agreed to cease and desist from violating the federal securities laws, including §§17(a) and 17(b) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c) promulgated thereunder. Additionally, Singh has agreed to pay disgorgement of $1.75 million, prejudgment interest of $151,676.94 and a civil monetary penalty of $1 million to the SEC. For five years after the entry of the SEC's cease-and-desist order, Singh is barred from participating in any offering of a penny stock, and is prohibited from acting as an officer or director of any issuer that has a class of securities issued under Section 12 of the Securities Act. *See* Singh Order.

418. The Singh Order revealed:

> From August 2011 to March 2014, Singh engaged in a paid stock-touting scheme involving 12 issuers, at least 10 writers, over 400 internet publications, and the distribution of emails to thousands of potential investors. At different points during this time period, Singh, who used his firm Lavos to engage in much of the stock promotion activity, was also the CEO of two publicly traded companies, [IMUC] and [Lion]. Singh worked with stock promotion firm Lidingo Holdings, LLC to pay writers to publish articles about public company clients on investment websites as well as to coordinate the distribution of articles to thousands of electronic mailboxes. In

addition, while he was their CEO, Singh hired Lidingo to perform promotional work for IMUC and Lion. The scheme was lucrative—entitling Singh to receive at least $1.75 million in cash and equity. Singh knew or was reckless in not knowing that none of the over 400 publications appropriately disclosed the receipt of compensation and that at least 200 of the articles affirmatively misrepresented that the author was not receiving compensation. These omissions and affirmative misstatements created the misleading impression that the views contained in the publications were objective and independently formed.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

419. As alleged herein, each of the Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company or with the Company's assent were materially false and misleading, knew or acted with deliberate recklessness in disregard that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

### A. Manish Singh

420. Besides the obvious monetary kickback Singh received from Lidingo as a result of engaging that company to promote IMUC (IMUC paid Lidingo, who, in turn, paid Singh), Singh was also motivated by his own incentive structure at IMUC

that used IMUC's market capitalization as a trigger for the vesting of Singh's stock options.

421. Singh joined IMUC full time on February 18, 2008, having previously worked as a consultant.

422. Singh was granted various incentive compensations that motivated him to inflate IMUC's stock price

423. For 2010, of the 200,000 option shares awarded to Singh contingent on a triggering factor for vesting, only 10% (200,000 shares that would vest only upon enrollment of IMUC's first patient in a Phase 2 clinical trial) were contingent on IMUC's performance as a pharmaceutical company. The remaining 180,000 awarded during 2010 were based on IMUC's market capitalization and stock price, providing Singh the motive necessary to engage with Lidingo in the illegal stock promotion scheme.

424. This was similar for the awards granted in 2009, where 50% of his contingent option awards were based on the Company's volume weighted average trading price, as compared to just 12.5% that were contingent on the Company's pharmacological successes, and the remaining contingent on the Company securing a financing, strategic alliance, or licensing agreement.

425. According to IMUC's 2011 10-K, as of February 15, 2012, Singh beneficially owned 1,870,223 shares in the Company (representing 4.76% of the outstanding shares), and 1,171,384 of which were shares issuable upon exercise of vested or near-vested stock options (indicating that he owned outright 698,839 shares of common stock at that point). These shares were acquired either through grants or

the exercise of stock options, rather than open market purchases. The options were exercisable at prices ranging from $0.27 to $1.00 per shares.

426. In addition, Singh owned options, not yet exercisable, to acquire an additional 315,000 IMUC shares at prices ranging from $0.90 to $2.25 per share.

427. According to IMUC's Proxy Statement dated August 10, 2012 (at 16), Singh had been granted, on April 4, 2011 a seven-year option to purchase 20,000 shares of our common stock at an exercise price of $2.25 per share, vesting if our stock achieves a market capitalization of at least $100 million for a period of ten consecutive trading days, (iv) a seven-year option to purchase 20,000 shares of our common stock at an exercise price of $2.25 per share, vesting if our stock achieves a market capitalization of at least $150 million for a period of ten consecutive trading days and (v) a seven-year option to purchase 20,000 shares of our common stock granted on April 4, 2011 at an exercise price of $2.25 per share, vesting if our stock achieves a market capitalization of at least $200 million for a period of ten consecutive trading days.

428. According to the Proxy Statement (at 2), as of July 31, 2012, IMUC had 40,587,548 shares issued and outstanding. Thus, Singh had a financial motive to cause IMUC's stock price to trade above $2.46 per share, $3.70 per share, and $4.93 per share over ten consecutive trading days. Although IMUC's shares traded above $3.70 per share on certain dates during June and July 2012, as a result of the inflation caused by the stock promotion scheme, Singh was not successful in causing the share price to close above $3.70 over ten consecutive trading days.

429. During 2012, according to IMUC's 2012 10-K, Singh cashed in on approximately 764,000 of his options, recognizing more than $2 million in value for

options exercised between January 1, 2012 and December 31, 2012 (calculated by taking the difference between the market price on date of exercise and the exercise price, multiplied by the number of shares underlying the options exercised).

430. Singh's ownership of IMUC common stock and stock options was not reported in SEC filings after his termination in August 2012. However, in light of his participation in the fraudulent stock promotion scheme (described herein) and his termination from IMUC.

431. There is a strong inference that Singh sold 698,839 shares that he held at the end of 2011 into an inflated market with IMUC common stock trading above $3.00 a share at inflated prices, with additional unlawful profits exceeding another $2 million. All told, through direct payments and stock sales, there is a strong inference that Singh made well in excess of $5 million in unlawful profits from the stock promotion scheme.

432. Further, as CEO of the Company at the time the analysis of the Phase 1 clinical data for ICT-107 was completed and submitted for publication, Singh had actual knowledge that: (1) of the six patients who had survived for four years or more, there was no clear correlation with the presence of immune response to ICT-107, a step necessary for the vaccine to work against GBM; (2) in five of the six patients, an apparently favorable outcome could be explained by a silenced MGMT gene, while in the sixth patient, the weak immune response made it unlikely that ICT-107 was related to the apparently lengthened survival, making it more likely that these patients experienced an OS and PFS of four years or more because of patient factors, rather than the ICT-107 vaccination; and (3) IMUC's business and prospects for success at Phase 2 were far worse than represented.

433. Although certain of these facts were disclosed in the July 31, 2012 Article, Singh caused IMUC to make misleading disclosures in its 2012 Form 10-K and caused the IMUC Writers to publish misleading articles to obscure these facts.

434. As alleged above, Singh: (i) knew Lidingo paid writers; (ii) knew Lidingo published articles on Seeking Alpha (which generally prohibits paid promotion articles); (iii) knew these articles did not contain the required paid disclaimers; and (iv) knew that the Phase 1 ICT-107 results and the likelihood of success of Phase 2 were not nearly as positive or encouraging as the IMUC Articles led the investing public to believe with his approval.

435. Additionally, Singh's efforts to coordinate with Bjorlin so as to hire only those writers that would not disclose the receipt of payments, even in the face of SEC and Seeking Alpha policy concerns, supports a strong inference that Singh knew such disclosure was required by the federal securities laws and Seeking Alpha, and any campaign conducted by Lidingo (including that orchestrated on behalf of IMUC) was improper. Further, Singh's continuous efforts to keep his involvement in the promotional schemes hidden further supports an inference of scienter.

**B. <u>David Fractor</u>**

436. At various points throughout the Class Period, Fractor was one of a small group of Company executive officers, along with Singh, Yu, Gengos, and James Bender, Vice President of Product Development and Manufacturing.

437. Under Fractor's employment agreement dated April 4, 2011 with IMUC, his primary duties as IMUC's CFO included the "maintenance of the Company's [SOX] compliance procedures and confirming accounting compliance under [SOX] on a quarterly basis" and "contract review for financial and [SOX] implications." As

IMUC's CFO, it was part of Fractor's employment to identify any internal control and disclosures issues, illegal activities in IMUC, and any illegal payments to third parties.

438. According to the 2013 Proxy, Fractor's professional background includes, "financial reporting and strategic planning services, including SOX compliance consulting services, to a variety of companies in a variety of industries." Fractor received a Bachelor of Science in accounting from the University of Southern California in 1982 and is a certified public accountant and a member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants.

439. As the only financial officer for IMUC, Fractor was privy to any outside contracts made between IMUC and a third-party, like the September 2011 agreement between IMUC and Lidingo. Given the substantial amounts paid by IMUC to Lidingo, and Fractor's role within IMUC, Singh's resignation and the excessive payments to Lidingo increasing IMUC's "investor relations" expense, Fractor either knew or but for his deliberate recklessness should have known the true facts concerning the services performed by Lidingo.

440. Further, Fractor was in charge of IMUC's finances in August 2012 when the Company made its final payment to Lidingo (a day after Singh's resignation) and continued as a member of the executive team throughout the remainder of the Class Period, during which the Company made no effort to bring to light its past association with Lidingo or atone for its participation in the stock promotion scheme.

441. Moreover, the cessation of payments to Lidingo coincided with Singh leaving IMUC. There is a strong inference that Fractor knew the association between the two.

442. Fractor, as IMUC's Treasurer and CFO since April 2011, knew or was deliberately reckless in not knowing about the stock promotion scheme and the payments of more than $230,000 by IMUC to Lidingo. The $230,000 in payments were material to IMUC's income statement and business. Fractor, as Treasurer and CFO either knew or was deliberately reckless in failing to know the true purpose of those payments. Accordingly, there is a strong, reasonable inference that Fractor reviewed the contract with Lidingo that called to make monthly payments of $5,000, and then continued to issue payments well above this amount and after the expiration of the term of the contract, to Lidingo and therefore, he either knew or was deliberately reckless in not knowing that IMUC had retained promotional firm Lidingo to inflate the market price of IMUC common stock and was making illegal payments to Lidingo for hiring and paying authors to publish promotional articles about IMUC.

443. Additionally, in his role as CFO, Fractor signed SOX certifications, as alleged above (see Section IV.H.1) that indicated he reported to IMUC's auditors and audit committee "[a]ny fraud, whether or not material, that involves management" of IMUC. As set forth herein, those SOX certifications were materially false and Fractor either knew or was reckless in not knowing that the Company was then employing, or had previously employed, Lidingo to orchestrate an illicit stock promotion scheme. Fractor also signed certain other SEC filings, as alleged above.

**C. <u>IMUC</u>**

444. As alleged herein, Singh was acting in his capacity as the CEO of IMUC when he engaged Lidingo to illegally promote IMUC's stock through the use of several authors who failed to make any disclosure related to their receipt of compensation.

445. Furthermore, during the Class Period, Fractor acted with the requisite scienter when, as CFO for the Company, he approved or recklessly disregarded the payments to Lidingo, evidencing either knowledge of the scheme or a reckless disregard to the fact that Lidingo had been engaged to unlawfully promote the Company. Fractor also signed several SOX certifications attesting to the absence or full disclosure of any known frauds at that time, yet failed to include the stock promotion fraud alleged herein the relevant SEC documents.

446. Further, IMUC contracted with Lidingo as an agent throughout the Class Period in order to oversee the stock promotion scheme. As set forth herein, as Lidingo was acting within its contractual relationship and perpetuated the fraud on behalf of, and with the oversight of IMUC, the scienter of Lidingo is imputed onto that company under common law principles of agency.

447. The scienter of IMUC's employees and agents (including Singh and Fractor) is imputed to IMUC under the doctrine of *respondeat superior* and common law principles of agency. IMUC is liable for the acts of these defendants, as well as Lidingo and its employees and agents under these common law principles.

**D. <u>Lavos LLC</u>**

448. As alleged herein, Lavos was a stock promotion firm that assisted Lidingo throughout the IMUC stock promotion scheme. Through its agent, Singh,

Lavos engaged in a concerted effort to generate positive articles about IMUC in exchange for financial compensation, all the while failing to disclose any connection between the articles and the subject company through the direct efforts of Singh and Lidingo.

449. The scienter of Lavos' employees and agents (including Singh) is imputed to Lavos under the doctrine of *respondeat superior* and common law principles of agency. Lavos is liable for the acts of these defendants and their employees and agents under these common law principles.

## VIII. **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

450. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired IMUC common stock on the open market during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

451. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IMUC common stock was actively traded on the NYSE Market or OTCBB, efficient markets. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by IMUC or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

452. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

453. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

454. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by defendants' acts as alleged herein;

b. whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IMUC;

c. whether defendants acted knowingly or recklessly in failing to convey material facts or to correct material facts previously disseminated;

d. whether defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

e. whether defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

f. whether the prices of IMUC common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

455. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

456. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. IMUC common stock are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NYSE Market or OTCBB and was covered by multiple analysts;

f. IMUC filed periodic reports with the SEC;

g. IMUC regularly communicated with public investors via established market communications mechanisms, including

through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

h. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

i. Plaintiffs and members of the Class purchased, acquired and/or sold IMUC common stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were fully disclosed, without knowledge of the omitted or misrepresented facts.

457. Based upon the foregoing, the market for IMUC stock promptly digested current material information regarding IMUC from all publicly available sources and reflected such information in IMUC's stock price. Under these circumstances, all purchasers of IMUC stock during the Class Period suffered similar injury thought their purchase of IMUC stock at artificially inflated prices.

458. Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## IX. LOSS CAUSATION

459. As alleged herein, Defendants either (i) actively engaged in a scheme to deceive investors during the Class Period by misrepresenting and omitting material facts concerning the stock promotion scheme in which IMUC paid Lidingo to publish on behalf of IMUC and the paid nature of each of the IMUC Articles; or (ii) upon

learning of the Company's participation in the scheme, made no efforts to correct the misinformation placed into the market and instead perpetuated the falsity that the Company had engaged in no fraudulent acts.

460. From November 8, 2011 (the day the first IMUC-controlled Lidingo article about the Company was published) to August 15, 2012 (the day the last IMUC-controlled Lidingo article about IMUC was published), the Company's stock price ***more than doubled***, from $1.43 per share to $3.02 per share, reaching as high as $3.88 per share on June 1, 2012 (an in Class Period date on which an IMUC Article was published).

461. As such, Defendants' materially false and misleading statements and omissions of material fact, as alleged above in Section V, caused the price of IMUC's common stock to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiffs and other Class Period purchasers of IMUC common stock.

462. Relying upon the integrity of the market price of IMUC common stock and public information relating to the Company, Plaintiffs and the other Class Members purchased or otherwise acquired IMUC common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact, as alleged herein.

463. Plaintiffs and the Class suffered actual economic loss and were damaged when the foreseeable risks of Defendants' fraudulent stock promotion scheme and concealment by Defendants' misstatements and omissions materialized through the public disclosure of new information concerning the efficacy of ICT-107 (which the IMUC Articles had improperly touted with the Company's oversight through the

misrepresentation of limited clinical data) and the near-certain success of the Phase 2 trials through two partial disclosures, and the existence of the scheme itself through both in-Class Period partial disclosures and a post-Class Period announcement by the SEC.

464. As alleged above in Sections IV.F and V and in this section, these partial corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' fraud caused foreseeable declines in the price of IMUC common stock by removing portions of the artificial inflation in the price of IMUC common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of IMUC common stock is in response to the public disclosure of new, Company-specific news on each of the foregoing days, as alleged herein, negating any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraud.

465. As set forth in detail above, a partial disclosure occurred on August 20, 2012, after the market closed, the Company filed a Form 8-K announcing the supposed resignation of Singh, with no further details other than the fact that the Company disputed Singh's claim to severance. *See supra* Section IV.F.

466. In actuality, Singh had been terminated for cause by the Company for his involvement in the stock promotion scheme, a fact supported by his ultimate non-receipt of any severance pay and the immediate halting to his salary as of the day his purported resignation was accepted; an occurrence only explainable under his then-operative employment agreement in a situation where he is terminated with cause. This initial disclosure partially, but incompletely, revealed some of the relevant truth

concealed and/or obscured by Defendants' prior misstatements and omissions concerning IMUC's involvement in the illegal stock promotion activities. The conclusion that Singh did not resign, his departure was not voluntary, and that wrongdoing was involved is further supported by the August 21, 2012 Cowen analyst report. *See supra* Section IV.F. In addition, as reported by Cowen, Singh did not have another employment opportunity lined up when he departed. Singh did not start working for another company until July 2013.

467. Thus, the August 20, 2012 disclosure also partially, but incompletely, revealed the materialization of the known foreseeable risks surrounding the Company's illegal stock promotion activities that Defendants knowingly and/or recklessly engaged in and/or concealed from investors.

468. As a direct and proximate result of the August 20, 2012 partial disclosure, the price of IMUC's common stock declined by approximately 16.5% on August 21, 2012 (the first trading day following the announcement) – from $2.91 per share to $2.43. IMUC common stock declined an additional $0.13 per share (or 5%) on August 22, 2012, to close at $2.30 per share as the market continued to digest Singh's resignation and questions from Cowen. The revelation that Singh had been exited from the Company thereby removed a portion of the artificial inflation cause by the stock promotion scheme from the price of IMUC's common stock, yet the stock price remained inflated as a result of: (i) the continued presence of the illicit articles in the market for consumption by the investing public; and (ii) the Company's efforts to conceal the fraud by withholding any pertinent public information regarding IMUC's and Singh's scheme participation.

469. A partial disclosure occurred after the market closed on December 11, 2013, when the Company announced its clinical results from its Phase 2 study for ICT-107. *See supra* Section V.

470. Therein, the Company announced that ICT-107 had failed to meet its primary endpoint of statistically significant overall survival in its Phase 2 study.

471. As alleged herein, the lackluster results partially negated the dozens of Class Period IMUC Articles (which were released at the Company's direction and with its editorial approval), evidencing that ICT-107 exhibited no efficacy as a treatment for GBM.

472. As a direct and proximate result of the December 11, 2013 partial disclosure, the price of IMUC's common stock declined by approximately 60% on December 12, 2013–from $2.72 per share to $1.10. The revelation that ICT-107 showed limited, if any efficacy in treating GBM, and thus it was not the "miracle drug" that the IMUC Articles touted it to be, thereby removed a portion of the artificial inflation cause by the stock promotion scheme from the price of IMUC's common stock, yet the stock price remained inflated as a result of: (i) the continued presence of the illicit articles in the market for consumption by the investing public that stressed *any Phase 2 positive results*, would be a sign of forthcoming approval by the FDA and efficacy; and (ii) IMUC's efforts to conceal the fraud by withholding any pertinent public information regarding IMUC's and Singh's participation.

473. As set forth herein, Defendants' wrongful conduct directly and proximately caused the damages suffered by Plaintiffs and the Class. Throughout the Class Period, the prices at which Plaintiffs and the Class purchased IMUC common stock were artificially inflated as a result of Defendants' materially false and

misleading statements and omissions of material fact concerning IMUC's involvement in an illegal stock promotion scheme. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and the Class would have not purchased or otherwise acquired IMUC common stock at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that engaging in an illicit stock promotion scheme designed to tout the Company's prospects and investment worthiness through the release of seemingly neutral third-party articles and then concealing the existence of such from the public would cause the prices of IMUC common stock to be artificially inflated, or maintain existing artificial inflation. It is also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omission, would cause the price of IMUC stock to decline, as the inflation resulting from Defendants' earlier materially false and misleading statements and omissions of material fact was removed from the price of IMUC common stock.

474. Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and the Class who purchased or otherwise acquired IMUC common stock during the Class Period.

475. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the Class are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact; (ii) the perpetuation of the illicit scheme; and (iii) the subsequent significant decline in the price of IMUC common stock when the truth was gradually revealed and/or the risks previously concealed by Defendants' fraud gradually materialized, as set forth herein.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

476. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

477. None of the statements complained of herein was a forward-looking statement. Rather, each was historical a statement or a statement of purportedly current facts and conditions at the time such statement was made.

478. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements, rendering any generalized risk disclosures made by IMUC insufficient to insulate Defendants from liability for their materially false or misleading statements.

479. To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

## XI. CLAIMS FOR RELIEF

## COUNT I

**(Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Against Singh, IMUC, Lavos, Bjorlin, and Lidingo)**

480. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

481. This Count is asserted against defendants IMUC, Lavos, Singh, Bjorlin, and Lidingo (the "Count I Defendants") and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

482. During the Class Period, the Count I Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

483. The Count I Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) in that they:

a. employed devices, schemes and artifices to defraud;

b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, conspiracies, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others

similarly situated in connection with their purchases of IMUC common stock during the Class Period.

484. Singh is named as a defendant for this count for all false statements made in the IMUC Articles during the Class Period until his resignation, and for all false statements contained in IMUC's SEC filings signed by him. Defendant IMUC is named as a defendant for all false statements made during the Class Period alleged herein. Fractor is named herein as defendants for this count for all statements they made in the name of IMUC via IMUC's SEC filings. Fractor is not named as a primary defendant on Count I for the statements alleged to be false herein contained in the IMUC Articles. Lavos, Bjorlin, and Lidingo are named as a defendant in this count for all statements alleged to be false herein contained in the IMUC Articles.

485. The Count I Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of IMUC, and/or Lidingo were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Count I Defendants, by virtue of their receipt of information reflecting the true facts of IMUC, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning IMUC, participated in the fraudulent scheme alleged herein.

486. IMUC is liable for false statements issued in the name of the Company, including its SEC filings and statements issued with its consent. Further, IMUC is

liable for the false statements contained in the IMUC Articles, as authorized by Singh while acting in his capacity as CEO of the Company, under the doctrine of *respondeat superior*. Alternatively, for any false statements that Singh did not authorize, Defendant IMUC is directly liable for the false statements of its contractual agent, Lidingo, under common law theories of principal and agency, who was acting within the scope of its relationship with IMUC when it carried out the fraud complained of herein through its role as an authority over the IMUC Articles.

487. Singh, as CEO of IMUC, in addition to being liable for false statements in signed documents submitted to the SEC, is also liable for the false statements contained in the IMUC Articles by virtue of his role as an absolute authority over the issuance of those false statements, including his approval of the statements themselves and control over the process.

488. Lavos is liable for the false statements contained in the IMUC Articles, as authorized by Singh, while acting in capacity as the controller of Lavos, under the doctrine of *respondeat superior*.

489. In the alternative, if Singh did not exercise absolute authority over the issuance of the false statements contained in the IMUC Articles, Bjorlin did by virtue of her position as sole managing member of Lidingo, her control over workflow, including the assignment of articles to which writers, and her control over the financial aspects of the fraud, including receipt and distribution of funds received from IMUC.

490. Pursuant to this alternative, if Bjorlin is found to have controlled the release of the IMUC Articles, Lidingo is also liable under the theory of *respondeat*

*superior*, as Bjorlin was acting within her capacity as sole managing member of Lidingo when overseeing the fraud alleged herein.

491. Fractor, who was a senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with extreme reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by the Company, themselves, other IMUC personnel, or the Lidingo Defendants to members of the investing public, including Plaintiffs and the Class.

492. As a result of the foregoing, the market price of IMUC common stock was artificially inflated during the Class Period. Unaware of the falsity of the statements by the Count I Defendants, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of IMUC common stock during the Class Period in purchasing IMUC common stock at prices that were artificially inflated as a result of the false and misleading statements by Defendants.

493. Had Plaintiffs and the other members of the Class been aware that the market price of IMUC common stock had been artificially and falsely inflated by the Count I Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased IMUC common stock at the artificially inflated prices that they did, or at all.

494. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

495. By reason of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of IMUC common stock during the Class Period.

**COUNT II**

**(Violations of §10(b) of the Exchange Age and Rule 10b-5(a) & (c) Against the Scheme Defendants)**

496. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

497. During the Class Period, defendants IMUC, Singh, Lavos, Bjorlin, Lidingo, Hodge, and Nichols (the "Count II Defendants") violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of IMUC publicly traded common stock during the Class Period as alleged in.

498. The Count II Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IMUC's value, performance, and continued substantial growth. As set forth more particularly herein, these acts included: (i) making, or participating in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements about IMUC and its business operations in light of the circumstances under which they were made, not misleading; (ii) hiring

Lidingo to promote IMUC; (iii) paying Lidingo $230,000; (iv) paying writers, through Lidingo, to write promotional articles about IMUC; (v) concealing writers' compensation or relationship with Lidingo and IMUC from investors; (vi) using pseudonyms to conceal author's identifies; and (vii) reviewing and approving the promotional articles. These practices and course of business operated as a fraud and deceit upon the purchasers of IMUC securities during the Class Period.

499. Prior to and during the Class Period, the Scheme Defendants worked in concert to hire writers to prepare and publish paid promotional articles promoting IMUC stock, which were first reviewed, edited, approved, and ultimately authorized by IMUC and Singh, but failed to disclose such review or the writers' payment for their articles.

500. Singh, through IMUC, entered into a contract with Lidingo for Lidingo to provide promotional services that involved the publication of the IMUC Articles such that the writers' relationship with IMUC was disguised through failure to disclose the writers' receipt of compensation for the article and the use of pseudonyms and fake profiles.

501. Singh and IMUC paid Bjorlin and Lidingo inflated rates. The contract called for $5,000 per month for fourth months, but Singh and IMUC paid $230,000 over 12 months.

502. Singh and Lavos received payment from Lidingo for the promotional services performed for public companies, including IMUC.

503. Singh had ultimate authority over the IMUC Articles, and concealed his involvement in the IMUC Articles through use of Lidingo.

504. The Scheme Defendants required that writers of the IMUC Articles could not disclose that they were being compensated for writing and publishing the articles.

505. The Scheme Defendants screened and would only hire writers who agreed not to disclose that they were compensated.

506. Singh directed the use of pseudonyms for the IMUC Articles.

507. Bjorlin, Lidingo, Hodge, and Nichols used pseudonyms when publishing some of the IMUC Articles.

508. Publication of the IMUC Articles were timed to take advantage of good news and mitigate bad news.

509. As a result of the Count II Defendants' fraudulent scheme, and failure to disclose material facts, as set forth above, the market price of IMUC's securities was artificially inflated during the Class Period.

510. During the Class Period, the Count II Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

511. The Count II Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. The Count II Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of

concealing IMUC's true financial condition from the investing public and supporting the artificially inflated price of IMUC common stock.

512. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IMUC publicly traded common stock. Plaintiffs and the Class would not have purchased IMUC publicly traded common stock at the prices they paid, or at all, had they been aware that the market prices for IMUC common stock had been artificially inflated by the Count II Defendants' materially false and misleading statements and omissions and the attendant scheme or artifice designed to defraud.

## COUNT III

## (Violations of §20(a) of the Exchange Act Against Defendants Singh and Fractor)

513. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

514. Defendant IMUC violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

515. Defendants Singh and Fractor (the "Count III Defendants") acted as controlling persons of IMUC within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of IMUC's operations and/or intimate knowledge of the Company's actual performance, the Count III Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein.

516. During the Class Period, the Count III Defendants participated in the operation and management of IMUC, and conducted and participated, directly and indirectly, in the conduct of IMUC's business affairs. Because of their senior positions, they knew the adverse non-public information about IMUC's misstatement and false statements.

517. As officers and/or directors of a publicly owned company, the Count III Defendants had a duty to disseminate accurate and truthful information with respect to IMUC financial condition and results of operations, and to correct promptly any public statements issued by IMUC which had become materially false or misleading.

518. Each of the Count III Defendants, therefore, acted as a controlling person of IMUC. By reason of their senior management positions and/or being directors of IMUC, the Count III Defendants had the power to direct the actions of, and exercised the same to cause, IMUC to engage in the unlawful acts and conduct complained of herein. The Count III Defendants exercised control over the general operations of IMUC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

519. By reason of the above conduct, the Count III Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by IMUC.

**COUNT IV**

**(Violations of §20(a) of the Exchange Act Against Defendants Singh and Lavos)**

520. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

521. The Lidingo Defendants and the IMUC Writers violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

522. Defendants Singh and Lavos (the "Count IV Defendants") acted as controlling persons of the Lidingo Defendants and the IMUC Writers within the meaning of §20(a) of the Exchange Act as alleged herein. During the Class Period, the Count IV Defendants conducted and participated, directly and indirectly, in the conduct of the Lidingo Defendants and the IMUC Writers concerning the IMUC Articles and the illicit stock promotion scheme. As alleged herein, Singh exercised total control over the illicit stock promotion scheme. Singh suggested the topics for IMUC Articles, edited IMUC Articles, and gave instructions and orders to the Lidingo Defendants and the IMUC Writers concerning content, topics, and timing of IMUC Articles. Singh instructed the Lidingo Defendants and the IMUC Writers that they could not disclose that they were being compensated for publishing the IMUC Articles. Singh exercised his control directly or through Lavos, which he controlled, and through which he employed Cassano to publish certain of the IMUC Articles.

523. In the alternative, if Lavos is not a control person of the Lidingo Defendants and the IMUC Writers, then Singh is liable as a control person of Lavos for Lavos's violations of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

524. Each of the Count IV Defendants, therefore, acted as a controlling person of the Lidingo Defendants and the IMUC Writers. The Count IV Defendants had the power to direct the actions of, and exercised the same to cause, the Lidingo Defendants and the IMUC Writers to engage in the unlawful acts and conduct complained of herein. The Count IV Defendants exercised control over the general

operations of the Lidingo Defendants and the IMUC Writers and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

525. By reason of the above conduct, the Count IV Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by IMUC.

**COUNT V**

**(Violations of §20(a) of the Exchange Act Against Defendants Bjorlin, Lidingo, and Hodge)**

526. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

527. The Lidingo Defendants and the IMUC Writers violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

528. Defendants Bjorlin, Lidingo, and Hodge (the "Count V Defendants") acted as controlling persons of the IMUC Writers within the meaning of §20(a) of the Exchange Act as alleged herein. During the Class Period, the Count IV Defendants conducted and participated, directly and indirectly, in the conduct of the IMUC Writers concerning the IMUC Articles and the illicit stock promotion scheme. As alleged herein, the Count V Defendants suggested the topics for IMUC Articles, edited IMUC Articles, and gave instructions and orders to the IMUC Writers concerning content, topics, and timing of IMUC Articles. The County V Defendants also instructed the IMUC Writers that they could not disclose that they were being compensated for publishing the IMUC Articles.

529. Each of the Count V Defendants, therefore, acted as a controlling person of the IMUC Writers. The Count V Defendants had the power to direct the actions

of, and exercised the same to cause, the IMUC Writers to engage in the unlawful acts and conduct complained of herein. The Count V Defendants exercised control over the general operations of the IMUC Writers and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

530. By reason of the above conduct, the Count V Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by IMUC.

## XII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

a. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

b. Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

c. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

d. Awarding such other and further relief as this Court may deem just and proper.

## XIII. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: June 29, 2018 **GLANCY PRONGAY & MURRAY LLP**

By: s/ Lionel Z. Glancy

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com

**WOLF POPPER LLP**
Robert C. Finkel
Joshua W. Ruthizer
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093
E-mail: rfinkel@wolfpopper.com
E-mail: jruthizer@wolfpopper.com

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins
(to be admitted pro hac vice)
Sebastiano Tornatore
(to be admitted pro hac vice)
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
E-mail: shopkins@zlk.com
E-mail: stornatore@zlk.com

*Co-Lead Counsel for Plaintiffs and the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On June 29, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 29, 2018, at Los Angeles, California.

*s/ Lionel Z. Glancy*
Lionel Z. Glancy

# Mailing Information for a Case 2:17-cv-03250-FMO-SK Arthur Kaye IRA FCC as Custodian DTD 6-8-00 v. ImmunoCellular Therapeutics, Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Tijana Martinovic Brien**
  tbrien@cooley.com,ywaldronrobinson@cooley.com
- **Angela L Dunning**
  adunning@cooley.com
- **John C Dwyer**
  jdwyer@cooley.com,bgiovannoni@cooley.com
- **Robert C Finkel**
  rfinkel@wolfpopper.com,cdunleavy@wolfpopper.com
- **Edward Gartenberg**
  egartenberg@gghslaw.com,smelara@gghslaw.com,mdolukhanyan@gghslaw.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **Jeffrey M Kaban**
  jkaban@cooley.com,lalmanza@cooley.com
- **Jessie A R Simpson Lagoy**
  jsimpsonlagoy@cooley.com,galancr@cooley.com
- **Charles Henry Linehan**
  clinehan@glancylaw.com
- **Francisca M Mok**
  fmok@reedsmith.com,ehalbreich@reedsmith.com,cwirtschafter@reedsmith.com,jwernick@reedsmith.com,aturner@reedsmith.com
- **Lesley F Portnoy**
  LPortnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com
- **Rosemary M Rivas**
  rrivas@zlk.com,qroberts@zlk.com,ebigelow@zlk.com,shopkins@zlk.com,jgrohsgal@zlk.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com
- **Joshua W Ruthizer**
  jruthizer@wolfpopper.com
- **James L Sanders**
  jsanders@reedsmith.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Brian Nichols**
7343 West Sand Lake Road
Unit 420
Orlando, FL 32819

**Stephen Ramey**
339 B Allman Road
Moultrie, GA 31788